**REDACTED – PUBLIC VERSION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BAVARIAN NORDIC A/S and ANTON MAYR, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-614-SLR |
| v. | ) ) ) | *FILED UNDER SEAL —* |
| ACAMBIS INC. and ACAMBIS PLC, | ) ) ) | *CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER* |
| Defendants. | ) | |

## BAVARIAN NORDIC'S OPENING BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
## ON THE ISSUE OF TORTIOUS CONVERSION

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
John W. Shaw (No. 3362) [jshaw@ycst.com]
Karen L. Pascale (# 2903) [kpascale@ycst.com]
D. Fon Muttamara-Walker (No. 4646)
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Phone: 302-571-6600

- and -

**BINGHAM MCCUTCHEN LLP**
Edward A. Pennington
Robert Bertin
Stephanie Scruggs
Krista L. Lynch
3000 K Street Suite 300
Washington, DC 20007
(202) 424-7500

*Attorneys for Plaintiff Bavarian Nordic A/S*

December 7, 2006

<u>REDACTED – PUBLIC VERSION</u>

## TABLE OF CONTENTS

<u>PAGES</u>

I. NATURE AND STAGE OF THE PROCEEDINGS .................................................1

II. INTRODUCTORY STATEMENT OF FACTS ............................................................1

III. SUMMARY OF ARGUMENT ...............................................................................4

IV. DETAILED STATEMENT OF FACTS ...................................................................6

    A.   Prof. Mayr Created MVA and Distributed for Research Purposes a
          Strain Called MVA 572...............................................................................6

    B.   Several Scientists Requested Samples of MVA to Conduct Research ...........8

    C.   Bavarian Nordic's Acquisition of MVA for Commercial Use.......................12

    D.   Acambis Had No MVA Program Prior to Meeting with Bavarian
          Nordic.........................................................................................................13

    E.   Acambis Illegitimately Developed MVA for Commercial Use.....................14

    F.   NIH and Moss Recognized His Restricted Rights When Refusing to
          Give MVA 572 to Therion ..........................................................................16

V. ARGUMENT ...................................................................................................17

    A.   The Summary Judgment Standard ...............................................................17

    B.   The Applicable Law of Conversion .............................................................18

    C.   The Applicable Law of Contract..................................................................22

    D.   There Is No Material Issue of Fact with Respect to Acambis's
          Tortious Conversion of the MVA 572 Strain................................................24

          1.   Bavarian Nordic and/or Mayr Own Commercial Rights to MVA 572...24

          2.   Moss Received MVA 572 From Mayr for the Limited Purpose of
              Conducting Noncommercial Research ..................................................25

          3.   Acambis Converted the Strain By Using It to Develop a
               Commercial Vaccine...........................................................................27

VI. CONCLUSION.................................................................................................27

REDACTED – PUBLIC VERSION

## TABLE OF AUTHORITIES

**PAGES**

**Cases**

*Abraham v. Raso,*
183 F.3d 279 (3d Cir. 1999) .................................................................. 17, 18

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................ 17

*Bickling v. Kent General Hospital,*
872 F. Supp. 1299 (D. Del. 1994) ............................................................ 18

*Danielson v. Winchester-Conant Properties, Inc.,*
186 F. Supp. 2d 1 (D. Mass. 2002) .......................................................... 19

*Goell v. Smith,*
128 Mass. 238 (Mass. 1880) .................................................................... 20

*Ghen v. Rich,*
8 F. 159 (D. Mass. 1881) ........................................................................ 24

*Hall v. Boston & W. R. Corp.,*
96 Mass. 439 (Mass. 1867) ...................................................................... 20

*Hall v. Corcoran,*
107 Mass. 251 (Mass. 1871) .................................................................... 19

*International Union, United Automobile, Aerospace & Ag. Implement Workers of
America, U.A.W. v. Skinner Engine Co.,*
188 F.3d 130 (3d Cir. 1999) .................................................................... 17

*Jack Davis, Inc. v. Southworth-Milton, Inc.,*
1997 Mass. Super. LEXIS 522 (1997) ..................................................... 19

*Kelley v. Laforce,*
288 F.3d 1 (1st Cir. 2002) ....................................................................... 19

*Liafall Inc. v. Learning 2000, Inc.,*
2002 U.S. Dist. LEXIS 22620 (D. Del. 2002) .......................................... 17

*Lloyd v. Jefferson,*
53 F. Supp. 2d 643 (D. Del. 1999) ........................................................... 17

*McClemy v. Brown,*
99 A. 48 (Sup. Ct. Del. 1916) ................................................................. 21

*Nixon v. United States,*
978 F.2d 1269 (D.C. Cir. 1992) .............................................................. 23

*Pacitti v. Macy's,*
193 F.3d 766 (3d Cir. 1999) .................................................................... 18

*Price v. United States,*
69 F.3d 46 (5th Cir. 1995) ....................................................................... 21

*United States v. Swiss American Bank, Ltd.*,
   191 F.3d 30 (1st Cir. 1999 (Mass.)) ............................................................. 18

**Statutes**

UCC §§ 1-205(3), 2-204 ...................................................................................... 23

3 German Civil Code §§ 858, 992 (Rothman ed. 1994) ..................................... 21

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................... 17

**Treatises**

5-24 *Corbin on Contracts* § 24.14 ...................................................................... 23

21A Am Jur 2d Customs and Usages § 24 ......................................................... 23

Restatement (Second) of Conflict of Laws, § 147 ............................................. 18

Restatement (Second) of Contracts § 222(3) ..................................................... 23

Restatement (Second) of Torts § 222A .............................................................. 19

Restatement (Second) of Torts §§ 224A, 234 ................................................... 21

Restatement (Second) of Torts, § 228 ........................................................ 20, 27

**REDACTED – PUBLIC VERSION**

## I.     NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Bavarian Nordic A/S ("BN") filed this action on August 19, 2005,
alleging that defendants Acambis Inc. and Acambis, PLC ("Acambis") have committed
acts of unfair trade practices, tortious conversion, misappropriation of trade secrets in
violation of state laws, and unfair competition under the Lanham Act. *See* D.I. 1.  Claims
by BN against Acambis for misappropriation of trade secrets, stemming from a
confidential disclosure of vital technical information by BN to Acambis in a June 2002
meeting, were dismissed in favor of arbitration in Germany, pursuant to an arbitration
clause in a non-disclosure agreement entered into by BN and Acambis as a precursor to
the meeting.  *See* D.I. 83 (August 21, 2006 Memorandum Order).

With leave of court, Professor Anton Mayr was added as a co-plaintiff to this
action (*see* D.I. 83), and plaintiffs filed a First Amended Complaint on August 23, 2006.
D.I. 85.  Discovery is closed, but for BN's Motion to Compel discovery of the National
Institute of Health ("NIH"), filed in the District of Maryland on September 14, 2006.[1]

BN has moved, pursuant to Rule 56 of the Federal Rule of Civil Procedure, for
summary judgment on the issue of tortuous conversion (Count I of the First Amended
Complaint).  This is BN's opening brief in support of its motion.

## II.     INTRODUCTORY STATEMENT OF FACTS

BN is the world's leading innovator and manufacturer of what could be called the
next generation small pox vaccine, one that is safer than the previous generation vaccine,

---

[1]     Bavarian Nordic's counsel has just learned that the U.S. District Court for the District
of Maryland will hold a telephonic hearing next week to consider the pending motion.

particularly for the immuno-compromised.[2]  The new generation small pox vaccine is based on an attenuated, or non-replicating, viral strain from the viral specie called "MVA," which stands for "modified vaccinia Ankara."  BN's commercial vaccine, called "MVA BN," is injected into the body, and the attenuated MVA virus causes the body to produce antigens that prevent the small pox virus from replicating in the body.

Acambis supplied to the United States government the prior generation small pox vaccine known as ACAM2000.  This vaccine, derived from the fully replicating DRYVAX virus which was used to inoculate most citizens of the United States prior to 1980, was based on a live, replicating vaccinia virus, not an attenuated live MVA virus. When applied to the skin, typically on the upper arm, ACAM2000 creates a blister, indicating the vaccinia virus is replicating enough to cause an immune response.  For people with healthy and mature immune systems, a scar forms in place of the blister to serve as proof of a vaccine take.  Unfortunately, for the general population, but especially for immuno-compromised individuals, the vaccinia virus used in ACAM2000 could continue to replicate, causing severe health problems.

That there is any need or demand for a small pox vaccine today says a great deal about the post September 11, 2001 times in which we live.  Although small pox was believed to be eradicated world-wide as of around 1980, the Soviet Union stockpiled live small pox virus for use in biological warfare during the Cold War.  Because of the possibility that terrorists could gain possession of this deadly virus, the United States

---

[2]    The "immuno-comprised" include the elderly, the very young and those suffering from AIDS or other disorders of the immune system.

government is now seeking to stockpile the new generation MVA based vaccine as part of its "Bioshield" initiative to combat bioterrorism.

The NIH and Department of Health and Human Services ("HHS") are responsible for procuring MVA-based small pox vaccine through the "Request for Proposal" or "RFP" process. It is Acambis's participation in the RFP process that has spawned BN's claims of conversion and unfair competition.[3] As seen below, Acambis could not have entered the bidding process without violating BN's personal property rights in the viral strain known as MVA 572, an important and preferred starting material for manufacturing the new MVA based vaccine.

Prior to June of 2002, Acambis had no MVA-based products whatsoever and no MVA expertise. They sought and obtained a meeting with BN's technical personnel, with a confidentiality agreement in place, in June of 2002, to discuss a possible joint venture. At about the same time, and unbeknownst to BN, Acambis met with another company with MVA expertise, Therion, to discuss a similar arrangement. Not long after the meeting, the NIH issued its first RFP for a MVA based small pox vaccine. Rather than partnering with BN, Acambis responded with its own proposal, using Therion as a partner.

The crux of the present dispute is the manner in which Acambis was able to be a competitive bidder in the RFP process. As will be seen herein, Acambis obtained the requisite starting material for manufacturing an MVA based vaccine — MVA — from

---

[3] BN has also made claims of patent infringement, in that Acambis has offered for sale products that infringe U.S. patents granted to BN on specific MVA strains and vaccines made there from. These claims are currently pending at the United States International Trade Commission. A final determination of patent infringement and validity is expected by January 31, 2007.

Dr. Bernard Moss of the NIH. Dr. Moss, who had been a paid consultant to Acambis before the RFP process began, requested a sample of MVA 572 from Prof. Mayr, a prominent German professor and scientist and recipient of multiple honorary University degrees.[4] Prof. Mayr, according to customs and practices in the academic and research fields, forwarded a sample to Dr. Moss for him to use "for research purposes only." Dr. Moss and Acambis were well aware of Dr. Moss's limited rights, and Acambis abandoned plans to license MVA material from Bavarian Nordic or Therion for millions of dollars. Instead, Acambis obtained the MVA from Dr. Moss **for free** and used it "commercially" to compete against BN in the RFP process. This commercial use by Acambis, without permission from either Prof. Mayr or BN, amounts to conversion under the common law.

## III.    SUMMARY OF ARGUMENT

Viewing the evidentiary record and all reasonable inferences drawn therefrom in Acambis's (the non-moving party's) favor, there are no material issues of disputed fact with respect to whether Acambis tortiously converted MVA 572 and/or its progeny:

1.    Prof. Anton Mayr created all MVA viral strains, at least up to and including MVA 572, by passaging a strain of the vaccinia virus that existed in nature called "CVA" hundreds of times. Prof. Mayr had a limited supply of MVA 572 in his freezer in Germany, and from that freezer, he provided samples, when asked, to members of the research community for "research purposes only."

2.    Dr. Bernard Moss of the NIH wrote a letter to Prof. Mayr in 2001 requesting a sample of MVA 572 referencing his work on recombinant vaccines.

---

[4] See Declaration of Prof. Dr. Dr. H.C. Mult Anton Mayr, Exh. C at ¶ 2.

Although the NIH has an Office of Technology Transfer, Dr. Moss made the request as one researcher to another, without giving any hint that he may at some later point pass the sample on to a commercial entity, Acambis, with whom he held a paid consulting relationship. Prof. Mayr complied by sending the sample to Dr. Moss at the NIH. Dr. Moss, however, rather than using the sample for research purposes only, transferred the sample, after first making a couple of passages, to Acambis, who then used the sample as a starting material in manufacturing a commercial product to compete for the NIH's MVA based small pox program. Prior to doing this, Dr. Moss was a paid consultant to Acambis. Both he and personnel at Acambis were aware of the restrictions on the use of Prof. Mayr's MVA 572 sample, but went forward with the conversion.

3.     Acambis, using Prof. Mayr's MVA 572 as a starting material, submitted proposals under RFP 1 and 2, the latter resulting in an order from Acambis for 500,000 doses of vaccine. These doses are derived from Prof. Mayr's starting material, and thus, constitute converted property.

4.     Although Prof. Mayr transferred all his intellectual and personal property rights in the MVA strains to BN, it does not matter in deciding this motion whether the strains were owned by BN or Prof. Mayr at the time of the act of conversion, since both BN and Prof. Mayr are plaintiffs in this action. Also, this Court need not decide choice of law questions between Germany and the United States, since the act of conversion occurred in the United States, when Acambis began making commercial use of MVA 572.

5.     Aside from that, German law supports BN's claim that Prof. Mayr had property rights to MVA 572 that he could convey or not to anyone else, and both German

law and United States law recognize conversion as a cause of action having substantially the same elements. German law and United States law further support BN's contention that no transfer of ownership occurred with respect to the provision of the MVA 572 sample to Dr. Moss and that Dr. Moss, or the NIH, therefore had no property rights to the strain that they could convey to Acambis. Under the laws of either country, Acambis overstepped the limited use granted by Prof. Mayr to Dr. Moss, to their commercial advantage.

## IV.    DETAILED STATEMENT OF FACTS

The parties have litigated the patent and unfair competition issues involving MVA strains before the United States International Trade Commission ("ITC"), and although there is no final determination yet on the patent issues, the parties had agreed to, and filed, a statement of stipulated facts on all issues. These stipulated facts are relevant, fairly comprehensive, and may be useful to this Court in understanding the dispute and underlying technology. The stipulation, styled "Joint Statement of Facts," is attached hereto as Exhibit A and is cited to as "JSF." Throughout the following description of facts relevant to the issues of conversion, BN will refer to items submitted into the record at the ITC, including discovery deposition transcripts and trial transcripts, and evidence produced only in this case.

### A.    Prof. Mayr Created MVA and Distributed for Research Purposes a Strain Called MVA 572.

It is well documented that Prof. Anton Mayr created "MVA" from "CVA." Referring to BN's U.S. patent no. 6,761,893 ("the '893 patent"),

> MVA was generated by 516 serial passages on chicken embryo fibroblasts of the Ankara strain of vaccinia virus (CVA) (for review see Mayr, A., et al. Infection 3, 6-

14 [1975]). As a consequence of these long-term passages, the resulting MVA virus deleted about 31 kilobases of its genomic sequence and, therefore, was described as highly host cell restricted to avian cells (Meyer, H. et al., J. Gen. Virol. 72, 1031-1038 [1991]). It was shown in a variety of animal models that the resulting MVA was significantly avirulent (Mayr, A. & Danner, K. [1978] Dev. Biol. Stand. 41:225-34).

Ex. B, col. 1 at 16-24. There is no dispute that Prof. Mayr created MVA 572, nor is there any dispute about how he created it. Creating MVA was Prof. Mayr's life long work, for which he has received universal acclaim. *See* Mayr Declaration, Exh. C at 4; Gritz deposition, Exh. D at 121:7-122:2. It is further well established that the live virus MVA is a man made (not naturally occurring) virus. The development of MVA and the creation of MVA 572 pertain to the time period of about 1960-1974, as noted in the above-cited 1975 Mayr et al. article, attached hereto as Exh. E. *See also*, Anton Mayr, "History of Variola, Smallpox Eradication and MVA," attached hereto as Exh. F, which Prof. Mayr provided the attendees of the poxvirus conference at Elmau on January 28, 1999, attended by virtually every peer scientist in the poxvirus field. As stated therein, "[i]n the period from 1960-1974, the author (**A. Mayr**) succeeded in attenuating the dermal vaccinia strain **Ankara (CVA)** through 572 continuous passages in primary chicken embryo fibroblast cultures (CEF) . . ." *Id.* at BNITC00091893. Table 4 shows that the CEF passaged Ankara strain is given the name MVA (Modified Vaccinia Ankara) in 1974, and attributes the MVA 572 passages to A. Mayr. *Id.* at BNITC00091901.

Prof. Mayr's position as originator and owner of MVA strains was not challenged by Acambis during the ITC investigation. In particular, Acambis asserted in its proposed statement of facts No. 47 that "In 1974, Anton Mayr plaque purified **his** MVA strain at

7

passages 569 and 570 and amplified it one further passage to arrive at passage 572. MVA 572 was deposited with the ECACC in January 1994 by Mayr." (Emphasis added). *See also*, JSF at ¶¶ 17, 69.

Further, at the ITC Acambis asserted in its proposed statement of facts No. 46 that Professor Mayr developed a modified vaccinia Ankara virus in the 1970s as an attenuated form of the chorioallantois vaccinia Ankara ("CVA") smallpox virus for use as a vaccine in humans and other mammals. In particular, Mayr attenuated a CVA smallpox virus by passaging the virus 371 times in chicken embryo fibroblasts ("CEF") to form MVA. *See also*, JSF at ¶ 17. By passaging the CVA in a new environment, i.e., CEF cells, Prof. Mayr was able to change the phenotype and genotype of CVA; thereby, making a more attenuated virus, MVA.

### B.     Several Scientists Requested Samples of MVA to Conduct Research

What happened next in the life of MVA is somewhat indicative of the nature of the scientific community. In general, when interesting new discoveries of biological materials are made, it is common for scientists to request samples so that they can add to the body of knowledge and understanding of the new material. By adding to the body of knowledge, it is hoped that mankind will be better served by, eventually, the development of products that improve the health and welfare of humans.

Consistent with this collaborative mentality, Prof. Mayr testified in his first deposition, taken in the ITC case, that he was proud to have received many requests from the research community for samples of MVA to study: "I can only comment there that we were very proud that MVA was so widely used in many labs. That is very satisfying for a lab person." Mayr Dep., Dec. 14, 2005, Exh. G at 60, lines 14-15. As was

customary in the scientific community, Prof. Mayr testified that, when asked for samples,

he did not have to explicitly state that the requestor was not permitted to use the material

for anything but research purposes:

> Q.    Prior to the year 2002 did you ever specifically say to any
> persons to whom you sent MVA that the recipients could not use it for
> commercial purposes?
>
> A.    No, we did not or I did not, because it is customary to
> exchange strains among scientists and that is only for research purposes.

Mayr Dep., Exh. G at 45, lines 16-21.  In fact, most publications require scientists to

make samples of material described in papers available to other scientists for research.

Dr. Bernard Moss of the NIH made a request to obtain a sample of MVA, and

when he did so, Prof. Mayr thought that he was asking as a scientist, for NIH, interested

in conducting research:

> Q:    Do you know a gentleman named Bernard Moss?
>
> A.    Yes.
>
> Q.    Have you ever sent to Dr. Moss samples of MVA viruses?
>
> A.    Yes.
>
> Q.    Have you ever told Dr. Moss in sending those samples that
> he was restricted in how he could use them?
>
> A.    I did not do so, because the exchange of viruses or strains
> on an international level is customary without imposing restrictions.

Mayr Dep., Exh. G at 19 line 22 through 20 line 5.

David Einhorn, an expert expected to testify on the customs and practices of

scientists exchanging biological samples, has stated in his deposition and in his expert

report that what Prof. Mayr experienced is exactly what is understood in the scientific

community: scientists freely exchange samples with each other without giving away

rights to commercialization. See Expert Report of David Einhorn, Exh. H, at ¶ 2. Dr.

Drillien, another expert who has spent his entire life working in the scientific community

conducting research specifically in the MVA field, with first hand experience exchanging

biological samples, concurs with Mr. Einhorn and Prof. Mayr's view. *See, e.g.*, Exh. I at

¶¶ 14, 15. It is also the policy of NIH to encourage sharing materials for research

purposes only, without any formal agreements a topic on which David Einhorn also has

testified. *See* NIH pamphlet, Exh. J.

When asked specifically about the samples sent to Dr. Moss, Prof. Mayr testified

that he never believed that Dr. Moss, acting presumably for the NIH, which is a well

known U.S. government owned research facility, would use the samples for anything but

research:

> MR. PENNINGTON:  When you sent samples to Dr. Moss, did you have an understanding as to whether or not the NIH was a research institution or a commercial institution?
>
> MR. COSTON:  Object to the form of the question.  Leading. Compound.
>
> A.      Until today I have always — and it is my continuing opinion — always assumed that NIH is not a commercial institution but a pure research institute.
>
> MR. PENNINGTON:  And when you gave samples to NIH, did you believe that you gave them permission to use the samples commercially?
>
> A. **No, no, no.**
>
> MR. COSTON:  Object to the form of the question.  Leading. Assumes facts not in evidence.
>
> MR. PENNINGTON:  Could you translate and then take the answer?

A. I never assumed when I sent samples or a sample to NIH, no matter which sample it was, that NIH would use it for commercial purposes and that continues to be my opinion today. I must add that I also have no information that NIH purses commercial purposes.

Q. I believe you testified earlier today that you gave strains of MVA out to other researchers. Is that correct?

A. Yes, but only for research purposes.

Q. Do you have a view as to whether or not the people who received your samples understood that it was only for research purposes?

MR. COSTON: Object to the form of the question. Leading. Calls for speculation.

A. That is what I assume.

MR. PENNINGTON: Do you know if there is an understanding in the academic and research community that if you receive a viral sample from a scientist that it is only for research purposes?

A. Yes.

Q. —as opposed to commercial purposes?

MR. COSTON: Objection. Compound. Leading. Calls for speculation. Calls for expert opinion without disclosure of expert qualifications.

A. That is my opinion, yes.

MR. PENNINGTON: Does your opinion extend worldwide or just in Germany?

A. Worldwide.

Mayr Dep., Exh. G at 73 line 2 through 74 line 20 (emphasis added).

C.     **Bavarian Nordic's Acquisition of MVA for Commercial Use**

Prof. Mayr and BN originally entered into a license agreement in 1996 that provided Bavarian Nordic "exclusive and sole access to" Mayr's MVA stocks, with the provision that "in the scientific community, there is a growing interest in performing basic non-commercial research including the MVA vector. Bavarian Nordic agrees not to unreasonably use its exclusivity to the MVA system to hinder basic research by third party non-commercial academia." A copy of the 1996 agreement is found at Exhibit K.

In 2002, Prof. Mayr entered into an Assignment Agreement with BN. In the recitals, the Assignment Agreement confirms that Prof. Mayr "previously granted BN . . . exclusive access to MVA vaccine stock and MVA viral stock" and further confirms "transfer of ownership of all MVA vaccine stock and MVA viral stock in the possession of Dr. Mayr ('MVA strains') to BN." After the recitals, the Assignment Agreement transfers from Prof. Mayr to BN the "entire right, title and interest in and to said MVA Strains and Patents . . . and all and every right to make commercial use of the MVA Strains." The MVA viruses assigned include MVA 572 and MVA-575. A copy of the 2002 agreement between Mayr and Bavarian Nordic is found at Exhibit L.

Prof. Mayr and BN entered into additional agreements regarding Prof. Mayr's MVA vaccine stock and other non-MVA vaccine stocks in 1999, 2001, 2003 and 2004. These are found at Exhibit M and all of the agreements reflect that Prof. Mayr has been compensated for his MVA by Bavarian Nordic.

Thus, BN is the only entity with ownership and the right to commercialize MVA strains that originated with Prof. Mayr. To the extent that Acambis converted MVA strains before particular BN agreements, Prof. Mayr would have the right to recover.

Alternatively, if the agreements have retroactive effect, then BN would have the right to recover. Since both BN and Prof. Mayr are plaintiffs, it matters not whether the agreements have retroactive application.

**D.    Acambis Had No MVA Program Prior to Meeting with Bavarian Nordic**

Acambis entered into a Secrecy Agreement with Bavarian Nordic on February 26, 2002 (the "Secrecy Agreement") (Exhibit N).



Acambis had no MVA program prior to May, 2002. (Hearing Transcript, May 11, 2006, Exh. O at 888:23-890:2). Personnel from Acambis and Bavarian Nordic met at Acambis' offices in Cambridge Massachusetts on June 12, 2002. The Acambis meeting included a detailed discussion of MVA-BN, Bavarian Nordic's animal testing models and replication data and information that would be needed to get a MVA program off the ground.

Following the June 12, 2002 meeting, Acambis and BN engaged in discussions for a period of time regarding a potential licensing agreement between the parties. These discussions were terminated by Acambis. JSF at ¶ 78. However, prior to termination, Acambis was willing to pay to BN ███████ Euro for MVA, but BN was asking for ███ ███ Euro. *See* AC0528358 – 60, Exhibit P; and Expert Report of John Jarosz, Exh. Q at 13.

**E.      Acambis Illegitimately Developed MVA for Commercial Use**

Acambis negotiated with Therion in parallel with Bavarian Nordic for MVA material in order to be "in the game" for the upcoming RFPs. *See* Higgins deposition, Exh. R at pages 54-55 and 66-101. Therion was offering MVA material to Acambis for approximately ████████ dollars, ███████████████. AC 0012419-20, Exh. S. *See also*, Jarosz Report at 14-15. Acambis took no steps to isolate its MVA team who had received information from Bavarian Nordic from its MVA development effort. Rather, Acambis focused on whatever information they could obtain from or about Bavarian Nordic. *Id.*

Acambis developed MVA3000 without any significant research and development effort between May of 2002 and September of 2002 when it responded to the first RFP. *See* Exh. T, Hearing Transcript, May 11, 2006 at 172:18-175:1, and May 12, 2006 at 40:2-40:21. Acambis sought and received a MVA virus for commercial use from Therion Biologics Corporation in Cambridge, Massachusetts. Therion had received its MVA from Mayr, but Acambis chose not to proceed with Therion's MVA because of a

███████████████████████████████████████████████████

███████████████████████████████████████████████████

14

███████████████████████████████████████ *See*

Higgins deposition at 66-101; Letter from Higgins to Therion, Exh. U at 2. Instead,

Acambis elected to proceed with a MVA virus from NIH that NIH had acquired from

Mayr for free and that Acambis acquired from NIH for free. *See* Exh. T, Hearing

Transcript, May 11, 2006 at 174:17-20.

Specifically, in 1995, Prof. Mayr provided Dr. Moss, an employee of the National

Institute of Allergies and Infectious Diseases at the NIH, with two types of MVA: (1)

MVA 575.FHE-Pass. v. 14.12.83; and (2) II/85. JSF at ¶ 70. In August 2001, Prof. Mayr

provided Dr. Moss, with MVA 572.FHE-22.02.1974. JSF at ¶ 71.

The MVA strain obtained by Acambis for use in MVA3000 was obtained from

the National Institutes of Health ("NIH") pursuant to a Materials Transfer Agreement

("MTA"). In particular, Acambis received vials of MVA stock labeled "MVA74 LVD6

$1.5 \times 10^9$ IU/mL 7/22/02" from NIH, which is derived from MVA 572.FHE-22.02.1974,

and renamed it Pre-Master Virus Seed "PIN IT-0056." *See* JSF at ¶ 72. The MTA states

that the virus is being provided "as is." *See* Materials Transfer Agreement, Exh. V.

The MTA states, in part, "3. NIAID [National Institute of Allergy and Infectious

Disease, an institute at the NIH] hereby grants to Recipient [Acambis] worldwide, non-

exclusive rights to make, have made, and use the Materials and to make and have made,

to use and have used, to sell and have sold, and to offer to sell Commercial Products in

the field of Use of Smallpox Vaccines." *Id.* The MTA provides no warranty to Acambis

with respect to freedom to operate. *Id.* In fact, the MTA requires Acambis to indemnify

the government relating to use of the virus stock and prevents Acambis from taking steps

to bring the government into a lawsuit involving the virus stock. *Id.*

Acambis shipped the Pre-Master Virus Seed, or a derivative thereof, to Baxter

Vaccine AG whereupon it was used as a basis to manufacture at least 505,000 doses of

MVA3000.  The MVA3000 doses were shipped back to the United States, of which

██████████████████████████████████████████████████████████

JSF at ¶ 74.

**F.    NIH and Moss Recognized His Restricted Rights When Refusing to Give MVA 572 to Therion**

Acambis has taken the position in the ITC case that the delivery of MVA 572

from Prof. Mayr to Dr. Moss was a "gift" with no restriction on use.  This is an ironic

position to take, given what Dr. Moss said to Therion.  Therion is the company who

originally partnered with Acambis to bid against BN in the first RFP with the NIH.

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

BN's expert Straus, a world renowned expert in international Intellectual Property

law, sees this as a clear recognition on the part of Dr. Moss that he did not have

permission to subsequently transfer MVA 572 or derivatives thereof to Acambis.  *See*

Straus' supplemental expert report, Exh. AA, at paragraph 10, citing the Therion

correspondence as one of several factors pointing in the direction of "no conveyance" of

any rights to NIH or Dr. Moss other than to perform research. Thus, Dr. Moss's actions vis-à-vis Therion are consistent with what Prof. Mayr testified was his understanding of the delivery of a MVA sample to Dr. Moss.

By contrast, Dr. Moss, who has historically been a paid consultant of Acambis and its corporate predecessor, gave MVA samples to Acambis for commercial purposes and responding to the RFP, for free, without authorization and indeed over the objections of Professor Mayr and BN.

## IV.    ARGUMENT

### A.    The Summary Judgment Standard

Summary judgment should be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Liafall Inc. v. Learning 2000, Inc.,* 2002 U.S. Dist. LEXIS 22620 at *3-4 (D. Del. 2002). An issue is "genuine" if, given the evidence, a reasonable jury could return a verdict in favor of the non-moving party. *See, e.g., Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-51 (1986)); *Lloyd v. Jefferson,* 53 F. Supp. 2d 643, 654 (D. Del. 1999) (citing same). A fact is "material" if it bears on an essential element of the plaintiff's claim. *See, e.g., Abraham,* 183 F.3d at 287; *Lloyd,* 53 F. Supp. 2d at 654.

On summary judgment, the court cannot weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *International Union, United Auto., Aerospace & Ag.*

17

*Implement Workers of America, U.A.W. v. Skinner Engine Co.,* 188 F.3d 130, 137 (3d

Cir. 1999) ("At the summary judgment stage, a court may not weigh the evidence or

make credibility determinations; these tasks are left to the fact finder."). Instead, the

court can only determine whether there is a genuine issue for trial. *See Abraham,* 183

F.3d at 287. In doing so, the court must look at the evidence in the light most favorable

to the non-moving party, drawing all reasonable inferences, and resolving all reasonable

doubts in favor of that party. *See, e.g., Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.

1999).

### B.    The Applicable Law of Conversion

As a threshold matter, we apply Delaware's choice-of-law statute to determine

whose conversion law applies. "To resolve choice of law issues in tort actions, Delaware

adheres to the 'most significant relationship' approach of the Restatement (Second) of

Conflict of Laws." *Bickling v. Kent Gen. Hosp.*, 872 F. Supp. 1299, 1305 (D. Del. 1994).

According to § 147 of the Restatement, "Injuries to Tangible Things," the most

significant relationship in a conversion case is generally the place where the injury

occurred. *See* Restatement (Second) of Conflict of Laws, § 147. In this case, the injury

to Bavarian Nordic occurred when Acambis received and commercialized MVA at its

Cambridge, Massachusetts offices, including by growing a master seed stock of NIH

MVA and sending that master seed stock to its partner Baxter Pharmaceuticals for the

purpose of manufacturing over 500,000 doses of MVA based vaccine for sale to the U.S.

Government. As such, Massachusetts conversion law most properly applies to this case.

*See also United States v. Swiss American Bank, Ltd.,* 191 F.3d 30, 37 (1st Cir. 1999

(Mass.)) ("The legal injury occasioned by the tort of conversion is deemed to occur

where the actual conversion takes place.")  As explained in greater detail below, however, the applicable principles of conversion law are operatively the same regardless of jurisdiction.

In Massachusetts, "conversion focuses on the wrongful possession of personal property of the owner, without the owner's consent." *Danielson v. Winchester-Conant Properties, Inc.*, 186 F. Supp. 2d 1, 28 (D. Mass. 2002).  It is thus defined as the "intentional and wrongful exercise of dominion, control, or ownership over another's personal property which seriously interferes with the other's rights to control the property." *Jack Davis, Inc. v. Southworth-Milton, Inc.*, 1997 Mass. Super. LEXIS 522 (1997) (citing Restatement (Second) of Torts § 222A).  In proving conversion, a plaintiff is not required to show that the converter took the property for his own benefit, so long as he intentionally exercised dominion and control over the property of another.  *See Kelley v. Laforce*, 288 F.3d 1, 12 (1st Cir. 2002).  Likewise, "It is no defense to conversion for defendant to claim that he acted in good faith, reasonably believing that he had a legal right to possession of the goods." *Id.*

It is long-settled law that a chattel is converted when a person — even in legal possession of the chattel — exceeds the limitations on that chattel's use.  *I.e.*, "when he departs from the object of the bailment, it amounts to a conversion of the property." *Hall v. Corcoran*, 107 Mass. 251, 255 (Mass. 1871).  As the *Corcoran* court explained,

> If the owner of cattle lent them to another to plough his land, and the bailee killed them, he was liable in trover. The riding or driving of a horse without the owner's leave, being an unlawful intermeddling with the property of another for the benefit of the person using it, was a conversion, for which trover would lie, whether he took the horse from the owner's stable, or acquired possession of it

> lawfully, as by a contract with the owner to drive it to a
> different place, or by finding in a highway.

*Id.* at 254 (Mass. 1871) (internal citation omitted). *See also Goell v. Smith*, 128 Mass.

238, 239-240 (Mass. 1880) ("where the violation of the terms of the agreement tends to

show the assumption of dominion over, and ownership of, the chattel, it is evidence

tending to show a conversion of it to his own use by the lessee or bailee."); *Hall v. Boston*

*& W. R. Corp.*, 96 Mass. 439, 443 (Mass. 1867) ("a delivery to an unauthorized person is

as much a conversion as would be a sale of the property, or an appropriation of it to the

bailee's own use. In such cases neither a sincere and apparently well founded belief that

the tortious act was right, nor the exercise of any degree of care, constitutes a defence

even to a gratuitous bailee.").

That conclusion is hardly limited to Massachusetts, but is a well-settled principle

of American common law. Thus the Restatement (Second) of Torts notes, "One who is

authorized to make a particular use of a chattel, and uses it in a manner exceeding the

authorization, is subject to liability for conversion to another whose right to control the

use of the chattel is thereby seriously violated." Restatement (Second) of Torts, § 228.

As *comment a* to this section elaborates, this issue "arises most frequently in cases of

bailments under contract for a particular use, but it is equally applicable to a servant, an

independent contractor, a gratuitous user, or any other person permitted to use the

chattel." *Id.* Professor Epstein presents the matter as follows:

> Bailment contracts frequently permit or authorize D ,
> expressly *or impliedly*, to make some limited use of the
> thing in question, and where D does as he is told or
> allowed, no conversion has taken place, even if those same
> acts would be found tortious if done by a stranger.
> Nonetheless some actions by D can easily fall outside the
> scope of permitted uses, and when the bailee acts as the

> owner of goods, then his unauthorized conduct amounts to
> a conversion, just as in the case of a stranger."

Richard A. Epstein, *Torts* § 1.12.3 "Specialized Cases of Conversion" (Aspen 1999)

(emphasis added). Moreover, "[e]very legal system," Epstein notes, "allows P to recover

the chattel or its value from the bad faith purchaser" where the bailee "sells or otherwise

disposes of goods to a third-party." *Id.* Delaware's courts are no different. For example,

Delaware law recognizes the situation, as we have in this case, where an owner lends

"property to another for use without pay" and where use of the property is limited to a

specific purpose. *McClemy v. Brown*, 99 A. 48, 50 (Sup. Ct. Del. 1916). In such

circumstances,

> it is a well-recognized rule of law, that if personal property
> is sold without the consent of the owner by one who has
> only a temporary right to its use by lending, or otherwise,
> *or a qualified possession of it for a specific purpose, as for*
> *personal use, the owner can follow and reclaim it in the*
> *hands of any person*, how-ever innocent.

*Id.* (emphasis added). And should this Court decide to look further afield, the Fifth

Circuit has concluded that "the essence of the tort of conversion under both German and

American law is an act by another that is inconsistent with an owner's interest in

property." *Price v. United States*, 69 F.3d 46, 50 (5th Cir. 1995) (comparing 3 German

Civil Code §§ 858, 992 (Rothman ed. 1994) with the Restatement (Second) of Torts §§

224A, 234).

To summarize, Acambis would be liable for conversion if it exercised dominion

and control over Bavarian Nordic's property by using it for a commercial purpose, thus

exceeding the limits on permissible use (i.e., research purposes only) under which Prof.

Mayr transferred MVA 572.

With respect to the question of ownership of MVA material, under applicable German law, Prof. Anton Mayr owned MVA-572, without restriction, until his assignment of rights in the virus to Bavarian Nordic. According to § 42 of the German Employee Invention Act, "inventions made by professors, lecturers and scientific assistants, in their capacity as such, at universities and higher schools of science shall be free inventions." *See* Straus Exp. Report at ¶ 16. Both tangible and intangible products of such research thus belong to the professor who invented them (Frieling 1987 GRUR 408 et seq.) and German law leaves it to the professor/inventor himself to determine how and/or whether to exploit the results of his research. (Ulrich, Privatrechtsfragen der Forschungsforderung in der Bundesrepublik Deutschland [Civil Law Issues of Research Promotion in the Federal Republic of Germany], 1984, p. 290). *See id.* Viruses, such as MVA-572, can be the subject of tangible property rights. *See id.* at ¶¶ 17-18. To transfer ownership of his property to another, German law requires that "the owner of the thing deliver it to the acquirer and that both agree that the ownership is transferred. It suffices, when the will for the transfer of ownership is revealed from the circumstances. Whether the will to agree exists, is to be judged according to the general principles applicable to the interpretation of legal transactions." *See* Straus Supp. Exp. Rep. at ¶ 8 (citing 1990 NJW 1913, left column. *Cf.* StaudingerIWiegand, 2004, § 929 No. 9 a)). Ownership will not transfer otherwise.

### C.    The Applicable Law of Contract

Because contractual relationships are implicated in this conversion claim, it is worthwhile to reiterate several settled principles of contract interpretation. Where an industry practices a particular custom or usage of trade, the parties are presumptively

22

bound by this custom or usage unless explicit evidence contradicts it. *See, e.g.*, 21A Am Jur 2d Customs and Usages § 24 ("absent an express statement or implication to the contrary, parties to a contract, the formation of which is governed by general usage, are presumed to have intended to proceed according to such usage.") Custom and trade usage affirmatively add terms and restrictions to an agreement between parties. *See, e.g.*, 5-24 *Corbin on Contracts* § 24.14 ("Usage and custom, including trade usage, may be proved, not only to aid in interpretation of the words of the parties by discerning the meaning of words contained in the contract, *but also to add to the contract a provision which the parties' words did not express*.") (emphasis added). Indeed, the Uniform Commercial Code, the Restatement (Second) of Contracts, and even the United Nations Convention on Contracts for the International Sale of Goods all agree that custom and trade usage define and supplement the terms of an agreement. *See* UCC §§ 1-205(3), 2-204; Restatement (Second) of Contracts § 222(3); U.N. Convention on Contracts for the International Sale of Goods, Art. 9(2); *see also* 5-24 *Corbin on Contracts* § 24.13.

Equally fundamental is that established customs define the manner in which property rights are acquired. See *Nixon v. United States*, 978 F.2d 1269, 1276 n.18 (D.C. Cir. 1992) ("It is an uncontroversial, yet often unarticulated proposition that, in the absence of constitutional, statutory or common law rules, custom and usage may identify and create contract or property rights.") Indeed, an industry's established customs may define proprietary rights even when they directly conflict with the common law. *See Ghen v. Rich*, 8 F. 159 (D. Mass. 1881).

### D.    There Is No Material Issue of Fact with Respect to Acambis's Tortious Conversion of the MVA 572 Strain.

Bavarian Nordic and/or Anton Mayr are entitled to summary judgment on the issue of tortious conversion. The undisputed facts demonstrate that one or both of these parties own the MVA virus material in question. The undisputed facts also demonstrate that although Dr. Moss was provided a sample of MVA 572 virus, it was for the limited purpose of conducting non-commercial research. Acambis unlawfully converted the strain when it terminated negotiations to pay millions of dollars for MVA material to BN or Therion, and instead used MVA material it acquired for free from Dr. Moss, to create a commercial vaccine, which it in turn sold to the government for millions of dollars.

#### 1.    Bavarian Nordic and/or Mayr Own Commercial Rights to MVA 572

The first element of proof is that Bavarian Nordic and/or Mayr own the strain. This element is clearly met. Mayr developed MVA 572 while a research scientist in Germany, and German law is unambiguous that in so doing, he obtained full rights in the virus he invented. Also undisputed is that Mayr transferred the sole right to commercialize MVA 572 to Bavarian Nordic. This transfer took place in a series of agreements beginning in 1996 and including the November 6, 2002 Agreement, wherein the parties effected "transfer of ownership of all MVA vaccine stock and MVA viral stock in the possession of Dr. Mayr ('MVA strains') to BN" in exchange for valuable consideration. Thus, there is no reasonable dispute that Mayr and/or Bavarian Nordic own the MVA virus material in question during at all relevant time periods.

24

2.    **Moss Received MVA 572 From Mayr for the Limited Purpose**
**of Conducting Noncommercial Research**

The second matter of proof is that Acambis has exercised dominion and control

over the virus in a manner adverse to and seriously interfering with Mayr and/or Bavarian

Nordic's property rights. This element, too, is met. As a threshold matter, it is

undisputed fact that Bavarian Nordic is the only entity to whom Mayr has given

ownership and the explicit right to commercialize MVA. Although Mayr has admittedly

provided samples of MVA to other researchers, including Bernard Moss of NIH, no

evidence whatsoever suggests that Mayr intended to derogate from the consistent custom

among scientists to share their research discoveries *for research purposes only*, in the

absence of an explicit agreement to the contrary. Bavarian Nordic has provided ample

law and testimony evidencing that this was the prevailing custom among researchers at

the time Mayr transferred the strain to Moss at NIH. *See, e.g.,* Einhorn Dep. at 30:5-31:1;

80:7-81:4 ("there is an understanding, an ethos, so to speak, among scientists who

understand that when they get materials from another scientist, there's been a lot of work

that's gone into it and they are to use it for the limited purposes of research"). Absent an

explicit license to commercialize the strain — a license only Bavarian Nordic possesses

— use of MVA 572 is authorized for research purposes only.

Acambis will argue in response that, in declining to explicitly reserve ownership

rights when providing Moss with the strain, Mayr transferred an ownership interest in

MVA 572. But this not only turns the law on its head, but is wholly inconsistent with the

undisputed evidence. For example, we know that Dr. Moss explicitly understood that his

possession of Mayr's MVA 572 strain was restricted to non-commercial uses, because he

refused to release the strain to Therion for commercial use without written authorization

from Mayr. *See* Feb. 26, 2002 letter from Gritz to Mayr, Exh. X ("Moss is willing to send us the virus but would like written permission from you before he sends us the virus.") Indeed, Mayr had specifically reiterated to Moss that the strain was for academic research. *See* Nov. 6, 2002 letter from Mayr to Moss, Exh. Y. Thus, the evidence of Moss's own understanding supports the undisputed fact that Bavarian Nordic owns sole commercial rights to MVA and that Moss's limited right to possess MVA 572 was limited to use in non-commercial research.

Indeed, Acambis itself was on notice, before it began to commercialize the strain, that ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ *See e.g.,* Exh. BB, at AC0012119, AC0012113, AC0012414, and AC0011704. Acambis made its understanding of this "cloud" explicit in the January 12, 2003 Business Officer's Report prepared by its agent Nicholas Higgins, which notes that negotiations with Therion stalled because Therion did not have good title to commercialize MVA. *See* Exh. CC. And in a December 24, 2002 email, Thomas Monath noted that ████████████████████████████

████████████████████████████ *See* Exh. DD at AC0336880 and AC0336980) Monath's statement carries particular weight as it was made just several days after Stephen Atkinson clearly informed Acambis of the risks of commercializing the MVA-TBC strain:

26



*Id,; see also* Exh. EE at TBC00880.

Acambis' own documents thus evidence that Moss's right to possess MVA 572 was limited to research purposes.

### 3.    Acambis Converted the Strain By Using It to Develop a Commercial Vaccine

Finally, Acambis converted the strain. To reiterate the law, "One who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby seriously violated." Restatement (Second) of Torts, § 228. That describes what happened here. The undisputed facts show that in 2002 Moss transferred his derivative of Mayr's MVA 572—for free—to Acambis, and that Acambis subsequently used the strain in a commercial vaccine. As such, Acambis is liable to Mayr and/or Bavarian Nordic for conversion.

## VI.    CONCLUSION

Because there is no material issue of disputed fact as to Acambis' wrongful exercise of possession and control over MVA 572 and/or its progeny in denial of Bavarian Nordic's rights to the strain, all of the elements of the tort of conversion are

met, and Bavarian Nordic respectfully requests that summary judgment be granted as to

Count I of the First Amended Complaint.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

December 7, 2006

_Karen L. Pascale_

John W. Shaw (No. 3362) [jshaw@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
D. Fon Muttamara-Walker (No. 4646)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

- and -

BINGHAM MCCUTCHEN LLP
Edward A. Pennington
Robert Bertin
George Jones
Stephanie Scruggs
3000 K Street Suite 300
Washington, DC 20007
(202) 424-7500

_Attorneys for Plaintiff, Bavarian Nordic A/S_

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on December 14, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Mary B. Graham [mbgefiling@mnat.com]
>James Walter Parrett, Jr. [jparrett@mnat.com]
>MORRIS, NICHOLS, ARSHT & TUNNELL LLP
>1201 North Market Street
>P.O. Box 1347
>Wilmington, DE 19899
>(302) 658-9200

I further certify that on December 14, 2006, I caused a copy of the foregoing document to be served on the above-listed counsel and on the following non-registered participants in the manner indicated:

>### *By E-Mail and Hand Delivery*
>
>Mary B. Graham [mgraham@mnat.com]
>James Walter Parrett, Jr. [jparrett@mnat.com]
>MORRIS, NICHOLS, ARSHT & TUNNELL LLP
>1201 North Market Street
>P.O. Box 1347
>Wilmington, DE 19899
>(302) 658-9200
>
>### *By E-Mail and Federal Express*
>
>William D. Coston [wdcoston@venable.com]
>Martin L. Saad [mlsaad@venable.com]
>Tamany Vinson Bentz [TJBentz@Venable.com]
>VENABLE LLP
>575 7th Street, NW
>Washington, DC 20004-1601
>(202) 344-4000

064417.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen L. Pascale*

Karen L. Pascale (No. 2903)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
Email:  kpascale@ycst.com
  *Attorneys for Plaintiffs,*
  *Bavarian Nordic A/S and Anton Mayr*