IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BAVARIAN NORDIC A/S and )
ANTON MAYR, )
)
               Plaintiff, )
)        C.A. No. 05-614 (SLR)
     v. )
)
ACAMBIS INC. and )        **REDACTED**
ACAMBIS PLC, )        **PUBLIC VERSION**
)
           Defendants. )
)

## OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT, ON ALL CLAIMS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Rodger D. Smith II (#3778)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

*Attorneys for Defendants
Acambis Inc. and Acambis plc*

OF COUNSEL:

William D. Coston
Linsday B. Meyer
Martin L. Saad
Tamany J. Vinson Bentz
VENABLE, LLP
575 7th Street, NW
Washington, DC 20004-1601
202.344.4000

Dated: December 7, 2006
Redacted Version Filed: December 18, 2006

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

PROCEDURAL BACKGROUND.........................................................................2

FACTS .....................................................................................................................4

ARGUMENT........................................................................................................17

STANDARD OF REVIEW ..................................................................................17

I.     PLAINTIFFS' CONVERSION CLAIM MUST BE DISMISSED..........18

     A.     CHOICE OF LAW – MARYLAND/MASSACHUSETTS .........18

     B.     INTANGIBLE RIGHTS, SUCH AS THE "RIGHT TO COMMERCIALIZE," ARE NOT ACTIONABLE IN CONVERSION...........................................................................20

     C.     EVEN IF INTANGIBLE RIGHTS WERE ACTIONABLE IN CONVERSION, THE "RIGHT TO COMMERCIALIZE" MAY ONLY BE PROTECTED BY CONTRACT OR INTELLECTUAL PROPERTY LAW .............23

     D.     EVEN IF THE "RIGHT TO COMMERCIALIZE" WERE ACTIONABLE IN CONVERSION, PLAINTIFFS' CLAIM FAILS........................................................................26

     E.     PLAINTIFFS' CLAIM FAILS BECAUSE ACAMBIS DID NOT EXCLUDE PLAINTIFFS FROM THE STRAIN OR RIGHT TO COMMERCIALIZE ............................27

II.     BN'S UNFAIR COMPETITION CLAIMS MUST BE DISMISSED ........................................................................30

     A.     BN'S LANHAM ACT CLAIM MUST BE DISMISSED.............31

          1.     BN Cannot Prove a False Representation of Origin .........31

          2.     BN Cannot Prove False Advertising...................................33

          3.     BN Cannot Prove Consumer Confusion ............................34

     B.     BN Cannot Prove a Violation of Delaware law.............................35

          1.     BN cannot prove a violation of subsections (1) or (2) of the DDTPA ...............................................................36

          2.     BN cannot prove a violation of subsections (5) or (7) of the DDTPA ...............................................................37

3.      BN cannot prove a violation of subsections (2), (3), or (12) of the DDTPA ........................................................37

CONCLUSION................................................................................................................39

TABLE OF AUTHORITIES

**Cases**

*ACCU Pers., Inc. v. Accustaff, Inc.,*
  846 F. Supp. 1191 (D. Del. 1994) ................................................................... 36

*Allied Inv. Corp. v. Jasen,*
  354 Md. 547, 731 A.2d 957 (1999) ................................................................ 21

*Astrazeneca LP v. Tap Pharm. Prod. Inc.,*
  444 F. Supp. 2d 278 (D. Del. 2006) ............................................................... 34

*Bob Creeden & Assoc. v. Infosoft,*
  326 F. Supp. 2d 876 (N.D. Ill. 2004) ............................................................. 37

*Brand Iron, Inc. v. Koehring Co.,*
  595 F. Supp. 1037 (D. Md. 1984) ................................................................... 25

*Bretford Mfg., Inc. v. Smith Sys. Mfg.,*
  286 F. Supp. 2d 969 (N.D. Ill. 2003), *aff'd* 419 F.3d 576 (7th Cir. 2005) ............ 32, 34

*Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.,*
  295 F. Supp. 2d 430 (D. Del. 2003) (Sleet, J.) ....................................... 18, 19

*Crown-Simplimatic Inc. v. Adcor Indus., Inc.,*
  299 B.R. 319 (Bankr. D. Del. 2003) ............................................................... 26

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
  539 U.S. 23 (2003) ................................................................................. passim

*Delaware Solid Waste Auth. v. E. Shore Env., Inc.,*
  C.A. No. 1472-K, 2002 WL 537691 (Del. Ch. March 28, 2002) .......................... 36, 37

*Discover Realty Corp. v. David,*
  2003 Mass. App. Div. 172 (Mass. App. Dec. 2003) ....................................... 21

*Duty Free Americas, Inc. v. Legg Mason Wood Walker, Inc.,*
  No. 24-C-04-005696, 2005 WL 914395 (Md. Cir. Ct. Jan. 13, 2005) ................... 27

*Exp. Lobster Co. v. Bay State Lobster Co.,*
  No. 92-6348-E, 1994 Mass. Super. LEXIS 90 (Mass. Super. Ct. Oct. 31, 1994) ........ 21

*Fainsbert v. Cuthbert,*
  No. 06-2017, 2006 WL 2096057 (D.N.J. July 27, 2006) ................................... 28

*FMC Corp. v. Cap. Cities/ABC, Inc.,*
  915 F.2d 300 (7th Cir. 1990) ......................................................................... 28

*Furash & Co., Inc. v. McClave,*
    130 F. Supp. 2d 48 (D.D.C. 2001) ................................................................ 28

*Gen. Univ. Sys. Inc. v. Lee,*
    379 F.3d 131 (5th Cir. 2004) ...................................................................... 31

*Green v. Fund Asset Mgmt., L.P.,*
    245 F.3d 214 (3d Cir. 2001) ........................................................................ 17

*Home Paramount Pest Control Cos., Inc. v. FMC Corp. Prods. Group.,*
    107 F. Supp. 2d 684 (D. Md. 2000) ............................................................ 28

*Horowitz v. Fed. Kemper Life Assurance Co.,*
    57 F.3d 300 (3d Cir. 1995) .......................................................................... 18

*In re Gen. Motors Class E Stock Buyout Sec. Litig.,*
    694 F. Supp. 1119 (D. Del. 1988) ................................................................ 17

*Innovative Network Solutions, Inc. v. Onestar Communications, LLC,*
    283 F. Supp. 2d 295 (D. Me. 2003) ............................................................ 26

*Jablonski v. Pan Am. World Airways, Inc.,*
    863 F.2d 289 (3d Cir. 1988) ........................................................................ 17

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,*
    11 F.3d 399 (3d Cir. 1993) .......................................................................... 17

*Jayson Assoc., Inc. v. United Parcel Serv.,*
    No. 04-10771-RWZ, 2004 U.S. Dist. LEXIS 13191 (D. Mass. July 15, 2004) ..... 21, 26

*Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms.,
Inc.,*
    19 F.3d 125 (3d Cir. 1994) .......................................................................... 34

*LP Matthews LLC v. Bath & Body Works, Inc.,*
    Civ. No. 04-1507-SLR, 2006 U.S. Dist. LEXIS 76116 (D. Del. Oct. 19, 2006)
    (Robinson, C.J.) ............................................................................................ 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) .................................................................................... 18

*Messing v. Bank of Am., N.A.,*
    373 Md. 672 (2003) .................................................................................... 27

*Miles, Inc. v. Scripps Clinic & Research Found.,*
    810 F. Supp. 1091 (S.D. Cal. 1993) ........................................................ *passim*

*Monsanto Co. v. Syngenta Seeds, Inc.*,
    No. 04-305, 2006 U.S. Dist. LEXIS 54515 (D. Del. Aug. 4, 2006) ..................... passim

*Orteck Int'l Inc. v. Transpacific Tire & Wheel, Inc.*,
    No. DKC 2005-2882, 2006 U.S. Dist. LEXIS 67702 (D. Md. Sept. 5, 2006) ...... passim

*Pagliai v. Del Re*,
    No. 99-CIV-9030(DLC), 2001 WL 220013 (S.D.N.Y. Mar. 7, 2001) ........................ 28

*Pearson v. Dodd*,
    410 F.2d 701 (D.C. Cir. 1969) ................................................................................ 28

*Radolf v. Univ. of Conn.*,
    364 F. Supp. 2d 204 (D. Conn. 2005) ..................................................................... 33

*Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*,
    902 F.2d 222 (3d Cir. 1990) ................................................................................... 34

*Schiffer Publ'g, Ltd v. Chronicle Books, LLC*,
    350 F. Supp. 2d 613 (E.D. Pa. 2004) ...................................................................... 32

*Shamrock Holdings v. Arenson*,
    Civ. No. 04-1339-SLR, 2006 U.S. Dist. LEXIS 70999 (D. Del. Sept. 29, 2006)
    (Robinson, C.J.) ..................................................................................................... 17

*Southmark Prime Plus, L.P. v. Falzone*,
    776 F. Supp. 888 (D. Del. 1991) ............................................................................ 17

*Toro Co. v. Textron, Inc.*,
    499 F. Supp. 241 (D. Del. 1980) ............................................................................ 37

*Travelers Indem. Co. v. Lake*,
    594 A.2d 38 (Del. 1991) ........................................................................................ 19

*Turbe v. Gov't of the Virgin Islands*,
    938 F.2d 427 (3d Cir. 1991) ................................................................................... 17

*United States v. Arora*,
    860 F. Supp. 1091 (D. Md. 1994) ........................................................................... 23

*Williams v. UMG Recordings, Inc.*,
    281 F. Supp. 2d 1177 (C.D. Cal. 2003) ............................................................ 31, 32

*Young v. Joyce*,
    351 A.2d 857 (Del. 1975) ...................................................................................... 36

**Statutes**

15 U.S.C. § 1125(a)(1) ................................................................. 31

35 U.S.C. § 271 (2006) ................................................................. 25

6 Del. C. § 2532(a) ........................................................... 31, 36, 38

Fed. R. Civ. P. 12(c) ................................................................ 1, 39

Fed. R. Civ. P. 56 ............................................................. 1, 18, 39

**Other Authorities**

18 Am. Jur. 2d Conversion § 67 ..................................................... 26

*Prosser & Keeton on the Law of Torts* § 15 (5th ed. 1984) ..................... 24

Restatement (Second) of Torts § 242, cmt. a (1965) ........................... 21

Acambis hereby moves for judgment on all of the claims in this case pursuant to Fed. R. Civ. P. 12(c) or 56. Simply put, there is no cause of action for the alleged conversion of a right to commercialize a viral strain. Nor is there a cause of action for reverse passing off under the Lanham Act or Delaware law without an alleged false representation of origin or consumer confusion. Hence, Acambis should be granted judgment on all claims as a matter of law. Further, to the extent that any facts beyond the pleadings are necessary to a determination of this motion, summary judgment on all counts is appropriate as there is no genuine issue as to any material fact.

## INTRODUCTION

This case involves a virus, modified vaccinia Ankara ("MVA"), used for over 30 years as the basis of smallpox vaccines. According to plaintiffs, Anton Mayr developed the virus and, as a result, owns all rights thereto. Plaintiffs allege that Prof. Mayr provided a sample MVA strain from his stocks to the National Institutes of Health ("NIH") with the *implied* understanding that the sample would be used for research purposes only. They further assert that NIH's provision of a *copy* of the viral strain to Acambis for purposes of developing a smallpox vaccine constitutes a conversion by Acambis. After the strain was provided to both NIH and Acambis, Plaintiff Bavarian Nordic A/S ("BN") claims to have contracted for ownership rights to Prof. Mayr's MVA. Plaintiff BN also alleges that Acambis engaged in unfair competition by offering its smallpox vaccine, MVA3000, in response to U.S. Government Requests for Proposals ("RFP") relating to MVA-based smallpox vaccines.

Plaintiffs claim that Acambis converted the purported "right to commercialize" MVA 572 by receiving a clone copy of the strain from NIH and using the copy to develop a smallpox vaccine. There are serious doubts about basic elements of plaintiffs' conversion theory – such as whether plaintiffs owned any such right, whether there

was any restriction implied in the transfer to NIH, and whether Acambis' research and development of a smallpox vaccine for the U.S. Government constitutes "commercial" use. But for purposes of this motion, there are some fundamental bases upon which outright dismissal or summary judgment is appropriate based on clear and undisputable facts.

First, the "right to commercialize" is an intangible right that cannot be the subject of a conversion claim. No court appears to have recognized such a right in the context of a conversion claim. The only case that appears to have addressed such a claim dismissed the claim as a matter of law. *See Miles, Inc. v. Scripps Clinic & Research Found.*, 810 F. Supp. 1091 (S.D. Cal. 1993). Second, even if the alleged right could be the subject of conversion, it cannot be asserted on the facts here because Acambis undisputedly did not exclude plaintiffs from any MVA strain or any rights thereto. At bottom, plaintiffs' claim does not fit the conversion rubric and must be dismissed.

BN's unfair competition claims must also be rejected. Acambis did not misrepresent the origin of its MVA3000 smallpox vaccine in its RFP responses to the U.S. Government. To the contrary, MVA3000 is a proprietary vaccine designed and produced by Acambis; the underlying viral strain is but one element used in the development of the vaccine. In this regard, plaintiff's claims are indistinguishable from those rejected as a matter of law in the *Dastar* line of cases, such as this Court's recent decision in *Monsanto Co. v. Syngenta Seeds, Inc.*, No. 04-305, 2006 U.S. Dist. LEXIS 54515 (D. Del. Aug. 4, 2006). Further, plaintiffs have failed to provide any evidence that the U.S. Government was confused about the origin of the strain underlying MVA3000 – indeed, the U.S. Government provided the strain to Acambis for the purpose of developing a smallpox vaccine.

## PROCEDURAL BACKGROUND

BN filed this suit on August 19, 2005, alleging that Acambis committed tortious conversion, misappropriation of trade secrets, unfair trade practices under Delaware

law, and unfair competition under the Lanham Act. All of the claims relate to Acambis' use of a MVA viral strain sample received from NIH in the development of its MVA3000 smallpox vaccine under contract with the NIH as part of the U.S. Government's antiterrorism and biodefense program.

On August 21, 2006, the Court granted Acambis' motion to dismiss BN's trade secret claims in favor of mandatory arbitration pursuant to a prior agreement between the parties.[1] D.I. 83.

In the August 21 Order, the Court also granted BN's motion to amend to add Professor Anton Mayr as a co-plaintiff to BN's conversion claim. BN sought to add Mayr on the basis that, "[o]n information and belief, Defendants intend to argue that at the time of the alleged tortious conversion, Bavarian Nordic had not yet acquired ownership of MVA from Prof. Mayr. Were Defendants' theory correct, Prof. Mayr – rather than or in addition to Bavarian Nordic – would be the aggrieved party entitled to relief."[2] D.I. 38, BN's Motion to Amend at 2. BN also amended the complaint to expressly acknowledge that it did not have *any* "ownership" rights in MVA until November 2002, *after* Mayr had already provided the MVA strain at issue to the NIH. D.I. 85, First Amended Compl. ¶ 24.

Hence, remaining before the Court are plaintiffs' claims for: (1) tortious conversion; (2) unfair competition under the Lanham Act; and (3) unfair competition under Delaware law.

---

[1]    BN included the trade secrets claim in its First Amended Complaint filed after the August 21 Order "purely to forestall any argument that plaintiffs have voluntarily dropped that claim, and not to derogate the effect of the August 21 Order." Ex. 1, 8/23/06 Letter from Pascale to Graham.

[2]    Despite being added as a plaintiff, Mayr testified that he was unaware he had been added as a party to this litigation and that he was not seeking any relief. Ex. 2, Mayr 9/21/06 deposition at 7.

On the same day that BN filed the instant suit, BN filed a parallel proceeding against Acambis before the International Trade Commission ("ITC") alleging infringement of two patents relating to MVA, misappropriation of trade secrets and conversion. In April 2006, as in this case, the ITC Administrative Law Judge ("ALJ") dismissed BN's trade secret claims in favor of arbitration. The ALJ also granted Acambis summary determination on BN's conversion claim on the basis that it was not part of the investigation ordered by the ITC and because it was "doubtful" that the ITC would have jurisdiction over such claim. *See* Ex. 3, ITC Order No. 27. Thus, only patent issues remained before the ITC.

Following a six-day hearing and post-trial briefing, on September 8, 2006, the ALJ issued his Initial Determination ("ID"), which found both of BN's asserted patents to be invalid on multiple grounds, including anticipation and inventorship. Both parties and the Office of Unfair Imports Investigations ("OUII") staff petitioned the Commission for review of various aspects of the ID. On November 22, 2006, the Commission announced that it would review the ALJ's decision and complete its investigation by January 31, 2007.

This Court noted in its August 21, 2006 Order, that, pending the proceedings in the parallel ITC action, "there has been little, if any, activity in the present action." D.I. 83 at 3. Since then, discovery has been robust, including the completion of eight expert depositions in the past two weeks.

## FACTS

Following are undisputed background facts relating to plaintiffs' claims:

### Development of MVA

1.    The MVA virus is as an attenuated form of the chorioallantois vaccinia Ankara ("CVA") smallpox virus. Ex. 4, ITC Joint Statement of Undisputed Facts ("JSUF") at ¶ 17. An attenuated virus such as MVA is not able to spread throughout the body – unlike the traditional smallpox vaccine, which is based on a live, replicating virus.

- 4 -

Hence, MVA is a suitable smallpox vaccine for that part of the population, such as the immune-compromised, who are contraindicated for the traditional smallpox vaccine. *Id.* at ¶ 16.

       2.     Prof. Mayr traces his ownership of MVA to his work performed at "the time when [he] was an assistant at the Bavarian State Vaccine Institute." Ex. 2, Mayr 9/21/2006 deposition at 8-10. At the direction of his "boss," Prof. Herrlich, Mayr went to Ankara, Turkey to obtain CVA virus, which was then passaged because his "boss, Professor Herrlich, believed that by continuing the passaging of the virus" it would become safer. Ex. 5, Mayr 12/14/2005 deposition at 12-14, 18. "Passaging" is the process of amplifying, or "growing" larger stocks of a viral particle (i.e. allowing the virus to create replicate clones thereby "growing" larger quantities of the virus). Each time a virus is passaged or plaque purified (discussed below), it is given a new, sequential number. In order to arrive at MVA, the CVA smallpox virus was passaged 371 times in chicken embryo fibroblasts ("CEF"). *Id.* at 17.

       3.     Although Professor Mayr left the Bavarian Vaccine Institute in 1959, he continued to work with colleagues from the Institute in connection with research and he testified that passages 516 through passage 572 – the passage at issue here – were performed at the Institute. Ex. 2, Mayr 9/21/2006 deposition at 20. Scholarly articles confirm that 572 was developed at the Institute. *See, e.g.,* Ex. 6, "MVA Vaccination Against Smallpox," Stickl, Mayr et al. (1974) (MVA strain "was taken over in the 516th passage by the Bavarian State Vaccination Institute and was continued on cell cultures of embryonal chick fibroblasts.").

███████████████████████████████████████████

██████████████████████████████

    4.      Upon reaching passage 572, MVA was a genetically stable, attenuated virus. Ex. 5, Mayr 12/14/05 deposition at 36-38, 48-49; Ex. 9, Mayr et al., Infection 3:1 (1975) at 3. As the ALJ in the parallel ITC proceeding found, all MVA viruses after passage MVA 572 are genetically identical. *See* Ex 10, ITC ID at 14. All modern MVA viruses derive from MVA 572. Ex. 11, Drillien ITC Direct testimony at 83:2-16 (Q.155-156); Ex. 12, ITC Hearing Tr. at 789:10-24 (Drillien).

    5.      In the early 1970s, the Bavarian State Vaccine Institute used MVA 572 as a smallpox vaccine "in 120,000 individuals, the vast majority of whom were children under the age of 2" without incident. *See* U.S. Patent No. 6,761,893 ("this MVA [572] strain has been tested in clinical trials…[t]hese studies involved over 120,000 humans"); U.S. Patent No. 6,913,752 (same). Since that time, MVA has been used widely as a vaccine as well as a "vector" for carrying other foreign genes to battle HIV, cancer, and other diseases.

Distributions of MVA

    6.      Apparently as a result of his work on MVA, Mayr possessed stocks of MVA, including MVA 572. *See* Ex. 2, Mayr 9/21/06 deposition at 22-25, 30-31.

---

[3]   At his deposition, Prof. Mayr was instructed by counsel – who also represents plaintiff BN – not to answer questions regarding his work at the Bavarian Vaccine Institute (*see* Ex. 2, Mayr 9/21/06 deposition at 15, 22, 56) and other topics, such as Prof. Mayr's prior distributions of MVA (*id.* at 41-42, 50-51, 53). Despite counsel's refusal to allow testimony on those topics, subsequent to Prof. Mayr's deposition, plaintiffs' purported expert on ownership, Prof. Dr. Joseph Straus, met with Prof. Mayr – with BN's in-house counsel present – to discuss issues of ownership and prior distributions for purposes of Straus' expert testimony. *See* Ex. 7, Straus 11/30/06 deposition at 53-56; Ex. 8, Straus Second Supplemental Expert Report at ¶¶ 1-2. Acambis reserves all rights to move to preclude testimony and evidence on such topics.

7.    Prof. Mayr widely distributed MVA, including MVA 572, over the years and took pride in that effort. *See* Ex. 5, Mayr 12/14/2005 deposition at 41 ("[W]e always have an interest in as many individuals as possible working with MVA"); *id.* at 42-43 ("[W]e sent samples to many institutes, because many of them had been interest[ed]"); *id.* at 59 ("[W]e were very proud that MVA was so widely used in many labs.  That is very satisfying for a lab person"); Ex. 2, Mayr 9/21/06 deposition at 52 ("[I]t was an honour for us whenever someone requested a strain that we were working with.  For that reason we did not execute anything in writing, and MVA – there were many requests for MVA samples").[4]

8.    For instance, in providing MVA 572 to the Chemical and Biological Defence Establishment in 1995, Prof. Mayr assured the recipient that:

> [T]his strain has a very good immunogenicity, a high safety and its genetical properties are well documented as you can see by the enclosed reprints.  For this reason *the strain is used by many institutes and research departments of vaccine producers in America, Japan, France etc.* for the development of vector vaccines.

Ex. 13, June 1995 Mayr letter to Bennett (Mayr 9/21/06 deposition exhibit 11) at BNITC00091849 (emphasis added).[5]

9.    Prof. Mayr also gave MVA 572 to Gerd Sutter while Dr. Sutter was a graduate student in Mayr's laboratory.  Ex. 14, Wulff 2/9/06 deposition at 68.  Dr. Sutter plaque purified and passaged MVA 572 until he got MVA 580, which he called MVA F6.[6]

---

[4]    At Prof. Mayr's deposition, he was instructed not to answer questions concerning his specific distributions of MVA viruses.  *See, e.g.*, Ex. 2, Mayr 9/21/06 deposition at 50-51.

[5]    During Prof. Mayr's deposition, he was instructed not to answer questions related to the transfer of MVA to the Chemical and Biological Defense Establishment despite his statement that he was "able to answer."  Ex. 2, Mayr 9/21/06 deposition at 41-42.

[6]    Plaque purification, also known as clone purification, is a process by which a specific viral particle is selected from a well of viral particles in order to assure a homogenous population of virus.  Dr. Sutter took MVA 572 through three rounds of plaque purification and passaging to arrive at F6.  NIH also took MVA 572 through three rounds

(Continued . . . )

Ex. 16, "History of vaccinia virus strain MVA" notes (BNITC00034113); Ex. 17, Notes of April 28, 2005 meeting with Mayr (BNITC00033626-28). According to BN, MVA F6 ███ ████████████████████████████████████████████████████████████████ ███████████████████████████████████ Ex. 18, Nov. 2004 Wulff email at BNITC00319145-46; *see also* Ex. 19, Correspondence between Wulff and Mayr at BNITC00089634 ████████████████████████████████ ████████████████████████████████████████████████ ███████████

   10.    In addition, Mayr provided MVA 572 to ███████████████ ██████████████████████████ without restriction despite knowing that ████ would use the strain for non-research purposes.  Ex. 20, Wulff 9/21/06 deposition at 185-87[7]; *see also* Ex. 21, Dec. 2003 letter to ████ (BNITC00069051-52); Ex. 22, Minutes from Feb. 3, 2004 meeting with ████ (BNITC00318674-75).  Neither Mayr nor BN has taken any formal action to prevent ████ commercial use of the strain, and ████ has used the strain in clinical trials.  *See* Ex. 20, Wulff 9/21/06 deposition at 182.

   11.    BN CEO Peter Wulff has catalogued Mayr's other distributions of MVA, including to ████████████████████████████████ ████████████████████████████████████████████

---

( . . . continued.)
   of plaque purification and passaging to arrive at the clone (MVA 577) the NIH gave to Acambis.  *See* Ex. 15, "History of MVA 1974 Stock" from NIH (AC0006786-95).

[7]


███████████████████████████████████████

█████████████████████████████████ Ex. 23, Sept. 8,

1999 Wulff email (BNITC00027436).

      12.    In a candid internal email, BN CEO Peter Wulff acknowledged that

██████████████████████████████████████

██████████████████████████ Ex. 18, Nov. 2004 Wulff email at

BNITC00319145-46.

<u>Transfer of MVA to the NIH by Mayr</u>

      13.    In addition to the transfers referenced above, on at least two occasions, Mayr transferred MVA to Dr. Bernard Moss at the NIH. The first transfer occurred in September 1995 and was comprised of two vials of MVA 575 and three vials of MVA vaccine II/85. Ex. 24, Sept. 1995 Letter Mayr to Moss (NIH00336). The second transfer – at issue in this case – was arranged in late July or early August 2001 with the material being received at the NIH in August. *See* D.I. 85, First Amended Compl. ¶ 28; Ex. 25, 8/3/01 Moss letter to Mayr (Mayr 9/21/2006 deposition exhibit 7) ("Gerd Sutter told me the good news that you have been able to locate an early sample of MVA in your freezer and have agreed to send it to me."); Ex. 26, NIH00117 (NIH lab notebook recording receipt of MVA 572 "from Gerd Sutter (from Anton Mayr) 8/?23/01 (was before 8/30/01)").

      14.    The actual shipment of MVA 572 in August 2001 was not accompanied by a written transmittal, but Mayr subsequently sent a September 12, 2001 letter providing the authentication of the MVA that Dr. Moss had previously requested "in order to satisfy the regulatory agencies here." *See* Exs. 25 and 27, 8/3/01 and 9/12/01 letters between Mayr and Moss (Mayr 9/21/2006 deposition exhibits 7 and 14). Once again, Mayr mentioned no restriction or limitation whatsoever on use of the MVA in the letter. *See* Ex. 27, 9/12/01 Mayr letter to Moss (Mayr 9/21/2006 deposition exhibit 14).

15.    In a subsequent letter to Mayr, Dr. Moss confirmed his understanding that the MVA had been provided without restriction: "In response to my request you generously provided MVA 572 in the summer of 2001, again with no restrictions." Ex. 28, 4/23/03 Letter from Moss to Mayr (Mayr 9/21/2006 deposition exhibit 13). When specifically asked whether Dr. Moss' recollection – that the transfers were "without any restrictions" – was correct, Mayr twice replied, "It is correct." Ex. 2, Mayr 9/21/2006 deposition at 55-56.

16.    Notes taken by Dr. Linda Gritz (a scientist with Therion Biologics Corp.) of a March 19, 2002 discussion with Mayr state that ███████████████ ████████████████████████████████████████████ See Ex. 29, TBC00844; Ex. 30, Gritz deposition at 236-37.

17.    NIH prepared clone copies of the MVA 572 sample by three successive steps of plaque purification and passaging resulting in five independent isolates. Ex. 15, "History of MVA 1974 Stock" from NIH (AC0006786-95). A small stock of virus was then generated from each of the five clones, and the growth characteristics of the five clones were compared to the MVA 572. Id. The results indicated that all of the clones were similar. Id. BN's expert, Drillien, admits that these clone copies made from MVA 572, one of which the NIH sent to Acambis, have the same properties as MVA 572. Ex. 31, Drillien 11/24/06 deposition at 9. Thereafter, the NIH prepared seed stock utilizing one of the clones, MVA 1974 clone #1. See Ex. 15, "History of MVA 1974 Stock" from NIH (AC0006786-95). That virus was then further concentrated by spinning down the cell debris. Id.

18.    Pursuant to U.S. Government RFPs for the development of a MVA-based smallpox vaccine (discussed below), the NIH offered to make a sample of the seed stock clone available to all "legitimate companies" interested in collaborative opportunities. See Ex. 32, RFP-1 at 3 (AC00008301); D.I. 85, First Amended Compl. ¶ 37. At no time did

- 10 -

the NIH send Acambis the actual MVA 572 it had received. Rather, it sent a copy of the virus that had been cloned and grown from the sample provided to NIH.

<u>Plaintiffs' Claims and NIH Investigation</u>

19.    In 2002, after learning of the possibility that NIH would make copies of the MVA 572 clone available to others, plaintiffs protested to NIH that the strain was provided to NIH for research purposes only. *See* D.I. 85, First Amended Compl. ¶ 38; Ex. 33, April/May 2002 email correspondence between Wulff and NIH (BNITC00064532-35); Ex. 34, November 2002 letters from Mayr to NIH (NIH00325-330).

20.    NIH investigated plaintiffs' claims and concluded that the claims were without merit. For instance, Dr. Michael Mowatt, Director of the NIH/NIAID's Office of Technology Development, stated that he was told by BN CEO Peter Wulff that "Dr. Mayr provided the material [MVA 572] to Dr. Moss under a 'stringent' material transfer agreement." *See* Ex. 33, April/May 2002 email correspondence between Wulff and NIH (BNITC00064532-35). This however, was false. As Mowatt learned, no such agreement existed. *Id.*; *see also* Ex. 35, 7/15/02 Letter Mowatt to Wulff (BNITC00091938-39) at 2 ("Your failure to supply such documentation despite my repeated numerous requests for copies of the documentation (see my 24 April 2002, 8 May 2002 and 28 May 2002 electronic mail messages, which are enclosed) leads me to conclude that the documentation does not exist."). BN now openly admits that no such MTA or other written restriction existed. *See, e.g.*, Ex. 36, BN's Response to Acambis' First Requests for Admissions, No. 132 at 36.

21.    Mowatt further noted that Mayr's September 12, 2001 letter to Dr. Moss "specifies no limitations on the NIAID's use and distribution of the material or of a progeny or derivatives of the material." Ex. 35, 7/15/02 Letter Mowatt to Wulff (BNITC00091938-39). As such, Mowatt advised that "the NIAID recognizes no limitations

- 11 -

on its ability to use and distribute the material, progeny or derivatives of the material." *Id.* at

2. He also advised that

> [T]he NIAID intends to use the material supplied by Dr. Mayr
> for research and development projects both internally and in
> collaborations with organizations in the public and private
> sectors.  In addition, the NIAID intends to distribute to
> qualified requestors progeny and derivatives of the material
> that have been and will be created by Dr. Moss and/or
> contractors of the NIAID.

*Id.* (with Mayr as a "cc" recipient) (emphasis added).

22.    After BN confirmed that Acambis had received MVA in September

2002 from the NIH, BN sent a letter to the NIH questioning "how [Acambis] would fulfill the

requirements in order to secure access to all necessary intellectual property and know-how

under the RFP."  Ex. 37, 3/27/03 Letter from Wulff to La Montagne, BNITC00068993.

Once again, the NIH evaluated BN's claims and determined that "the NIAID may use and

distribute the material, progeny or derivatives of the material without limitation, and does not

require the permission of Bavarian Nordic for use and distribution of the material, progeny or

derivatives of the material."    Ex. 38, 6/30/03 Letter from La Montagne to Wulff,

BNITC00091973-74.

<u>Transfer of MVA by the NIH to Acambis</u>

23.    In September 2002, NIAID/NIH and Acambis entered into a

Materials Transfer Agreement ("MTA") whereby a sample of the seed stock clone created by

NIH was provided to Acambis. Ex. 39, NIH-Acambis MTA at AC0006735-37.  NIH shipped

six vials prepared from MVA 1974 clone #1, each containing 0.5 ml of the virus, to

Acambis' laboratories in Cambridge, Massachusetts, which were, in turn, forwarded to

Acambis' sub-contract manufacturer, Baxter Vaccines AG, for the development of Acambis'

smallpox vaccine, MVA3000.  *See* Ex. 15, "History of MVA 1974 Stock" from NIH

(AC0006786-95); Ex. 40, 2/2/2006 Lee deposition at 53-54. Several other companies subsequently received this MVA strain from the NIH.[8]

24.    The MTA entered into between the NIH and Acambis granted Acambis "worldwide, non-exclusive rights to make, have made, and use the Materials ... in the field of use of Smallpox Vaccines." Ex. 39, NIH-Acambis MTA at AC0006735-37. The NIH did not charge for or receive any commercial benefit from the transfer; the use was for research and development and delivery to the U.S. Government of a vaccine to protect the public from a bioterrorism attack. *See id.*; *see also* Ex. 32, RFP-1 at AC0008301-05.

25.    After complaints from plaintiffs, Dr. Michael Mowatt of NIH confirmed to Acambis that "prior to distribution of the material NIAID determined that it is within its rights to transfer the material to other parties." *See* Ex. 42, 1/17/03 letter from Mowatt to Acambis (AC0012086-87).

Agreements Between Mayr and BN

26.    After being advised that the NIH intended to make MVA available to other parties (*see* Ex. 35, 7/15/02 Mowatt letter to Wulff, BNITC00091938-39 at 1), and after NIH provided the clone sample of MVA to Acambis, BN and Mayr entered into a November 2002 "Assignment Agreement" by which BN alleges it "acquired by assignment ownership" of MVA. D.I. 85, First Amended Compl. at ¶ 24. The agreement purported to grant the

████████████████████████████████████████████████████████████

██████████████████████████████████    Ex. 43, BNITC00068086-089 at

---

[8]    NIH has transferred MVA and derivatives to at least the following four additional companies: ███████████████████████ Merck (*see* Shiver et al., Replication-incompetent adenoviral vaccine vector elicits effective anti-immunodeficiency-virus immunity, *Nature,* 2002 Jan. 17, 415(6869):331-35), GeneMax (MTA with NIAID, *available at* http://sec.edgar-online.com/2005/04/15/0000950134-05-007541/Section37.asp (last accessed Nov. 6, 2006)); and ████████████ (Ex. 12, ITC Hearing Tr. at 1066-68).

¶¶ 1.1, 2.1 (emphasis added).  The agreement further states ███████████

██████████████████████████████████████████████████████████

██████████████████     *Id.*

███████Prior to the November 2002 agreement, BN and Mayr had entered

into a series of contracts providing BN with "access" to MVA strains in Prof. Mayr's

possession.  *See* D.I. 85, First Amended Complaint at ¶ 24. *See, e.g.,* Ex. 44, May 1996

Agreement between BN & Mayr (BNITC00091928-31).  Wulff acknowledged in an internal

email that "access" rights merely restricted Mayr's ability to give out MVA; it did not grant

*ownership* or *possessory* rights.  Ex. 18, Nov. 2004 Wulff email at BNITC00319145 ███

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████

  28. BN and Prof. Mayr also entered into "Supplemental Agreement" in

March 2004 ████████████████████████████████████████████████

████████████████.  Ex. 46, BNITC00017192.  The March 2004 agreement purported to

██████████████████████████████████████████████████████████

███████████████████████████████████████     *Id.* at BNITC00017191.

The 2004 agreement also purported to grant the ████████████████████████

████████████████  *Id.* at BNITC00017193, ¶ 2.1.

- 14 -

U.S. Government MVA RFPs

29.     After September 11, 2001, in response to concerns that the smallpox virus may be used as a weapon by terrorists, the U.S. Government initiated new programs and funding to stockpile smallpox vaccines, including one pursuant to the BioShield anti-terrorism program. D.I. 85, First Amended Compl. ¶ 35.   In connection with that effort, the U.S. Government issued a series of three Requests for Proposals for contracts relating to MVA-based smallpox vaccines. Both Acambis and BN bid on each of the three RFPs using their respective MVA-based smallpox vaccines, MVA3000 and IMVAMUNE®.

30.     The first contract proposal, RFP No. NIH-NIAID-DMID-03-44 ("RFP-1"), was directed to the research and development of a MVA-based smallpox vaccine. The contract award was divided between BN and Acambis. Ex. 4, JSUF ¶ 13.  As noted above, RFP-1 also offered NIH's MVA seed stock clone to any "legitimate" party willing to collaborate with and manufacture a minimum amount of doses for the NIH.  Ex. 32, RFP-1 at AC00008301.

31.     A second contract proposal, RFP No. NIH-NIAID-DMID-04-49 ("RFP-2"), issued for the continued research and development of a MVA smallpox vaccine. It included requirements for clinical testing and the manufacture of 500,000 doses of the MVA smallpox vaccine.  The contract award was again split between Bavarian Nordic and Acambis. Ex. 4, JSUF ¶ 14.

32.     The third contract proposal, RFP No. DHHS-ORDC-V&B-05-06 ("RFP-3"), which issued on August 15, 2005, is for continued clinical testing and manufacture and delivery of 10-20 million doses of the MVA smallpox vaccine.  It also includes the option for purchase of 60 million additional doses of the MVA smallpox vaccine and "warm-base" manufacturing over the longer term.  "Warm-base" refers to keeping a manufacturing facility "warm" by producing a minimum amount of vaccine each year for the

U.S. Government. Both BN and Acambis have submitted bids for RFP-3. RFP-3 has not yet been awarded (Ex. 4, JSUF ¶ 15), but Acambis was notified on November 13, 2006 that it was no longer eligible for an award of the contract.

33.    Acambis' smallpox vaccine, MVA3000, is being developed and imported solely for the U.S. Government in furtherance of RFP-1 and RFP-2. *See* D.I. 85, First Amended Compl. ¶ 20. To date, Acambis has provided MVA3000 only to the U.S. Government pursuant to those RFPs. Ex. 47, Lewin 9/29/06 deposition at 51 ("[T]here is no other customer for the vaccine beyond the U.S. Government").

34.    The MVA viral strain is the basic component for a vaccine, but it is merely the starting point and must go through considerable processing and is combined with a proprietary recipe of other additives and diluents to make a vaccine. *See* Ex. 48, Acambis' IND at AC0000441. The process of developing Acambis' MVA3000 vaccine occurs at its manufacturer Baxter Vaccines AG's facilities, where the MVA viral strain is processed and formulated into the final vaccine product. *Id.* at AC0000442, 465-466; *see also* Ex. 49, B001548-50 and B002854-59 (diagrams of Baxter's production process flow sheet). ■

## ARGUMENT

## STANDARD OF REVIEW

As set forth below, all of plaintiffs' claims must be rejected pursuant to Federal Rule of Civil Procedure 12(c) or Rule 56. The standard of review for these Rules is as follows:

### Rule 12(c)

When deciding a Rule 12(c) motion for judgment on the pleadings, a district court must view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. *Shamrock Holdings v. Arenson*, Civ. No. 04-1339-SLR, 2006 U.S. Dist. LEXIS 70999, at *10-11 (D. Del. Sept. 29, 2006) (Robinson, C.J.) citing *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 220 (3d Cir. 2001); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 406 (3d Cir. 1993). The motion can be granted only if no relief could be afforded under any set of facts that could be provided. *Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991); *see also Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 891 (D. Del. 1991). However, the court need not adopt conclusory allegations or statements of law. *In re Gen. Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1125 (D. Del. 1988). Judgment on the pleadings will only be granted if it is clearly established that no material issue of fact remains to be resolved and that the movant should be granted judgment as a matter of law. *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988).

### Rule 56

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *LP Matthews LLC v. Bath & Body Works, Inc.*, Civ. No. 04-1507-SLR,

2006 U.S. Dist. LEXIS 76116, at *8-10 (D. Del. Oct. 19, 2006) (Robinson, C.J.) (quoting Fed. R. Civ. P. 56(c)).

The moving party bears the burden of proving that no genuine issue of material fact exists. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10, (1986)). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Id.* at *9 (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted)).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita*, 475 U.S. at 587). "The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue." *Id.* at *10.

If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party should be granted judgment as a matter of law. *Id.*

I.    PLAINTIFFS' CONVERSION CLAIM MUST BE DISMISSED

A.    CHOICE OF LAW – MARYLAND/MASSACHUSETTS

Under Delaware choice of law rules, the law of the state with the "most significant relationship to the occurrence" applies to a conversion claim. *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 295 F. Supp. 2d 430, 434 (D. Del. 2003) (Sleet, J.) (noting that Delaware state courts follow the conflicts of laws provisions in the

Restatement (2d) of Conflicts); *see also Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991).

Factors considered in the most significant relationship test are: "(a) the place where the injury occurred, (b) the place where the conduct causing injury occurred, (c) the location of the parties, and (d) the place where the relationship between the parties is centered." *Callaway*, 295 F. Supp. 2d at 434. However, as this Court held in the recent *Callaway* decision, "*the principal location of the defendant's conduct [is] usually...given the greatest weight.*" *Id.* (emphasis added) ("[B]ecause all of the alleged acts by [the defendant] took place in California, the court will apply California law to [the plaintiff's] conversion claim.").

Here, as set forth below, Maryland or Massachusetts law applies to the conversion claim as all of the conduct allegedly constituting conversion – which is to be afforded the "greatest weight" under *Callaway* – took place in Maryland and Massachusetts, where NIH and Acambis are respectively based.

While plaintiffs' counsel suggest that the conversion "started" with the transfer to Dr. Moss at NIH – "the act of conversion started with a transaction that occurred between Professor Mayr and Dr. Maas [sic]" – they have not brought suit against either Dr. Moss or the NIH. D.I. 107, 10/5/06 Discovery Conference Tr. at 6. Rather, plaintiffs focus on the subsequent transfer by which they contend NIH breached an implied understanding by distributing copies of the strain to others, including Acambis, from NIH's Bethesda, Maryland laboratories for commercial vaccine development. In fact, it appears that all of NIH's activities relating to the strain – *e.g.*, preparation of seed stock clones, offering and sending the strain to others for collaboration, correspondence with plaintiffs regarding rights – took place at NIH's facilities in Bethesda, Maryland.

- 19 -

Acambis' conduct relating to the strain took place largely in Massachusetts. Acambis received the strain from NIH at its laboratories in Cambridge, Massachusetts; executed the MTA with NIH and prepared and filed its RFP responses from its offices in Cambridge; and is now storing the 505,000 doses of MVA3000 – the subject of BN's damages claim – for the U.S. Government at its facilities in Massachusetts.

Given those facts, Maryland (or Massachusetts) law should apply to the alleged conversion; no other state has a more significant relationship to the claim. On the points raised below, there do not appear to be any differences in Maryland and Massachusetts law.[9]

B.     INTANGIBLE RIGHTS, SUCH AS THE "RIGHT TO COMMERCIALIZE," ARE NOT ACTIONABLE IN CONVERSION

Neither Maryland nor Massachusetts recognizes a claim for conversion of an intangible property right, *except* where the right is "merged" into a transferable document

---

[9]   Maryland and/or Massachusetts may look elsewhere for the applicable law on certain issues not pertinent to this motion. Plaintiffs have offered Prof. Dr. Joseph Straus as a purported expert on German property law for purposes of establishing Prof. Mayr's ownership of the MVA 572 strain provided to NIH. However, Prof. Straus admitted in deposition that he only holds an honorary professorship at the University of Munich, is not qualified to teach on German civil or property law (see Ex. 7, Straus 11/30/06 deposition at 22), and has only co-authored one article that in any way touches upon property law (*id.* at 23-24). The totality of his formal training as to German civil law was limited to one two-semester course with non-German students as part of his post graduate work (*id.* at 12-13), and he has never been admitted to practice law in Germany or elsewhere (*id.* at 18-20). On the issue of ownership, Prof. Straus admits that he did not analyze choice of law principles to determine whether German law would apply to a transfer of material from the NIH in Maryland to Acambis in Massachusetts. *Id.* at 72-73. He also concedes that under German law, transfer of ownership requires only (1) change of possession and (2) an agreement that ownership of the property is being transferred. Any terms and conditions associated with the transfer of ownership are analyzed separately and do not affect the validity of the transfer. *Id.* at 104-108. Accordingly, even if there had been any agreement between Mayr and NIH that the transferred MVA was only to be used for research, any breach by NIH would not have affected the transfer of *ownership* to the NIH (or its subsequent transfer to Acambis).

- 20 -

representing title to the physical property. *Orteck Int'l Inc. v. Transpacific Tire & Wheel, Inc.*, No. DKC 2005-2882, 2006 U.S. Dist. LEXIS 67702, at *77 (D. Md. Sept. 5, 2006) ("[T]he Court of Appeals [of Maryland] has limited the expansion of the rule [that intangible property may be converted] to include only intangible property rights 'that are merged or incorporated into a transferable document,' e.g., a stock certificate, and has refused 'to cover completely intangible rights.'") citing *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 562, 731 A.2d 957 (1999) (conversion only extends to intangible property rights that are merged into a transferable document and refusing to extend the tort to cover "completely intangible rights"); *see also Jayson Assoc., Inc. v. United Parcel Serv.*, No. 04-10771-RWZ, 2004 U.S. Dist. LEXIS 13191, at *4 (D. Mass. July 15, 2004); *Discover Realty Corp. v. David*, 2003 Mass. App. Div. 172, 175 (Mass. App. Dec. 2003); *Exp. Lobster Co. v. Bay State Lobster Co.*, No. 92-6348-E, 1994 Mass. Super. LEXIS 90, at *21 (Mass. Super. Ct. Oct. 31, 1994).

An intangible right is only considered "merged" into a document when "the right of possession and dominion so inheres in the physical document that possession of that document governs exercise of the right itself. Conversion of a bankbook, for example, not only deprives the depositor of that document, but, more importantly, prevents exercise of the right that it embodies – the depositor cannot withdraw his balance." *Discover Realty Corp.*, 2003 Mass. App. Div. at 175; *see also Orteck*, 2006 U.S. Dist. LEXIS 67702, at *77-78 (dismissing conversion claim involving customer list and information pursuant to Rule 12(b)(6)) quoting RESTATEMENT (SECOND) OF TORTS § 242, cmt. a (1965) (defining intangible property as being "merged" where "the right to immediate possession of a chattel and the power to acquire such possession is represented by a document," the document is "regarded as equivalent to the obligation," and the document is viewed "as representing the title to the chattel or the obligation.").

- 21 -

In this case, plaintiffs' conversion claim must fail as a matter of law as it is based on the intangible "right to commercialize" the MVA 572 strain provided to NIH. *See* D.I. 85, First Amended Compl. ¶ 51; Ex. 50, Jarosz Report at 11 (██████████ ████████████████████████████████ (emphasis added); *see also id.* at 5; Ex. 51, Drillien Report at ¶ 9. The right to commercialize must be intangible – *i.e.*, separable from the physical strain – as Prof. Mayr routinely gave out the strain for at least research purposes.[10] In other words, this right is but one of a purported bundle of rights to the strain. Indeed, BN itself claims to have contracted for that right separate from receiving the physical virus. *See* Ex. 46, March 2004 Supplemental Agreement (BNITC00017193) at ¶ 2.1 ████████████████████████████

Further, the "right to commercialize" is not the type of intangible right that can be "merged" into a transferable document. Rather, it purportedly represents the right to use a physical strain in a certain way – *i.e.*, commercial purposes. Even if such a right had been documented in writing, it would not have represented "title" to the physical strain, but only to an intangible right to commercialize the strain. Such a right cannot be the subject of a conversion claim. *See Orteck*, 2006 U.S. Dist. LEXIS 67702, at *77-78 ("[A] customer list

---

[10] It is undisputed that Mayr willingly provided the MVA 572 to NIH and made no limitation on transfer, at least for research purposes. *See* Ex. 27, 9/12/01 Mayr letter to Moss (Mayr 9/21/2006 deposition exhibit 14); Ex. 2, Mayr 9/21/2006 deposition at 55-56. Mayr himself testified that he "always [had] an interest in as many individuals as possible working with MVA" and was "very proud that MVA was so widely used in many labs." Ex. 5, Mayr 12/14/2005 deposition at 41, 59. In fact, purported BN expert Straus testified that, in a recent conversation, Prof. Mayr stated that he regularly gave MVA to *companies* without any written restriction. Ex. 7, Straus 11/30/06 deposition at 53-56. Indeed, according to the complaint, Prof. Mayr made the strain available through the ECACC depository so that *anyone* seeking to use the strain could obtain a copy for research use. D.I. 85, First Amended Compl. ¶ 25-26; *see also* ECACC website Order Form, *available at* http://www.ecacc.org.uk/ (last visited Nov. 6, 2006); Ex. 52, Straus Supplemental Expert Report at ¶10. In other words, the physical strain was available to anyone, at least for research use.

and customer information is not the type of intangible information generally thought to 'merge' with or be 'incorporated' into a transferable document.").[11]

C.    EVEN IF INTANGIBLE RIGHTS WERE ACTIONABLE IN CONVERSION, THE "RIGHT TO COMMERCIALIZE" MAY ONLY BE PROTECTED BY CONTRACT OR INTELLECTUAL PROPERTY LAW

Further, even if Maryland or Massachusetts followed a more liberal approach to the conversion of intangible rights, plaintiffs' "right to commercialize" claim should still be rejected as a matter of law; such a right may only be protected by contract or intellectual property law, not conversion. In what appears to be the only reported decision involving a purported conversion of a "right to commercialize," the U.S. District Court for the Southern District of California dismissed the plaintiff's claim pursuant to Rule 12(b)(6) on the basis that the claim may sound in contract or patent law, but could not go forward as a tort for conversion. *See Miles,* 810 F. Supp. at 1094-99.

The *Miles* case involved the alleged "right to commercialize" a human cell line used to create a substance that permits a hemophiliac's blood to clot. *Id.* at 1093. Scripps-Miles prepared and sold immuno-chemical materials, such as the cell line at issue. Plaintiff Miles, a pharmaceutical company, and defendant Scripps, a non-profit research foundation, jointly owned Scripps-Miles. After Scripps-Miles dissolved, Scripps and others licensed the right to use the cell line, and transferred the cell line itself, to pharmaceutical companies. *Id.* Miles then brought suit against Scripps and the pharmaceutical companies

---

[11]    *See also United States v. Arora*, 860 F. Supp. 1091, 1099 n.13 (D. Md. 1994) (acknowledging "that Maryland law does not recognize a cause of action for conversion of intangible property rights," but finding conversion of a physical vial of cells destroyed by disgruntled former employee because "[a]lthough microscopic, a cell line is certainly *tangible* in nature") (emphasis added).

"based on the alleged conversion of the right to commercialization of the cell line." *Id.* at n.3.

On defendants' motion to dismiss, the court rejected the plaintiff's conversion claim, holding that the intangible property right to commercialize a cell line is "one not protected by a conversion cause of action." *Id.* at 1095; *see also id.* at 1096 ("[I]t is not uncommon for a person to have an intangible property right without a cause of action in conversion to protect that right."). The court explained that "[a] cause of action for conversion is unnecessary since contract or patent law would cover the alleged violation," and refused "to extend California's law of conversion" simply because the plaintiffs "did not protect themselves through other available processes." *Id.* at 1096. It further noted that "the parties developing the cell lines are sophisticated researchers capable of protecting themselves legally.... [A] regime exists under which readily available cell lines are protected by contract or patent law and parties are on notice of possible claims on ownership and control." *Id.* at 1097.[12]

---

[12] It further explained the ramifications of extending state conversion law to cover the claimed right to commercialize:

> If these [contract and patent] "protections" were expanded to include the strict-liability tort of conversion, then the threat of conversion actions would take away a measure of reliability of source materials and could create a chilling effect on research. The threat of a conversion action would thereby impose a duty of investigation on all subsequent users of cells and cell lines. Researchers would need to determine the "consensual pedigree" of cell lines before beneficial research could be conducted. "Title insurance companies" for cell lines could become the norm. This costly result would add an entirely new procedural dimension to important medical research; time and money would necessarily be diverted to fund the search efforts for ownership rights. This result is unwarranted. Furthermore, it is beyond the competence of this Court to extend California's conversion law, to create a new cell-registry regime. Such a result is better left to the California legislature.

*Id.* at 1097-98; *see also* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 15, at 92 (5th ed. 1984) ("[I]t would seem preferable to fashion other remedies ... to

(Continued . . . )

- 24 -

Per *Miles*, Maryland and Massachusetts conversion law should not be extended to cover plaintiffs' "right to commercialize" claim. Plaintiffs are perfectly capable of executing contracts and pursuing patents to protect any rights to commercialize inventions and products. The very purpose of patent law is to provide incentives for inventors by allowing them to reap commercial reward for their innovations. *See generally* 35 U.S.C. § 271 (2006). Indeed, BN has pursued patents on its MVA-BN virus (and sued Acambis thereon in the ITC), and Prof. Mayr is listed as the inventor on at least six U.S. patents. *See, e.g.*, D.I. 85, First Amended Compl. ¶ 15. However, Mayr did not seek patent rights on MVA 572, which the plaintiffs have always agreed is prior art and can no longer be the subject of a patent claim. *See generally* U.S. Patent No. 6,761,893; Ex. 9, Mayr et al, Infection 3:1(1975). Furthermore, BN's own expert, Drillien, admitted that anyone is free to use viruses in the public domain, like MVA 572, for commercial purposes as they cannot be the subject of a conversion action. *See* Ex. 31, Drillien 11/24/06 deposition at 57-64.

Because no patent rights were available, BN attempted to lock up rights to MVA 572 through contracts with Mayr. Indeed, plaintiffs' theory in this case is predicated on the breach of an implied agreement between Mayr and the NIH.[13] *See* Ex. 31, Drillien 11/24/06 deposition at 10-12, 82-85. But that cannot be the basis for a conversion claim against Acambis. *See Brand Iron, Inc. v. Koehring Co.*, 595 F. Supp. 1037, 1039-40 (D. Md. 1984) (granting summary judgment under Maryland law on conversion claim based on the

---

( . . . continued.)

protect people from having intangible values used and appropriated in unfair ways.").

[13]  BN decided as a matter of business strategy not to sue NIH, BN's largest customer, despite being on clear, actual notice as of July 2002 that NIH would distribute the strain to others. *See* Ex. 20, 9/21/06 Wulff deposition at 120 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

"[f]ailure by a contracting party to pay the contract price or debt [, which]... is not a conversion, but merely a breach of contract."); *Crown-Simplimatic Inc. v. Adcor Indus., Inc.*, 299 B.R. 319, 326 (Bankr. D. Del. 2003) (dismissing conversion claim based on allegation "that [defendant] did not receive the benefit of its bargain because Debtors did not provide [defendant] with exclusive rights to the purchased intellectual property."); *Innovative Network Solutions, Inc. v. Onestar Communications, LLC*, 283 F. Supp. 2d 295, 301 (D. Me. 2003) (conversion claim based on breach of contract must be dismissed); *see also* 18 AM. JUR. 2d Conversion § 67 ("[A] claim for conversion cannot be maintained if it is predicated on a mere breach of contract.").

In the end, state conversion law should not be extended to cover plaintiffs' claim where plaintiffs were perfectly capable of protecting themselves in contract or patent law, particularly given the potential ramifications for the biotech field. *See Miles*, 810 F. Supp. at 1097.

> D.    EVEN IF THE "RIGHT TO COMMERCIALIZE" WERE ACTIONABLE IN CONVERSION, PLAINTIFFS' CLAIM FAILS

Even if the right to commercialize were an intangible right that could be actionable in conversion, plaintiffs' claim must fail. First, the right was not actually merged into any document. There is no document embodying Mayr's purported rights to the MVA 572 strain, and BN admits that it did not have any contract representing "ownership" rights until November 2002, after the strain was provided to NIH in August 2001, and after a copy of that strain was provided to Acambis in September 2002.[14] *See* D.I. 85, First Amended

---

[14]    Prior to November 2002, at most BN had a right to "access" MVA in Prof. Mayr's possession, which is not actionable in conversion. *See* Exs. 44 & 45, May 1996 and June 2001 agreements between BN and Mayr. Rather, to state a claim for conversion, a plaintiff must have ownership (or at least possessory) rights in the subject property. *See Jayson Assocs.*, 2004 U.S. Dist. LEXIS 13191 at *5 ("Defendant cannot convert what
(Continued . . . )

Compl. ¶ 24.  Second, even if the right had been merged into a document, it is undisputed that Acambis never converted or even possessed any such document.  *See, e.g., Messing v. Bank of Am., N.A.*, 373 Md. 672, 695 (2003) (granting summary judgment on conversion claim where bank teller returned allegedly converted check to plaintiff for thumbprint signature within a few minutes after receipt).  To the contrary, plaintiffs allege only that Acambis received a copy of the physical viral strain provided to NIH.

> E.    PLAINTIFFS' CLAIM FAILS BECAUSE ACAMBIS DID NOT EXCLUDE PLAINTIFFS FROM THE STRAIN OR RIGHT TO COMMERCIALIZE

In addition, plaintiffs' conversion claim must fail on the separate and independent basis that Acambis did not exclude plaintiffs from any property.  To the contrary, Acambis merely received a clone copy of the strain from NIH and a "non-exclusive" right to use the strain.

In order to succeed on a claim for conversion, the defendant must possess the subject property "to the complete exclusion" of the plaintiff.  *See Orteck,* 2006 U.S. Dist. LEXIS 67702, at *78; *accord Duty Free Americas, Inc. v. Legg Mason Wood Walker, Inc.*, No. 24-C-04-005696, 2005 WL 914395, at *2 (Md. Cir. Ct. Jan. 13, 2005); *Home Paramount*

---

( . . . continued.)

> plaintiff does not own.").  Plaintiffs' purported property expert Straus clearly testified that "exclusive access is not ownership" and did not even evaluate the "access" agreements because he found them to be "irrelevant" to ownership.  *See* Ex.  7, Straus 11/30/06 deposition at 100-102 ("Q.  So we can agree that even if there was an agreement in place between Professor Mayr and Bavarian Nordic to give them access to stocks that Professor Mayr owned, that so long as Professor Mayr is assumed to be the owner of the MVA, he has it within his legal power to transfer ownership to someone else?  A.  First of all, exclusive access is not ownership and he would be in a position to transfer it.").  Indeed, it was for that reason that BN sought to amend to add Prof. Mayr as a plaintiff.  *See* D.I. 38, BN's Motion to Amend at 2 ("On information and belief, Defendants intend to argue that at the time of the alleged tortious conversion, Bavarian Nordic had not yet acquired ownership of MVA from Prof. Mayr.  Were Defendants' theory correct, Prof. Mayr – rather than or in addition to Bavarian Nordic – would be the aggrieved party entitled to relief.").

*Pest Control Cos., Inc. v. FMC Corp. Prods. Group.*, 107 F. Supp. 2d 684, 693 (D. Md. 2000) (summary judgment on conversion claim where plaintiff had "not produced any evidence to show that it was denied access to the [allegedly converted] data"); *see also Fainsbert v. Cuthbert*, No. 06-2017, 2006 WL 2096057, at *5-6 (D.N.J. July 27, 2006); *Pagliai v. Del Re*, No. 99-CIV-9030(DLC), 2001 WL 220013, at *5-7 (S.D.N.Y. Mar. 7, 2001).

For instance, receipt of a copy of property – even if wrongfully taken – cannot constitute conversion. *See, e.g., Furash & Co., Inc. v. McClave*, 130 F. Supp. 2d 48, 58 (D.D.C. 2001) ("[A]n owner [cannot] state a claim for conversion when it retains originals or other copies of documents another improperly uses because the owner is not deprived of the beneficial use of the information."); *Pearson v. Dodd*, 410 F.2d 701, 706 (D.C. Cir. 1969) (conduct of two employees of Senator (1) broke into plaintiff's office, (2) took documents from the plaintiff's files, (3) copied the documents overnight, (4) returned the originals, and (5) turned copies over to columnists, did not constitute conversion because "the intermeddling [fell] short of the complete or very substantial deprivation of possessory rights in the property."). As the Seventh Circuit explained, "where the alleged converter has only a copy of the owner's property and the owner still possesses the property itself, the owner is in no way being deprived of the use of [the] property. The only rub is that someone else is using it as well." *FMC Corp. v. Cap. Cities/ABC, Inc.*, 915 F.2d 300, 304 (7th Cir. 1990).

The September 2006 *Orteck* case from the U.S. District Court of Maryland is also illustrative. In *Orteck*, the plaintiff, a tire wholesaler, established an exclusive relationship to distribute tires for a Japanese tire manufacturer. According to the plaintiff, once the tire manufacturer "realized the substantial amount of business" created by plaintiff, the manufacturer and others "induced [the plaintiff] to give them [the plaintiff's] customer list and customer information 'under the false pretense that [defendants] sought the list to

improve customer quality and strengthen the relationships between the companies and that that they would not sell tires to [plaintiff's] customers.'" 2006 U.S. Dist. LEXIS 67702, at *3, *76. The Maryland District Court dismissed plaintiff's conversion claim pursuant to Rule 12(b)(6) on the basis that "Plaintiffs do not allege any facts showing that they were in any way excluded from using the customer list and customer information after [plaintiffs] provided it to Defendants. That is, Plaintiffs do not claim that the Defendants used the customer list and information 'to the complete exclusion' of [plaintiff], and in fact emphasize that [plaintiff] tried to continue selling to its customers but were rejected." *Id.* at *78.

In this case, as in *Orteck*, Acambis has not excluded plaintiffs from MVA 572 or any right thereto – Acambis merely received a clone copy of the strain and the "non-exclusive" rights to use it. *See* Ex. 31, Drillien 11/24/06 deposition at 8-9; Ex. 39, NIH-Acambis MTA at AC0006735-37. NIH remains in possession of the original sample, and has granted "non-exclusive" rights to others to use the strain. *See* Ex. 41, ██████████

████████████; Shiver et al., Replication-incompetent adenoviral vaccine vector elicits effective anti-immunodeficiency-virus immunity, *Nature*, 2002 Jan. 17, 415(6869):331-35) (Merck); GeneMax MTA with NIAID, *available at* http://sec.edgar-online.com/2005/04/15/0000950134-05-007541/Section37.asp (last accessed Nov. 6, 2006)(GeneMax); and Ex. 12, ITC Hearing Tr. at 1066-68 ████████.

Further, plaintiffs have continued to enjoy possession and use of Mayr's MVA 572 stocks. Indeed, BN paid for the ████████████████████ ███████████████ *after* he provided the strain to NIH. *See* Ex. 43, 11/02 Assignment Agreement at BNITC000068087-88 at ¶¶ 1.1, 2.1; *see also* D.I. 85, First Amended Compl. ¶ 24; Ex. 46, 3/24/04 Supplemental Agreement ¶ 2.1 (BNITC00017193). BN continues to utilize MVA-BN, its copy of MVA 572 in performing and delivering doses of MVA vaccine under RFPs 1 and 2. BN also acknowledges that Mayr gave MVA 572 to

- 29 -

others, including at least once for non-research purposes, *after* NIH received the strain. *See* Ex. 21, Dec. 2003 letter to ███ (BNITC00069051-52); Ex. 22, Minutes from Feb. 3, 2004 meeting with ███ (BNITC00318674-75); Ex. 23, Sept. 8, 1999 Wulff email (BNITC00027436); Ex. 18, Nov. 2004 Wulff email at BNITC00319145-46 ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████

Hence, because plaintiffs' have not been excluded from using MVA 572 in any way, their conversion claim must fail.

## II.    BN'S UNFAIR COMPETITION CLAIMS MUST BE DISMISSED[15]

Like conversion, BN's unfair competition claims must also be rejected pursuant to Rule 12(c) or Rule 56. The crux of BN's unfair trade claims is that Acambis "used [BN's] proprietary and patented technology to bid on RFP-1 and subsequent RFPs." Ex. 53, BN's Second Supplemental Response to Interrogatory No. 8 at 2 [hereinafter Interrogatory Responses]; *see also* D.I. 85, First Amended Compl. ¶ 70 ("[The alleged] conduct is likely to cause consumers to be confused, mistaken or deceived into believing that Acambis has a right to use Bavarian Nordic's proprietary MVA strains and know how...."). In particular, BN asserts that, by offering its MVA3000 vaccine in response to U.S. Government RFPs, Acambis wrongfully implied that it developed MVA3000 and "had a lawful right to possess and use MVA 572 plaque purified by Dr. Moss." Ex. 53, Interrogatory Response No. 8 at 3.[16]    Whether brought pursuant to the Lanham Act or Delaware law, BN's unfair competition claims must fail.

---

[15]    BN only sought to add Prof. Mayr to the allegations relating to Count I for "Tortious Conversion;" all other claims are brought in BN's name only.

[16]    BN also appears to assert some sort of improper influence allegation – that Acambis violated the Lanham Act and Delaware Deceptive Trade Practices Act ("DDTPA") by (Continued . . . )

A.    BN'S LANHAM ACT CLAIM MUST BE DISMISSED

1.    BN Cannot Prove a False Representation of Origin

BN's Lanham Act claim alleges that Acambis passed off its MVA3000 vaccine product as its own when, according to BN, the vaccine is built on BN's "proprietary MVA strains and know how" – in other words, a classic "reverse passing off" claim. *See, e.g., Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 1177, 1183-84 (C.D. Cal. 2003). The Supreme Court has limited the scope of reverse passing off claims to include only misrepresentations concerning the final product, and not the source of the components making up the product. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 26-27, 37 (2003) (holding that "origin of goods … refer[s] to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods").

Following *Dastar*, this Court and others have rejected reverse passing off claims where the defendant merely uses plaintiff's tangible item or intellectual property as an element of its own product rather than simply selling plaintiff's product as defendant's own. *See, e.g., Monsanto*, 2006 U.S. Dist. LEXIS 54515 (dismissing plaintiff's unfair trade claims under *Dastar* because the misappropriated technology, a seed trait, was not the tangible product sold in the marketplace); *Gen. Univ. Sys. Inc. v. Lee*, 379 F.3d 131, 149 (5th Cir. 2004) (affirming summary judgment because the plaintiff had not accused the defendant of "taking tangible copies of its software, removing its trademarks, and selling them as its

---

( . . . continued.)
    using "Bernard Moss of the NIH in order to gain anti-competitive benefits." *See* Ex. 53, Interrogatory Response No. 8. However, neither the Lanham Act nor DDTPA recognize such a claim. *See* 15 U.S.C. § 1125(a)(1) ("[A]ny false designation of origin, false or misleading description of fact, or false or misleading representation of fact."); Del. C. § 2532(a)(1).

- 31 -

own"); *Schiffer Publ'g, Ltd v. Chronicle Books, LLC*, 350 F. Supp. 2d 613, 618 (E.D. Pa. 2004) ("[B]ecause Defendants are the physical producers-the fabricators, so to speak-of 1000 Patterns, they cannot be held liable under § 43(a)(1)(A) even if they are not the creators of the pictures at issue."); *Bretford Mfg., Inc. v. Smith Sys. Mfg.*, 286 F. Supp. 2d 969, 970-72 (N.D. Ill. 2003), *aff'd* 419 F.3d 576 (7th Cir. 2005) (dismissing reverse passing off claim under *Dastar* where defendant incorporated the plaintiff's table leg into a finished product and marketed the table as its own).

In *Monsanto*, this Court considered whether *Dastar* precluded Monsanto's claim that Syngenta had marketed a seed admittedly containing Monsanto's GA21 event. 2006 U.S. Dist. LEXIS 54515, at *8-9. The Court dismissed the plaintiff's Lanham Act claim pursuant to Rule 12(b)(6), concluding that the seed was the tangible product under *Dastar* even though consumers buy Syngenta's corn for its GA21 event. *Id.* at *9 ("[T]he seed is the tangible product sold in the marketplace[;] the court understands that consumers buy the seed for its GA21 trait.").

In this case, BN's Lanham Act claim is barred by *Dastar* and its progeny because MVA3000 – a vaccine product – is undisputedly designed and produced by Acambis. *See, e.g., Williams*, 281 F. Supp. 2d at 1183-84 ("[A] claim that a defendant's failure to credit the plaintiff on the defendant's goods is actionable only where the defendant literally repackages the plaintiff's goods and sells them as the defendant's own – not where, as here, defendants are accused only of failing to identify someone who contributed..."). In other words, the tangible product at issue here is not MVA, but rather the MVA3000 vaccine, which is indisputably different from the underlying viral strain.

It is undisputed that MVA3000 is not simply a viral strain, but is a full-fledged, finished vaccine product. *See, e.g.*, D.I. 85, First Amended Compl. ¶ 20. MVA3000 is manufactured through a multi-step process that includes growing the virus in CEF cells,

purifying, formulating the vaccine with the addition of diluents, and filling the vaccine in correct concentrations. These manufacturing steps were all developed and tested by Acambis' subcontract manufacturer, Baxter, and are proprietary to Baxter. *See* Ex. 54, Acambis Response to RFP-3 §4.2.2, AC0076632-34. The MVA viral strain is but one component used in this process to manufacture the overall vaccine product, MVA3000. *Id.*

In fact, BN's Lanham Act claims are nothing more than repackaged patent infringement claims, which are explicitly precluded by *Dastar* because they "create[] a species of perpetual patent and copyright, which Congress may not do." *Dastar*, 539 U.S. at 37. For instance, during the ITC patent litigation, BN's infringement argument was based on the following allegations:

> MVA3000 virus is a man-made virus which is the progeny of
> MVA572 received from Dr. Anton Mayr. MVA3000 virus
> was created according to the method described in the patent,
> which includes plaque purification and growth in CEF cells,
> to achieve an improved safety profile over the prior art strains.
> … Acambis imports MVA3000 virus into the United States in
> the MVA3000 small pox vaccine product bearing the same
> name, including as described above. Acambis has imported
> and delivered/sold the 5,000 doses and 500,000 doses….

Ex. 55, BN's ITC Third Supplemental Response to Interrogatory Nos. 29 and 30 at 7. These allegations are the very same as those at the heart of BN's Lanham Act claims – *i.e.*, that Acambis received progeny of MVA 572 and commercialized it as a vaccine product. As such, pursuant to *Dastar*, BN's Lanham Act claim must be dismissed.

2.    BN Cannot Prove False Advertising

*Dastar* would also prohibit BN's claim to the extent that BN seeks to couch the claim in terms of false advertising (as opposed to unfair competition). *See, e.g., Radolf v. Univ. of Conn.*, 364 F. Supp. 2d 204, 222 (D. Conn. 2005) ("In short, Dr. Radolf asserts that Defendants passed off his research as their own. And that type of claim, however styled, is barred by the language and holding of Dastar.").

Here, the only alleged false representations involve Acambis' right to possess and use MVA. *See* Ex. 53, Interrogatory Response No. 8 at 4 ("Bavarian Nordic asserts that Acambis engaged in unfair trade practices by seeking to commercialize, and in fact commercializing, an MVA strain in which Bavarian Nordic had the sole commercial rights [and] by willfully and/or negligently failing to inform the NIH that Acambis did not have the right to commercialize the MVA strain it had received from Moss."). Such representations do not relate to the "nature, characteristics [or] qualities" of MVA3000 as required to state a false advertising claim. Rather, they boil down to Acambis' right to use MVA – the crux of BN's reverse passing off claim – and, therefore, are also be barred by *Dastar* and its progeny. *See Monsanto Co.,* 2006 U.S. Dist. LEXIS 54515, at *12 ("Under Dastar, a false advertising claim that merely rephrases a reverse passing off claim is barred."); *see also Bretford Mfg.,* 286 F. Supp. 2d at 972.

3.    <u>BN Cannot Prove Consumer Confusion</u>

In addition, BN's Lanham Act claim, whether pitched as a false representation of origin or false advertising, must be rejected on a separate and independent basis – failure to prove any possibility that any representation by Acambis confused the U.S. Government, the only customer at issue.

As a Lanham Act plaintiff, BN "bears the burden of proving actual deception by a preponderance of the evidence." *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.,* 902 F.2d 222, 228-29 (3d Cir. 1990). A plaintiff "cannot obtain relief by arguing how consumers *could* react; it must show how consumers *actually do* react." *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,* 19 F.3d 125, 130 (3d Cir. 1994) (emphasis in original); *see also Astrazeneca LP v. Tap Pharm. Prod. Inc.,* 444 F. Supp. 2d 278 (D. Del. 2006) (granting partial summary judgment because claimant did not have

- 34 -

evidence to support the contention that consumers were misled by certain Internet advertising).

In this case, BN has offered no evidence whatsoever that any statement by Acambis deceived (or had the potential to deceive) the U.S. Government.[17] Nor could it do so as the U.S. Government was fully aware of plaintiff's claims, investigated those claims, and rejected the claims long before Acambis ever submitted an RFP bid. *See, e.g.*, Ex. 35, 7/15/02 Letter Mowatt to Wulff, BNITC00091938-39 at 2 ("Your failure to supply such documentation despite my repeated numerous requests for copies of the documentation (see my 24 April 2002, 8 May 2002 and 28 May 2002 electronic mail messages, which are enclosed) leads me to conclude that the documentation does not exist."); Ex. 28, 4/23/03 Letter from Moss to Mayr, BNITC00091986-87; Ex. 38, 6/30/03 Letter from La Montagne to Wulff, BNITC00091973-74. In fact, the very strain at issue came from the U.S. Government, so it could not possibly have been confused as to the origin of the strain. *See* D.I. 85, First Amended Compl. ¶ 46.

Therefore, judgment in favor of Acambis must be granted.

**B.**     <u>BN Cannot Prove a Violation of Delaware law</u>

BN also alleges that Acambis violated the Delaware Deceptive Trade Practices Act ("DDTPA").[18] Factually, BN's state law claims are identical to its Lanham Act

---

[17]     When asked in discovery to "[i]dentify and describe in detail each and every instance of consumer confusion, mistake, or deception," BN merely referenced other interrogatory responses, none of which mention any instance of confusion. *See* Ex. 56, 2/24/06 BN Responses to Acambis' First Set of Interrogatories at No. 10.

[18]     In particular, BN asserts that Acambis committed the following violations under the DDTPA:

    (1)     Passes off goods or services as those of another;

    (2)     Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(Continued . . . )

claim – when asked in discovery to "describe in detail" its Delaware unfair competition claim, BN made no effort to distinguish the claim and merely incorporated by reference its interrogatory responses relating to the Lanham Act claim. *Compare* Ex. 53, BN Interrogatory Response No. 8 *with id.* at No. 9. Like its Lanham Act claims, BN's DDTPA claims are not legally cognizable.[19]

        1.      BN cannot prove a violation of subsections (1) or (2) of the DDTPA

        BN cannot prove any claims based upon ownership or origin. As this Court has previously held, *Dastar*'s analysis is equally applicable to state unfair competition claims. *See Monsanto*, 2006 U.S. Dist. LEXIS 54515, at *13-15 (state DDTPA claims "fail for the same reason as the Lanham Act claim fails") citing *Toro Co. v. Textron, Inc.*, 499 F.

---

    (3)    Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another; ...

    (5)    Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; ...

    (7)    Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; ...

    (8)    Disparages the goods, services, or business of another by false or misleading representation of fact; ...

    (12)    Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

6 Del. C. § 2532(a); *see also* Ex. 57, October 13, 2006 letter from counsel for BN to counsel for Acambis.

[19]  The Amended Complaint alleges Acambis violated the DDTPA "and the Delaware common law of unfair competition." *See* D.I. 85, First Amended Compl. ¶ 65. However, "[a]ccording to the Delaware Supreme Court, [the DDTPA] simply codifies the state common law of unfair competition." *ACCU Pers., Inc. v. Accustaff, Inc.*, 846 F. Supp. 1191, 1214 (D. Del. 1994) (citing *Young v. Joyce*, 351 A.2d 857, 859 (Del. 1975)); *see also Delaware Solid Waste Auth. v. E. Shore Env., Inc.*, C.A. No. 1472-K, 2002 WL 537691, at *4 (Del. Ch. March 28, 2002). Therefore, BN cannot maintain a state unfair competition claim independent of the DDTPA.

Supp. 241, 249 n.17 (D. Del. 1980) (concluding that DDTPA affords no greater protection than the Lanham Act); *see also Bob Creeden & Assoc. v. Infosoft*, 326 F. Supp. 2d 876, 880 (N.D. Ill. 2004). Hence, BN's claims of passing off or confusion as to the source of MVA3000 fail for the same reasons as its Lanham Act claim.

  2. BN cannot prove a violation of subsections (5) or (7) of the DDTPA

    BN cannot prove a violation under subsections (5) and (7) because, as explained previously, it has not identified any explicit false representation by Acambis. *See Delaware Solid Waste Auth. v. E. Shore Env., Inc.*, 2002 WL 537691, at *5 ("Although DSWA's claim of an 'implied misrepresentation' is novel, it unfortunately finds no legal justification in the Uniform Act or Delaware case law...."). Statements that merely *imply* that a defendant has the authority to do something do not violate the DDTPA. *See id.* ("It would be an odd result if this Court were to announce a rule that when a dispute arises over a company's permit to operate and while the dispute is pending the company is permitted to operate, the company has a duty to disclose the existence of the dispute in all its advertisements, or else be found to have committed a deceptive trade practice."). Here, BN's claim is that Acambis' RFP bid offering MVA3000 *implied* that Acambis had the rights to such product and, hence, is not actionable under subsections 5 or 7.

  3. BN cannot prove a violation of subsections (2), (3), or (12) of the DDTPA

    BN's claim under these subsections must fail as BN has not alleged that Acambis improperly used any trademark, service mark, certification mark, or collective mark in its RFP responses. *See Delaware Solid Waste Auth.*, 2002 WL 537691, at *5 ("[C]laims brought under those Sections -- which use a 'likelihood of confusion' standard -- are to be based on the 'approval, endorsement, or certification of goods or services caused by *trademark, service marks, certification marks, or collective marks* likely to be associated

with preexisting trade symbols.") (emphasis in original).    Further, any claim under these subsections must fail as BN has not (and cannot) offer any evidence that Acambis' RFP bids were likely to confuse or mislead the U.S. Government.    *See* 6 Del. C. § 2532(a) (2), (3), (12) (requiring "likelihood of confusion"); *id.* (8) (requiring "false or misleading representation of fact").    Rather, as explained above, the government was fully aware of BN's claims long before it distributed the strain to others, including Acambis.    After considering and investigating BN's claims, the NIH concluded that it had the authority to use MVA as it pleased, including distributing it to commercial collaborators, such as Acambis, for development.

## CONCLUSION

For the foregoing reasons, all of plaintiffs' claims should be rejected pursuant

to Fed. R. Civ. P. 12(c) and/or 56.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr.*

Mary B. Graham (#2256)
Rodger D. Smith II (#3778)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

*Attorneys for Defendants*
*Acambis Inc. and Acambis plc*

OF COUNSEL:

William D. Coston
Linsday B. Meyer
Martin L. Saad
Tamany J. Vinson Bentz
VENABLE, LLP
575 7th Street, NW
Washington, DC  20004-1601
202.344.4000

Dated:  December 7, 2006
549294

- 39 -

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> John W. Shaw, Esquire
> YOUNG CONAWAY STARGATT & TAYLOR LLP
> The Brandywine Building, 17th Floor
> 1000 West Street
> Wilmington, DE 19801

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on December 18, 2006 upon the following individuals in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

John W. Shaw, Esquire
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801

### BY E-MAIL AND FEDERAL EXPRESS

Edward A. Pennington
BINGHAM MCCUTCHEN LLP
3000 K Street, Suite 300
Washington, DC 20007

*/s/ James W. Parrett, Jr.*

James W. Parrett, Jr. (#4292)