IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BAVARIAN NORDIC A/S and ANTON MAYR, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-614 (SLR) |
| ACAMBIS INC. and ACAMBIS PLC, | ) ) ) | **REDACTED PUBLIC VERSION** |
| Defendants. | ) ) ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CONVERSION CLAIM

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Rodger D. Smith II (#3778)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

*Attorneys for Defendants
Acambis Inc. and Acambis plc*

OF COUNSEL:

William D. Coston
Linsday B. Meyer
Martin L. Saad
Tamany J. Vinson Bentz
VENABLE, LLP
575 7th Street, NW
Washington, DC  20004-1601
202.344.4000

Redacted Filing Date: January 10, 2007
Original Filing Date:  January 3, 2007

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................. 2

I.    PLAINTIFFS DO NOT OWN COMMERCIAL RIGHTS TO THE
      STRAIN AT ISSUE ............................................................ 3

      A.    Mayr Has No Ownership Under German Law ........................ 3

      B.    Mayr Transferred Any Ownership Rights to NIH .................. 9

      C.    MVA Clone Provided by NIH to Acambis Is Not Mayr's Property ... 12

      D.    Mayr's Unrestricted Transfers Exempted Any Commercial Rights ... 14

II.   MAYR TRANSFERRED THE MVA 572 SAMPLE TO NIH WITHOUT
      RESTRICTION ................................................................ 15

III.  NO IMPROPER USE BY ACAMBIS ................................................ 23

CONCLUSION ........................................................................... 26


DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
      JUDGMENT ON CONVERSION CLAIM ........................................ 1

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................. 2

I.    PLAINTIFFS DO NOT OWN COMMERCIAL RIGHTS TO THE
      STRAIN AT ISSUE ............................................................ 3

      A.    Mayr Has No Ownership Under German Law ........................ 3

      B.    Mayr Transferred Any Ownership Rights to NIH .................. 9

      C.    MVA Clone Provided by NIH to Acambis Is Not Mayr's Property ... 12

      D.    Mayr's Unrestricted Transfers Exempted Any Commercial Rights ... 14

II.   MAYR TRANSFERRED THE MVA 572 SAMPLE TO NIH WITHOUT
      RESTRICTION ................................................................ 15

III.     NO IMPROPER USE BY ACAMBIS                    23

CONCLUSION                                              26

TABLE OF AUTHORITIES

**Cases**

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
   489 U.S. 141 (1989) ........................................................................... 25

*Boston Educ. Research Co., v. Am. Mach. & Foundry Co.*,
   488 F.2d 344 (1st Cir. 1973) ............................................................. 14

*Brand Iron, Inc. v. Koehring Co.*,
   595 F. Supp. 1037 (D. Md. 1984) ....................................................... 12

*Coats v. Merrick Thread Co.*,
   149 U.S. 562 (1893) ........................................................................... 25

*Fainsbert v. Cuthbert*, No. 06-2017, 2006 WL 2096057, at *5-6 (D.N.J. July 27, 2006) 14

*FMC Corp. v. Cap. Cities/ABC, Inc.*,
   915 F.2d 300 (7th Cir. 1990) ............................................................. 13

*Furash & Co., Inc. v. McClave*,
   130 F. Supp. 2d 48 (D.D.C. 2001) ..................................................... 13

*Innovative Network Solutions, Inc. v. Onestar Communications, LLC*,
   283 F. Supp. 2d 295 (D. Me. 2003) .................................................... 12

*Jayson Assocs., Inc. v. United Parcel Serv. Co.*, No. 04-10771-RWZ, 2004 U.S. Dist.
   LEXIS 13191, at *5 (D. Mass. July 15, 2004) ..................................... 3

*Miles, Inc. v. Scripps Clinic & Research Found., et al.*,
   810 F. Supp. 1091 (S.D. Cal. 1993) ................................................... 12

*Orteck Int'l Inc. v. Transpacific Tire & Wheel, Inc.*, No. DKC 2005-2882, 2006 U.S.
   Dist. LEXIS 67702, at *78 (D. Md. Sept. 5, 2006) .......................... 13, 14

*Pagliai v. Del Re*, No. 99-CIV-9030 (DLC), 2001 WL 220013, at *5-7 (S.D.N.Y. Mar. 7,
   2001) ................................................................................................. 14

*Simplimatic Inc. v. Adcor Indus., Inc.*,
   299 B.R. 319 (Bankr. D. Del. 2003) ................................................... 12

**Statutes**

18 Am. Jur. 2d Conversion § 67 ....................................................................... 12

**Rules**

Fed. R. Civ. P. 56(c) ...................................................................................... 2

**INTRODUCTION**

Defendants Acambis Inc. and Acambis plc hereby respond to plaintiff Bavarian Nordic A/S ("BN") and Anton Mayr's motion for summary judgment on plaintiffs' claim for tortious conversion. Plaintiffs' motion must be denied.

Plaintiffs have the burden on every element of their conversion claim. In order to succeed on their motion, plaintiffs acknowledge that they must prove that: (1) they owned the strain at issue and commercial rights thereto; (2) use of the strain was legally restricted to research only; and (3) Acambis' use of a copy of the strain to fulfill U.S. Government contracts for a smallpox vaccine violated that restriction. *See* Pl. Opening Br. at 24-27. As set forth below, the great weight of the evidence on each of these elements favors defendants. Plaintiffs' brief, on the other hand, inexplicably ignores key facts and evidence on each element. If summary judgment is not entered in favor of defendants, at the very least, genuine issues of material fact adverse to the plaintiffs exist on each element, particularly when the facts are viewed in the light most favorable to the defendants.[1]

If anything, plaintiffs' motion confirms the fundamental flaws in the conversion claim described in defendants' motion to dismiss and/or for summary judgment, which seeks judgment on all claims. For instance:

- Plaintiffs acknowledge that the allegedly converted property is the "right to commercialize" a viral strain, which as a matter of law is not actionable in conversion. *See* Pl. Opening Br. at 21 ("To summarize, Acambis would be liable

---

[1]  Defendants invite the Court to review the statement of facts set forth in defendants' summary judgment motion, which includes some background facts on issues necessary to plaintiffs' motion. *See* Def. Opening Br. at 4-17.

- 1 -

for conversion if it exercised dominion and control over Bavarian Nordic's property by using it for a commercial purpose, thus exceeding the limits on permissible use (*i.e.*, research purposes only) . . . ."); Def. Opening Br. at 22.

- Plaintiffs acknowledge that the purported right to commercialize is an *intangible* right that may be licensed despite the fact that intangible rights are not actionable under applicable law, which plaintiffs suggest should apply. *See* Pl. Opening Br. at 25 ("Absent an explicit license to commercialize the strain – a license only Bavarian Nordic possesses – use of MVA 572 is authorized for research purposes only."); Def. Opening Br. at 20-22.

- Plaintiffs confirm that the conversion claim is predicated on an alleged breach of contract, which cannot serve as the basis for a conversion claim. *See* Pl. Opening Br. at 22 ("Because contractual relationships are implicated in this conversion claim, it is worthwhile to reiterate several settled principles of contract interpretation."); Def. Opening Br. at 23-26.

- And plaintiffs acknowledge that Acambis merely received a copy of a "sample" of a strain provided to NIH and not the actual strain plaintiffs provided the NIH, which cannot constitute conversion as a matter of law. *See* Pl. Opening Br. at 4, 5; Def. Opening Br. at 12-13, 27-30.

As a result, and wholly aside from the factual issues raised in plaintiffs' motion, judgment should be granted in favor of the defendants.

## ARGUMENT

As plaintiffs acknowledge, summary judgment may only be granted "when there are no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Pl. Opening Br. at 17 (citing Fed. R. Civ. P. 56(c)). A fact is material "if it bears on an essential element of the plaintiff's claim." *Id.* In reviewing the facts, "the court cannot weigh the evidence or make credibility determinations." *Id.* "[T]he court must look at the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences, and resolving all reasonable doubts in favor of that party." *Id.* at 18. As set forth below, on each of the elements necessary to plaintiffs'

motion – (1) ownership; (2) restriction on use; and (3) use by defendants – the facts favor judgment for the defendants.

## I.    Plaintiffs Do Not Own Commercial Rights to the Strain at Issue

The Court should deny plaintiffs' motion for summary judgment because there are serious doubts as to whether plaintiffs owned the MVA 572 virus sample provided to NIH or any rights thereto, which plaintiffs acknowledge is a necessary prerequisite to their conversion claim.  *See* Pl. Opening Br. at 24 ("The first element of proof is that Bavarian Nordic and/or Mayr own the strain."); *Jayson Assocs., Inc. v. United Parcel Serv. Co.*, No. 04-10771-RWZ, 2004 U.S. Dist. LEXIS 13191, at *5 (D. Mass. July 15, 2004) ("Defendant cannot convert what plaintiff does not own."). Plaintiffs cannot even state with certainty which plaintiff owns the purported right at issue.  *See* Pl. Opening Br. at 24 ("Bavarian Nordic and/or Mayr Own Commercial Rights to MVA 572").[2]  In either case, as set forth below, the facts demonstrate that, for *several* reasons, plaintiffs did *not* own the strain at issue or any commercial rights thereto.

### A.    Mayr Has No Ownership Under German Law

The sole basis of ownership claimed by plaintiffs is Prof. Mayr's development of MVA in Germany – "Mayr developed MVA 572 while a research scientist in Germany, and German law is unambiguous that in so doing, he obtained full rights in the virus he invented."  *See* Pl. Opening Br. at 24.  Plaintiffs argue that Mayr

---

[2]    The facts are clear that BN did not have any "ownership" rights in MVA until November 2002 at the earliest, after the strain was provided to NIH in August 2001, and after a copy of that strain was provided to Acambis in September 2002.  *See* D.I. 85, First Amended Compl. at ¶ 24.  Even then, the assignment of "ownership" was limited to MVA stocks in Mayr's "possession," which would not have included the MVA sample already provided to NIH.  *See* Ex. 1, BNITC00068086-089 at ¶¶ 1.1, 2.1.

owned MVA 572 based *solely* upon § 42 of the German Employee Invention Act, which applies to "inventions made by professors...in their capacity as such, at universities and higher schools of science . . . ." *See* Pl. Opening Br. at 22 and Ex. 2, Straus Expert Report at ¶ 16. However, the facts – including Mayr's own testimony – demonstrate that development of MVA 572 occurred at the Bavarian Vaccine Institute (not a university or higher school of science where Prof. Mayr was a professor) and is the property of that Institute. *See, e.g.,* Ex. 3, Mayr 9/21/2006 deposition at 8-10, 17, 20.

      According to Mayr himself, his work on MVA began ███████████████ ████████████████████████████████████ *Id.* at 8-10. Mayr further acknowledges that as to that work, he ████████████████████████████ ████████████████████████████ *Id.* at 17. While plaintiffs' brief credits Mayr with having "invented" MVA (Pl. Opening Br. at 24), in fact, Mayr ████████████████████████████████████████ ████. Ex. 4, Mayr 12/14/2005 deposition at 18 ████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████████ *Id.* at 12-14.

      While Mayr left full-time employment at the Bavarian Vaccine Institute in approximately 1959 for a position at the University of Munich, he continued to collaborate with colleagues from the Institute. ████████████████████ ██████████████████████████████████████████████ ████████████████. Ex. 3, Mayr 9/21/2006 deposition at 20. In Mayr's own words:

- 4 -



*Id.*

Scholarly articles written by Mayr himself confirm that MVA 572 was created at the Institute. *See, e.g.*, Ex. 5, "MVA Vaccination Against Smallpox," Stickl, Mayr et al. (1974) (MVA strain "was taken over in the 516th passage by the Bavarian State Vaccination Institute and was continued on cell cultures of embryonal chick fibroblasts."). According to BN's own patents, the MVA 572 developed at the Bavarian Vaccine Institute was used by the German government in the 1970s as a smallpox vaccine "in 120,000 individuals" without incident. *See* U.S. Patent No. 6,761,893; U.S. Patent No. 6,913,752 (same); *see also* Ex. 6, Section 7, MVA-BN IND at BNITC00011905.

European patents relating to MVA confirm that MVA 572 was developed at the Institute, and that the State of Bavaria (the owner of the Vaccine Institute) owned any rights to the strain, including for use in a smallpox vaccine. For instance, two patent publications identify the Free State of Bavaria as the initial owner of inventions relating to MVA in which Prof. Stickl (of the Bavarian State Vaccine Institute) was the named inventor. *See* Ex. 7, AC00559584-90 (German Publication 2145 477, filed September

- 5 -

11, 1971, issued March 15, 1973); Ex. 8, Swiss Patent 568 392 (filed September 8, 1972 and claiming priority to the German Publication 2145 477, issued September 15, 1975). The Swiss patent claims the process by which MVA was created, *i.e.*, culturing "the Ankara vaccinia virus . . . in more than 500 cell culture passages in chick fibroblast cells."[3] The German patent claims a vaccine comprised of "attenuated, modified vaccinia viruses," including a vaccine comprised of vaccinia virus Ankara that has been through "more than 500 passages in chicken-fibroblast cells." *Id.* at AC00559590. Further, as recently as 2005, the State of Bavaria is reported to have licensed the use of MVA to a German company, Vivacs.[4]

　　Plaintiffs completely ignore facts relating to the Bavarian Vaccine Institute in their summary judgment motion, instead relying *solely* on the so-called "professorial privilege."[5] *See* Pl. Opening Br. at 22. But as conceded by plaintiffs' own purported expert, Joseph Straus, the German "professorial privilege" is simply not

---

[3]　A Swiss patent registry shows that in 1982 (approximately the same time that the Vaccine Institute ceased operation), ownership of the Swiss patent may have been transferred to Stickl and Mayr. However, no deed or other written evidence of assignment has been produced and the original files are no longer available.

[4]　*See* 7/7/2005 news article at www.lifescience.de/portal/news_detail, 6647,755,66596,detail.html ("VIVACS signs agreement with Bavarian Ministry of Environment, Health and Consumer Protection (StMUGV) on formerly registered smallpox vaccine MVA"); *see also* Ex. 9, Heller 2/16/06 deposition at 166-171; Ex. 10, Gritz notes at TBC00835 ██████████████████.

[5]　Plaintiffs do not explain the underlying factual basis for the argument that the professorial privilege applies, but it is presumably based on Mayr's work as a professor at the University of Munich veterinary school. *See* Pl. Opening Br. at 6-8. While Mayr may have tested MVA on animals at the University (and even maintained stocks to do so), there is no evidence that MVA 572 was created there or that he owned any rights to commercially exploit MVA. To the contrary, as set forth above, all evidence, including Mayr's testimony, proves that MVA 572 was passaged at the Bavarian Vaccine Institute and owned by that Institute.

applicable to work done at the Bavarian Vaccine Institute where, as Mayr testified and

other evidence confirms, MVA 572 was created:

> Q.    Do you have an opinion as to whether or not work that would
> be done at the Vaccine Institute would have qualified for the
> professorial privilege?

MR. PENNINGTON:    Objection, vague and foundation.

> A.    THE WITNESS:  If it would be only at the state institutes, it
> wouldn't be under privilege.

> Q.    And that's because it wouldn't be an institution of higher
> learning or for another reason?

> A.    The privilege of Section 42 of the—the former Section 42 of
> the Employees Inventions Law was applicable only to the
> professors, assistants and so-called consultant at the
> universities.

> Q.    Okay.

> A.    And at a certain point in time for the so-called higher
> facchochschule, which is something in between university and
> normal higher education.   Not applicable to employees of state
> or not to Max Planck, for instance.

> Q.    And okay.   And would not have been applicable to the
> employees of the Vaccine Institute?

> A.    No.

Ex. 11, Straus 11/30/06 deposition at 86-87.[6]

---

[6]    Plaintiffs offer Joseph Straus, a purported "world renowned expert in international
*Intellectual Property* law," in support of this argument.  *See* Pl. Opening Br. at 16
(emphasis added).  Dr. Straus, however, is not expert in German property or civil law
– he only holds an *honorary* professorship at a German university (allowing him to
teach intellectual property law only), is not qualified to teach on German civil or
property law (*see* Ex. 11, Straus 11/30/06 deposition at 22), and has never been
admitted to practice law in Germany or elsewhere (*id.* at 18-20).   In contrast,
defendants offer Prof. Winfried Tilmann as a recognized expert on German law.  His
experience includes many years of service as a Judge in the German Ministry of
Justice, followed by more than 25 years of private practice and teaching in the area of
intellectual property law, including the relationship between IP law and general civil
(Continued . . . )

Further, Straus was not even provided with information regarding the Bavarian State Vaccine Institute; however, he conceded in deposition that the European patent applications were "prima facie" indicia that the State of Bavaria had some ownership interest. *See id.* at 88-91. Further, BN's own CEO, Peter Wulff, testified that ███████████████████████████████████████████████████ ██████████████████████████████████ Ex. 13, Wulff 9/21/06 deposition at 13-14, 24.

Finally, plaintiffs should be precluded from offering any additional evidence on ownership as they actively sought to prevent defendants from further discovery on issues relating to Bavarian State ownership rights. ███████████ ████████████████████████████████████████████████████ ██████████████████████ (*see* Ex. 3, Mayr 9/21/06 deposition at 15, 22, 56), and counsel for Acambis ███████████ ████████████████████████████████ *Id.* at 63. That refusal to allow testimony on key facts was discussed at length in a recent discovery conference. *See* D.I. 107, 10/5/06 Discovery Conference Tr. at 10-22; *id.* at 18 ("THE COURT: . . . [B]ecause [plaintiffs' counsel] insisted on limiting [Mayr's deposition], we've got an issue here."). The Court ultimately ruled that "the record is closed....and you are all stuck with the record you've made." *Id.* at 22. Plaintiffs should now be held to that record.[7]

_____

( . . . continued.)
　　law. He has published more than 100 books and articles. *See* Ex. 12, Tilmann Expert
　　Report ¶¶ 6-7.

[7]　*See, e.g., Ins. Corp. of Ireland, Ltd., v. Compagnie Des Bauxites De Guinee*, 102 S.
　　Ct. 2099, 2107-2109 (1982) (district court did not abuse discretion by deeming an
　　issue established after party's failure to comply with discovery order regarding issue
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(Continued . . . )

- 8 -

**B.**    <u>Mayr Transferred Any Ownership Rights to NIH</u>

Even if Mayr held any ownership rights to the MVA 572 sample provided to NIH, German law is clear that Mayr *transferred* ownership of the sample to NIH.[8]  As explained by defense expert Prof. Tilmann, German law would apply the "abstraction" principle to determine whether Mayr transferred ownership to NIH.  The transfer of ownership is viewed as an "abstract," or independent, question from whether there is also an additional separate "obligatory purpose-agreement," such as the use restriction that plaintiffs allege should be implied here:

Under German Law, due to its independent nature, a transfer of ownership remains valid independent of whether any obligations arising out of any valid obligatory purpose-agreement are fulfilled or not fulfilled by the obliged party (*paland/Helfrich, Bürgerliches Gesetzbuch, 65th edition 2006, EGBGB Art. 43 Nr. 3 with further references to German Court Decisions)*.  *See* Ex. 12, Tilmann Report at ¶¶ 15-17.

Although not an expert in German property or civil law, plaintiffs' purported expert, Straus, agrees with this explanation of the law:

> Q.    As I understand it, under German law there is what's known as an abstraction principle?
>
> A.    Yes.

---

( . . . continued.)

that the party itself put into question); *Wallace v. Graphic Mgmt. Assoc.,* No. 05-5216, 2006 U.S. App. LEXIS 18446 (3d Cir. July 21, 2006) (dismissal of plaintiff's case appropriate remedy for repeated failure to permit discovery); *see also St. Surin v. Virgin Islands Daily News, Inc.,* 21 F.3d 1309, 1315 (3d Cir. 1994) (finding summary judgment against non-movant inappropriate when failure of proof caused by movant's failure to provide discovery).

[8]    Again, plaintiffs cite to German law on this issue.  *See* Pl. Opening Br. at 22.

> Q.   In which you would separately analyze whether there has been a transfer of ownership from whether or not there is some other agreement that may specify terms and conditions, and that under the first analysis, you look at whether there is transfer of ownership that requires change of possession and an agreement to transfer ownership. And if that has occurred, then any other agreement is analyzed separately under this abstraction principle. Is that an accurate statement?
>
> A.   That's an accurate statement, yes.
>
> Q.   And so let's take that as a hypothetical that ownership has transferred, and let's assume that there is some other agreement between the transferor and transferee. Under that set of principles or that set of assumptions where ownership has transferred, but we have a separate agreement, am I correct that breach of that separate agreement by either party does not change the fact that ownership has transferred?
>
> A.   In principle, that's correct . . .

Ex. 11, Straus 11/30/06 deposition at 104-105.

For ownership to transfer, "there need only be two elements: (1) change of possession and (2) agreement as to the transfer of ownership of the specific personal property transferred." Ex. 12, Tilmann Report at ¶ 17. In this case, the first element is not disputed – NIH took possession of the MVA 572 sample.[9] As to the second element, Prof. Mayr intended to transfer ownership of the sample, at least for research purposes – for instance, NIH could use the sample for research, propagate it, or even destroy it without any understanding that the sample must be returned. *See, e.g.,* D.I. 85, Amended

---

[9]   The transfer of MVA 572 at issue was arranged in late July or early August 2001 with the material being received at the NIH in August. *See* Ex. 14, 8/3/01 Moss letter to Mayr (Mayr 9/21/2006 deposition exhibit 7) ("Gerd Sutter told me the good news that you have been able to locate an early sample of MVA in your freezer and have agreed to send it to me."); Ex. 15, NIH00117 (NIH lab notebook recording receipt of MVA 572 "from Gerd Sutter (from Anton Mayr) 8/?23/01 (was before 8/30/01)").

Complaint ¶ 29.   As such, as explained by Prof. Tilmann, ownership of the strain transferred from Mayr to NIH:

> Prof. Mayr sent the MVA strains to Dr. Moss/NIH at the end of August 2001 without any commentary, especially not suggesting that Dr. Moss should return them or otherwise refrain from exercising ownership over the strains.  He clearly did not want these MVA strains returned, because they were to be used by the recipient.  Nor did Prof. Mayr in his letter of September 12, 2001, sent to Dr. Moss after having sent the material to him, request any return of the changed or unchanged material.  He had sent these MVA-strains once and for all.  This and the acceptance of the material and the letter of September 12, 2001 by Prof. Mayr can only be understood as establishing an agreement regarding transfer of ownership.  Ex. 12, Tilmann Report at ¶¶ 19-20.

Plaintiffs argue that the sample was to be used for research only, but that argument (disputed below) is irrelevant to the transfer of ownership.  Under German law, any such restriction could arise only by separate "obligatory purpose-agreement" and be enforceable in contract law only against the transferee (here the NIH), not a conversion claim against a third-party recipient; it would not affect *ownership* rights.  As explained by Prof. Tilmann:

> The reason for the *Abstraktionsprinzip*, a specialty of German Law, is to provide legal security for third parties who want to acquire ownership from the transferee (Erman/Palm, BGB 11th ed. 2004 Einl. § 104 Nr. 21):  the real importance of the principle is in respect to third parties; the law wants to keep the abstract transfer-agreement free from deficiencies of the causal agreement [translation].

Ex. 12, Tilmann Report at ¶ 16; *see also id.* at ¶ 31.

Indeed, courts in the United States follow the same approach, refusing to extend conversion law to cover claims that are properly protected by contracts or

- 11 -

intellectual property.  *See, e.g., Miles, Inc. v. Scripps Clinic & Research Found., et al.*,
810 F. Supp. 1091, 1097-98 (S.D. Cal. 1993) (dismissing conversion claim involving
alleged "right to commercialize" cell line);[10] *Brand Iron, Inc. v. Koehring Co.*, 595 F.
Supp. 1037, 1039-40 (D. Md. 1984) (granting summary judgment on conversion claim
based on the "[f]ailure by a contracting party to pay the contract price or debt
[, which] . . . is not a conversion, but merely a breach of contract."); *Crown-Simplimatic
Inc. v. Adcor Indus., Inc.*, 299 B.R. 319, 326 (Bankr. D. Del. 2003) (dismissing
conversion claim based on allegation "that [defendant] did not receive the benefit of its
bargain because Debtors did not provide [defendant] with exclusive rights to the
purchased intellectual property."); *Innovative Network Solutions, Inc. v. Onestar
Communications, LLC*, 283 F. Supp. 2d 295, 301 (D. Me. 2003); *see also* 18 Am. Jur. 2d
Conversion § 67 ("[A] claim for conversion cannot be maintained if it is predicated on a
mere breach of contract.").

**C.    MVA Clone Provided by NIH to Acambis Is Not Mayr's Property**

Even if Mayr owned the MVA 572 sample provided to NIH, he does not
own the clone copy provided by NIH to Acambis.  First, possession of a copy is not

---

[10]  "[A] regime exists under which readily available cell lines are protected by contract
or patent law and parties are on notice of possible claims on ownership and control.
If these 'protections' were expanded to include the strict-liability tort of conversion,
then the threat of conversion actions would take away a measure of reliability of
source materials and could create a chilling effect on research.  The threat of a
conversion action would thereby impose a duty of investigation on all subsequent
users of cells and cell lines.  Researchers would need to determine the 'consensual
pedigree' of cell lines before beneficial research could be conducted. 'Title insurance
companies' for cell lines could become the norm.  This costly result would add an
entirely new procedural dimension to important medical research; time and money
would necessarily be diverted to fund the search efforts for ownership rights.  This
result is unwarranted."  810 F. Supp. at 1097-98.

actionable as a matter of law.  *See, e.g., Orteck Int'l Inc. v. Transpacific Tire & Wheel, Inc.*, No. DKC 2005-2882, 2006 U.S. Dist. LEXIS 67702, at *78 (D. Md. Sept. 5, 2006) (copy of customer list not actionable in conversion); *Furash & Co., Inc. v. McClave*, 130 F. Supp. 2d 48, 58 (D.D.C. 2001) ("[A]n owner [cannot] state a claim for conversion when it retains originals or other copies of documents...."); *accord FMC Corp. v. Cap. Cities/ABC, Inc.*, 915 F.2d 300, 304 (7th Cir. 1990).

Second, as a matter of fact, in the parallel ITC proceeding, plaintiff BN has argued that MVA F6 is free from any conversion claim, despite the fact that MVA F6 is derived from MVA 572 by the exact same process that NIH used to create the clone purified derivative of MVA 572 that it provided to Acambis.  *See* Ex. 16, 12/22/06 BN ITC Reply at 15 ("Acambis could have avoided the conversion ... claim[] levied against it by BN, as a result of their [sic] taking an MVA 572 derivative from Dr. Moss, if they had simply used F6.").[11]  Plaintiffs have not provided any explanation as to why Sutter's clone purified MVA F6 (derived from MVA 572), and NIH's clone purified MVA (the

---

[11] ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████ NIH followed the
same process as Dr. Sutter – it prepared clone copies of the MVA 572 sample by
three successive steps of plaque purification and passaging.  *See* Ex. 20, "History of
MVA 1974 Stock" from NIH (AC0006786-95); *see also* Ex. 21, Drillien 11/24/06
deposition at 9.  Just as Sutter had selected a particular isolate, F6, the NIH prepared
seed stock utilizing one of the clones, MVA 1974 clone #1.  *See* Ex. 20, "History of
MVA 1974 Stock" from NIH (AC0006786-95).  NIH then gave samples of the seed
stock grown from MVA 1974 clone #1 to Acambis and others.  *See id.*

"MVA 1974 clone #1" derived from MVA 572 that Acambis received) should be treated

any differently for purposes of a conversion analysis.

### D.     Mayr's Unrestricted Transfers Exempted Any Commercial Rights

In addition to lack of ownership of the strain itself, Prof. Mayr has given

up any exclusive rights to commercial use of MVA 572.  *See Orteck,* 2006 U.S. Dist.

LEXIS 67702, at *78 (conversion claim only lies where defendant's use is "to the

complete exclusion" of plaintiff); *Boston Educ. Research Co., v. Am. Mach. & Foundry*

*Co.,* 488 F.2d 344, 348 (1st Cir. 1973) (affirming Massachusetts District Court and

holding "conversion is . . . an unauthorized and assumption of the right of ownership over

goods belonging to another, to the *exclusion* of the owner's right . . . ") (emphasis added);

*see also Fainsbert v. Cuthbert*, No. 06-2017, 2006 WL 2096057, at *5-6 (D.N.J. July 27,

2006); *Pagliai v. Del Re*, No. 99-CIV-9030 (DLC), 2001 WL 220013, at *5-7 (S.D.N.Y.

Mar. 7, 2001).  BN's own CEO Peter Wulff admitted in a candid email that ████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████"[12]  *See* Ex. 22, BNITC00319145-46.

Perhaps the clearest example of Mayr giving away the strain for what he

knew would be non-research purposes involved ████████████████████████████

██████████  According to BN CEO Wulff, Mayr provided MVA 572 to ██████████

████  in August 2002 (before Acambis received the clone from NIH) without restriction

despite *knowing* that ██████ would use the strain for non-research purposes. Ex. 13, Wulff

---

[12] ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████ Ex. 22, Nov. 2004 Wulff email at BNITC00319145-46;

*see also* Ex. 23, Correspondence between Wulff and Mayr at BNITC00089634.

- 14 -

9/21/06 deposition at 185-87.  When asked whether Mayr's distribution violated his

agreement with BN, Wulff testified:



*Id*. at 186-87 (emphasis added).  Neither Mayr nor BN has taken any formal action to

prevent ████  commercial use of the strain, ████████████████

████  *See* Ex. 13, Wulff 9/21/06 deposition at 182; Ex. 24, Dec. 2003 letter to ████

(BNITC00069051-52); Ex. 25, Minutes from Feb. 3, 2004 meeting with ████

(BNITC00318674-75); *see also* Ex. 10, Gritz notes at TBC00833 ████████

████████████████

      Further, at Prof. Mayr's deposition, plaintiffs' counsel instructed Prof.

Mayr not to answer questions concerning his specific distributions of MVA viruses,

despite Prof. Mayr's statement that he was ████████  *See, e.g.*, Ex. 3, Mayr

9/21/06 deposition at 41-42, 50-51.  Again, that frustration of discovery should preclude

plaintiffs from offering evidence that the distributions were for non-commercial purposes

and from summary judgment.

## II.    Mayr Transferred the MVA 572 Sample to NIH Without Restriction

      Even if plaintiffs are found to have owned the clone provided to Acambis

and commercial rights thereto, plaintiffs' motion for summary judgment must be denied

because plaintiffs cannot prove that they restricted use of the strain to research purposes

only.  To the contrary, plaintiffs admit that Prof. Mayr did not explicitly – orally or in

- 15 -

writing – restrict NIH's use of the strain.  *See* Pl. Opening Br. at 9 (quoting Mayr

deposition at 19, 45); *see also* Ex. 3, Mayr 9/21/06 deposition at 52 ████████

█████████████████████[13]  Prof. Mayr and Dr. Moss merely exchanged two letters

relating to the transfer – an August 3, 2001 letter from Dr. Moss to Prof. Mayr requesting

the strain, and a September 12, 2001 letter from Prof. Mayr to Dr. Moss providing the

genealogy of the strain – neither of which contained any restriction on use of the strain.

Ex. 14, August 3, 2001 Moss letter to Mayr and Ex. 26, September 12, 2001 Mayr letter

to Moss.

      Nonetheless, plaintiffs argue that an implied "custom" legally restricted

NIH's use of the MVA 572 sample.  *See* Pl. Opening Br. at 25 ("[N]o evidence

whatsoever suggests that Mayr intended to derogate from the consistent custom among

scientists to share their research discoveries *for research purposes only*, in the absence of

an explicit agreement to the contrary.") (emphasis in original).  The great weight of the

evidence demonstrates that no such custom exists.

      Defendants offer two expert witnesses (who plaintiffs do not mention in

their summary judgment briefing) who have testified that no implied custom exists.  Dr.

Ashley J. Stevens opines that "[i]n the absence of [] restrictions, [scientists] understand

that they are free to use the materials for any purpose."[14]   Ex. 27, Stevens Report ¶ 45.

---

[13]  ████████████████████████████████████████████████████

[14]  Dr. Stevens is currently the Director of the Office of Technology Transfer at Boston
University, a position he has held since 1995.  Prior to that, he was the Director of the
Office of Technology Transfer at the Dana-Farber Cancer Institute from 1991 to
1995.  Before joining Dana-Farber, Dr. Stevens held various business development
positions in the biotechnology industry where he was responsible for negotiating
(Continued . . . )

- 16 -

Based on his experience as the head of technology transfer at Boston University, he testified that "[i]f there is no restriction placed on the use of the materials, then… we are free to use them without legal obligation to the other party…." Ex. 28, Stevens deposition at 107; *see also id.* at 105 ("If there are agreements, then we read them and if necessary, contact the other institution. If there are no such agreements, then we consider we are free to go ahead and use those materials.").

Dr. Stevens also specifically opined that there was no restriction on the NIH's use of the MVA 572 sample in this case:

> Q:    [O]ne of the positions you are taking in your expert report is that because there was no material transfer agreement between Professor Mayr and Dr. Moss, then Professor Mayr gave up his rights to the biological material? Isn't that your opinion?
>
> A:    In part, that is my opinion, and in part, because the correspondence between them clearly placed no restriction on Dr. Moss's use of the materials.
>
> Q:    Would it change your opinion if Professor Mayr did not intend to give away all rights?
>
> A:    No, it would not.

*See* Ex. 28, Stevens deposition at 42-43; *see also* Ex. 27, Stevens Report at ¶ 6.

Further, defense expert Louis Berneman, whose extensive experience in the technology transfer field includes service as the President of the Association of University Technology Managers, opines that there is no implied custom restricting use

---

( . . . continued.)
    licenses and strategic partnerships. Dr. Stevens has over twenty years of experience in structuring the transfer of technology and has negotiated approximately 100 licenses as well as numerous other Material Transfer Agreements, Confidentiality Agreements and Sponsored Research Agreements. Ex. 27, Stevens Report ¶¶ 2-3.

of materials in the absence of an *express* restriction.[15]  *See* Ex. 29, Berneman Report at ¶ 56 ("[S]hared biological materials that are not accompanied by formal written agreements are not restricted and may be used for any purpose."); *id.* at ¶ 58 ("As I have indicated throughout this Report, it is customary and standard practice that recipients of materials transferred without restriction or limitation permit the recipient unencumbered rights to use and distribute the material."); *see also id.* at ¶¶ 54-64.  Mr. Berneman confirmed that opinion in deposition testimony:  "material is exchanged or is transferred without limitation as to use or restriction as to distribution unless if there is an agreement to thereby limit or restrict."  Ex. 30, Berneman deposition at 42; *see also id.* at 43, 46-48.

     In addition, BN's own documents demonstrate that no implied "custom" exists and that, as a result, it demands that restrictions be placed in writing.  *See* Ex. 31, BNITC00092041 ████████████████████████████████

████████████████████████████████████████

████████████████████████████████  BN also initially told NIH's technology transfer investigators that the MVA 572 sample was provided to NIH under a "stringent material transfer agreement."  Ex. 32, April/May 2002 email correspondence between Wulff and NIH (BNITC00064532-35).   While admittedly false – there was no agreement of any sort – that claim further demonstrates BN's acknowledgement that restrictions on the use of biological materials are made by

---

[15]  In addition, Dr. Berneman served as the Managing Director of the Center for Technology Transfer at the University of Pennsylvania from 1995 to 2005 and as Director of Licensing and Business Development at the Virginia Center for Innovative Technology from 1989 to 1995.  Ex. 29, Berneman Report at ¶¶ 4-5.  In these capacities, Dr. Berneman has negotiated numerous patent option and license agreements as well as handled over 5000 Material Transfer Agreements.  *Id.*

- 18 -

express agreement, not implied custom. Further, during a lapse in the term of the "access" agreements between BN and Mayr, Wulff feared that Mayr would continue his practice of distributing MVA without restriction – ██████████████████

████████████████████████████████████████████████

██████████ Ex. 33, BNITC00319188.

Plaintiffs' support of their nebulous implied custom theory is flimsy and does not withstand scrutiny. Their two purported experts – David Einhorn and Robert Drillien – pale in comparison to defense experts Stevens and Berneman. Indeed, Mr. Einhorn's testimony supports defendants' case. Einhorn admitted that, notwithstanding this purported implied custom, it is his own practice to use a material transfer agreement to document the transfer of biological material with "commercial value" even if that material was being transferred to an academic. Ex. 34, Einhorn Dep. 68-71; *id.* 75-76. And Dr. Drillien, a virologist, admits that, unlike defense expert Stevens, he is not expert in the "legal aspect of transfer of materials." Ex. 21, Drillien 11/24/06 deposition at 89. Rather, his opinion is simply based on his personal "understanding" of what is "proper conduct" in the field. *See id.* at 81.

Plaintiffs also argue that Mayr subjectively "believed," "assumed," and "thought" that NIH's use of the strain was restricted to research purposes and that Dr. Moss "explicitly understood" that limitation "because he refused to release the strain to Therion for commercial use without written authorization from Mayr." Pl. Opening Br. at 25-26. But the underlying facts demonstrate that there was no such understanding.

In fact, Dr. Moss specifically recounted his understanding that there were "no restrictions" in a April 23, 2003 letter to Mayr, which Mayr confirmed was ██████████

- 19 -

> I contacted you in 1995 to request MVA from an original vial of either a vaccine lot or a master seed for the purpose of producing recombinant vaccines for clinical use. In response to my request you generously provided MVA 575 and MVA II/85 without any restrictions. Because the U.S. Food and Drug Administration had expressed concern about the theoretical possibility that the causative agent of bovine spongiform encephalopathy (BSE) was a contaminant in MVA preparations made in the 1980's, I subsequently requested a vial of an earlier lot. In response to my request you generously provided MVA 572 in the summer of 2001, again with no restrictions.

Ex. 35, 4/23/03 Moss letter to Mayr (Mayr 9/21/2006 deposition exhibit 13). When specifically asked whether Dr. Moss' recollection – that the transfers were "without any restrictions" – was correct, Mayr twice replied, ███████ Ex. 3, Mayr 9/21/2006 deposition at 55-56.

Further, according to Therion's Linda Gritz, Dr. Moss did not understand that he was under any legal restriction when he suggested that Therion contact Prof. Mayr – ████████████████████████████████ ████████ Ex. 36, Gritz deposition at 230. In fact, Dr. Gritz's testimony and contemporaneous notes demonstrate that Mayr himself did not believe there was any restriction on NIH. To the contrary, even after BN intervened and prohibited Mayr from granting permission, Mayr specifically told Gritz that ████████████████ ████████████████████████████████[16] Ex. 10, Gritz notes at TBC00844 (emphasis added); Ex. 36, Gritz deposition at 147; *see also*

---

[16] ████████████████████████████████████████████████████████████████████████████████

Gritz deposition at 244; TBC00848 (contemporaneous notes stating that Mayr ████████ ████████); Ex. 37, TBC00907 (email confirming that Mayr ████████ ████████); Ex. 38, BNITC00027436 (Sept. 8, 1999 Wulff email); Ex. 39, NIH00321. ████████████████████

████████████████████

        In fact, after investigating and rejecting plaintiffs' claims of a restriction on use, NIH provided the strain to Therion without any authorization from Mayr. Ex. 40, Therion-NIH MTA at TBC01016-18; *see also* Ex. 41, 7/15/02 Letter Mowatt to Wulff (BNITC00091938-39) at 2 ("the NIAID recognizes no limitations on its ability to use and distribute the material, progeny or derivatives of the material."). Dr. Michael Mowatt, Director of the NIH/NIAID's Office of Technology Development, specifically noted that Mayr's September 12, 2001 letter to Dr. Moss "specifies no limitations on the NIAID's use and distribution of the material or of a progeny or derivatives of the material," and that plaintiffs failed to provide any evidence of a restriction (despite BN CEO Peter Wulff's initial false claim that "Dr. Mayr provided the material [MVA 572] to Dr. Moss under a 'stringent' material transfer agreement"). *See* Ex. 41, 7/15/02 Letter Mowatt to Wulff (BNITC00091938-39) at 2 ("Your failure to supply such documentation despite my repeated numerous requests for copies of the documentation (see my 24 April 2002, 8 May 2002 and 28 May 2002 electronic mail messages, which are enclosed) leads me to conclude that the documentation does not exist."); *see also* Ex. 32, BNITC00064532-35. Plaintiffs do not mention NIH's investigation in their motion.[17]

_____

[17]  Plaintiffs' suggestion of favoritism to Acambis and conflict of interest by Dr. Moss are hollow and irrelevant. As is common in the industry, Dr. Moss provided limited
(Continued . . . )

- 21 -

Lastly, in support of their *implied* custom theory, plaintiffs argue "that there was a 'cloud' on Therion's ability to commercialize MVA." Pl. Opening Br. at 26. But the *facts* prove the opposite – that restrictions are made *expressly* and *in writing*. As a matter of fact, the virus at issue was MVA 575 (not MVA 572 as plaintiffs suggest, *see* Pl. Opening Br. at 27), which had been transferred to Therion in 1995. *See* Ex. 45, TBC00003-5. And in the cover letter to Mayr requesting that 575 virus, Therion *expressly* provided that the virus would be used "for research purposes only." *Id.*; *see also* Ex. 36, Gritz deposition 43:12-20. Because of that *express* restriction, Acambis concluded that Therion may not have the ability to commercialize that MVA strain.[18]

---

( . . . continued.)

consulting services for a number of companies, including Acambis' predecessor, OraVax. After being approached in the spring of 1998, Dr. Moss consulted for OraVax for approximately two-and-one-half years. *See* Ex. 42, Moss deposition at 41-48. Dr. Moss at all times adhered to NIH procedures, submitting a "Request For Approval of Outside Activities" and receiving the requested approval. *See id.* at 77-78, 87, and Exs. 43 and 44, Moss deposition exhibits 6 and 7. After OraVax later received a separate CDC contract for work on a non-MVA vaccine, further consulting was terminated in order to avoid even the appearance of impropriety. *See* Ex. 42, Moss deposition at 49-50, 68-69. The transfers of MVA at issue occurred after termination of the consulting agreement. Dr. Moss is a dedicated career public servant who has never been charged with any ethical violation. *See id.* at 16-17.

[18] Plaintiffs also erroneously argue that Therion "was offering MVA materials to Acambis for approximately 10.5 million dollars." Pl. Opening Br. at 14. In fact, Therion and Acambis were negotiating a partnership in which Therion was primarily offering technical expertise in the development of a MVA vaccine. Indeed, Therion provided an entire portfolio of test data and experience that went into Acambis' RFP-1 bid. Ex. 46, Therion email to Cynthia Lee with attached TBC-MVA Master File. Plaintiffs also falsely state that "Acambis was willing to pay to BN 17 million Euro for MVA . . ." Pl. Opening Br. at 14. Again, the arrangement under consideration was a collaboration in which Acambis would obtain know-how and also contemplated that Acambis would receive a ███████████ for the sale of vaccine (except for specified German speaking countries). *See* Ex. 47, BNITC00112910-11. On the other hand, the evidence is clear that BN paid ██████████ ███████ in the November 2002 Assignment Agreement. *See* Ex. 1, (Continued . . .)

- 22 -

### III.    No Improper Use by Acambis

          Finally, even if plaintiffs were able to prove ownership and an implied custom restricting use (which they cannot), plaintiffs' motion must be denied because Acambis' use of the clone from NIH did not violate any such custom. To the contrary, Acambis' use – providing a smallpox vaccine to fulfill U.S. Government contracts to create a stockpile to protect citizens in the event of a bioterror attack – is no different from the German government's use of MVA 572. Indeed, the Bavarian State patented that use, which is now dedicated to the public and may not be monopolized.

          As defense expert Berneman notes, "[c]ommercial use is by definition commerce – markets, products, customers and the like," and "Acambis' MVA3000/ACAM3000 is not a traditional, commercial product." Ex. 29, Berneman Expert Report ¶ 73. MVA3000 is not a product that is offered for sale to any interested public consumer. Rather, it is undisputed that Acambis has only supplied MVA3000 to the U.S. Government pursuant to two procurements. These procurements authorized the U.S. Government to procure vaccines for its stockpile. *See* Ex. 29, Berneman Expert Report, fn 59 at 25 *citing* Project Bioshield 2004.07.21b: HHS Fact Sheet July 21, 2004 Fact Sheet. The stockpiled vaccines were intended solely to inoculate the U.S. population in the event of the use of infectious agents as weapons of bioterrorism.[19] *See*

---

( . . . continued.)
    BNITC00068086-089 at ¶ 4.1.

[19]   To the extent that plaintiffs seek recovery of the 505,000 doses of MVA3000 that Acambis is holding in storage for the U.S. Government (and which are indisputably the property of the U.S. Government), their claim must be dismissed for failure to join an indispensable party. *See* Pl. Opening Br. at 3 ("These [500,000] doses...constitute converted property."); Fed. R. Civ. P. 19; *Acierno v. Preit-Rubin, Inc.*, 199 F.R.D. 157, 162-63 (D. Del. 2001) (granting summary judgment for failure
(Continued . . . )

Ex. 48, RFP NIH-NIAID-DMID-03-44 ("RFP-1") at 3 ("[T]he U.S. government is currently procuring enough smallpox vaccine for every U.S. citizen.").

As BN's own patents acknowledge, Acambis' use is precisely the same use of MVA 572 for purposes of a smallpox vaccine as that by the German Government inoculating its citizens in the 1970s. *See* U.S. Patent 6,761,893 at col. 19, l. 25 and col. 20, ll. 50-51 ("[M]VA 572 (used in 120,000 people)" that was "previously used in the smallpox eradication program in Germany."); U.S. Patent 6,913,752 (same). Further, in providing MVA 572 to the ███████████████████████████ in 1995, Prof. Mayr boasted that ██████████████████████████████ ████████████████████████████████████████████ ██████████ Ex. 49, June 1995 Mayr letter to Bennett (Mayr 9/21/06 deposition exhibit 11) at BNITC00091849.

Despite those prior uses, Mayr himself subsequently executed contracts with BN with the █████████████████████████████████ █████████████████ *See, e.g.,* Ex. 1, 11/2002 Assignment Agreement (BNITC00068086-89) at ¶ 3.1(b). If those prior uses were "strictly non-commercial," then Acambis' provision of smallpox vaccine to the U.S. Government must be too.

In fact, the Free State of Bavaria patented the use of MVA beyond 500 passages in a smallpox vaccine and vaccinated 120,000 of its citizens using MVA 572. *See* Ex. 7, AC00559584-90 (German Publication 2145 477, filed September 11, 1971, issued March 15, 1973) (naming Prof. Stickl of the Bavarian State Vaccine Institute as

---

( . . . continued.)
    to join necessary government entity).

inventor).   That patent claims a vaccine comprised of "attenuated, modified vaccinia viruses," including a vaccine comprised of vaccinia virus Ankara that has been through "more than 500 passages in chicken-fibroblast cells." *Id.* at AC00559590.  That patent has now expired, so the use of MVA 572 in a vaccine has, as a matter of law, been dedicated to the public.  *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989) ("We have long held that after the expiration of a federal patent, the subject matter of the patent passes to the free use of the public as a matter of federal law); *see also Coats v. Merrick Thread Co.*, 149 U.S. 562, 572 (1893) ("[P]laintiffs' right to the use of the embossed periphery expired with their patent, and the public had the same right to make use of it as if it had never been patented").

## CONCLUSION

Based on the foregoing and for the reasons set forth in Acambis' motion for summary judgment, plaintiffs' motion should be denied and judgment entered in favor of defendants on plaintiffs' tortious conversion claim.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr. (#4292)*

Mary B. Graham (#2256)
Rodger D. Smith II (#3778)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

OF COUNSEL:                                     *Attorneys for Defendants*
                                                 *Acambis Inc. and Acambis plc*
William D. Coston
Linsday B. Meyer
Martin L. Saad
Tamany J. Vinson Bentz
VENABLE, LLP
575 7th Street, NW
Washington, DC  20004-1601
202.344.4000

Dated:  January 3, 2007
665350.1

- 26 -

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2007, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> John W. Shaw, Esquire
> YOUNG CONAWAY STARGATT & TAYLOR LLP
> The Brandywine Building, 17th Floor
> 1000 West Street
> Wilmington, DE  19801

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on January 10, 2007 upon the following individuals in the manner indicated:

**BY E-MAIL AND HAND DELIVERY**

John W. Shaw, Esquire
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801

**BY E-MAIL
(AND FEDERAL EXPRESS on 01/11/07)**

Edward A. Pennington
BINGHAM MCCUTCHEN LLP
3000 K Street, Suite 300
Washington, DC  20007

*/s/ James W. Parrett, Jr.*
_____
James W. Parrett, Jr. (#4292)