# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

**ORIGINAL**

```
- - - - - - - - - - - - - - - x
BAVARIAN NORDIC A/S,            :
                               :    Case No. 06-2406
            Plaintiff,         :
                               :
    v.                         :
                               :
ACAMBIS, INC., et al.,         :    Greenbelt, Maryland
                               :
            Defendants.        :    December 13, 2006
- - - - - - - - - - - - - - - x
```

**TELEPHONE CONFERENCE**

BEFORE:        THE HONORABLE CHARLES B. DAY, Judge

APPEARANCES:

For the Plaintiff:        DAVID MICHAEL LUBITZ, Esq.
                          Bingham, McCutchen, LLP
                          2020 K Street, N.W.
                          Washington, D.C.  20006

For the Defendant         JEFF DUNN, Esquire
Acambis, Inc.:

For the Defendant NIH:    James A. Frederick, Esq.
                          Office of the United States Attorney
                          36 S Charles Street, 4th Fl.
                          Baltimore, MD  21201

Also Present:             Gary Hoskin, Esq.
                          Erica Frederick, Esq.
                          Department of Justice, Intellectual
                          Property Section
Audio Reporter:           None

Transcription Company:    CompuScribe
                          5100 Forbes Boulevard, Suite 102
                          Lanham, Maryland  20706
                          (301) 577-5882

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>I N D E X</u>

                                                                    <u>Page</u>

Comments by David Michael Lubitz, Esq.
        On Behalf of the Plaintiff                                     4


Comments by Gary Hoskin, Esq.
        On Behalf of the Defendant NIH                                 8


Rebuttal by - David Michael Lubitz, Esq.                              18


Ruling - Magistrate Judge Charles B. Day                              43

KEYNOTE:  "---" Indicates inaudible in transcript.

feb                                                                              3

1                          P R O C E E D I N G S

2              THE COURT:  Okay.  This is the case of Bavarian

3    Nordic versus Acambis, Case No. DKC-06-2406.  And if I could

4    have counsel identify themselves for the record.

5              MR. LUBITZ:  David Lubitz, L-u-b-i-t-z, on behalf

6    of Bavarian Nordic.  Good morning, Your Honor.

7              MR. DUNN:  And Jeff Dunn, D-u-n-n, of the Venable

8    firm, on behalf of Acambis, Your Honor.  Good morning.

9              THE COURT:  Good morning.

10             MR. FREDERICK:  Good morning, Your Honor.  Jim

11   Frederick, from the United States Attorney's Office, on

12   behalf of the National Institutes of Health.

13             MR. HOSKIN:  Good morning, Your Honor.  This is

14   Gary Hoskin, from the Department of Justice, Intellectual

15   Property Section.  With me also is Erica Franklin of our

16   section.  Also on behalf of NIH.

17             THE COURT:  Okay.  Thank you all.

18             MR. FREDERICK:  Your Honor, this is Jim Frederick.

19   Just real briefly, Mr. Hoskin and his assistant there will be

20   handling the substance of this matter on behalf of the

21   Government.

22             THE COURT:  Okay.  Thank you.  And if I am correct,

23   this is really a matter between Bavarian Nordic and the

24   Government, and I assume counsel for Acambis is really just

25   here for the ride?

1    MR. DUNN:  That is pretty much accurate, Your

2  Honor.  We have an interest in it, but it is their motion.

3    THE COURT:  Got you.  Okay.  Well, since it is the

4  motion of Bavarian Nordic, I will give you first and last

5  opportunity.  I have -- in the interest of full disclosure, I

6  have reviewed all of the materials that the parties have

7  provided.  I have looked at virtually all of the cases.

8    I certainly have my leanings going in, but I'm

9  having a hearing because, in fact, I want to make sure that

10  I'm right and I want to see if there is anything that I have

11  missed.  And, this is your opportunity to move me off of

12  whatever dime I'm sitting.

13    So, Plaintiff, you get to go first.

14    MR. LUBITZ:  Thank you, Your Honor.  As the Court

15  is aware, Bavarian Nordic issued a subpoena in this matter,

16  dated July 24th.  The subpoena asked for documents, as well

17  as testimony.

18    If the Court is amenable, I will discuss the

19  subpoena for documents first.

20    THE COURT:  Okay.

21    MR. LUBITZ:  The NIH has responded in this matter

22  by letter dated August 1st objecting to the production of

23  documents, as well as the production of individuals for

24  testimony.  Bavarian Nordic then endeavored to have oral

25  discussions with the Government in an effort to try to come

feb                                                                    5

1    to some resolution of this matter.

2             And then, on September 1st, 2006, Bavarian Nordic

3    sent a letter to NIH narrowing the topics for the requested

4    documents, as well as for testimony.  And NIH never replied

5    thereafter.

6             With respect to the subpoena for documents, NIH is

7    in violation of its own regulation, 45 CFR, Section 2.5

8    therein.  The regulation requires NIH to treat the subpoenas

9    as subpoenas.  So long as the subpoenas are legally

10   positioned, the Court has jurisdiction over them and --

11   and --

12            THE COURT:  Properly served.

13            MR. LUBITZ:  Properly served.  That is right.

14   Thank you.

15            THE COURT:  Okay.

16            MR. LUBITZ:  Your Honor, can I just interject and

17   say that two of my colleagues, Robert Burdon and Crystal

18   Lynch, have joined me.  But I will continue.

19            THE COURT:  Okay.

20            MR. LUBITZ:  So, in that regard, Your Honor, NIH

21   was required to respond with documents responsive to our

22   request, and they did not do so.  They objected, citing

23   various grounds, but none of the grounds really go to the

24   sufficiency of the -- the legal sufficiency of the subpoena,

25   the proper service or this Court's jurisdiction.  So, for

1  that reason, we think there is a violation of the APA.

2         THE COURT:  Let me ask a question.  How is this

3  really different from say the classic civil dispute to when a

4  party files a request for discovery and they don't get proper

5  responses?  One side decides to file a motion for a

6  protective order, and the other one decides a motion to

7  compel.  Aren't they really just flip sides of the same

8  issue.

9         MR. LUBITZ:  Well, there has been no motion for a

10 protective order filed by NIH in this case, and I would agree

11 with you that essentially, under the facts of this matter,

12 NIH is no different than a private party with respect to the

13 substance of the subpoena and the motion to compel.

14        THE COURT:  Okay.

15        MR. LUBITZ:  With respect to the subpoena for

16 testimony, it is true that NIH has objected saying that it is

17 not in its interest to comply with the subpoena for

18 testimony.  But under the circumstances of this case, Your

19 Honor, we think it pretty clear that their decision also

20 violates the APA.

21        There is a material transfer agreement that NIH

22 entered into with Acambis holding NIH harmless and

23 indemnifying NIH.  So, the idea that they are somehow liable

24 in this case is incorrect.

25        THE COURT:  Let me ask a question.  Does NIH face

1   any exposure from any other litigant that may want to sue

2   them over this issue?

3        MR. LUBITZ:  Well, I think not because of the

4   material transfer agreement.  The provision of the material

5   transfer agreement is extremely broad, and I'm not aware of

6   any other parties who claim an intellectual property interest

7   in the MVA that is at issue in the underlying matter.

8        THE COURT:  Well, let me be more direct.  Is there

9   anything that would prevent Bavarian Nordic from bringing

10  direct suit against NIH?

11       MR. LUBITZ:  Well, no.  Not to my knowledge.  I

12  mean, you -- you mean anything legally?  Any legal --

13       THE COURT:  Yes.  Sovereign immunity would not

14  prevent that.  Is that right?

15       MR. LUBITZ:  Well, I think that -- well, sovereign

16  immunity, as this Court is aware, certainly applies in suits

17  against the government.  I mean, it could affect perhaps the

18  forum.  So, I mean, I don't know the degree to which

19  sovereign immunity would prevent Bavarian Nordic from suing

20  the government.

21       THE COURT:  Okay.

22       MR. LUBITZ:  But, in any event, with respect to the

23  subpoena for testimony, we also are confident that NIH has

24  violated 45 CFR, Section 2.1(b), which requires a policy of

25  strict impartiality on the part of NIH in suits between

1    private parties.

2              Here in its letter objection to Bavarian Nordic NIH

3    has, on at least a couple of occasions, directly refuted some

4    of Bavarian Nordic's central allegations that are made in the

5    complaint here.  And given the centrality of NIH's

6    participation in the receipt and transfer of the MVA virus to

7    Acambis, we think that the facts really are such here that it

8    requires testimony on the part of NIH officials.

9              THE COURT:  Okay.  Thank you.  Let me swing around

10   to the Government.

11             MR. HOSKIN:  Thank you, Your Honor.  This is Gary

12   Hoskin.  I guess -- well, first, as I understand it, Bavarian

13   Nordic is not addressing the testimonial aspect of it at all.

14   So, we are just dealing with the documents at this point.

15             THE COURT:  I think that was his last argument.

16             MR. LUBITZ:  That is correct, Your Honor.  I am

17   addressing the testimonial portion.

18             MR. HOSKIN:  Okay.  As to the -- let me start

19   though with the testimonial portion because I think that is,

20   by far, the clearest.  I think the Tuhey case directly

21   addresses that.

22             As to the ability of the Court to determine whether

23   it is really in the best interest of NIH to provide

24   testimony, we don't think that the Court is really in the

25   best position to do that.  This is a type of decision that is

1    really best left to NIH to determine what is in its best

2    interest and what is not.

3            THE COURT:  Don't you really have to take, head on,

4    this question about the Vioxx decision?

5            MR. HOSKIN:  Well, I don't think we do, Your Honor.

6    I think in this circuit the law is clear as to sovereign

7    immunity.  Now, the Vioxx decision dealt with a totally

8    different question, and that is whether or not the Government

9    is a person, not whether the Government, even if a person,

10   has sovereign immunity.

11           We are not addressing the person part of it.  Vioxx

12   may have viability certainly in the Fifth Circuit.

13           THE COURT:  At least the Eastern District of

14   Louisiana.

15           MR. HOSKIN:  Correct.  But in this circuit

16   certainly Comsat is the controlling law.  It says that the

17   Government does have sovereign immunity and that, therefore,

18   this is to be treated as an APA action and not under Rule 45.

19           THE COURT:  I don't think anybody is disputing that

20   this is an APA issue.  I think you are all on the same page

21   with that, and I agree.

22           MR. HOSKIN:  And therefore, as a result of that,

23   the Vioxx issue of whether or not the government is a person

24   really falls away, since we are not dealing with Rule 45 and

25   whether or not it is -- the government can be a person under

1    Rule 45.

2              THE COURT:  Didn't the Vioxx decision go on to say

3    that the Court found that the refusal under the APA arbitrary

4    capricious standard was one which the FDA failed to get over,

5    and therefore, it was going to allow the depositions?

6              MR. HOSKIN:  And we don't dispute that even under

7    Comsat that the government -- or that the Court rather has

8    the ability to reach the arbitrary/capricious standard.  But

9    as we point out in our brief, there are some decisions and we

10   think this is one, that are really best left to the agency.

11   And it is really very difficult for a Court to come in and

12   say, well, this Court believes that the -- that the

13   Government's best interests are not in withholding testimony.

14             And I think that in real as -- that is exactly what

15   the Tuhey case stands for, the proposition that once a

16   government executive, a secretary of a department, has issued

17   orders, that those orders are to generally to be obeyed,

18   unless there can be a showing that they have violated their

19   own regulations, and we don't have that here.  Certainly not

20   as to the testimony.

21             The question on the document side may be a little

22   bit different, but I will address that in a moment.

23             THE COURT:  But in the Court's review of the

24   arbitrary/capricious question, isn't there a need for the

25   Court to look at the explanation offered by the Government

1    and to see if, in fact, it fits with the context of the case?

2          MR. HOSKIN:  Well, that is true, Your Honor.  Well,

3    I don't think with the context of the case.  I think the

4    question is whether the agency has determination -- is

5    arbitrary and capricious looking at the reasons that the

6    agency gave.  You don't look at the case at all.

7          THE COURT:  Well, I think we are saying the same

8    thing.  It is one thing to say that we are not going to

9    release these materials because we don't like the way you

10   look.  That would be arbitrary and capricious.

11         It is another thing to say we are not going to

12   release or allow someone to testify because we don't think it

13   is in our best interest.

14         MR. HOSKIN:  That is correct, Your Honor.

15         THE COURT:  So, if there is, I guess, a place for

16   the Court to at least look behind the label of saying we are

17   not going to allow this testimony under the Tuhey decision or

18   the Tuhey rationale, but then to say why is it that you are

19   not going to do so and does it at least pass, you know, the

20   laugh test?

21         MR. HOSKIN:  Well, that is correct, Your Honor, and

22   I think you have to look at all of the reasons the agency

23   gave.  I think in this case that goes a little beyond just we

24   don't want to do it because it is not in our best interest,

25   but I think that is certainly a central issue.

1      Unless the Court has some other questions, I would

2  like to maybe move on to the documents.

3      THE COURT:  Okay.

4      MR. HOSKIN:  The first thing that I would like to

5  point out is if we go to Exhibit 9, which is this follow on

6  (sic) September 1st letter in which, I guess, Bavarian Nordic

7  complains now that they haven't received a response, I would

8  like to point out that the reason that they didn't receive a

9  response is that essentially the -- they sent the letter on

10 September 1st, which is the Friday before Labor Day.

11     The letter, on page 10, indicates that they intend

12 to file a motion the following week and are nonspecific as to

13 what day during that week.  So, of four possible work days in

14 which they could file the motion, it could have been anywhere

15 from Tuesday to Friday.

16     I think it is -- and the letter itself is 10 pages

17 long.

18     THE COURT:  But the motion wasn't filed actually

19 for another 13 days.

20     MR. HOSKIN:  Yes.  It was filed on the 14th, Your

21 Honor.  But the expectation from the letter itself is that

22 the motion could be filed any time from the 5th to the 8th.

23     THE COURT:  Well, wasn't that driven, in part, by t

24 he need to get this done before discovery closed on September

25 21?

1    MR. HOSKIN:  Well, it seems to be a little

2  disingenuous to wait until the last minute and then say you

3  have a lack of time.  --- in which if they wanted to pursue

4  it, they could have gone ahead and pursued it with the

5  agency.

6    THE COURT:  I thought the discussion was one in

7  which you all had some previous communications where they had

8  expressed an intent to narrow the discovery, the scope of the

9  request.  Intervening along the way was the deposition.  And

10  then right after that they say, okay, by the way, here is the

11  narrow request; let's talk about it or let's move forward.

12  And basically, it sounds like the Government disappeared.

13    MR. HOSKIN:  Well, I wouldn't say that, Your Honor.

14  I think that you are requesting a response within one or two

15  days to a 10-page letter.  It is a little unrealistic, to say

16  the least.

17    The fact that they waited another 11 days is --

18  certainly was their call, not the Government's.  The

19  anticipation by NIH at least was that the -- or appears to be

20  that the letter, on its face, was saying that the motion was

21  going to be filed regardless.

22    You give a person one to two days to respond to a

23  10-day letter and then complain about it?  I find that hard

24  to believe, Your Honor.  But going to the merits, I think

25  there is an important point that is made in the response of

feb                                                                          14

1    NIH, and that is --

2            THE COURT:  Before you get there, you have taken me

3    a good long way in terms of the unreasonableness, if you

4    will, of Bavarian to expect, I guess, an instantaneous

5    response.  It is true that the letter says we expect you to

6    does.  And let me find the language where it says we are

7    going to move to enforce the subpoena, which we will do next

8    week absent a response.

9            Well, you used the word earlier about call,

10   c-a-l-l.  Maybe a call, an email note saying, hey, we have

11   got it, we are thinking about it, we will get back to you,

12   can we have more time?  Why none of that?

13           MR. HOSKIN:  I am not here to testify on behalf of

14   the agency as to what their motivation was or why it -- you

15   know, they did not respond sooner.  You know, I think that --

16           THE COURT:  They did not respond at all.

17           MR. HOSKIN:  Especially if you look at the intent

18   of the letter.  The last -- the next to last paragraph on

19   page 10, I'm not so sure that that is an offer of compromise

20   as it is essentially a threat; that if you don't react in the

21   next couple of days, we are going to file the suit anyway.

22           THE COURT:  You may be right about that.  Okay.

23   I'm sorry.  I have slowed you down enough.  Go right ahead to

24   the next issue.

25           MR. HOSKIN:  Moving then to the -- it is actually

the merits of their argument.   I apologize for my cough, Your

Honor.

THE COURT:   That is all right.

MR. HOSKIN:   There has been no violation of the

regulation here, but I think an important point to note is at

the very beginning in the response of NIH they indicate that

they have already, in response to the ITC subpoena, which

they treated as a FOIA request -- they had already produced

essentially all of the documents that they had that they

would be willing to produce.

THE COURT:   So that means you wouldn't be producing

any documents regarding the relationship between NIH and

Acambis that may have been the subject to this issue?

MR. HOSKIN:   I believe that the indication is that

all documents -- remembering that the ITC case essentially

involves the same parties, was brought by Bavarian Nordic at

the same time, involves many of the same issues, or at least

the factual predicate for the issues are the same, the same

documents were produced; would have been produced.

THE COURT:   I got the impression from Bavarian's

reply memorandum that the only thing that was produced was

basically what Bavarian already had, those documents relating

to the relationship between Bavarian and NIH.   However, the

scope of their inquiries go beyond that and really are

talking about what is going on between Acambis and NIH with

16

1    respect to this virus strain and the relationships.

2           Am I missing that?  And I know you didn't have a

3    chance to file any kind of sur-reply or a rebuttal brief, but

4    that was the last word I had on that subject.

5           MR. HOSKIN:  Well, I think, Your Honor, that the --

6    that much of -- I gather from -- in a sense, from NIH's

7    response; that whatever documents that BN believes that they

8    have would not have been produced in any event.

9           To the extent that -- I guess right now the issue

10   as framed is based on -- the only denial that we have is the

11   denial of the initial subpoena, which --

12          THE COURT:  Is that --- not attached?

13          MR. HOSKIN:  -- really the lack of information

14   provided and lack of a basis for requesting the information

15   from NIH.  That is Exhibit 1, the two-page letter from BN.

16          Based on that letter and the denial of the request

17   from NIH, it is what this Court has -- it is how this Court

18   has to reach its decision.  I think it is speculation, to

19   some degree, to try to determine what NIH would do if -- you

20   know, if it had proceeded and maybe if there had been further

21   discussions.  That is something that maybe -- that there may

22   be some middle ground in, but that didn't occur.

23          We have the bare request for documents from BN.  We

24   have the denial of that request based on essentially that the

25   documents have already been produced or -- or at least

1    anything that would -- that the agency felt would be produced

2    had already been produced in the prior request.

3            And I think that actually answers, for the most

4    part, what -- you know, what Bavarian Nordic is seeking.  I

5    mean, if that is all the agency would be giving them,

6    treating this again as a FOIA request since the Government is

7    not a party, then what are we really arguing about?

8            THE COURT:  Is there anything to prohibit the

9    Government from being sued by Bavarian Nordic?

10           MR. HOSKIN:  That is a difficult question, Your

11   Honor, because we have to speculate as to what Bavarian

12   Nordic's grounds for suit would be, and that is something

13   that I'm not really prepared to do.  I think that -- I don't

14   know of any general prohibition against Bavarian Nordic suing

15   the United States, but obviously it would depend a lot on

16   what the allegations in any complaint would be.

17           And here, so far the only thing that Bavarian

18   Nordic has alleged is essentially some type of trade secret

19   violation, perhaps a violation of some kind of an agreement.

20   But the allegations are -- have never been actually framed

21   against the United States, and so I would really hesitate to

22   speculate as to how or what Bavarian Nordic believes that

23   they could bring against the United States.

24           THE COURT:  Okay.

25           MR. LUBITZ:  Your Honor, may I reply to some of the

1    points made by counsel?

2              THE COURT:  Yes.  It is your motion.  So you get

3    the last word.

4              MR. DUNN:  Your Honor?

5              THE COURT:  Yes?

6              MR. DUNN:  Jeff Dunn.  I would like to offer just

7    one or two observations, if I could.  I don't know whether

8    you want that before or --

9              THE COURT:  I probably should not, in the sense

10   that really the briefing is between the Government and

11   Bavarian Nordic.  I suspect that you have got more knowledge

12   about this than I could ever hope to have.  I probably should

13   limit it to these two on the record.

14             MR. DUNN:  That is fine, Your Honor.

15             THE COURT:  Okay.  But thank you so much.

16             MR. LUBITZ:  Your Honor, first of all, with respect

17   to the sequencing of events in this matter, I just also want

18   to point out that there was a certificate of conference of

19   counsel that was filed with our motion to compel in which it

20   is noted that after we sent our September 1st letter to NIH

21   we then followed up with a phone call on September 11th

22   explaining to them that we would file suit unless we could

23   come to a resolution of this matter.

24             So, I think the idea that Bavarian Nordic has not

25   gone as far as it possibly could go to try to resolve this

1    matter short of litigation is incorrect.  I mean, just sort

2    of taking a step back, you have got a subpoena, you have got

3    an objection, you have got a series of phone calls of counsel

4    for Bavarian Nordic to NIH.

5          After those series of phone calls you have got a

6    September 1st letter.  Still no response from NIH.  And then

7    you have got a final phone call from counsel for Bavarian

8    Nordic.  So I think that the -- the idea that somehow

9    procedurally Bavarian Nordic has not done everything it

10   possibly could before putting this issue before the Court is

11   just not correct.

12         With respect to the documents and the ITC

13   proceeding, I think it is -- it should be pretty clear, as a

14   matter of law, that a FOIA response is less than what ---

15   might be entitled to under Rule 25.  And for support of that,

16   Your Honor, I think I can just point you to the Federal

17   Register cite from our reply brief.  That is 68 Federal

18   Register 25-838, which is the final rule of promulgating

19   amendments to 45 CFR Part 2.

20         And in that Federal Register cite NIH, or the

21   Department of Health and Human Services itself, notes that --

22   I will quote it.  It says, "These amendments -- I'm going to

23   quote the paragraph that surrounds the phrase that I cited in

24   my reply brief.

25         "These amendments are designed to address cases in

1    which a federal court has jurisdiction to issue a subpoena

2    for DHHS documents.  In such cases the current regulation may

3    infringe on the power of the Court by allowing greater

4    authority to withhold a document under the FOIA than would be

5    the case under the rules governing the disclosure of

6    documents in court."  Then it cites the Supreme Court case of

7    FTC against Grover, Inc.

8            It says it is not the intention of the department

9    "to create or broaden a federal litigation privilege through

10   this part.  We are amending the regulation to limit the

11   applicability of FOIA to situations in which the issuing

12   tribunal has no jurisdiction over the department."

13           It should be pretty clear that NIH needs to go back

14   and look at its documents to see whether there are ones that

15   we are entitled to under the subpoena that is before this

16   Court.  NIH, in responding to the ITC issued subpoena,

17   asserted that the ITC did not have jurisdiction over it, and

18   therefore, was treating that subpoena pursuant to FOIA.

19           THE COURT:  Well, let me slow you down and see if I

20   understand the Government's position on this just a tad.

21   Didn't the Government say somewhere in its briefing that you

22   never provided the Court with the right subpoena to pursue

23   this at this time?

24           MR. LUBITZ:  Well, I think the Government said

25   that, and we didn't provide the ITC subpoena, but we are not

feb

1    asking the Court to rule on the ITC issued subpoena.

2              THE COURT:  I gather that.  I thought that they

3    were saying that you did not provide the right subpoena in

4    this case.  But did you do so in your submissions?  Was that

5    Exhibit No. 1 or 2?

6              MR. LUBITZ:  Yes, Your Honor.

7              THE COURT:  Okay.  Let me hear from the Government

8    on that point.

9              MR. HOSKIN:  No.  I don't think that is the

10   argument that we made, Your Honor.

11             THE COURT:  You are saying that they subpoenaed NIH

12   and they should have subpoenaed Dr. Moss?

13             MR. HOSKIN:  Well, no.  There are several different

14   subpoenas out here, and I think that the -- there is an

15   argument made by BN relating to the subpoena to Moss and our

16   efforts to limit Dr. Moss' testimony consistent with Tuhey.

17             Now, BN makes a fairly extended argument relating

18   to the Moss deposition and what occurred at that deposition.

19   Our argument was that none of that is relevant to this issue

20   because that was a separate subpoena and Tambian has never

21   raised the legitimacy of the Government's actions in that

22   subpoena as being improper or -- you know, in any way.

23             THE COURT:  Let me shape the question so I can

24   understand better this point.  I am looking at Exhibit 1 that

25   was attached to the Plaintiff's motion.

1              MR. HOSKIN:  Correct, Your Honor.

2              THE COURT:  Okay.  Are you with me?

3              MR. HOSKIN:  That is a subpoena to NIH.

4              THE COURT:  This is a subpoena for the documents

5    that we are arguing about in part here today.  Correct?

6              MR. HOSKIN:  That is correct.

7              THE COURT:  Okay.  This is the subpoena to which I

8    don't believe the Government has ever suggested that it was

9    legally insufficient or that it was improperly served or that

10   the Court didn't have authority.  Is that right?

11             MR. HOSKIN:  The first two are correct.  We have

12   not disputed that it was -- the service.  Well, I guess to a

13   certain degree the legal sufficiency or the jurisdiction or

14   the question because of the Government's sovereign immunity.

15             THE COURT:  Was that raised in your papers?

16             MR. HOSKIN:  Excuse me?

17             THE COURT:  Was that raised in your papers?

18             MR. HOSKIN:  Yes, Your Honor.  I believe it is.

19             THE COURT:  Take me there again.

20             (Pause.)

21             MR. HOSKIN:  Page 12, Your Honor.  The ---

22   paragraph begins, "Although NIH responds, it does not

23   specifically articulate counsel's conclusions."

24             THE COURT:  Yes.  I have that highlighted with a

25   question mark beside it.  So, give me just a moment.

feb

1              (Pause.)

2              THE COURT:  And for some reason you think that

3      because you are not a party to the litigation that this

4      subpoena, under Rule 45, is barred.  Under Comsat?  Is that

5      where you are at?

6              MR. HOSKIN:  Yes.  Our argument is that under NIH's

7      own regulation and in light of Comsat that the NIH was only

8      required to treat the subpoena as a request under FOIA.

9              THE COURT:  I thought that came under the

10     regulation cited Title 45 CFR 2.5(b).  Sub 'b' says if it is

11     legally insufficient, improperly served or the Court doesn't

12     have jurisdiction, then the subpoena shall be deemed a

13     request under FOIA.  What am I missing?  Obviously something

14     is going on.

15             MR. HOSKIN:  I am not sure that you are missing

16     anything, Your Honor.  I think that the -- there is

17     essentially a tension here because of the Government's

18     sovereign immunity, and -- so how you can serve a subpoena

19     that is enforceable against the Government when it is immune

20     is the question.

21             The Comsat case and NIH's own regulations certainly

22     provide for providing documents; treating any subpoena as a

23     FOIA request and providing documents.

24             THE COURT:  Any subpoena or only subpoenas that are

25     in some way defective.

1         MR. HOSKIN:  Right.  Or over -- where the Court

2    does not have jurisdiction over the party.

3         THE COURT:  Correct.  Okay.

4         MR. HOSKIN:  And in this case it is our contention

5    that the Court does not have jurisdiction over the Government

6    because of sovereign immunity.

7         THE COURT:  Because you are not a party to the

8    litigation?

9         MR. HOSKIN:  Exactly.  May I reply to that point?

10         THE COURT:  Just a moment.  I want to make sure I

11    grasp it all though, and I think I need counsel now to take

12    me to Comsat and to highlight that language for me again.

13    I'm looking myself, and maybe I'm just missing it, because

14    Comsat was dealing with an arbitrator's subpoena, not a court

15    subpoena.

16         MR. HOSKIN:  That is true, Your Honor.

17         (Pause.)

18         MR. HOSKIN:  I think it is the portion --

19         THE COURT:  Take your time.

20         MR. HOSKIN:  We address at length in the standard

21    of review section, starting on page four.

22         THE COURT:  I wasn't so much looking at your

23    memorandum, but I will go back there.  Give me a second.

24    Standard review.  I have got it.  And you cite page 274 of

25    the Comsat decision.

1          MR. HOSKIN:  Correct.

2          THE COURT:  Let me turn to page 274.  "When the

3    Government is not a party, the APA provides the sole avenue

4    of review of an agency's refusal to permit its employees to

5    comply with subpoenas.  I read that as testimonial subpoenas.

6    Am I missing something?

7          MR. HOSKIN:  If I may have just a moment, Your

8    Honor.

9          (Pause.)

10         MR. HOSKIN:  That is dealing with testimonial

11   subpoenas.  That is correct.  But I think that there is also

12   a statement I have referenced on 277.

13         THE COURT:  Okay.  Give me a second.  Let me find

14   my place.

15         (Pause.)

16         THE COURT:  277.  I'm there.

17         MR. HOSKIN:  I don't have the exact quote, Your

18   Honor, but I had cited it as saying that sovereign immunity

19   generally permits the federal government to refute compliance

20   with a third party subpoena.

21         THE COURT:  I think that language is reflected in

22   the next to the last paragraph of the decision under subtitle

23   three where it says "in summary" and then maybe a couple of

24   sentences therein.  I have been reading that to talk about

25   the testimonial portion as opposed to documents.

feb

1          MR. HOSKIN:  Your Honor, I think that -- the

2    difference -- the only real difference between these

3    situations, between testimony and documents, is that the

4    government generally has waived a certain degree of sovereign

5    through FOIA for documents.  There is a set statutory

6    procedure which obviously even if the -- if there is

7    absolutely no jurisdiction of any court over the government,

8    any citizen could come in and request documents.

9          The regulations essentially account for that by

10   setting up one procedure for documents and one procedure for

11   testimony of employees.  I think that is why there may be a

12   little bit of a confusion here.  The rules generally apply --

13   in terms of jurisdiction and sovereign immunity apply to the

14   government as a whole, and it shouldn't make any difference

15   as to whether it is documentary or testimonial, but for the

16   fact that FOIA exists and we always have to account for FOIA.

17         And that is what the NIH's own regulations attempt

18   to do.  It sets one standard for testimony where FOIA would

19   not apply in any event, and a separate standard then for

20   documents where even if the subpoena is insufficient, the

21   agency would comply with what it would ordinarily have to

22   comply with anyway, which is the FOIA standard.

23         THE COURT:  Give me a moment.

24         (Pause.)

25         THE COURT:  Okay.  Let me hear further from

1    Bavarian.

2              MR. LUBITZ:  Your Honor, first of all, the waiver

3    of sovereign immunity, of course, is subject to the APA,

4    which provides for an arbitrary, capricious and contrary to

5    law standard of review.  The government and NIH are subject

6    to Rule 45.  If you look at both the Vioxx decision and the

7    recent D.C. Circuit decision that I cited, I think it should

8    be pretty clear that the government is a person under Rule

9    45.

10             In addition, the regulations -- NIH's own

11   regulations provide that FOIA is only applicable where a

12   party sends something to the government that should not be

13   construed as a subpoena.  That is not the case here.  The

14   regulations themselves provide that so long as the Court has

15   jurisdiction, so long as the subpoena is legally sufficient

16   and so long as service is proper, that NIH is supposed to

17   treat that subpoena as a subpoena.

18             THE COURT:  So, is it your position that Comsat's

19   language, with respect to federal of civil procedure 45 where

20   it says in the last paragraph that the District Court erred

21   in enforcing the arbitrator's subpoenas, the Court also erred

22   when it reviewed the government's actions under Rule 45

23   rather than the APA, that that really is only triggered

24   because the arbitrator did not have appropriate authority to

25   issue the subpoena?

feb

28

1          MR. LUBITZ:  I think that is one point.  But I

2   think the other point is that what Comsat stands for is that

3   the subpoenas themselves, when the government is not a party,

4   should be reviewed under the APA's arbitrary, capricious and

5   contrary to law standard.  And, of course, Rule 45 has a less

6   onerous undue burden standard, at least from the perspective

7   of the subpoenaing party, leaving that as the critical point

8   that Comsat was making.

9          THE COURT:  Well, if your position is true, then it

10  all comes full circle with respect to an analysis as to

11  whether or not the government's action here was arbitrary and

12  capricious.

13         MR. LUBITZ:  Yes.

14         THE COURT:  I'm sorry?  I couldn't hear you.

15         MR. LUBITZ:  Yes.

16         THE COURT:  Okay.  And you bear the burden of proof

17  on that, and that is what you have set forth, at least your

18  position, in your papers.  Is that right?

19         MR. LUBITZ:  Yes.  Yes.  So, the idea that this

20  Court has no jurisdiction because the subpoenas are

21  unenforceable pursuant to Rule 45 I think is incorrect.

22  These subpoenas with respect to the documents pass the test

23  under 45 CFR, Section 2.5(a), and the government was obliged,

24  or NIH was obliged, to treat these as subpoenas for

25  documents.

1          And they violated their own regulations, and in

2    doing so they violated the APA's arbitrary and capricious

3    standard.

4          THE COURT:  Okay.  I understand where you are

5    coming from.

6          MR. LUBITZ:  Okay.  And then, with respect to the

7    testimony of -- to pick up on your analogy, Your Honor, you

8    said that if NIH had said, well, we are not going to enforce

9    this subpoena because we don't like the way you look, that

10   that would be arbitrary and capricious.  I think everybody

11   agrees with that.

12         I think if NIH further said we are not going to

13   enforce these subpoenas because we think it is not in our

14   best interest because we don't like the way you look, this

15   Court would also be obliged to hold that NIH's determination

16   that it wasn't in its own best interest to enforce the

17   subpoena is arbitrary and capricious and contrary to law.

18         And, in effect, that is what NIH has done with

19   respect to the subpoena for testimony.  The reasons that they

20   have given as to why they refused to permit their employees

21   to sit for testimony are arbitrary, capricious and contrary

22   to law.  They violate the section of the regulations that

23   require strict impartiality and the reasons -- when you look

24   at the context of this particular case with the fact that

25   there is a material transfer agreement here, as well as a

1    protective order, a two-tier protective order in place, they

2    don't hold water.  They are arbitrary and capricious.

3            THE COURT:  Aren't they saying in both instances,

4    and haven't they said in both instances, that the reason we

5    are not going to do this is because you are going to make us

6    look bad?

7            MR. LUBITZ:  Yes.  And that is an arbitrary and

8    capricious reason.

9            THE COURT:  At least under the <u>Vioxx</u> decision it

10   is.

11           MR. LUBITZ:  Yes.  And not only that, but if you

12   look at the housekeeping statute here, if you look at the

13   Project Bioshield legislation here, all of those are

14   different components of showing that that reason is arbitrary

15   and capricious.

16           THE COURT:  Okay.  Thank you.  Let me hear further

17   from the Government.

18           MR. HOSKIN:  Just a couple of points, Your Honor.

19   First, the reason that the agency withheld testimony is not

20   because they would look bad, but because they would not have

21   an adequate ability to defend themselves and their employees.

22           THE COURT:  Defend yourself from no lawsuit?

23           MR. HOSKIN:  Well, we wouldn't be a party.  And as

24   we point out in the brief, Bavarian Nordic's attorneys, even

25   at the deposition, tried to prevent government counsel from

1    presenting any objections during the testimony.

2              THE COURT:  I think it was just the opposite.  It

3    was government attorneys who were preventing Bavarian Nordic

4    counsel from discovery, and be that right or be it wrong,

5    they were the ones there who were there to protect their own

6    interests.  And I'm still struggling with if it is not about

7    a lawsuit, what is the interests that the government is

8    trying to protect that they cannot protect?

9              MR. HOSKIN:  Well, --- party to the lawsuit.  We

10   could seek our own testimony.  We could seek discovery from

11   the other parties.  We could show what the weaknesses of

12   their arguments are and --

13             THE COURT:  Let me try differently.  If the

14   government is not being blamed, what is it that the

15   government -- and if the government has no fear of being

16   sued, what is the need for the government to protect

17   anything?

18             MR. HOSKIN:  Well, we are being blamed.  That is

19   the whole point.  Acambis hasn't been accused of any

20   wrongdoing, but the NIH employees have been.

21             THE COURT:  Acambis is being sued.  Acambis is

22   being sued.  There is a formal charge against Acambis, be it

23   right or be it wrong.  You are being -- at least your

24   employees are being subpoenaed to provide testimony.

25             Now, when I say it is one thing to talk about

1  having blamed in a non-legal sense.  If the theories that are

2  lined just beneath Bavarian Nordic's action here hold true,

3  then what they are really saying is Acambis may have done

4  something wrong, but guess what?  The folks over at NIH,

5  including Dr. Moss, did something terribly wrong as well.

6  They breached the contract and all these other things.

7          Well, if those other things never grow up to be a

8  lawsuit or if the government never has exposure directly,

9  regardless of indemnity or anything else, if they could never

10 be sued by Bavarian Nordic or anyone else on this action,

11 what is the interest, the legal interest, that the government

12 needs to protect by being a party opponent.

13          MR. HOSKIN:  If all of those things were true, Your

14 Honor, there would be no need.

15          THE COURT:  Okay.  So what is it?

16          MR. HOSKIN:  That is the question, is whether any

17 of those things are true, and that is the problem that we

18 face.  The allegations are made in a lawsuit in which we have

19 no ability to take discovery, no ability to defend the

20 government or its employees and, to a certain degree, that

21 after BN gets done with its suit with Acambis, that it won't

22 file suit against the government.

23          THE COURT:  That is the interest then.

24          MR. HOSKIN:  That it won't use the very discovery

25 it got as a basis for another lawsuit against the government.

1          THE COURT:  Well, that would be the legal interest

2     that I think you have been hinting around that you have some

3     exposure on.

4          MR. HOSKIN:  Well, certainly that is a possibility.

5     The trouble is we don't know right whether we have exposure

6     or not because Bavarian Nordic essentially is playing games

7     out here.

8          THE COURT:  Okay.  I appreciate the fact that there

9     may be the potential for a lawsuit.  Whether it is in reality

10    or not, you don't know sitting where you are today, and there

11    is nothing wrong about that analysis.

12         But in the event -- let's assume there was a law

13    out there that says the government cannot be sued by Bavarian

14    Nordic on this claim or anything related to it, I don't know

15    that the government has a need to protect any other interests

16    by being a party litigant.  And if I'm missing -- I'm trying

17    to figure out if there is something else aside from the

18    potential of a lawsuit that the government is concerned

19    about.

20         MR. HOSKIN:  Well, --

21         THE COURT:  Why else would you take depositions?

22         MR. HOSKIN:  Well, I guess if there was no

23    possibility of a lawsuit against the government or its

24    employees for their actions in the course of their

25    employment, then that would be true.  Unfortunately, such a

1    law just does not exist.

2            THE COURT:  Okay.  Fair enough?

3            MR. LUBITZ:  Your Honor, may I just make two

4    points?

5            THE COURT:  Well, you were promised the last word.

6    So, go ahead.

7            MR. HOSKIN:  Before he does, Your Honor, I have one

8    other point I would like to make.

9            THE COURT:  Okay.  I am going to give him the last

10   word.  So, you slip in now while you can.

11           MR. HOSKIN:  One of the -- I think one thing that

12   may have been lost in the discussion here is that one of the

13   very significant reasons for denying the subpoena, or the

14   production under the subpoena, was NIH's determination that

15   the request failed to comply with the regulation, and I think

16   that is an important point that the Court should look at.

17   That is all I have, Your Honor.

18           THE COURT:  How did it fail to comply?

19           MR. HOSKIN:  Well, particularly that the

20   information requested was not otherwise available from

21   another source.  Most of the information that was requested

22   is stuff that either BN should have in its own possession or

23   people like Dr. Mayer or its -- or co-plaintiff should know

24   because he was a party to the discussions.  Information that

25   was already available from Acambis or from other sources,

1  such as the information previously supplied to the ITC

2  subpoena.

3          THE COURT:  Well, let me try it like this.  I

4  haven't taken the time to look through or commit to memory

5  all of the various topics and issues attached to this

6  subpoena.  I'm looking at -- just say question number 11.

7  "All documents concerning any steps taken by NIH to isolate

8  individuals at NIH who received or are exposed to

9  confidential information from Bavarian Nordic."

10         Are you telling me that information has been

11 provided in the FOIA request or would have been provided?

12         MR. HOSKIN:  Well, no.  I think that the point that

13 I am trying to make here, Your Honor, is that as to each one

14 of these requests Bavarian Nordic did not indicate why that

15 information was not available from another source.  It

16 implied the only place they could go was the government.

17         THE COURT:  Wasn't that the subject of the letter

18 that they wrote to you?

19         MR. HOSKIN:  Well, their response to NIH was the

20 September 1st letter which, of course, became water under the

21 bridge as soon as this action was filed.  But even in that

22 letter, Your Honor, all they did is say, well, it is not

23 available from other sources.

24         For instance, with Dr. Mayer in particular they

25 say, well, because we don't know essentially what the NIH

1   would say about Dr. Mayer; discussions with NIH.  That is not

2   the question.  It is what -- certainly you may not have

3   complete information in the sense where you are talking about

4   discussions that each and every person may have a different

5   point of view.  That is not the question.

6           The question is whether the information is

7   available from another source, and in each one of these cases

8   the regulation requires that the first requestor provide

9   information as to why they can't get the requested

10  information from a different source.

11          THE COURT:  Okay.  Let me ask it this way.  Let's

12  go down to number 22.  They asked for NIH policies regarding

13  employment and consulting agreement between NIH employees and

14  third parties.  What would be the other source of information

15  there?

16          MR. HOSKIN:  Your Honor, again, I think we are

17  reversing the question.

18          THE COURT:  Okay.  I understand that they have a

19  burden to tell you why they can't get it.  I am assuming to

20  some degree that was articulated in the letter of September

21  1, 2006.  This question, standing on its face, would give one

22  great reason to think that they have this information in

23  their possession, nor would they have legal, reasonable means

24  to obtain.

25          It is like asking you what do you do in-house.  And

1    it talks about third parties with no indication of who these

2    third parties may be.  You are telling me they need to tell

3    you something else to respond to this question other than we

4    don't know and we don't know where to find it?

5           MR. HOSKIN:  I think -- certainly there is -- to

6    the extent that that also requests documents, I'm not sure

7    that that hasn't already been answered, in the sense that it

8    may have been produced already.  And certainly I think some

9    of these requests may be --

10          THE COURT:  I accept your position with respect to

11   the information they could or should be able to obtain from

12   either Acambis or their own in-house experts, be it Professor

13   Mayer or whoever else.

14          But it seemed to me, just glancing at this request,

15   that there were some things in there that were certainly

16   beyond their ability to go fetch from some other place.

17          MR. HOSKIN:  And certainly some of those are also

18   answered by the other objections, which is not in the

19   interest of NIH.  But at the end of the day there perhaps are

20   some documents which the government would be willing to

21   produce in response to a request where the -- Bavarian Nordic

22   comes in and says, yes, these are the few times that we just

23   cannot get anywhere else and narrow it down that way and

24   provide the government with some -- either some basis or --

25   and certainly some of these -- you know, we have got a forest

1    of requests here and one tree that -- or maybe two trees that

2    have some validity.

3            THE COURT:  I love that analogy.  I am going to

4    steal it and use it somewhere else.

5            MR. HOSKIN:  Thank you.  I would be honored.

6            THE COURT:  Is that to say that if their September

7    1st letter had come in and given you a longer window to

8    respond, that there may be something out there that may be

9    worthy of a response?

10           MR. HOSKIN:  I think in terms of the document

11    request that is certainly the case.  Now, part of the problem

12    here is the -- Bavarian Nordic has mentioned the September

13    11th conference, and I think there is a bit of debate here as

14    to whether that was really an attempt to settle or whether at

15    the end of that conference the government was essentially

16    told this is the end, we are filing suit and as a result of

17    that took no further action.

18           THE COURT:  Okay.  I can appreciate that.  I think

19    the point that was being made by Mr. Lubitz at that point was

20    that the letter of September 1 wasn't the last communication.

21    By the way, we picked up the phone on the 11th and we were

22    still seeing if something was coming, and it wasn't.

23        It very well may be, from your perspective at

24    least, that at the end of that discussion on the 11th this

25    was a matter headed for the courthouse steps.

1          MR. HOSKIN:  Right.  And certainly I think it is a

2    matter of common experience too, at least for -- in the sense

3    that it is well known that once it becomes a matter in

4    litigation then the agency turns it over to the Department of

5    Justice, and we are the ones that are responsible for all

6    actions thereafter.

7          So, yes.  It is not -- or it is not a case, one way

8    or the other, that the government is in any way attempting to

9    avoid answering.  It is a matter of reality, that once we are

10   notified that it is going to be in litigation, you know, it

11   gets transferred.  It comes down to the Justice Department or

12   out to the Assistant United States Attorney, or the United

13   States Attorney's Office, and we are the people that become

14   the lawyers.

15         THE COURT:  Well, to the extent that I have a

16   criticism on the exchange here and the procedure between the

17   parties following this September 1 letter, it is that I think

18   the government should have done more.  I don't think that

19   they should have read that letter, which said we are going to

20   do something if we haven't heard from you by next week, as

21   saying we have only got a couple of days.

22         Granted, it is on the tail of a long holiday

23   weekend, but I think to the extent of the parties trying to

24   move these things along, picking up the phone or sending an

25   email note, particularly in light of the extensive activity

1    that was occurring within the five to seven days before then,

2    and particularly with the pendency of this close of discovery

3    on this basically out of district litigation, to just sit and

4    do nothing; I think there is a better practice out there.

5            I shouldn't say anything more stronger than that.

6    I just wish that we could have handled this a little bit

7    differently, and you obviously perceived it in a little

8    different way.

9            MR. HOSKIN:  Well, no, Your Honor.  I understand

10    what you are saying, but I think certainly the -- we also

11    have to be aware that this was a very limited amount of time.

12    And as you point out, it is a 10-page letter.

13            There is no actual even "respond by a certain

14    date."  It is just kind of hidden in at the end of the

15    letter.  That was my only point, Your Honor.  I don't think

16    that it is that unrealistic, given the time frame, that the

17    government didn't respond.

18            And certainly there is always room for hope that we

19    could respond better or that we should respond quicker, but

20    these are large organizations and it takes time sometimes

21    just to get the request to the large person.  And over a

22    holiday weekend, that person may not even be there.

23            THE COURT:  All right.  Thank you, Mr. Hoskin.  I

24    promised Mr. Lubitz I would give him another shot.  I assume

25    Mr. Dunn is still awake?

1      MR. DUNN:  Yes, Your Honor.  It is hard to keep my

2  mouth shut, but I'm following your guidance.

3      THE COURT:  Okay.  Well, thank you, sir, and I

4  appreciate your patience with us.

5      Mr. Lubitz, your last shot.

6      MR. LUBITZ:  Thank you, Your Honor.  Let me just

7  point out first that seven weeks elapsed between the date of

8  the subpoena that Bavarian Nordic served on NIH and the date

9  that Bavarian Nordic filed suit in your court.  During those

10  seven weeks there was a single response from the government.

11      On the side of Bavarian Nordic there was a 10-page

12  letter, as has been extensively discussed, as well as two

13  sets of phone calls.

14      With respect to the September 1st letter and the

15  allegation by the government here that somehow we haven't

16  explained how we can't get these documents and testimony

17  topics from anywhere else, I think the letter, Exhibit 9 to

18  our motion to compel, goes into great detail on each topic

19  narrowing -- eliminating some topics and narrowing others.

20      I think, to continue the analogy, if there was a

21  forest, I think that there are now, by virtue of Exhibit 9,

22  the important select trees that are at issue here and all of

23  them are important.  And the ways in which Bavarian Nordic

24  needs the information from the government is explained in

25  detail in Exhibit 9.

1           THE COURT:  My goodness.  I am starting to feel

2    like a park ranger.

3           MR. LUBITZ:  Well, in Greenbelt I think you have

4    probably got some more trees than we do here.

5           THE COURT:  Okay.

6           MR. LUBITZ:  Thirdly, with respect to the issue

7    about any legal liability on the part of NIH, I want to

8    emphasize the broad nature of the release from liability that

9    the government negotiated with Acambis.  That is at Exhibit

10   3, paragraph 11 I believe, which is attached to our motion to

11   compel.

12          There is an indemnification provision and there is

13   a hold harmless provision.

14          THE COURT:  Does that really help them?  I mean, it

15   saves them from any suit brought by Acambis, but it doesn't

16   mean that they don't have to deal with a lawsuit.

17          MR. LUBITZ:  Well, but I think it holds them

18   harmless.  I am just going to take a look at paragraph 11 and

19   just quote it.  "Recipient agrees to indemnify and hold

20   harmless the United States Government from any claims, costs,

21   damages or losses that may arise from or through recipient's

22   use of materials or commercial products."

23          THE COURT:  That still doesn't mean that the folks

24   at NIH have to go over to a two-week trial as defendants.

25          MR. LUBITZ:  Well, I think that the fact is that

1    Acambis would -- if there were a two-week trial and there

2    were a verdict and if NIH -- that Acambis might well be

3    liable.

4            THE COURT:  That may be if NIH is liable.  But at

5    the end of the day NIH is still looking at headlines.  Their

6    professor does something wrong and the U.S. Government looks

7    bad, even though Acambis may be footing the bill at the end

8    of the day.

9            MR. LUBITZ:  Well, again, Your Honor, I think it

10   goes back to the point made by you and by the Vioxx court,

11   that truth is not a bad thing, especially in light of the

12   fact that there is no legal liability here on the part of

13   NIH.

14           The last point that I just want to make is if the

15   government truly was concerned here about its ability to

16   participate in discovery, it could look at Federal Rule 24

17   and look at the question of intervention.

18           THE COURT:  I somehow thought you would save that

19   last little bit there.  Okay.  Yes.  They do have

20   intervention powers possibly.  Okay.

21           Well, you all have been very helpful in educating

22   me and, hopefully, moving along my analysis of this case.  I

23   am going to review some of my notes on this and try to give

24   you some kind of rambling analysis of where I think this

25   matter comes out.

1        It is not my intention to issue a detailed written

2   memoranda on this point.  So, this record is basically what

3   the parties will be referred to, to the extent that you have

4   a need to come back to it.  Of course, it will be on file

5   with the Clerk's Office, and you are free to order

6   transcripts or whatever you needs may be to be addressed.

7        There is no dispute that Bavarian Nordic provided

8   technology to NIH, and this is all about an effort to develop

9   some better smallpox vaccine in compliance with some federal

10  programs.  And we have got RSPs out there and the Defendant,

11  Acambis, and the Plaintiff, Bavarian Nordic, were awarded

12  contracts, and I assume that one was still pending at the

13  time of the filing of Plaintiff's motion.

14       But the Plaintiff contends that it gave this

15  technology to NIH under two non-disclosure agreements on

16  December of 2000 and February of 2001.  Parenthetically.  I

17  don't recall seeing such agreements and certainly the

18  existence of these agreements is in dispute, but my

19  eyeballing those agreements is not really controlling here.

20       Bavarian Nordic contends that Professor Mayer

21  provided technology to Dr. Bernard Moss, supposedly for

22  research purposes only.  NIH strongly disputes that

23  characterization of it being for research purposes only.

24  Bavarian contends that its competitor, Acambis, thereafter

25  improperly obtained the technology from NIH by the hand of

1    Dr. Moss.

2              There are documents that have been provided that

3    suggest that this was done under a material transfer

4    agreement dated 11/27/02, which includes Defendant's

5    agreement, that is, Acambis' agreement, to indemnify the

6    United States for any claim arising from its receipt of this

7    technology.

8              The agreement also contains Acambis' agreement not

9    to bring the United States into any lawsuit involving these

10   technology materials, and Bavarian Nordic has reason to

11   believe that Dr. Moss has a longstanding consulting

12   relationship with Acambis and has previously engaged in

13   providing Acambis with Plaintiff's confidential information.

14             Bavarian Nordic contends that Acambis has used

15   Bavarian's technology for a commercial advantage, and this is

16   all the essence of a lawsuit in the District of, I believe,

17   Delaware.  But by way of deposition and production of

18   documents, Bavarian Nordic is seeking discovery on these

19   circumstances which led to Dr. Moss' receipt of the

20   technology and how it was provided to Acambis.

21             We certainly have a letter of August the 1st, 2006

22   where Dr. Kington, of NIH, advised Bavarian Nordic that it

23   had failed to comply with 45 CFR Part 2 in the issuance of

24   the subpoena.  In that letter Dr. Kington noted that NIH did

25   not improperly provide the technology, that the subpoena was

1    overly broad and sought privileged information without

2    further specificity and stated that the documents had been

3    previously provided in response to a FOIA request.

4          Dr. Moss also was prohibited from providing

5    testimony on the technology and contracted issues when he was

6    deposed in his individual capacity.  That deposition occurred

7    on August 28th.  Also present at the deposition were counsel

8    for the government, and Dr. Moss was prohibited from

9    answering certain questions, leaving Bavarian Nordic's

10   counsel with uncertainty as to what activities were conducted

11   by Dr. Moss as part of his duties at NIH and which were done

12   as part of any consulting activities on behalf of Acambis, if

13   such existed.

14         Finally, on September 1 we have this letter that we

15   have discussed at great length wherein Bavarian Nordic

16   narrowed the discovery request and the scope of the hope of

17   testimony from Dr. Moss.  This was provided in an attempt to

18   demonstrate the relevance of the sought after information,

19   why it was not otherwise available and why disclosure was in

20   the best interest of NIH.  And as of the time of the filing,

21   there was no indication that the government had provided any

22   response thereto, and I think we have heard a little bit

23   about that today.

24         I agree with the parties that this case is governed

25   by Comsat Corporation vs. NSF, a 4th Circuit 199 decision,

1    and I believe that <u>Comsat</u> makes clear that in the Fourth

2    Circuit we are to follow the Administrative Procedures Act.

3    That Act also includes -- rather, the <u>Comsat</u> case also

4    includes the reference to a differential standard of review

5    to agency action, and we are looking at 5 USC 706's standard

6    of arbitrary and capricious conduct.

7         Let me put my hand on the section again where it

8    says it in 706.  "That to the extent necessary to decision

9    and when presented, the reviewing court shall decide all

10   relevant questions of law, interpret constitutional and

11   statutory provisions and determine the meaning or

12   applicability or the terms of an agency action.  The

13   reviewing court shall, 1) Compel agency action unlawfully

14   withheld or unreasonably delayed; and 2) Hold unlawful and

15   set aside agency action findings and conclusions found to be

16   arbitrary, capricious and abuse of discretion or otherwise

17   not in accordance with the law."

18        The parties have not made reference to the other

19   subparts, being b, c, d, e and f, and I don't take any issue

20   with their non-relevance.

21        But 45 CFR 2.3 empowers the NIH director to permit

22   testimony of employees or the disclosure of documents "based

23   on a determination that compliance would promote the

24   objectives of the department."

25        So, I take the time to look at the various factors,

1   as did the <u>Comsat</u> Court, as did the <u>Vioxx</u> Court, in terms of

2   whether or not the decisions here are arbitrary and

3   capricious.

4           NIH says it produced documents under the FOIA Act

5   in response to a subpoena in a proceeding before the

6   International Trade Commission.  Plaintiff contends that NIH

7   only produced documents reflecting communications between

8   Plaintiff and NIH, correspondence between Dr. Moss and

9   Professor Mayor and lab notes regarding NIH's research on the

10  technology.

11          The Plaintiff further states that nothing has been

12  produced which relates to the circumstances of NIH's

13  disclosure to Acambis and the requests have, thereafter, been

14  narrowed.  On this prong I find in favor of Bavarian Nordic.

15          The availability of documents from other sources.

16  The Plaintiff claims that it has narrowed the request to seek

17  only internal NIH documents that are not available elsewhere.

18  NIH suggests that some of the documents are protected from

19  disclosure by privilege.  No log has been provided, as would

20  be required under Rule 45, and I believe counsel have all

21  agreed that Rule 45 as further modified by the arbitrary and

22  capricious standard.

23          So, I won't touch so much upon the privilege

24  question, but the availability of all of these documents from

25  another source I don't think is true.  I think there are

1    documents that are internal to NIH and not otherwise

2    available from other places, which the Plaintiff has

3    satisfied his burden on that point and should be entitled to

4    those documents if all other points are in favor of Plaintiff

5    or if, in fact, the Plaintiff carries the day on the

6    balancing of factors here.

7           There is also a factor that I believe the Comsat

8    Court talked about; the indemnity relationship or whether or

9    not the Government has some exposure.  And as a non-party,

10   NIH contends that it cannot defend its interests, and I think

11   through the course of discussion here that that interest

12   really is driven by its potential legal exposure.  While not

13   in this case at present, it certainly may be down the road.

14          I have not heard any clear statement that the

15   government is beyond the powers of any potential plaintiff to

16   bring a lawsuit on these actions.  Here there is the

17   indemnification, there is a covenant not to sue or something

18   to that effect by Acambis, but I do not find that the

19   government's interests are completely covered.

20          Another factor is whether an injustice will occur

21   if the government is not required to make a disclosure.  I

22   don't have enough information on that prong to say whether an

23   injustice would occur.  But the other balancing of interests

24   involved is that Plaintiff suggests that NIH violates its own

25   policy under 45 CFR 2.1(b) of maintaining strict

1    impartiality, as it believes that Dr. Moss has been aligned

2    with Acambis and allegedly conveyed confidential information.

3        I don't know about the confidential information

4    that may have preceded this particular involvement, and I

5    don't know if the case has been proven, but it certainly is

6    an interest that the Plaintiff is moving forward on.  That is

7    an important interest, the answer of which I have no way of

8    knowing.

9        But I would agree with the Plaintiff that there

10   would be no hardship for Dr. Moss to speak under oath again.

11   He has done so once, and there is no reason to believe that

12   such would impair or substantially impair the operations of

13   NIH.

14       To the extent that there is a concern about the

15   floodgates of litigation, I agree with the opinion writer in

16   _Vioxx_, although I do believe that there is some Fourth

17   circuit language to the contrary.  The Plaintiff contends

18   that the Project Bioshield Act promotes a partnership between

19   the national defense and the private sector industry and the

20   government in this area and that intellectual property

21   protection is crucial to this effort.

22       That may be true.  So that factor, if there is

23   such, weighs in Plaintiff's favor.  And Plaintiff's cover

24   letter with the subpoena of July 24, 2006 noted that the

25   litigation was, in part, concern with the "safeguards that

1   scientists rely on when they transfer innovative property to

2   other researchers in the hope of creating opportunities for

3   collaboration.  These safeguards include assurances that the

4   materials will be used only for research purposes."

5          That is an important interest.  Whether or not it

6   is subverted by the government's actions here is another

7   question, and to the extent that there were any concerns

8   about these requests being over broad, I believe that the

9   Plaintiff has sufficiently narrowed the scope in the face of

10  no further response from the NIH.

11         Assuming all of the representations of Bavarian

12  Nordic are true, and I do in large measure here, it is still

13  quite apparent to me that allowing Dr. Moss to testify would

14  more likely than not reveal evidence that is contrary to the

15  interests of NIH.  There is the potential breach of

16  non-disclosure agreements.  There is the potential complicity

17  with Acambis.  There is potential tortous conduct, which is

18  not protected by sovereign immunity.

19         NIH's fears about facing a lawsuit for these very

20  reasons has been articulated in its letter to Plaintiff of

21  January 11th, 2006, when it was facing similar claims that

22  were then lodged before the International Trade Commission.

23  There is strong Fourth Circuit law in favor of the

24  government.  The most meaningful case for the Plaintiff, of

25  course, is the Vioxx decision.

feb                                                                    52

1      I am, however, drawn back to the Motor Vehicle

2    decision.   The Supreme Court made a ruling in <u>Motor</u> <u>Vehicle</u>

3    <u>Manufacturer's</u> <u>Association</u> <u>vs.</u> <u>State</u> <u>Farm</u> in 1983 which said

4    that the "scope of review under this arbitrary and capricious

5    standard is narrow and the court is not to substitute its

6    judgment.   The agency must examine the relevant data and

7    articulate a satisfactory explanation, including a rational

8    connection between the facts found and the choice made."

9       "Normally the agency rule is arbitrary and

10   capricious if the agency relied on factors that Congress did

11   not intend or failed to consider an important aspect of the

12   problem or offered an explanation that runs counter to the

13   evidence or is too implausible."

14      Further, in the <u>Maryland</u> <u>General</u> <u>Hospital</u> case, 4th

15   Circuit of 2002, "The Court is to give substantial deference,

16   though not blind obedience to the action of the agency."

17      I don't find anything "arbitrary or capricious"

18   about the government's interest in protecting itself from

19   allegation of misconduct.   There are very limited exceptions

20   to the Sovereign Immunity Doctrine, and the lawmakers have

21   intended that the government can elect to protect or, should

22   I say, prohibit disclosure under such circumstances.

23      Such an election has been made.   Plaintiff's

24   motion, accordingly, is denied, as well as the request for

25   fees and expenses incurred.

feb

1    My judgment, my view, my ideas about government

2    transparency are completely irrelevant.  Those who make the

3    law determine what, if anything, the government's obligations

4    are.  And I think in this instance, while it may not be as

5    one would expect in the typical civil scenario where we are

6    expecting full disclosure on everything that is not

7    privileged, there are other interests to be afforded here,

8    and that is what the law attempts to get it.

9    Is it arbitrary?  No.  The government provides a

10   reason.  Is it capricious and mean spirited and filled with

11   ill will?  No.  The government has articulated a reason.

12   Basically, self interest.  Is it otherwise contrary to law?

13   Not at all.  There is nothing in the actions of the

14   government.

15   Even though there is the quotation about the strict

16   impartiality and the reference to the Bioshield Act, I don't

17   find that either of those fly contrary to the position taken

18   by the government.  So, as best as I can read it, I think

19   that the government's action is protected here.  Not only as

20   to the testimony, but also as to the documents.

21   I suspect that this may not be the end of it, but

22   hopefully, you all have sufficient information to work from

23   and to take it to the next level.  Any response further from

24   the -- I guess Plaintiff gets to go first.

25   MR. LUBITZ:  Well, I would like a clarification,

1    Your Honor.  Are you denying the motion to compel both to the

2    documents and to the testimony?

3    THE COURT:  Yes.  Because both are governed by the

4    arbitrary and capricious question.  If I analyze that

5    question appropriately, whether the government is not

6    providing these documents because it is not in their best

7    interests, or if they are not allowing the testimony to go

8    forward for the same reason, I think our discussion earlier

9    came back to even under Rule 45 that would be modified by

10   whether or not the government is acting in an arbitrary and

11   capricious way.

12   And since that is the standard that governs both, I

13   believe that their response, even though procedurally may be

14   faulty, it comes back to that analysis at the end of the day.

15   MR. LUBITZ:  Okay.  Well, I just reserve objection

16   on the record, because I think that there is a different

17   standard for documents and testimony.  But we can take that

18   up.  Thank you.

19   THE COURT:  That is fair enough.  Anything further

20   from the NIH?

21   MR. HOSKIN:  No, Your Honor.

22   THE COURT:  Okay.  And, Mr. Dunn, I thank you again

23   for your measured silence.

24   MR. DUNN:  All I can say, Your Honor, is that while

25   we would have enjoyed having the testimony and filed our own

feb                                                                                          55

1   <u>Tuhey</u> request, we looked at the response and came to the same

2   conclusion that Your Honor did, that it was reasonable.

3              THE COURT:  Okay.  Well, I thank you all again for

4   your patience, and I wish you a good holiday season.  Have a

5   good day.

6              (Whereupon, the telephone conference was

7   concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I certify that the foregoing is a correct

transcript from the electronic sound recording of the

proceedings in the above-entitled matter.

_____          _____
Fabiana E. Barham                                        Date
Transcriber                                         12/18/06