<u>**REDACTED – PUBLIC VERSION**</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BAVARIAN NORDIC A/S and ANTON MAYR, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-614-SLR |
| v. | ) ) | *FILED UNDER SEAL —* |
| ACAMBIS INC. and ACAMBIS PLC, | ) ) ) ) | *CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER* |
| Defendants. | ) | |

## BAVARIAN NORDIC'S REPLY BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT ON CONVERSION

YOUNG CONAWAY STARGATT & TAYLOR LLP
John W. Shaw (No. 3362) [jshaw@ycst.com]
Karen L. Pascale (# 2903) [kpascale@ycst.com]
D. Fon Muttamara-Walker (No. 4646)
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Phone:  302-571-6600

- and -

BINGHAM MCCUTCHEN LLP
Edward A. Pennington
Robert Bertin
Krista L. Lynch
3000 K Street Suite 300
Washington, DC 20007
(202) 424-7500

*Attorneys for Plaintiff Bavarian Nordic A/S*

January 12, 2007

**TABLE OF CONTENTS**

<u>PAGES</u>

I.   INTRODUCTION ....................................................................................................1

II.  ARGUMENT...........................................................................................................4

     (1).  Alleged Ownership Rights of the Bavarian Vaccine Institute.....................5

     (2).  Alleged Granting of "Free" Use of MVA 572 ..........................................6

     (3)  Plaintiffs' Rights in MVA 572 Extend to its Progeny................................12

     (4)  There Have Been No Unrestricted Transfers By Prof. Mayr Exempting Any
         Commercial Rights............................................................................14

     (5)  Moss Never Received Permission From Mayr to Commercially Exploit the
         Value of the Strain ...........................................................................14

     (6)  Acambis Has Made Commercial Use of MVA 572................................18

III. CONCLUSION ....................................................................................................19

i

**TABLE OF AUTHORITIES**

**PAGES**

**Cases**

*Duty Free Americas, Inc. v. Legg Mason Wood Walker, Inc.*,
  No. 24-C-04-005696, 2005 WL 914395 (Md. Cir. Ct. Jan. 13, 2005)...................................... 13

*Fainsbert v. Cuthbert*,
  No. 06-2017, 2006 WL 2096057 (D.N.J. July 27, 2006)........................................................... 13

*Furash & Co., Inc. v. McClave*,
  130 F. Supp. 2d 48 (D.D.C. 2001) ........................................................................................... 13

*Goell v. Smith*,
  128 Mass. 238 (Mass. 1880) ..................................................................................................... 12

*Ghen v. Rich*,
  8 F. 159 (D. Mass. 1881) .......................................................................................................... 15

*Hall v. Corcoran*,
  107 Mass. 251 (Mass. 1871) ..................................................................................................... 12

*Home Paramount Pest Control Cos., Inc. v. FMC Corp. Prods. Group.*,
  107 F. Supp. 2d 684, 693 (D. Md. 2000) ................................................................................. 13

*McClemy v. Brown*,
  99 A. 48 (Sup. Ct. Del. 1916) ................................................................................................... 12

*Nixon v. United States*,
  978 F.2d 1269 (D.C. Cir. 1992) ................................................................................................ 15

*Orteck Int'l, Inc. v. Transpacific Tire & Wheel, Inc.*,
  2006 U.S. Dist. LEXIS 67702 (D. Md. 2006).......................................................................... 13

*Pagliai v. Del Re*,
  No. 99-CIV-9030 (DLC), 2001 WL 220013 (S.D.N.Y. Mar. 7, 2001) .................................... 13

*Pearson v. Dodd*,
  410 F.2d 701 (D.C. Cir. 1969) .................................................................................................. 13

**Statutes**

§ 929 BGB (Bürgerliches Gesetzbuch—Civil Code).................................................................... 10

German Employee Invention Act.................................................................................................. 8-9

**Treatises**

Richard A. Epstein, *Torts* § 1.12.3 "Specialized Cases of Conversion" (Aspen 1999) ................ 12

Restatement (Second) of Torts, § 228 .......................................................................................... 12

Plaintiff Bavarian Nordic A/S ("BN") hereby submits this Reply Brief in further support of its motion for summary judgment on its conversion claim filed against Defendants Acambis Inc. and Acambis plc (collectively, "Acambis").

## I.    INTRODUCTION

In its Motion for Summary Judgment, Bavarian Nordic established ownership of MVA and a well-founded case of conversion by Acambis' possession and use of MVA material outside the scope of its permissible use that brought Acambis unjust enrichment in the form of lucrative government contracts.  The evidence presented establishes, *inter alia*:

- Everyone, including Acambis, Therion, NIH, Bavarian Nordic and Mayr believed that Mayr is the creator, owner and legitimate supplier of MVA material and has been for decades.

- Mayr's testimony and evidence of custom demonstrate that there was no sale or transfer of ownership of MVA to the NIH or Moss.  The custom evidence includes NIH's own policy encouraging scientists to provide samples to each other for research purposes only without formal written agreements.

- Evidence of course of dealing between Moss and Mayr shows that Mayr, after acquiring the MVA sample, refused to give MVA Moss grew from that sample to Therion without Mayr's permission, which fully supports the mountain of custom evidence that Moss knew he didn't own or have unfettered control of MVA.

- Acambis acquired MVA from the NIH for free pursuant to a material transfer agreement.  That MTA fully confirms that NIH did not own MVA.  For example, in the Material Transfer Agreement, NIH makes no representation about ownership of the MVA being provided and to the contrary provides it explicitly "as is" and identifies the MVA as MVA that came from Mayr as described in a Mayr publication.  Moreover, NIH made Acambis agree to indemnify NIH and not bring NIH into any lawsuits involving use of Mayr's material that NIH provided to Acambis.

- Acambis' own documents show that Acambis recognized the risks inherent in obtaining MVA without permission from Mayr from any source.

- Acambis called off two negotiations to pay millions of dollars for MVA from Therion and Bavarian Nordic in order to acquire it for free from NIH, despite the risks.  This was a calculated and fundamentally dishonest decision—and, the evidence shows that Acambis misrepresented the risks to the U.S. Government, which for an important product such as a protective vaccine is unconscionable, as discussed in Bavarian Nordic's Opposition to Acambis' Motion for Summary Judgment.  *See* D.I. 125 at 31.

1

Acambis, in its responsive brief (D.I. 122) ("Defs. Ans. Brief.") does not address or attempt to justify any of its fundamentally dishonest and risky behavior. Risk in this industry—where blockbuster drugs are developed at a rate of 1 in 20 attempts at best—is necessary for survival. Acambis also does not address head-on any of the evidence discussed above, or present documentary evidence to support its arguments. Instead, Acambis attempts to side-step the evidence by relying on unconnected statements, taken out of context, and at other times rank hearsay, attempting to argue points that are fundamentally contradicted by the evidence and history of Prof. Mayr's MVA.

With respect to original ownership of MVA by Prof. Mayr, Acambis attempts to establish that Prof. Mayr never owned MVA. Acambis relies for its argument on its assertion that the German government owns MVA. But, Acambis does not and cannot address the overwhelming evidence that everyone acknowledges Prof. Mayr as the creator, owner and legitimate source of MVA—including Prof. Mayr himself and Acambis in its own documents. Acambis has produced no documentation of the German government's ownership of MVA material, and there is none. Moreover, it is undisputed that Prof. Mayr created his stocks of MVA more than 30 years ago, that he has exported samples of MVA out of Germany over the years, and that he has published numerous papers about his research with MVA. Notwithstanding this, there is no evidence or even argument that Acambis has produced that the German government sought to reclaim Prof. Mayr's stocks of MVA or prosecuted Prof. Mayr for stealing any MVA that is German property.

To the contrary, over the years, the evidence establishes that Prof. Mayr has been awarded two honorary degrees at German Universities for his work with MVA and is a world renowned and highly regarded scientist precisely for his work with his MVA stocks. Moreover, Bavarian Nordic's contracts with Mayr, dating back to 1996 for exclusive access to Prof. Mayr's stocks of MVA, have led to commercial success and acclaim for Bavarian Nordic, both within Germany where Bavarian Nordic's R&D facilities are located, and world-wide, all without any

interference by the German government. Acambis' arguments and supposed evidence here simply do not withstand scrutiny.

With respect to Acambis' argument that Mayr transferred ownership rights in the MVA sample to NIH, this argument is based on an alleged "agreement" with respect to ownership. However, no such agreement transferring ownership has been identified and there is none. And, Acambis has not identified any monetary or other consideration that would support such an agreement. To the contrary, the evidence shows that Mayr did not contemplate a transfer of ownership to Moss or NIH and rather provided a sample for research use only, as the copious evidence on what is customary demonstrates. Mayr retained control over other uses.

At best, Acambis can offer contradictory evidence of custom. However, with respect to custom, Acambis does not even address the evidence in its own documents showing its understanding that Mayr and Bavarian Nordic retain ownership of MVA from the NIH and Therion—the so called "cloud" on title. Moreover, Acambis does not and cannot contradict the further evidence of course of dealing between Mayr and Moss, demonstrated by Moss' refusal to provide Mayr's MVA to Therion without permission from Mayr, which further reinforces Dr. Mayr's understanding of the provision of the sample and his, NIH's and Bavarian Nordic's experts' understanding and testimony regarding custom.

Acambis' further arguments are similarly unsupported. Acambis, for example, relies on its argument that cloning Mayr's MVA property and sending that to Acambis for commercial use is not a misuse or conversion of Mayr's property. However, the evidence of custom and course of dealing between Mayr and Moss overwhelmingly show that Moss's research and reproduction of the MVA sample is customary and subject to Mayr's ownership of that MVA. Thus, Mayr's and Bavarian Nordic's ownership interest in the "clones" of the sample is the same as in the sample.

For the foregoing reasons, explained in more detail below, Bavarian Nordic has established Acambis' conversion of MVA and significant unjust enrichment through that

3

conversion. Acambis' reply does not contradict that evidence and at best creates a material

dispute of fact regarding what is customary with respect to the treatment of property provided as a

sample between research scientists in this field. Bavarian Nordic respectfully submits, however,

that material facts establishing the conversion are not reasonably in dispute, and therefore

respectfully requests summary judgment on this issue.

## II.    ARGUMENT

In its responsive brief (D.I. 122) ("Defs. Ans. Brief."), Acambis strays far from the

relatively simple issues of fact and law that are required to decide a case of conversion.

The facts necessary to decide Bavarian Nordic's motion for summary judgment are

indeed simple, and undisputed. They are as follows:

(1)    Professor Anton Mayr is undisputedly the creator of a viral strain called

"MVA 572." The development of the new virus MVA from a virus preexisting in nature took

several years, spanning the time of approximately 1960-1974.

(2)    Professor Mayr distributed a very limited number of sample vials of

MVA 572 (two or three vials) over a time period of about thirty years to researchers "for research

purposes only."

(3)    Dr. Bernard Moss, a researcher with the National Institute of Health

("NIH"), requested a sample of MVA 572, from Professor Mayr.

(4)    Professor Mayr complied with the request, by mailing to Dr. Moss one

sample vial of MVA 572. Unbeknownst to Professor Mayr, Dr. Moss was a paid consultant to

the defendant Acambis.

(5)    Rather than using the MVA 572 samples for research, Dr. Moss

delivered the MVA 572 virus, after passaging it a few times, to his client Acambis, who then used

the virus to create its commercial product ACAM3000.

These facts are all that is necessary to prove conversion. The law of conversion is

equally simple and undisputed: Conversion is the taking of property that does not belong to you,

4

and "converting" it to yours. This is exactly what Acambis did: they used the MVA 572 samples to make their commercial product without any rights, or permission, to do so, thereby violating the property rights belonging to the Plaintiffs in this case.

Acambis has tried hard to deviate the Court's attention away from these simple issues, by raising numerous irrelevant issues and asserting unproven facts. Most notably of these follow:

### (1) Alleged Ownership Rights of the Bavarian Vaccine Institute

Acambis asserts that Professor Mayr created MVA 572 while he was employed by the Bavarian Vaccine Institute, and therefore, either the Institute or the state of Bavaria owns MVA 572. This is simply not true. First of all, it is true that Professor Mayr was employed at this institute in the early 1950s, but he undisputedly did not begin creating his novel virus MVA until a decade later.[1] Secondly, there is no evidence that the Institute or the State of Bavarian has ever asserted an ownership claim to the vial of MVA 572 that Professor Mayr delivered to Dr. Moss. There has been no discovery of anyone from the Institute or the State of Bavaria who could have testified about the German governmental rights.

To the contrary, there is evidence that the Institute ceased to exist after the eradication of small pox in the 1980s, and that the State of Bavaria has never asserted ownership rights to any of the strains that Professor Mayr transferred to Bavarian Nordic, especially not MVA 572. *See* Declarations of Dr. Li Westerlund and Axel Spies, attached hereto as Exhibits A and B, respectively.

Acambis attempts to provide vicarious proof that the State of Bavaria owns rights to "MVA," but in the process confuses, or exacerbates its own confusion about, the different between "intellectual" property rights and "personal" property rights. For example, Acambis

---

[1]     Prof. Mayr developed MVA from CVA over a lengthy period of time. Prof. Mayr testified that while he was an employee of the Bavarian Vaccine Institute he flew to Ankara to obtain CVA at his boss, Prof. Herrlich's request. D.I. 123, Exh. 4 (Mayr deposition) at 12-14. Prof. Mayr, however, worked with CVA, not MVA at the Bavarian Vaccine Institute. *Id.*

asserts that because Karl Heller, through his company called VIVACS, received a license from the State of Bavaria to an MVA virus, then the State of Bavaria owns the MVA 572 that Professor Mayr delivered to Dr. Moss. That conclusion, however, simply doesn't follow.

First of all, Karl Heller has not testified under oath, or submitted any declarations, about what, if any, rights he may have received from the State of Bavaria. Secondly, even if he gave testimony, it would not establish that the State of Bavaria indeed had rights to give. And thirdly, Karl Heller is simply not credible: he is an ex Bavarian Nordic known to Acambis' chief technical officer as a "mole," who is on Acambis' payroll to generate "reports" that purport to contradict Bavarian Nordic's patents.

### (2)    Alleged Granting of "Free" Use of MVA 572

Acambis asserts that, because Professor Mayr did not execute a written document specifying that Dr. Moss could only use MVA 572 for research purposes only, Dr. Moss was free to transfer the viral product to his consulting client, Acambis.

In support of its position that such transfers, without written documents, were ordinary and customary in the research community, Bavarian Nordic relies on the direct testimony of Professor Mayr, one of the two participants in the exchange, who said repeatedly, that his transfer of MVA 572 to Dr. Moss was for research purposes only. The only other person who could contradict Professor Mayr with direct testimony is Dr. Moss, yet he refused to testify. Indeed, the NIH refused to allow him to testify, noting that Dr. Moss' testimony could be potentially damaging to the government. On this basis, U.S. District Court for the District of Maryland refused to compel Dr. Moss' testimony. In his December 13, 2006 decision, Magistrate Judge Day stated the following:

> Assuming all of the representations of Bavarian Nordic are true, and I do in large measure here, it is still quite apparent to me that allowing Dr. Moss to testify would more likely than not reveal evidence that is contrary to the interests of NIH. There is the potential breach of non-disclosure agreements. There is the potential complicity with Acambis. There is

6

> potential tortous [sic] conduct, which is not protected by
> sovereign immunity.

*See* D.I. 126, Exh. A (Motion to Compel Hearing Tr. at 51).

Dr. Moss' failure to give testimony in this proceeding is telling. Logically, if Dr. Moss could have provided helpful testimony, meaning testimony that would have supported the proposition that Dr. Moss received the MVA 572 sample with no restrictions, he would have been allowed to testify.

Other evidence supports Bavarian Nordic's claim that custom and practice in the research community supports the notion that written agreements are not necessary to provide biological materials to fellow researchers, for research purposes only. Significantly, no one besides Acambis has ever commercialized MVA, so this fact alone would show that other researchers who received MVA 572 from Professor Mayr, honoured the understanding that any use would be for research purposes only. (*See* Exh. A hereto, Westerlund Decl. ¶ 4).

Furthermore, Bavarian Nordic's experts agree that the understanding in the research community was such that transfers of biological material, between scientists, was for research purposes only. (*See* D.I. 126, Exh. H (Einhorn Expert Report) at ¶ 2, Exh. AA (Straus Expert Report) ¶¶ 32-33). These opinions are consistent with the facts stated above, and prove that Professor Mayr did not "give away" valuable rights to the sample vial of MVA 572.

Finally, Acambis' own actions prove that it knew it was acting without permission when it took MVA 572 from Dr. Moss and commercialized it. The facts show that Bavarian Nordic and Acambis held a high level technical meeting in June of 2002 to discuss a licensing venture to develop MVA based small pox vaccines. Under terms of confidentiality, Bavarian Nordic disclosed how to make an MVA based small pox vaccine, including the importance of using MVA 572 as a starting material. After initially expressing interest, Acambis abruptly called off negotiations on terms of the arrangement, which would have called for millions of dollars to be

paid to Bavarian Nordic. (*See* Exh. A, Westerlund Decl. ¶ 4). Acambis then partnered with a new, alternative MVA partner, Therion.

Therion, however, only had in its possession MVA 575, which it had received earlier from Professor Mayr for research purposes only. Acambis, recognizing that Therion did not have rights to commercialize MVA 575, instructed Therion to obtain permission from Professor Mayr to commercialize MVA 575. Instead, Therion went to Dr. Moss at the NIH and asked Dr. Moss for MVA 572. Dr. Moss responded that Therion should obtain written permission from Professor Mayr to use the MVA 572. When Professor Mayr refused permission, Acambis fired Therion as its MVA source, and went directly to NIH/Moss for MVA 572. Oddly, the very same product that Dr. Moss told Therion it needed permission from Professor Mayr to use, was then given to Acambis by Dr. Moss to use commercially. It's worth remembering at this point, that Dr. Moss was a paid consultant to Acambis, and at least appeared to be favouring his client in giving to Acambis what Acambis knew it didn't have permission to use.

All of the above shows that Acambis was desperate to have MVA 572 as a starting material to make a commercial small pox vaccine. The fact that Acambis took MVA from Dr. Moss, rather than any other source, supports the existence of two important facts that are inconsistent with Acambis' theory of "free" MVA: (1) there were no other sources of MVA 572, and (2) not all MVAs are the same. This MVA 572 sample from Professor Mayr was the key to making a commercial product, in the millions of doses. That is why the conversion of a sample vial, which forms the seed stock to make millions of doses, is so important.

A German legal opinion obtained by ███████ and produced in this case recognizes Prof. Mayr's ownership rights in MVA based on the professorial privilege under German law and his status as a professor at the University of Munich. (*See* Exh. C, (TBC00013-00017)). Indeed, ███████ sought this legal opinion after it received an MVA sample from Prof. Mayr for research purposes and wanted to put the sample to commercial use. The opinion states: ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ *Id.* at 15. This is consistent with Prof. Straus'

opinion.

Acambis also argues that BN prevented discovery on the issue of the Bavarian Vaccine

Institute. Again, this is completely false. Acambis has deposed Prof. Mayr twice in this case.

The scope of the second deposition was limited to certain topics by the Court at the discovery

conference held on September 13, 2006. These topics were specified by counsel for Acambis and

included the "transfer of the viral strain from Dr. Mayr to Dr. Moss...Professor Mayr's

agreements with Bavarian Nordic concerning the viral strain and also Professor Mayr's damages

in this case." *See* D.I. 100, 9/13/2006 discovery conference transcript, at 13:14-22. Moreover,

Acambis has had ample opportunity to seek Prof. Mayr's testimony on all issues relevant to this

case but failed to do so.  (Exh. H, Mayr 12/14/2005 deposition at 76: 7-12 and 77: 21-23).  On

October 5, 2006, the court declined to order yet a third deposition of Dr. Mayr.  (*See* D.I. 107,

(10/5/2006 discovery conference transcript)).

It is also telling that the Material Transfer Agreement ("MTA") executed between

Acambis and NIH for MVA 572 makes no warranty with respect to freedom to operate or

ownership of Prof. Mayr's MVA 572 sample provided to Acambis.  D.I. 116, Exh. V (Materials

Transfer Agreement) at ¶ 10.   The MTA specifically states that the virus is being provided "as is"

and that NIH "does not offer any guarantee of any kind." *Id.* Moreover, the material provided to

Acambis pursuant to this MTA is defined as "Modified Vaccinia Ankara (MVA) virus 572 FHE-

22.02.1974, as described in Mayr et al., Passage history, properties and applicability of the

attenuated vaccinia virus strain MVA, Infection 3:6-14(1975) and which was plaque purified by Dr. Bernard Moss of the NIAID." *Id.* at ¶ 1a.

Additionally, Acambis offers a Swiss patent 568 392 and German patent 2145 477 as evidence that Dr. Stickl of the Bavarian Vaccine Institute and the Free State of Bavarian are the owners of MVA 572. (Defs. Ans. Brief, D.I. 122, at 5-6). However, as explained by BN expert Prof. Straus, neither of these patents relates to MVA 572, or any specifically identified MVA strain. (*See* Exh. G (Straus Second Supp. Rep.) at ¶3-8). Rather, the Swiss patent claims relate to "a process for culturing a virus intended for producing an inoculant against smallpox." The German patent claims relate to a vaccine for intracutein smallpox vaccination, characterized in that the vaccine is composed of attenuated, modified vaccinia viruses (Claim 1), or (dependent claim 2) characterized in that the vaccine is generated through the use of vaccinia-Ankara virus, which has been bred over 500 passages in chicken fibroblast cells." *Id.* at ¶ 4  The original filing of the German patent listed only Dr. Stickl as an inventor, but Prof. Mayr was added as an inventor to the German patent two years later.  *Id.*  It can only be reasoned based on the corrected inventorship of the German Patent that Dr. Stickl himself recognized Prof. Mayr as the inventor of the virus strains in the German patent.  *Id.* at ¶ 5.

Acambis argues that under German law, Mayr transferred ownership of MVA-572 to the NIH. (Defs. Ans. Brief at 9-12.)  This is not the case.  As a threshold matter, BN's German law expert Dr. Straus expressly agreed with Acambis' German law expert Dr. Tilmann regarding the elements for the transfer of ownership: that there must be a transfer of possession and there must be an agreement between the parties to transfer ownership.  (*See* Exh. D (Straus Supp. Rep. at ¶ 3.)  Both parties also agree that the first element, transfer of possession, was satisfied when Mayr sent the physical MVA-572 strain to Moss. *Id.* at ¶ 4.  Where Acambis errs, however, is in arguing that the second element is satisfied—"agreement as to the transfer of the ownership of the specific personal property transferred." *See* § 929 BGB (Bürgerliches Gesetzbuch—Civil Code). To the contrary, Acambis' own argument shows that there was no such "agreement." Although

10

Acambis' expert Prof. Tilmann, is a purported expert in German law he failed to consider case law from the German Federal Supreme Court (BGH) which specifically requires an analysis into the circumstances of the case when determining whether or not ownership has transferred. *See* Exh. D. (Straus Supp. Report) at ¶ 8-9.

For example, Acambis acknowledges that "Prof. Mayr sent the MVA strains to Dr. Moss/NIH at the end of August 2001 without any commentary." (Defs. Ans. Brief at 11.) Yet in Section II, where it better suits their purposes, Acambis asserts that scientists (including even BN and BN's expert witness David Einhorn) specifically use written material transfer agreements to transfer ownership of their biological materials, rather than relying on custom. (Defs. Ans. Brief at 11.) There is simply no express agreement to transfer ownership of MVA-572 from Mayr to Moss.

It is true that even without an express agreement, one can imply the parties' will to transfer ownership from the surrounding circumstances. (*See* Exh. D (Straus Supp. Rep.) at ¶¶ 8, citing 1990 NJW 1913.) Yet Acambis fails to prove any such will to agree to transfer ownership. Acambis assumes that there was an intent to transfer ownership because Mayr never expressly requested that the strains ever be returned to him. (Defs. Ans. Brief at 11.) But Mayr's conduct is just as consistent with the assumption that he was giving Moss possession of the strain purely for research purposes than that he was conferring full ownership over the strain. Indeed, Acambis agrees that Mayr's 1995 transfer of MVA-575 to Therion was expressly limited to Therion's possession of the strain for research purposes (Defs. Ans. Brief at 22), yet Mayr similarly did not include any language about the strain being returned to him, but simply sent the virus to Linda Gritz of Therion without further explanation. (*See* Exh. D (Straus Supp. Rep.) at ¶ 10(iii)). Similarly, in 1995, when Moss requested MVA-575 from Mayr specifically for the purpose of making recombinant expression vectors, Mayr also simply sent Moss material without further explanation. (*Id.* at ¶¶ 10(iii)-(iv)). Thus, we can infer from Mayr's prior course of dealing that

he acted no differently in his 2001 transfer of MVA-572 to Moss than he acted on other occasions where he only transferred possession, rather than ownership.

Moreover, in attempting to imply Mayr's "will to agree" from the surrounding circumstances, Mayr's actions must be contextualized by the applicable customs within the scientific community. As argued in more detail below, Mayr's transfer of possession of the strain to Moss is entirely consistent with the custom that a scientist transfers only possession of his materials for a limited purpose unless there is an express agreement to transfer ownership. (*See* Exh. E, Einhorn Dep. at 51:20-52:8; Exh. F, Drillien Dep. at 81:11-20). Thus, not only is there no express agreement to transfer ownership of the strain to NIH, but such agreement cannot be implied from Mayr's actions.

Rather, the only conclusion supported by the evidence is that Mayr wished to transfer *possession* of the strain to Moss. As such, the transfer of the strain is analogous to a bailment of a chattel for a particular purpose, an argument BN has raised consistently in its original motion and its response to Acambis' summary judgment motion. (BN Op. Brief, D.I. 115, at 19-21; BN Ans. Brief, D.I. 125, at 23-24.) Acambis cites several cases for the proposition that conversion law does not apply to actions to enforce a contract. (Defs. Ans. Brief at 11-12.) While that may be the case, BN and Mayr are not attempting to enforce a contract in this action, but attempting to enforce the terms of a bailment. Acambis cannot reasonably dispute that conversion actions lie against a bailee who exceeds the terms of his bailment. *See* BN Ans. Brief at 23-24, citing *Hall v. Corcoran*, 107 Mass. 251, 255 (Mass. 1871); *Goell v. Smith*, 128 Mass. 238, 239-240 (Mass. 1880); *McClemy v. Brown*, 99 A. 48, 50 (Sup. Ct. Del. 1916); Restatement (Second) of Torts, § 228; Richard A. Epstein, *Torts* § 1.12.3 "Specialized Cases of Conversion" (Aspen 1999). As such, Acambis' arguments in part I-B of its response brief are unavailing, and BN is entitled to summary judgment on its conversion claim.

12

(3)    **Plaintiffs' Rights in MVA 572 Extend to its Progeny**

Acambis asserts that even if Mayr owned the MVA-572 provided to Moss, he has no

actionable rights to MVA-572's progeny. (Defs. Ans. Brief at 12-13.) This argument is based on

Acambis' misunderstanding about conversion law, and particularly how that law applies to

MVA-572's progeny, which Acambis dubs a "copy." (Id.) Acambis argues that "possession of a

copy is not actionable as a matter of law." (Id.) Yet, as explained in considerable detail in BN's

answering brief to Acambis' summary judgment motion, the legal principle Acambis evokes

applies only when the property in question is an *intangible* right, such as mere information, or an

idea. (*See* BN Ans. Brief at 21-23.)  *See Orteck Int'l, Inc. v. Transpacific Tire & Wheel, Inc.*,

2006 U.S. Dist. LEXIS 67702, *76 (D. Md. 2006) (allegedly converted property is a customer

list); *Duty Free Americas, Inc. v. Legg Mason Wood Walker, Inc.*, No. 24-C-04-005696, 2005

WL 914395, at *2 (Md. Cir. Ct. Jan. 13, 2005) (allegedly converted property is a trade secret);

*Home Paramount Pest Control Cos., Inc. v. FMC Corp. Prods. Group.*, 107 F. Supp. 2d 684, 693

(D. Md. 2000) (allegedly converted property is a customer list); *Fainsbert v. Cuthbert*, No. 06-

2017, 2006 WL 2096057, at *5-6 (D.N.J. July 27, 2006) (allegedly converted property is secret

financial information); *Furash & Co., Inc. v. McClave*, 130 F. Supp. 2d 48, 58 (D.D.C. 2001)

(allegedly converted property is trade secrets); *Pearson v. Dodd*, 410 F.2d 701, 706 (D.C. Cir.

1969) (allegedly converted property is secret business information).

Unlike the trade secrets, customer lists, and other business information at issue in the

cases cited by Acambis, however, MVA-572 is tangible property. And what is true for intangible

ideas does not hold true for tangible property. *See Pagliai v. Del Re*, No. 99-CIV-9030(DLC),

2001 WL 220013, at *5-6 (S.D.N.Y. Mar. 7, 2001) (property is a painting, and court holds that it

was converted). Under Acambis' erroneous approach to conversion law, for example, one could

steal a pregnant cat and not be liable in conversion for its kittens. But that is not the law.

Acambis' argument that F6 should not be treated any differently than Dr. Moss' clones

for purposes of conversion is irrelevant. (Defs. Ans. Brief at 14). BN would still have a

conversion claim against Acambis based on their commercial use of MVA F6 instead of MVA 572 but that would not have involved the NIH.[2]

### (4) There Have Been No Unrestricted Transfers By Prof. Mayr Exempting Any Commercial Rights

Acambis continues to assert that Prof. Mayr has somehow given up his ownership rights to MVA 572 by providing the strain to fellow researchers for research purposes. (Defs. Ans. Brief at 14). This argument can only be seen as a veiled attempt to excuse its own conduct. In support of this argument, Acambis submits that Prof. Mayr has given a sample of MVA 572 to ▮▮▮▮▮▮▮, who has provided it to ▮▮▮ and that ▮▮▮ is now engaged in clinical trials. *Id.* First of all any such provision would concern a different vial of MVA-572 and not the specific property at issue in this case. Secondly, Acambis also argues that Prof. Mayr gave MVA 572 to ▮▮▮ for non-research purposes. This however, is completely false. Wulff testified that Prof. Mayr had been threatened by ▮▮▮, who then gave the sample to ▮▮▮. (Exh. I, Wulff 9/21/2006 deposition at 177:8-178:3). Moreover, BN met with ▮▮▮ on February 3, 2004 to discuss BN's rights in the MVA 572 sample, thus, it is also untrue that BN has not acted. (*Id.* at 177).[3]

### (5) Moss Never Received Permission From Mayr to Commercially Exploit the Value of the Strain.

Acambis next argues that the transfer of MVA-572 from Mayr to Moss was not restricted to use of the strain for research purposes only. (Defs. Ans. Brief at 15-22.) This argument must fail. As a threshold matter, Acambis concedes (as it must) that established custom within an industry defines the manner in which property rights are acquired. *See* BN Op. Brief at 22-23;

---

[2] BN's CEO, Peter Wulff, has testified that BN recognizes that it has property rights in MVA F6 but has had not any reason to assert these rights. (Exh. I, Wulff 9/21/06 deposition at 168:14-169:7).

[3] Although Acambis claims that ▮▮▮ is engaged in clinical trials presumably using MVA 572, it has not provided any evidence to support this assertion. Clinical trials, however, are usually done for research purposes. Nonetheless, Wulff's deposition testimony is clear that ▮▮▮ is not making any commercial use of MVA 572 at this time and that BN may in the future request that ▮▮▮ return the MVA 572 sample to BN. *Id.* at 182:10-183:5

*see also Nixon v. United States*, 978 F.2d 1269, 1276 n.18 (D.C. Cir. 1992); *Ghen v. Rich*, 8 F.

159 (D. Mass. 1881). Acambis offers no case law or authority of any kind to rebut this

established principle of property law. As such, it is necessary merely to discern what the custom

was among the biotech research community at the time Mayr transferred the strain to Moss when

a transfer is silent about the material's permissible use.

The custom in the research community, as supported by substantial evidence (as well as

common sense), is that you do not have the right to commercially exploit another scientist's

research unless that scientist explicitly gives you the right to do so. As Acambis states in its brief,

and BN agrees, neither of the letters exchanged between Moss and Mayr during the transfer of the

strain contained any language delineating the permissible uses of the strain. (Defs. Ans. Brief at

15-16.) Prof. Mayr described the effect of this silence among the custom of research transfers in

his deposition:

> Q. Have you ever told Dr. Moss in sending those samples that he was restricted in how he
> could use them?
>
> A. I did not do so, because the exchange of viruses or strains on an international level is
> customary without imposing restrictions.

(Mayr Dep., D.I. 116 Exh. G, at 19 line 22 through 20 line 5). Acambis, however, would impose

an additional burden on researchers to "opt out" of other people exploiting their research for

commercial gain; this turns the established custom on its head. For example, Prof. Mayr testified

that, when asked for samples (as he frequently was), he did not have to explicitly state that the

requestor was not permitted to use the material for anything but research purposes:

> Q. Prior to the year 2002 did you ever specifically say to any persons to whom you sent
> MVA that the recipients could not use it for commercial purposes?
>
> A. No, we did not or I did not, because it is customary to exchange strains among
> scientists and that is only for research purposes.

(Exh. H, Mayr Dep. at 45, lines 16-21). BN's expert witnesses, David Einhorn and Dr. Robert

Drillien offered considerable testimony regarding the ubiquity of this custom among research

scientists. For example, Einhorn stated:

15

as I say every day of the week, scientists exchange materials between institutions and
academia without any documentation, clearly with understandings that
the materials will be used for research purposes only.

(*See* Exh. E, Einhorn Dep. at 52:15-20.)  As such, Einhorn concluded that the transfer of MVA-

572 from Mayr to Moss would similarly have been limited to research uses:

> [M]y opinion is that the intention of Professor Mayr, and I think the expectation of Dr.
> Moss, based on custom and practice in the community, was that when he was,
> when Dr. Moss requested the MVA 572 from Professor Mayr, that Professor Mayr sent it
> to him with the understanding, implicit understanding, because that is the custom in the
> community of two academic scientists, that the materials would be used for research
> purposes only.

(*See* Exh. E, Einhorn Dep. at 51:20-52:8.)

Of particular value was the testimony of Dr. Drillien, who is himself a virologist.

Drillien testified that in the research community, the transfer of research material without a

written agreement confers only the right to use the material for research.

> Q. Do you have an opinion as to whether or not Mayr and Moss entered into an
> agreement that limited the use of the virus to research purposes only?
>
> A. Well, as I said previously, it's standard practice, customary practice between
> researchers to provide material to other researches for—for fundamental studies.  So I
> don't think this is an exception.  It's many that was not necessarily written, a written
> limitation on the use of those materials, but it was an understanding that that limitation
> would apply as there is this kind of understanding in the research community.
>
> Q. So, by saying that there was an understanding, what do you mean?
>
> A. An understanding that the material was provided for research purposes.

(*See* Exh. F, Drillien Dep. at 11:14-12:11.)  In contrast, Dr. Drillien testifies that if a transferee

wanted to commercially exploit the transferor's research, he would enter into an explicit

agreement to that purpose:

> my understanding of what is proper conduct in using biologicals obtained from
> researchers is that a company interested in developing a product from a biological
> obtained from a research institution would enter into an agreement with that research
> institution for royalties during the commercial use of that product
> for a down payment or for a lump sum of money, and this has not been the case in this
> particular instance between Acambis and Professor Mayr or his representatives.

(*See* Exh. F, Drillien Dep. at 81:11-20.)

Acambis derides Dr. Drillien for not being an "expert in the legal aspect of transfer of materials," unlike its own expert witness, Dr. Stevens. (Defs. Ans. Brief at 19.) But of course, that is precisely the point: Dr. Drillien is not merely a researcher's *lawyer*, he is an actual *researcher*. *See* Exh. F, Drillien Dep. at 88:22-89:9 ("I believe that Dr. Stevens is a specialist in this area, but is not a virologist and is not familiar with the customs that virologists practice, but more of a specialist of the legal aspect of transfer of materials.") Unlike Acambis' expert witness, Dr. Drillien is qualified to describe the custom actually practiced by researchers.

Indeed, the NIH has itself issued a pamphlet on Sharing Biomedical Research Resources that precisely contemplates and advocates the exchange of research tools without a formal written agreement:

> Each iteration in a negotiation over the terms of a license agreement or materials transfer agreement delays the moment when a research tool may be put to use in the laboratory. Recipients should take every reasonable step to streamline the process of transferring their own research tools freely to other academic research institutions using either no formal agreement, a cover letter, …

(D.I. 116, Exh. J (NIH Pamphlet)). And in the context of this same pamphlet, Einhorn notes that this limitation of use for research is necessary to NIH because it allows them to basic research materials from the commercial world:

> For instance, the policy talks about the fact—which I think is relevant to what we have here, that when a for-profit company shares research tools, or biomedical resources with an academic, that that academic should be sensitive to the fact that these may be proprietary, and that they should be circumspect in terms of sharing that with commercial partners. It's actually, it's there in the policy.
> Otherwise, the for-profit world will not be willing to share basic research tools with academia if they think those research tools are going to end up in the hands of their competitors.

(*See* Exh. E, Einhorn Dep. at 45:15-46:6).

As such, evidence even within Moss's own institution suggests that Moss did not obtain the right to commercially exploit MVA-572 merely because there was no written restriction imposed by Mayr.

17

Acambis expends many pages on arguments that are, quite frankly, irrelevant. For example, Acambis argues that that BN and Einhorn's own institution often use material transfer agreements. (Defs. Ans. Brief at 18-19). It is unclear how this helps Acambis' case. Undoubtedly, when your transferor uses lawyers to transfer a material, the lawyers are going to insist on written agreements; yet this observation yields nothing of value respecting the transfer from Mayr to Moss, and particularly tells us nothing about how we are supposed to interpret the *absence* of a written agreement. Nor do Acambis' subsequent arguments concerning Linda Gritz's understandings about Moss's understandings of the transfer or Michael Mowatt's post-hoc understandings of the transfer (Defs. Ans. Brief at 19-22) push the ball forward concerning the one relevant question at issue here: against which party does one interpret the silence in this materials transfer? Did Moss bear the burden of requesting the right to exploit MVA-572 commercially, a virus he received for free from Mayr? Or was the burden on Mayr to explicitly withhold commercial rights to MVA-572 each and every time he made his research available (for free) to other scientists? Both common sense and overwhelming evidence suggest that the burden was on Moss, and that—having failed to obtain explicit permission to commercially exploit Mayr's labor—he is restricted to research use of the strain.

### (6)    Acambis Has Made Commercial Use of MVA 572

Acambis has supplied over 500,000 vaccine doses to the U.S. Government under RFPs 1 and 2 and earned at least $▮ million in revenues due to its commercialization of MVA 572. (D.I. 116, Exh. Q, Jarosz expert report at 18, citing ACDEL000001, ACDEL004446.) Notwithstanding this significant amount of revenue, Acambis attempts to argue that its use of the MVA sample received from NIH is somehow not commercial. Defs. Ans. Brief at 23. In particular, Acambis suggests that its use of MVA "providing a smallpox vaccine to fulfill U.S. Government contracts to create a stockpile to protect citizens in the event of a bioterror attack" is similar to the German government's use of MVA 572. *Id.* While BN acknowledges that the German government used MVA 572 as a pre-vaccine to vaccinate 120,000 people against

smallpox, there is no evidence that there was any money paid as part of the circumstances of this transaction. It is also irrelevant for the purpose of deciding the present case.

### III.    CONCLUSION

Based on the foregoing reasons, and all of the reasons set forth in its Opening Brief (D.I. 115), Bavarian Nordic respectfully requests that its motion for summary judgment on the issue of conversion be granted.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

January 12, 2007

John W. Shaw (No. 3362) [jshaw@ycst.com]
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
D. Fon Muttamara-Walker (No. 4646)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

- and -

BINGHAM MCCUTCHEN LLP
Edward A. Pennington
Robert Bertin
Krista Lynch
3000 K Street Suite 300
Washington, DC 20007
(202) 424-7500

*Attorneys for Plaintiff, Bavarian Nordic A/S*

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on January 22, 2007, I caused to be electronically filed a true and correct copy of the foregoing sealed document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Mary B. Graham [mbgefiling@mnat.com]
> James Walter Parrett, Jr. [jparrett@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200

I further certify that on January 22, 2007, I caused a copy of the foregoing sealed document to be served on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### By E-Mail and Hand Delivery
>
> Mary B. Graham [mgraham@mnat.com]
> James Walter Parrett, Jr. [jparrett@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
>
> ### By E-Mail and Federal Express
>
> William D. Coston [wdcoston@venable.com]
> Martin L. Saad [mlsaad@venable.com]
> Tamany Vinson Bentz  [TJBentz@Venable.com]
> VENABLE LLP
> 575 7th Street, NW
> Washington, DC 20004-1601
> (202) 344-4000

DB02:5354425.1                                                           064417.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen L. Pascale*

_____

Karen L. Pascale (No. 2903)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
Email:  kpascale@ycst.com
   *Attorneys for Plaintiff Bavarian Nordic A/S*