20.   As indicated above, Professor Mayr developed MVA virus from CVA over a lengthy period of time. It appears beyond doubt and does not seem to be disputed that he, when he in 1963 became director of the Institute for Medical Microbiology, Infectious and Epidemic Diseases at the Veterinary Faculty of the Ludwig-Maximilians-University in Munich, brought into his new lab CVA samples, which had undergone already considerable numbers of passages. Quite apart from the fact that his former employers, namely the Bavarian Vaccine Institute in Munich and the Federal Research Institute for Virus Diseases in Animals, Tübingen, never raised any tangible property claims in CVA samples of Professor Mayr's lab, their property in CVA, had it ever existed, would have vanished in view of the results of the further research work of Professor Mayr in that material. As I understand, the successful and decisive creative work of Professor Mayr was performed during his time as Professor and Director of the Munich University Institute for Medical Microbiology, Infectious and Epidemic Diseases in the early 1970-ies, when he reached the 516th passage and renamed the virus into MVA. MVA, unlike its predecessors, due to deletion of some 31 kilobases of its genomic sequence, became highly host cell restricted to avian cells and was significantly avirulent (*supra* no. 11). From the general interest demonstrated in MVA from so many prominent sides worldwide, it clearly follows, that MVA displayed new, important and in view of its purposive use, decisive properties as compared to the CVA as starting material. It also follows from that fact that MVA constituted from the very beginning a new and independent asset, exclusively owned by Professor Mayr.

21.   MVA-571 (Prof. Mayr's 571 serial passage strain of MVA) was registered in 1976 in Germany. This MVA virus was used at a very low dose as a pre-vaccine before administering the conventional smallpox vaccine and shown to be safe in that dose in more than 120,000 individuals, including at-risk subjects for smallpox vaccination. The clinical trials were

9

conducted by a medical doctor named Stickl through the Bavarian Vaccine Institute (Bayer Landesimpfanstalt) Munich in collaboration with Prof. Mayr. As a clinician, Dr. Stickl obviously never passaged or plaque purified the virus. Prof. Mayr was the virologist and he was always the one who worked with the virus itself. Based on this collaboration, however, the MVA strain was tested in clinical trials as a vaccine to immunize against the human smallpox disease (*Mayr et al.*, Zbl. Bakt.Hyg. I, Abt.Org. B 167, 375-390 [1987], *Stickl et al.*, Dtsch. med. Wschr. 99, 2386-2392 [1974]). The Defendant has suggested that ownership somehow could have transferred to Dr. Stickl based on the clinical testing conducted at the Bayer Landesimpfanstalt and the subsequent use of MVA as a pre-vaccine in Germany. I disagree.

22. Specifically, ownership of the MVA viruses created by Prof. Mayr did not at any point transfer to Dr. Stickl based on the mere provisions of MVA viruses for clinical trials, or vaccinations of the general population as suggested by Acambis. The record reveals no separate transfer of ownership from Prof. Mayr to Dr. Stickl. At any rate, this aspect is irrelevant as I understand this case to concerns a specific MVA virus, namely the MVA-572 virus delivered from Prof. Mayr to Dr. Moss and not any MVA potentially existing at the Bavarian Vaccine Institute. Accordingly, I will focus on the specific MVA-572 virus which is relevant to this case that Prof. Mayr per request provided to Dr. Moss at the NIH.

## V. MY OPINION REGARDING TRANSFER OF RIGHTS TO MVA-572 BETWEEN PROF. MAYR AND BAVARIAN NORDIC

23. Prof. Anton Mayr and Bavarian Nordic originally entered into a license agreement in 1996 that provided Bavarian Nordic "exclusive and sole access to" Mayr's MVA stocks, with the provision that "in the scientific community, there is a growing interest in

10

performing basic non-commercial research including the MVA vector. BN agrees not to unreasonably use its exclusivity to the MVA system to hinder basic research by third party non-commercial academia." Mayr and Bavarian Nordic entered into additional agreements regarding Mayr's MVA vaccine stock in 1999, 2001, 2003 and 2004.

24.    In 2002, Mayr entered into an Assignment Agreement with Bavarian Nordic. In the recitals, the Assignment Agreement confirms that Mayr "previously granted BN . . . exclusive access to MVA vaccine stock and MVA viral stock" and further confirms "transfer of ownership of all MVA vaccine stock and MVA viral stock in the possession of Dr. Mayr ('MVA strains') to BN." After the recitals, the Assignment Agreement transfers from Mayr to Bavarian Nordic the "entire right, title and interest in and to said MVA Strains and Patents . . . and all and every right to make commercial use of the MVA Strains." The MVA viruses assigned include MVA-572.

25.    It is my opinion that Prof. Mayr transferred title to BN with respect to all MVA strains including the MVA-572 based on the 2002 agreement between Anton Mayr and BN, unless rights have been transferred to a third party prior to this date based on a concrete agreement to that effect. Accordingly, Prof. Mayr had no rights to transfer with respect to any MVA strains, including MVA-572 to third parties after he transferred his rights to BN.

26.    It is my opinion that Prof. Mayr's transfer of his rights regarding ownership and royalty claims with respect to any commercialisation of MVA strains covers all MVA strains being provided by him to third parties for research purposes. Accordingly, BN legally stands in the shoes of Prof. Mayr and any right Prof. Mayr has in any particular MVA strain is the rights of BN.

11

## VI.    MY OPINION REGARDING TRANSFER OF OWNERSHIP

27.    According to German law, a receiver of an MVA strain owned by BN would only be free to use that MVA-strains commercially based on either a transfer of ownership or an explicit agreement regarding commercial use of the strain at issue.  The relevant strain is the MVA-572, which was provided to Dr. Moss at the National Institute of Health ("NIH") in August 2001.

28.    According to German law, a transfer of ownership does not take place by a mere provision of an MVA strain by an owner to a third party.  In fact, ownership to the MVA-572 cannot be transferred solely based on right of use or a sales contract.

29.    German law requires a separate transfer of ownership.

30.    According to the so-called *Abstraktionsprinzip* both these transactions (*i.e.* sales contract and transfer of ownership) are legally independent transactions.

31.    Absent an explicit and separate transfer of ownership, Dr. Moss and/or NIH would not be permitted to use the MVA-572 strain or its progeny for commercial purposes. Particularly, the record fails to demonstrate an explicit and separate transfer of ownership to Dr. Moss or the NIH.  To the contrary, the record shows that Prof. Mayr provided the MVA-572 strain to Dr. Moss for research purposes only.

32.    A provision of an MVA-572 strain for research purposes certainly does not automatically qualify as a transfer of rights for commercial purposes unless there is a specific agreement between the parties to that effect, either explicitly or based on research or industry practice.  With respect to research and industry practices, live biological material, such as a MVA strain, provided to a research institution for research purposes cannot be used for

12

commercial purposes without an explicit agreement to that effect.

33.   Prof. Mayr has a well recognized duty in the scientific community based on his numerous publications in renowned scientific journals to provide the MVA virus to interested parties for research purposes. As one example of many, see *Meyer, H., Sutter, G., and Mayr, A.* "Mapping of deletions in the genome of the highly attenuated vaccinia virus MVA and their influence on virulence" J.Gen.Virol., 72 ( Pt 5), 1031-1038. 1991. As specifically revealed from the Instructions for Authors (at p. 8, lines 24-28), "By publishing in JGV, authors agree that any viruses, plasmids and living materials, such as cell lines or bacterial strains that are newly described within the article are available without unnecessary delay and at a reasonable cost to members of the scientific community for non-commercial purposes." (See also generally, *e.g.*; ". . . and material/information must be made available, to permit the work to be repeated by others." And further; "Supply of materials . . . and must be for legitimate, bona fide research needs." J. Gen. Virology Instructions to Authors at p. 2, l. col. ,lines 11-18.) Moreover, Dr. Moss acknowledged the restrictions on the transfer of MVA-572 from Prof. Mayr when he required Therion Biologics Corporation, a for-profit company, to first acquire Prof. Mayr's permission before providing the strain (see letter of Therion Biologics of February 26, 2002).

34.   Prof. Mayr deposited the MVA-572 virus at the European Collection of Animal Cell Cultures ("ECACC") under number V940012707, thus, making this virus available to the research community for research purposes only.

35.   Accordingly, Dr. Moss and/or NIH had no right to provide the MVA-572 or its progeny to Acambis as per the Material Transfer Agreement dated 9 September 2002. This MTA also explicitly provides no warrant regarding freedom to operate and includes an indemnification clause to the benefit of the NIH.

13

36.     If called, I will testify that, in my opinion, according to Section 929 of the German Civil Code (BGB), a transfer of ownership requires an agreement of both parties regarding the transfer of ownership and a delivery of the respective good (*Einigung und Übergabe*). Prof. Mayr, has neither explicitly nor implicitly agreed to transfer ownership, or any commercial rights, to Dr. Moss and/or NIH. Under the rules prevailing in the scientific research community the facts at hand exclude an assumption of an implicit (tacit – stillschweigend) transfer of ownership or license for commercial use of MVA-572 to Dr. Moss and/or NIH. Since also BN never agreed to transfer ownership or any commercial rights in MVA-572 to Dr. Moss and/or NIH, Dr. Moss and/or NIH were not free to use the MVA-572 strain and/or its progeny commercially.

37.     Prof. Mayr or BN never provided the MVA-572 strain to Acambis, thus, Prof. Mayr or BN has not transferred ownership, or any commercial rights, to Acambis. Accordingly, Acambis was not free to use the MVA-572 strain and/or its progeny commercially.

## VII.    MY OPINION REGARDING GOOD FAITH DEFENCE

38.     Dr. Moss or NIH could only become owner(s) on basis of Section 932 para.1 BGB if they were in good faith receiving the MVA-572 strain. However, according to Section 932 para.2 BGB the purchaser will not be in good faith "if he knew or due to gross negligence did not know that the MVA-572 strain did not belong to the seller." The letter, which Therion Biologics wrote to Prof. Mayr on February 26, 2002, where one can read: "Dr. Moss is willing to send us the virus but would like written permission from you before he sends us the virus", clearly reveals that Dr. Moss and NIH were fully aware of the legal status of MVA-572. CEF, i.e., that they had no title of ownership in it.

14

39.     Good faith depends on the circumstances. For example, there was no money transaction in connection with the shipment of this strain. In any event, Dr. Moss and the NIH were put on notice by Prof. Mayr and BN prior to the provision of the MVA-572 strain and/or its progeny to Acambis and certainly before any commercial use has been made of it.

40.     Acambis was not and cannot have been in good faith as required by German law. For example, the MVA dated 9 September 2002 explicitly provides no warrant regarding freedom to operate and includes an indemnification clause to the benefit of the NIH. Acambis was put on notice by BN prior to receiving the MVA-572 virus strain regarding Bavarian Nordic's rights of Prof. Mayr's MVA viruses, and thus also regarding Prof. Mayr's rights to his man made MVA viruses, and certainly before any commercial use has been made of it. Acambis was further put on notice by the NIH of claims made by Bavarian Nordic and Prof. Mayr regarding legal rights to the MVA-572 virus strain prior to receipt of this particular strain and certainly before any commercial use has been made of it. Ignorance of the law is no defense to liability under the law.

41.     Accordingly, Dr. Moss and/or NIH or Acambis cannot be considered bona fide purchasers and were therefore not free to use the MVA-572 strain and/or its progeny commercially.

Respectfully submitted,

_____
Prof. Dr. Dres. h.c. Joseph Straus

15

# EXHIBITS 16-18

## REDACTED IN THEIR ENTIRETY

# EXHIBIT 19

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                         - - -

 4   BAVARIAN NORDIC A/S and ANTON    :    CIVIL ACTION
     MEYR,                           :
 5                                    :
                Plaintiffs           :
 6                                    :
           vs.                       :
 7                                    :
     ACAMBIS INC. and ACAMBIS PLC,    :
 8                                    :
                Defendants           :    NO. 05-614 (SLR)
 9                         - - -

10                         Wilmington, Delaware
11                         Wednesday, September 13, 2006
                           11:03 o'clock, a.m.
12                         - - -

13   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
14                         - - -

15   APPEARANCES:
16
           MORRIS, NICHOLS, ARSHT & TUNNELL
17           BY:  MARY B. GRAHAM, ESQ. and
                  JAMES W. PARRETT, JR., ESQ.
18
19                -and-
20
           VENABLE, LLP
21           BY:  TAMANY J. VINSON BENTZ, ESQ.
                  (Washington, D.C.)
22
23           Counsel for Plaintiffs
24                         Valerie J. Gunning
                           Official Court Reporter
25
```

Page 2

```
 1   APPEARANCES (Continued):
 2
           YOUNG, CONAWAY, STARGATT & TAYLOR LLP
 3           BY:  KAREN L. PASCALE, ESQ. and
                  JOHN W. SHAW, ESQ.
 4
 5                -and-
 6
           BINGHAM McCUTCHEN LLP
 7           BY:  EDWARD A. PENNINGTON, ESQ.
 8           Counsel for Defendants
 9                         - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1           P R O C E E D I N G S

2

3

4           (Proceedings commenced in the courtroom,

5   beginning at 11:03 a.m.)

6

7           MS. GRAHAM: Good morning.

8           THE COURT: Good morning, counsel. I take it you

9   are here because there are some issues that we can address

10  and resolve?

11          MS. GRAHAM: Correct, we hope.

12          THE COURT: All right. I generally start with

13  plaintiffs' counsel. Let's do that.

14          MS. PASCALE: Good morning, your Honor. Karen

15  Pascale for the plaintiffs, Bavarian Nordic, and and along

16  with John Shaw from Young Conaway.

17          MR. SHAW: Good morning.

18          MS. PASCALE: And our co-counsel is Ed Pennington

19  from Bingham McCutchen.

20          THE COURT: All right.

21          MS. GRAHAM: And if I might just reintroduce to

22  the Court before Mr. Pennington starts, I'm Mary Graham for

23  Acambis, and with me today are Tamany Bentz from the Venable

24  firm. And, your Honor, we are filing the motion for her

25  admission pro hac vice this morning and I have a copy with

Page 4

1   me, if that would be helpful.

2           THE COURT: That's all right. It has been noted

3   on our electronic filing. So ordered.

4           MS. GRAHAM: Also with me is James Parrett, my

5   associate.

6           THE COURT: Thank you.

7           MS. GRAHAM: I should say that Ms. Bentz and I

8   probably will be both addressing discovery issues, depending

9   a little bit on how they come up, what makes most sense for

10  us to address.

11          THE COURT: All right. Thank you.

12          MR. PENNINGTON: Good morning, your Honor.

13          THE COURT: Good morning.

14          MR. PENNINGTON: Your Honor, I thought I'd start

15  off by just trying to give an overview of where I think we

16  are with the discovery issues.

17          I believe in a somewhat late-breaking

18  development, we are filing today a motion to compel in

19  Maryland for discovery on NIH. We had served subpoenas in

20  Maryland to get documents and to compel the testimony of Dr.

21  Bernie Maas.

22          On the conversion claim, your Honor, there was a

23  transaction that took place between Professor Anton Mayr, a

24  consultant for Bavarian Nordic, and Dr. Maas, an employee of

25  NIH.

### Page 5

1      We had a deposition in Washington of Dr. Maas, I
2 think it was between a week and two weeks ago. I'm not sure
3 of the exact date. But an attorney for the Justice
4 Department appeared at the deposition and instructed Dr. Maas
5 not to answer any topic or any question that wasn't
6 specifically related to a consulting agreement that Dr. Maas
7 had with Acambis, the defendant in this matter.
8      So what happened is, your Honor, we were trying
9 to explore Dr. Maas' communications, discussions, and
10 intentions with respect to the receipt of a viral strain from
11 Professor Mayr and we were not able to do that. So I know
12 that's outside of this Court, but I wanted to bring it to
13 your attention that that was going on.
14      On a, I guess a smoother course, I think we
15 have a deposition scheduled for Friday. I do not think
16 there's any controversy about that. It's of their in-house
17 counsel, Mr. Waddups. That is going to be in Washington,
18 D.C.
19      There has been some discussion about the taking
20 of Dr. Mayr's deposition, and I'm not sure that we have a
21 full agreement on the parameters for that deposition.
22      Dr. Mayr was deposed for two days in
23 Munich during the course of the ITC action, which, I
24 think -- I think those depositions took place in
25 December of '05.

### Page 6

1      During those deposition days, Dr. Mayr was
2 interrogated thoroughly about the first transfer of the viral
3 strain from him to the NIH, and the issue of whether or not
4 that transfer was for research purposes only or not, and
5 that, again, goes to the heart of the issues before this
6 Court.
7      Dr. Mayr was -- his testimony was preserved for
8 trial. It was videotaped. It was transcribed. He was
9 cross-examined and redirected, I believe, and it will be
10 clear from the videotape that Dr. Mayr is -- I believe he's
11 now 85 years old. He's quite frail. I think his demeanor,
12 is fine, but it's somewhat unlevel.
13      I know that he has trouble traveling even from
14 his home to Munich. We don't believe it would be in his
15 interest at all to travel to the United States.
16      I believe the other side has agreed to take a
17 deposition in Munich. Again, I am not sure about that, but
18 I think so.
19      Our concern, your Honor, would be to put some
20 kind of limitations on the scope of his interrogation for a
21 couple reasons. One is that they've already had two days of
22 Dr. Mayr, and I believe that there is an agreement also to
23 use all the testimony from the ITC in this case. So it's
24 perfectly usable, number one.
25      Number two, we're not going to call Dr. Mayr as a

### Page 7

1 witness, as a live witness. We have no intention of bringing
2 him to our trial in this case.
3      And so what we would hope to do is have some
4 agreement, or the Court's intervention, hopefully, to try to
5 put a restriction on how much time they are going to take and
6 what subjects they're going to depose him on.
7      We also recently discovered that Acambis' counsel
8 is attempting to take the deposition of Dr. Mayr's wife. We
9 received a notice to take her deposition. There has been, I
10 think, some discussion about it.
11      We are not willing to provide Dr. Mayr's wife
12 voluntarily for a deposition. She's not a party. There is a
13 Hague Convention for taking nonparties. It has not been used
14 in this case by Acambis.
15      The role of Dr. Mayr's wife, to my knowledge, is
16 that she has acted in the past as a translator for Dr. Mayr,
17 whose primarily language is obviously German, but his English
18 is not as good as perhaps his wife's is.
19      Her role in his life, I guess, came to light in
20 the depositions that were taken in December of '05, so we
21 believe that Acambis has a 102 attempt to get her through the
22 Hague Convention. They could have done it. This case has
23 been pending for as long as the ITC case has been pending.
24 They could have noticed her through the Hague at any time and
25 we're just now getting the notice, I would say weeks before

### Page 8

1 the close of discovery in this case.
2      On interrogatories, we were having a brief
3 discussion before your Honor came into the courtroom about
4 the current status. Both sides had initial responses to
5 interrogatories. I think it's fair to say both sides were
6 dissatisfied with the initial responses.
7      Counsel for Acambis and I were discussing which
8 ones we were unsatisfied with this morning. There are at
9 least two that they are unhappy with that I can say on the
10 record we're willing to supplement. They are Interrogatories
11 22 and 24 that relate to Dr. Mayr's payments from Bavarian
12 Nordic or lack thereof. I'm happy to do that.
13      And counsel represented that we had objected to
14 their responses to our Nos. 21 and 32, and, your Honor, I'm
15 not sure if that was all. And I believe they were willing to
16 supplement those, but I'm not sure as I stand here whether
17 that was the totality of our objection. I'm not sure if we
18 had other general objections.
19      It might be that both sides are still objecting
20 to each other's contention interrogatory responses, and if
21 that's the case, what I would hope is that both sides work as
22 hard as we can to provide supplementations that would avoid
23 any intervention on your part.
24      We certainly remain cooperative in that area. I
25 don't think we've come to a brick wall on either side.

Page 9

1      I also found out this morning on the train up
2 that we just received a document production that may number
3 in the thousands, maybe a couple of pages of documents coming
4 from Acambis.
5      Your Honor may recall that we had some disputes
6 over the protective order. Our in-house counsel was fairly
7 adamant about participating in this case and needed to have
8 access to documents so that she could fairly participate and
9 assist her client, who is also our client, Bavarian Nordic.
10 And I understand from one of my associates that all the pages
11 of documents that were produced were marked Outside Counsel
12 Eyes Only. I believe that would be 100 percent of what was
13 produced today.
14      Just one example, your Honor, I was told that one
15 document that was marked Outside Counsel Eyes Only was a
16 communication from an in-house attorney at Acambis to
17 personnel at NIH, inviting them to attend our ITC hearing.
18 And that was marked Attorneys Eyes, Outside Attorneys Eyes
19 Only. That's just, I believe, an example.
20      So we may end up having to either ask for the
21 Court's intervention or certainly we're going to ask the
22 other side to make some good-faith effort to declassify and
23 make legitimate claims to the status that was negotiated and
24 put into the protective order. The negotiations, I believe,
25 focused on keeping from the in-house counsel very sensitive

Page 10

1 bidding documents that might be presented to the NIH, and we
2 have no problem with keeping that out of the view of our
3 in-house counsel, but we believe that there's quite a bit of
4 other documents that would be fair for our in-house counsel
5 to see.
6      Your Honor, that's pretty much my overview. I
7 don't know if you have any questions for me, but that's
8 pretty much all I have as an overview.
9      THE COURT: I don't have anything yet.
10      Let's go to defendants' counsel to address those,
11 what I have as four issues, and then we can address
12 defendants' issues as well.
13      MS. BENTZ: Good morning, your Honor.
14      THE COURT: Good morning.
15      MS. BENTZ: I will try to make sure I touch on
16 all of Mr. Pennington's issues, but if I miss one, please let
17 me know.
18      First, we do have a deposition scheduled this
19 Friday, although we were notified that it would be Roger
20 Macavoy, who was Acambis' former general counsel, so I would
21 ask Mr. Pennington if that's correct. That's who we're going
22 to have being deposed on Friday?
23      MR. PENNINGTON: I believe you're correct.
24      MS. BENTZ: Okay.
25      MR. PENNINGTON: I stand corrected.

Page 11

1      MS. BENTZ: And I belief we have an agreement on
2 that, so that will go forward.
3      For Professor Mayr, his deposition in December,
4 for the record, was a half-a-day deposition in Germany and it
5 was translated, so, in essence, it was really a quarter of a
6 day of testimony.
7      I recall this because it was highly contested.
8 We wanted more time than half a day. We were told that
9 Professor Mayr was elderly and unable to be deposed for
10 longer than that, so we agreed because he was not a party in
11 the ITC litigation, and because he was in Munich, so outside
12 the United States' jurisdiction.
13      We are requesting his deposition now because he
14 is a party to this litigation, because we were restricted in
15 time frame the last time we took his deposition, and because
16 we believe there are issues that we did not ask him about in
17 his first deposition that we need to inquire about now.
18      We have agreed to travel to Munich because we
19 understand that Professor Mayr cannot travel here. We
20 believe that plaintiffs have agreed to pay for the extra cost
21 for traveling to Munich and conducting a deposition in
22 Munich.
23      Last night, there was some e-mail correspondence
24 about which charges they would or wouldn't pay for. I
25 believe we can work those out amongst ourselves.

Page 12

1      We, I believe, last week, sent a letter to
2 counsel for plaintiffs, requesting that we be allowed to take
3 the deposition of Professor Myr's wife. To the extent he was
4 going to rely on her in his initial deposition in December,
5 he indicated that some of the negotiations and correspondence
6 with Bavarian Nordic had been through his wife. So we merely
7 asked if he was going to rely on his wife in this next
8 deposition, that we be allowed to take her deposition.
9      To my knowledge, counsel for Bavarian Nordic
10 didn't respond until today that they would not be voluntarily
11 making her available.
12      And my colleague just informed me that we
13 would request the Mayr deposition in Munich to be seven
14 hours.
15      THE COURT: Do we know whether Dr. Mayr is
16 capable of going one day seven hours or whether that really
17 needs to be two half days because of his age?
18      MR. PENNINGTON: First of all, your Honor, I was
19 there. I was pretty sure it was two days. I may be --
20      MS. BENTZ: Christy Mysinger was the day before,
21 so there were two consecutive depositions back to back.
22      MR. PENNINGTON: I thought Mayr appeared for two
23 days, but we can certainly check into that.
24      As far as his health goes, he has better days and
25 better hours. I mean, his health is fairly frail.

## Page 13

1      I would say, your Honor, his only involvement in
2 this case involved the transfer of a viral strain to the
3 other side and he was asked about that. We do not want, if
4 it is seven hours, we don't want them straying off that
5 course and getting into matters that that are not germane to
6 the case and may be very upsetting to him.
7      We have told him, and we have met with his
8 counsel to talk about what the issues are in this case and
9 they involve the transfer to Dr. Maas and that has already
10 been investigated.
11      We're not asking for the Court to prohibit the
12 deposition from taking place alone. We're asking for some
13 restrictions on it.
14      THE COURT: All right. Well, let me go back to
15 defendants' counsel. And, first of all, is there agreement
16 that the scope of the deposition should be focused on, if not
17 limited to, this transfer of the viral strain from Dr. Mayr
18 to Dr. Maas?
19      MS. BENTZ: We would ask that it also include
20 Professor Myr's agreements with Bavarian Nordic concerning
21 the viral strain and also Professor Myr's damages in this
22 case.
23      And I would add that, to the extent we cover the
24 transfer of the virus, in his first deposition, it was in a
25 very superficial manner both because of time and because

## Page 14

1 conversion was a minor issue in the ITC litigation.
2      MR. PENNINGTON: Your Honor, we would not have a
3 problem with limiting it to a discussion of the viral
4 transfer of the Bavarian agreements, which were already
5 discussed back in December, but we certainly recognize that
6 that is germane and if they believe they need another bite at
7 it, that's not a problem. And the other one was damages. We
8 have no problem with that either as they relate to this
9 case.
10      THE COURT: All right. Well, given the fact that
11 Dr. Mayr is a party, given the fact that we have to include
12 time for translation and include time for his age, I am going
13 to say that seven hours is a reasonable time for this new
14 deposition. However, it seems to me that if he has good
15 times during the day, it might be spread over two days. If
16 he's best from 10:00 to 3:00 or 10:00 to 2:00, then that's
17 when you should have the deposition, and I think everyone
18 needs to accommodate that.
19      With respect to his wife, if, in fact, when he
20 says that he relied on her, I guess -- I don't know whether
21 that means he relied on her just for translation or whether
22 he relied on her advice as well. It seems to me that if it's
23 the latter, that it's appropriate to get her take on this,
24 and I don't know whether at this point we know enough about
25 it or whether we really need to see what Dr. Mayr actually

## Page 15

1 says when asked those questions, because I assume those
2 questions are within the scope that we have already set, the
3 negotiations.
4      Is that the case? The scope that we have set for
5 Dr. Mayr would include the questions that would make his wife
6 relevant, her testimony relevant or not?
7      MS. BENTZ: Yes, your Honor.
8      MR. PENNINGTON: The only thing I would say to
9 that is she's just not a party, your Honor. I'm not sure
10 if somebody said I want you to testify, I don't represent
11 Mrs. Mayr, and we've used the Hague Convention in the past,
12 and that's the general procedure for getting that kind of
13 testimony.
14      THE COURT: Well, I wrote down in my notes, and
15 I'm fairly compulsive about writing down what people say,
16 that the plaintiff was not willing to provide her
17 voluntarily. That would indicate to me that you had the
18 power to provide her voluntarily, so I think what you are
19 just telling me is a little inconsistent with respect to that
20 issue.
21      MR. PENNINGTON: I actually don't, your Honor. I
22 can say what I mean by that. If the Court orders her to
23 appear, there's an issue of whether or not she's subject to
24 that order.
25      THE COURT: Oh, I certainly can't order her to do

## Page 16

1 anything, but what I can do is, if you are in a position,
2 which it seems to me you are, to ask her to answer limited
3 questions in a limited time frame and she says no, that's one
4 thing, but for you to tell me that you are not even going to
5 ask her is something else, and while I might not be able to
6 order you to do that, it certainly will reflect poorly on
7 getting these issues resolved.
8      So you can tell me what you plan to do and I will
9 take that into account.
10      MR. PENNINGTON: Your Honor, I can certainly ask
11 her questions. I'm not going to avoid doing that. Without
12 possibly suggesting an alternative, though, if they had some
13 interrogatories to formally propose to ask her in
14 interrogatory form.
15      As I stand here today, I'm not even sure what
16 they could ask her, your Honor, because, from my
17 understanding and recollection of the deposition, she was
18 somewhat of an administrative assistant with respect of
19 receiving a letter in English and providing some sort of
20 explanation or translation, if he received the letter in
21 English.
22      THE COURT: Well, to tell you the truth, if I
23 were him, and it seems to me as though it would be helpful
24 for the defendant to, if not formalize specific
25 interrogatories, at least give a written explanation of what

Page 17

1  questions or what subject area they would be interested in
2  talking to her about so that that can at least be broached
3  with her prior to everyone's getting to Munich, to see if she
4  would be comfortable answering a few questions on that
5  subject area or answering specific questions in writing, and
6  we can go from there.
7       I do believe it would be helpful to have that
8  information given the fact that we don't have any control
9  over her at this point.
10      MS. BENTZ: I think that's something we can work
11  with counsel for Bavarian Nordic on and work towards some
12  type of written notification, topics or questions to
13  Professor Myr's wife.
14      THE COURT: All right. I think we are done
15  Issues 1 and 2. I think we have the interrogatories and the
16  classification of the document production.
17      MS. BENTZ: I will skip ahead to the document
18  production.
19      I can say that the document production from
20  yesterday was mostly Acambis' revised proposal in response to
21  the Government's RFP3. I believe that's why it was all
22  classified as Outside Attorneys Eyes Only, because it was
23  sensitive bidding information.
24      To the extent that there were documents in there,
25  for example, the e-mail that Mr. Pennington brought up, that

Page 18

1  were wrongfully captioned Outside Attorneys Eyes Only, we
2  will take a second look at that, if they could notify us of
3  Bates numbers for documents they believe are miscaptioned.
4       THE COURT: All right. Thank you.
5       MS. GRAHAM: Your Honor, I'm happy to address the
6  interrogatories. That will then lead me into our issues.
7       THE COURT: All right.
8       MS. GRAHAM: Also, because they are related.
9       With respect to concerns of, with respect
10 to Acambis' responses to interrogatories, in July we got
11 a letter from Mr. Burton, who isn't here, but asking
12 about our responses, complaining about our responses in
13 a general way to many, many document requests and to
14 five interrogatories, and we wrote back and said, Well,
15 this very generalized complaint that you have essentially --
16 you know, you've asked repeat requests from what was in
17 the ITC, and like Bavarian Nordic, Acambis is relying on
18 its responses there. If you have particular things, you
19 know, you need to let us know.
20      Then we didn't hear anything more on that until
21 last night at 6:52 in an e-mail, when Mr. Burton brought up
22 Interrogatories 21 -- 21 and 32, and that was the first time
23 we had heard of those, but we are happy to supplement those.
24 He did not mention any other particular ones. If they want
25 to mention other particular ones to us, we'll certainly

Page 19

1  consider those.
2       But obviously there needs to be a focus
3  now because many of the interrogatories that were asked,
4  of course, related to trade secrets, which is now out of
5  the case. And so to the extent they have particular ones
6  that remain that relate to conversion that they think have
7  not been adequately answered, they just need to tell us
8  that.
9       But we will supplement 21 and 32 to the extent
10 that we have some supplementation, and I can't say whether we
11 do or we don't.
12      But that leads me to our concern about Bavarian
13 Nordic's responses to contention interrogatories, and they're
14 of two sorts: One is their contentions with respect to their
15 remaining unfair trade practices, claims, and have two of
16 those, one that's State law and one that's Lanham Act. And
17 we have been asking for supplementation for a long time with
18 respect to those because we really need to know what is in
19 those claims. And we got a supplementation finally,
20 yesterday, except that that supplementation is quite
21 insufficient.
22      While it indicates that there have been alleged
23 misrepresentations to employees of NIH, that there was
24 improper influence, that Acambis has misrepresented aspects
25 about intellectual property, it does not identify specifics.

Page 20

1  It does not identify who it is that supposedly made
2  misrepresentations. It does not say who they were made to,
3  and, very significantly, it does not give you enough about
4  what the alleged misrepresentations were for us to really
5  know what they're talking about.
6       And they don't identify specific documents, for
7  example. Although there's a reference in here, they say,
8  Gee, there's this agreement, new agreement that they obtained
9  from Mr. Maas. Well, I don't know what agreement they're
10 talking about. They need to identify if there are specific
11 documents. But we need to know the specific
12 misrepresentations.
13      And not only, of course, is this the general
14 concern one has in a case so we can prepare for trial, so we
15 know is there a deposition we need to take, is there going to
16 be somebody who supposedly made or heard a misrepresentation
17 that we haven't noticed because we didn't know that we needed
18 to.
19      But, secondly, and very importantly, is hidden in
20 amongst these unfair trade practices claim are some hidden
21 issues that we really need to bring up and get up on the
22 table.
23      Reading the interrogatory, it may be -- the
24 interrogatory response, it may be that there is nothing to
25 this claim other than what is essentially either a trade

Page 21

1 secrets claim, i.e., Acambis misrepresented that it had the
2 right to use this strain, that it had these intellectual
3 property rights.
4       Well, why is that supposedly a
5 misrepresentation? Presumably, or, you know, they may
6 say, I don't know what they'll say, that they were the trade
7 secrets of Bavarian Nordic, in which case we've now got what
8 is essentially a trade secrets claim and so that should not
9 be litigated here, or maybe they're going to say they have
10 patent rights in the strains, and then, in order to know
11 whether there's a misrepresentation, are we going to be
12 getting into a dispute over whether, in fact, they had the
13 patent rights?
14       And we hinted at this issue a little bit way back
15 at the beginning of the case, and surely this is important to
16 what's going to happen at trial. I expect, if we get this
17 clearly laid up on the table, for example, and that's all
18 there is to these claims, that we would likely be filing a
19 motion that says, to the extent it's based on trade secrets,
20 that's out by virtue of your Honor's order that says trade
21 secrets is supposed to be arbitrated.
22       To the extent that it's patents, this Court has
23 also said that we're not introducing wholesale other issues
24 at this point in time, and our counterclaims, if the Court
25 will recall in our inequitable conduct defense, are out of

Page 22

1 the case, because essentially patent issues aren't supposed
2 to be in the case.
3       So we need to know whether that is what they're
4 talking about or if they have something else, we certainly
5 need to know what it is, because we don't have a clue as to
6 what they're talking about.
7       For example, when they talk about improper
8 influence, and we need to know that now, it's possible we
9 would need some additional discovery if they're going to be
10 suddenly introducing new items at this point and we'd
11 obviously have to take that up with the Court since the
12 discovery is supposed to close in less than two weeks, I
13 believe.
14       So we would ask that they have to respond
15 specifically to the contention interrogatories at the
16 earliest time. I don't know what's reasonable. I mean, from
17 my standpoint, I would love to have the responses by Friday,
18 but that may not be reasonable, in Mr. Pennington's view.
19       So that's our first issue with respect to
20 interrogatories.
21       In a related vein, though, for Professor Mayr, he
22 has also not answered the contention interrogatory, the most
23 critical one posed to him, relating to -- actually, I think
24 it was two of them. It was 10 and 11, relating to his
25 contentions on conversion, his contentions as to his rights

Page 23

1 in this strain, and what he does is refer to BN's responses
2 to interrogatories. However, BN's responses to
3 interrogatories related to BN's rights, not to his rights,
4 and we need his answers also to those interrogatories, and we
5 need them in advance of the deposition.
6       You know, again, I expect this Friday probably
7 isn't reasonable. I don't know if Monday is reasonable, but
8 his deposition is scheduled for the 21st, so we don't have a
9 lot of time.
10       Thirdly, then, related to Mayr, is that he
11 has not produced any documents, and we have reason to
12 believe he has documents, and we keep asking for the
13 documents and we keep not getting them. So we really need
14 to get his documents and we need to have them in advance
15 of the deposition in time that we can look them over, and
16 if any are in German, we need the time to be able to
17 translate them.
18       So I think those are our issues, your Honor.
19       THE COURT: All right. Thank you.
20       Mr. Pennington?
21       MR. PENNINGTON: Your Honor, there are no hidden
22 issues. We're happy to provide supplemental interrogatory
23 responses and we'll show the other side as well to supplement
24 their contention interrogatories, too.
25       As far as the details of what might be missing,

Page 24

1 your Honor, there's -- the example that I mentioned of a
2 communication between their in-house counsel and personnel at
3 NIH goes to one facet of an unfair competition claim.
4       We believe it's unfair that people who are
5 bidding against us for an NIH bid are using the primary
6 scientists at the NIH. Dr. Maas, who is in charge of this
7 technology was their paid consultant.
8       There's no mystery to the agreements that we were
9 responding to or referring to. They were consulting
10 agreements between Maas and Acambis, and they certainly
11 aware of them and have copies of them.
12       I will be happy to supplement a response to
13 identify them by date or whatever it is they want. But we
14 have found through the course of the ITC discovery that there
15 was a lot, we believe, of communication that was helpful in
16 the bidding process, and we believe that's unfair
17 competition.
18       We have general unfair competition claims. We're
19 happy to supplement our contentions, our responses, to point
20 out these items. There's nothing hidden about that.
21       Just briefly addressing Dr. Mayr's documents,
22 from what I understand, your Honor, I have met Dr. Mayr in
23 Germany. As I said, I believe he's 85 years old. He is
24 Professor Doctor Doctor Anton Mayr in Germany and I think
25 elsewhere in Europe.

## Page 25

1   Professors have a certain amount of --
2   professorship has probably more cache than it might over
3   here.
4       He has an office at his -- at his University.
5   I'm not sure how active he is. I know that, from what I can
6   see, I've never spoken to anybody in the administration at
7   the University, but he has an office. It's maybe like a
8   retired law partner who comes in and talks to the young
9   associates. I don't know.
10      But I was told in a recent meeting with Dr. Mayr,
11  when asked about what became of all your documents that
12  relate to the development of the NVA strains and you're
13  talking about development that started perhaps in the fifties
14  and went clear through maybe the seventies and eighties, I
15  don't know, but as you might know that these NVA strains have
16  numbers, depending on how many times they've been reproduced,
17  and we're talking about 572, 580, numbers like that.
18      Any lab documentation that goes back into the
19  history of that could be, if it was around, it was 40, 30,
20  20, ten years old. What I was told by Dr. Maas was that the
21  University cleaned out his lab as far back as three or four
22  years ago and from what I've heard from him, the history of
23  his work in NVA, if it existed, would have been at the
24  University. The University would have been the custodian of
25  those files.

## Page 26

1       I'm happy to double-check with Dr. Mayr on that,
2   but that was as a result of my direct communication with him
3   and my direct answer -- I'm sorry -- questioning of him and
4   his response.
5       There's one other thing I should point out, and
6   that is that Dr. Mayr -- some of the agreements that Ms.
7   Bentz referred to we've had produced before, and they are
8   agreements between Bavarian Nordic and Dr. Mayr, where Dr.
9   Mayr, at first I believe he granted a license, an exclusive
10  license to Bavarian Nordic to these strains and then he
11  assigned his rights and then he has a consulting agreement.
12  He is actually a paid consultant to Bavarian Nordic, and for
13  that reason, we believe that, you know, whatever documents he
14  may have, we would certainly produce.
15      What I told -- what I was told was that, again,
16  probably three or four years ago, whatever Dr. Mayr had with
17  respect to his transfer, because it -- because our client,
18  Bavarian Nordic, ended up owning the strain, they did some
19  due diligence some years ago to find out what strains, if
20  any, he might have transferred to other people. There were a
21  handful of letters, from what I understand. Those were
22  transferred from Dr. Mayr to Bavarian Nordic. Those letters
23  were produced in the ITC litigation.
24      From what I understand, that's all there is with
25  respect to the transfer of strains. I asked Dr. Mayr that

## Page 27

1   point-blank. I think recently there was a document that we
2   produced that may have -- I think Mr. Poston thought that
3   that might represent, you know, some indication that other
4   documents might be available. This was a letter in 2001 from
5   Dr. Maas to Dr. Mayr, and that would have been one of the
6   letters that came into Bavarian Nordic's custody, and as I
7   understand it, we've asked for discovery from NIH. That
8   letter was never produced. However, that -- we had that
9   letter. We had every intention of producing it during the
10  ITC case.
11      That letter was referred to in our Delaware
12  complaint, and as I understand it, when we were putting the
13  complaint together, referring to the letter, it ended up in
14  one of our files.
15      I understand from Ron Burton that somebody
16  three-hole punched it or two-hole punched it or whatever.
17  That caused Mr. Poston to believe it came out of the file.
18  In fact, it went actually into a file, one of our files.
19      So there is a letter that we recently produced
20  that was from Maaas to Mayr, and from what I understand,
21  that's -- that's all we have.
22      And that was -- why it was produced just
23  recently, I wish it had been produced earlier, your Honor,
24  but that's -- we inadvertently hadn't produced it earlier.
25      I'm perfectly willing to search Dr. Mayr's home.

## Page 28

1   I've been to his home, but I may not have the ability to
2   search the University. I have not explored that, your Honor,
3   but I don't represent the University. I'm taking at face
4   value that they do not have his lab records, but we could
5   certainly inquire.
6       THE COURT: All right. It seems to me as though,
7   number one, there has to be a formal inquiry of what
8   documents Dr. Mayr has now and what happened to the relevant
9   documents and have that representation made formally on the
10  record. And it could be that it is an appropriate fourth
11  subject for Dr. Mayr's deposition for the defendant just to
12  confirm that from Dr. Mayr himself if, in fact, no documents
13  end up being produced.
14      If someone says they don't have documents, then
15  there's not a whole lot the Court can do, but it could be
16  that that is an appropriate subject for his deposition, if
17  nothing comes up.
18      MS. GRAHAM: And we appreciate that, your Honor.
19  Many times, of course, we know from litigation that we ask
20  our clients for documents and they don't find them the first
21  time around, but they find them later. And particularly
22  here, because he was not a party in the ITC, he did not
23  produce documents.
24      My understanding is that the documents that
25  Acambis has gotten are only BN's copies, for example, of

## Page 29

1 letters, and so it's particularly important that a serious
2 request be made of him, and we do appreciate that we can then
3 pursue that also at his deposition.
4      If I might, I shouldn't be interrupting the
5 Court.
6      THE COURT: Well, that's all right. If you want
7 to respond, and then I had my thoughts on the other two
8 issues.
9      MS. GRAHAM: Okay.
10      THE COURT: You may continue.
11      MS. GRAHAM: Yes. On the other issues, first, I
12 wanted to say, to put on the record that the Mayr
13 interrogatories that we are talking about with his
14 contentions are 10 and 11, the ones for Bavarian Nordic, with
15 respect to its contentions on the unfair trade practices and
16 the Lanham Act claim, are 8, 9 and 10.
17      I also should -- and corresponding to that,
18 though, is Interrogatory 11, which relates to damages,
19 does not break out the damages, correlating them to the
20 types of damages they're going to seek, does not break
21 those out by claim, and that's absolutely critical, again,
22 for us to know what's in the case and what's associated
23 with what claim.
24      So that's also -- that's part of our request.
25      Now, I understand that Mr. Pennington is saying

## Page 30

1 that he will supplement, but the difficulty here is that
2 we've been asking for the supplementation for some time.
3      We finally got this, as I indicated yesterday,
4 but it isn't sufficient because it does not identify
5 statements. It does not identify, and I should say it does
6 not identify statements and it does not describe them in a
7 specific way to allow us to test whether or not we have --
8 there's a claim here beyond trade secrets and patents.
9      Second is the -- particular people are not
10 identified.
11      And the third thing is the particular documents
12 are not identified, preferably by Bates number, but -- and,
13 of course, there may be oral statements that aren't in
14 documents.
15      With respect to his saying, Well, of course,
16 they'll supplement, the difficulty here, your Honor, is that,
17 because we've been asking for it, we're at the end of
18 discovery, and my concern is if we don't have a clear order
19 to Bavarian Nordic, we're going to be past the discovery
20 period, there are going to be disputes down the road about
21 whether they have a right to put in evidence at trial, that
22 sort of thing. And the formality of, at least the Court
23 ordering on the record that they provide this information,
24 will allow us to go back and then test what they then
25 provide. There will have been a Court Order to measure that

## Page 31

1 against.
2      So we would ask for the Court to direct Bavarian
3 Nordic specifically to provide that supplementation
4 immediately.
5      THE COURT: All right. Thank you.
6      Mr. Pennington, it seems to me that if, in fact,
7 the plaintiff is relying on general misrepresentations either
8 made orally or through documents, that it is appropriate, if
9 not necessary, to make the discovery process a meaningful
10 one, for you to identify the people who made or received the
11 statements and any documents that you will be relying on.
12 And certainly at the beginning of the case, you might not
13 have a grasp of all of those, of all of that basically what
14 will be evidence, but given the fact we're this close to the
15 end of discovery, is there any reason why you believe it's
16 still appropriate to have general contentions as opposed to
17 the kind of specific contentions and identifications that
18 defendant is asking for?
19      MR. PENNINGTON: Your Honor, I have no problem
20 providing that.
21      Again, it was my understanding that this was
22 something that both sides were looking for. We had other
23 contentions that we were hoping to have supplementation on
24 their part for, so I have no problem doing it and I don't
25 believe they would either.

## Page 32

1      THE COURT: And how about Professor Mayr? I
2 understand that he's elderly. I thought I heard you say that
3 he is represented by an attorney. It seems to me as if, as a
4 party, if contention interrogatories have been propounded,
5 that he is responsible for answering them.
6      MR. PENNINGTON: Oh, yes, your Honor. We're
7 happy to do that.
8      To make this clear, I represent him in this
9 matter.
10      THE COURT: All right.
11      MR. PENNINGTON: But he also has independent
12 counsel that represents him just generally.
13      THE COURT: Right.
14      MR. PENNINGTON: And I've met with his counsel.
15 That's not to say I don't represent him.
16      THE COURT: All right. Well, it seems to me that
17 by Monday, which is the 18th, which gives you a weekend, that
18 both parties need to supplement whatever contention
19 interrogatories are outstanding. And to the extent that a
20 party does not specifically supplement, identifying people
21 with knowledge and relevant documents, that that kind of
22 evidence may later be precluded in terms of being admissible
23 trial evidence.
24      So it's important that you all get a handle on
25 your respective cases and understand that your proof might be

Page 33

1   limited by how you respond at this point.

2       Are there any other issues or any questions?

3       MR. PENNINGTON: Just one thought, your Honor.

4   And, again, I was at the Mayr deposition in December. I'm

5   pretty sure they inquired about recordkeeping and document

6   production and issues like that.

7       I don't see any problem in asking him that again,

8   but I just believe that, for the sake of completion, of this

9   issue, I'm pretty sure they've already asked about it back in

10   December.

11       THE COURT: All right. Well, we've limited them

12   to seven hours. Hopefully, that won't be an issue that will

13   take up much of that time.

14       MR. PENNINGTON: Okay, your Honor.

15       THE COURT: Anything else?

16       MR. PENNINGTON: Your Honor, I have very able

17   local counsel who reminds me of things I forget, but one is

18   there has certainly been a, I think it's fair to say from our

19   perspective, a stonewalling that has been going on at the

20   NIH,. specific documents that we would love to rely on we

21   believe are there.

22       Just as one example, this letter that we recently

23   found and produced is a letter from Bernie Maas to Dr. Mayr.

24   It was never produced by NIH.

25       So they basically -- I think what they did is

Page 34

1   they took what we had already produced and then produced a

2   mirror image of it. So why did they leave that one letter

3   out?

4       We inadvertently left it out. We believe that

5   there's more there and some of the trail to that leads

6   through Acambis. We have some e-mails now to people at NIH.

7   What we're looking for is additional materials.

8       So I would hope that -- I'm happy to do the best

9   I can by Monday, but there may be -- I might supplement the

10   supplementals if we have a fruitful, you know, production

11   from NIH.

12       THE COURT: All right. And certainly, if, after

13   next week week's supplementation and after Dr. Mayr's

14   deposition, if there are still issues or new issues that it

15   would be helpful to talk about again, you can contact my

16   office.

17       Is there anything else that we should address?

18       MS. GRAHAM: I don't think so, your Honor. Thank

19   you for your time today.

20       THE COURT: Have a good one.

21       (Counsel respond, "Thank you, your Honor.")

22       (Court recessed at 11:53 a.m.)

23       - - -

24

25

**'05** [2]   5:25   7:20
**-and** [1]   1:19   2:5
**00** [4]   14:16   14:16
 14:16   14:16
**03** [2]   1:11   3:5
**05-614** [1]   1:8
**1** [1]   17:15
**10** [5]   14:16   14:16
 22:24   29:14   29:16
**100** [1]   9:12
**102** [1]   7:21
**11** [6]   1:11   3:5
 22:24   29:14   29:18
 34:22
**13** [1]   1:11
**18th** [1]   32:17
**2** [2]   14:16   17:15
**20** [1]   25:20
**2001** [1] 27:4
**2006** [1] 1:11
**21** [4]   8:14   18:22
 18:22   19:9
**21st** [1]   23:8
**22** [1]   8:11
**24** [1]   8:11
**3** [1]   14:16
**30** [1]   25:19
**32** [3]   8:14   18:22
 19:9
**40** [1]   25:19
**52** [1]   18:21
**53** [1]   34:22
**572** [1]   25:17
**580** [1]   25:17
**6** [1]   18:21
**8** [1]   29:16
**85** [2]   6:11   24:23
**9** [1]   29:16
**a.m** [1]   1:11   3:5
 34:22
**A/S** [1]   1:4
**able** [4]   5:11   16:5
 23:16   33:16
**absolutely** [1]   29:21
**Acambis** [14]   1:7
 1:7   3:23   5:7
 7:14   7:21   8:7
 9:4   9:16   18:17
 19:24   24:10   28:25
 34:6
**Acambis'** [4]   7:7
 10:20   17:20   18:10
**access** [1]   25:5
**accommodate** [1]
 14:18
**account** [1]   16:9
**Act** [2]   19:16   29:16
**acted** [1]17:16
**action** [2]   1:4
 5:23
**active** [1]   25:5
**adamant** [1]   9:7

**add** [1]   13:23
**additional** [2]   22:9
 34:7
**address** [6]   3:9
 4:10   10:10   10:11
 18:5   34:17
**addressing** [2]   4:8
 24:21
**adequately** [1]   19:7
**administration** [1]
 25:6
**administrative** [1]
 16:18
**admissible** [1]   32:22
**admission** [1]   3:25
**advance** [2]   23:5
 23:14
**advice** [1]   14:22
**again** [9]   3:6
 6:17   23:6   26:15
 29:21   31:21   33:4
 33:7   34:15
**against** [1]   24:5
**age** [2]   12:17   14:12
**ago** [4]   5:2   25:22
 26:16   26:19
**agreed** [4]   6:16
 11:10   11:18   11:20
**agreement** [9]   5:6
 5:21   6:22   7:4
 13:15   20:8   20:8
 20:9   26:11
**agreements** [6]   13:20
 14:4   24:8   24:10
 26:6   26:8
**ahead** [1]   17:17
**alleged** [2]   19:22
 20:4
**allow** [1]   30:7
 30:24
**allowed** [1]   12:2
 12:8
**alone** [1]   13:12
**along** [1]   3:15
**alternative** [1]   16:12
**amongst** [2]   11:25
 20:20
**answer** [3]   5:5
 16:2   26:3
**answered** [1]   19:7
 22:22
**answering** [3]   17:4
 17:5   32:5
**answers** [1]   23:4
**Anton** [3]   1:4
 4:23   24:24
**appear** [1]   15:23
**APPEARANCES** [1]
 1:15
**appeared** [2]   5:4
 12:22
**appreciate** [2]   28:18
 29:2
**appropriate** [5] 14:23
 28:10   28:16   31:8

**31:16**
**arbitrated** [1]   21:21
**area** [2]   8:24   17:5
**ARSHT** [1]   1:16
**aspects** [1]   19:24
**assigned** [1]   26:11
**assist** [1]   9:9
**assistant** [1]   16:18
**associate** [1]   4:5
**associated** [1]   29:22
**associates** [2]   9:10
 25:9
**attempt** [1]   7:21
**attempting** [1]   7:8
**attend** [1]   9:17
**attention** [1]   9:17
**attorney** [3]   5:3
**Attorneys** [3]   9:18
 9:18   17:22
**available** [2]   12:11
 27:4
**avoid** [1]   8:22
 16:11
**aware** [1]   24:11
**B** [1]   1:17
**based** [1]   21:19
**Bates** [2]   18:3
 30:12
**Bavarian** [22]   1:4
 3:15   4:24   8:11
 9:9   12:6   12:9
 13:20   14:4   17:11
 18:17   19:12   21:7
 26:8   26:10   26:12
 26:18   26:22   27:6
 29:14   30:19   31:2
**became** [1]   25:11
**beginning** [3]   3:5
 21:15   31:12
**Bentz** [12]   1:21
 3:23   4:7   10:13
 10:15   10:24   12:20
 13:19   15:7   17:10
 17:17   26:7
**Bernie** [2]   4:21
 33:23
**best** [2]   14:16   34:8
**better** [2]   12:24
 12:25
**between** [5]   4:23
 5:2   24:2   24:10
 26:8
**beyond** [1]   30:8
**bid** [1]   24:5
**bidding** [3]   17:23
 24:5   24:16
**Bingham** [2]   2:6
 3:19
**bit** [3]   4:9   10:3
 21:14
**bite** [1]   14:6
**BN's** [3] 23:2   23:3
 28:25

**break** [1]   29:19
 29:20
**brick** [1] 8:25
**brief** [1] 8:2
**briefly** [1]   24:21
**bring** [2] 5:12   20:21
**broached** [1]   17:25
**brought** [2]   17:25
 18:21
**Burton** [3]   18:11
 18:21   27:15
**C** [1]   3:2
**cache** [1]   25:2
**cannot** [1]   11:19
**capable** [1]   12:16
**case** [21] 6:23   7:2
 7:14   7:22   7:23
 8:21   9:7   13:2
 13:6   13:8   13:22
 14:9   15:4   19:5
 20:14   21:7   21:15
 22:2   27:10   29:22
 31:12
**cases** [1] 32:25
**caused** [1]   27:17
**certainly** [15]   8:24
 9:21   12:23   14:5
 15:25   16:6   16:10
 18:25   22:4   29:19
 26:14   28:5   31:12
 33:18   34:12
**charge** [1]   24:6
**charges** [1]   11:24
**check** [1]   12:23
**Chief** [1]   1:13
**Christy** [1]   12:20
**CIVIL** [1]   1:4
**claim** [9]   4:22
 20:20   20:25   21:8
 24:3   29:16   29:21
 29:23   30:8
**claims** [5]   20:3
 19:15   19:19   21:18
 24:18
**classification** [1]
 17:16
**classified** [1]   17:22
**cleaned** [1]   25:21
**clear** [4] 6:10   25:14
 30:18   32:8
**clearly** [1]   21:17
**client** [3]   9:9
 9:9   26:17
**clients** [1]   28:20
**close** [2] 22:12   31:14
**clue** [1]   22:5
**co-counsel** [1]   3:18
**colleague** [1]   12:17
**comfortable** [1] 17:4
**coming** [1]   9:3
**commenced** [1] 3:4
**communication** [4]
 9:16   24:2   24:15
 26:2

**communications** [1]
 5:9
**compel** [2]   4:18
 4:20
**competition** [3] 24:3
 24:17   24:18
**complaining** [1]
 18:12
**complaint** [3]   18:15
 27:12   27:13
**completion** [1] 33:8
**compulsive** [1] 15:15
**Conaway** [2]   2:2
 3:16
**concern** [4]   6:19
 19:12   20:14   30:18
**concerning** [1] 13:20
**concerns** [1]   18:9
**conduct** [1]   21:25
**conducting** [1] 11:21
**confirm** [1]   28:12
**consecutive** [1] 12:21
**consultant** [3]   4:24
 24:7   26:12
**consulting** [3]   5:6
 24:9   26:11
**contact** [1]   34:15
**contention** [7]   8:20
 19:13   22:15   22:22
 23:24   32:4   32:18
**contentions** [9] 19:14
 22:25   22:25   24:19
 29:14   29:15   31:16
 31:17   31:23
**contested** [1]   11:7
**continue** [1]   29:10
**control** [1]   17:8
**controversy** [1] 5:16
**Convention** [3] 7:13
 7:22   15:11
**conversion** [3]   4:22
 19:6   22:25
**cooperative** [1] 8:24
**copies** [2]   24:11
 28:25
**copy** [1] 3:25
**correct** [3]   3:11
 10:21   10:23
**corrected** [1]   10:25
**correlating** [1] 29:19
**correspondence** [2]
 11:23   12:5
**corresponding** [1]
 29:17
**cost** [1]   11:20
**counsel** [26]   1:22
 2:8   3:8   3:13
 5:17   7:7   8:7
 8:13   9:6   9:11
 9:15   9:25   10:3
 10:4   10:10   10:20
 12:2   12:9   13:8
 13:15   17:11   24:2
 32:12   32:14   33:17
 34:21

counterclaims [1]
21:24
couple [2]        6:21
9:3
course [9]        5:14
5:23    13:5    19:4
20:13   24:14   28:19
30:13   30:15
Court [45]        1:24
3:8     3:12    3:20
3:22    4:2     4:6
4:11    4:13    5:12
6:6     6:9     10:14
12:15   13:11   13:14
14:10   15:14   15:22
15:25   16:22   17:14
18:4    18:7    21:22
21:24   22:11   23:19
28:6    28:15   29:5
29:6    29:10   30:22
30:25   31:2    31:5
32:10   32:13   32:16
33:11   33:15   34:12
34:20   34:22
Court's [2]        7:4
9:21
courtroom [2]        3:4
8:3
cover [1]        13:23
critical [2]        22:23
29:21
cross-examined [1]
6:9
current [1]        8:4
custodian [1]        25:24
custody [1]        27:6
D [1]        3:2
D.C [2]        1:21    5:18
damages [5]        13:21
14:7    29:18   29:19
29:20
date [2]        5:3    24:13
days [7]        5:22    6:21
12:17   12:19   12:23
12:24   14:15
December [7]        5:25
7:20    11:3    12:4
14:5    33:4    33:10
declassify [1]        9:22
defendant [4]        5:7
16:24   28:11   31:18
Defendants [2]        1:8
2:8
defendants' [3] 10:10
10:12   13:15
defense [1]        21:25
Delaware [3]        1:2
1:10    27:11
demeanor [1]        6:11
Department [1] 5:4
depending [2]        4:8
25:16
depose [1]        7:6
deposed [3]        5:22
10:22   11:9
deposition [35] 5:4
5:15    5:20    5:21

6:17    7:8     7:9
7:12    10:18   11:3
11:4    11:13   11:15
11:17   11:21   12:3
12:4    12:8    12:8
12:13   13:12   13:16
13:24   14:14   14:17
16:17   20:15   23:5
23:8    23:15   28:11
28:16   29:3    33:4
34:14
depositions [3] 5:24
7:20    12:21
describe [1]        30:6
details [1]        23:25
development [3]
4:18    25:12   25:13
difficulty [1]        30:16
diligence [1]        26:19
direct [3]        26:2
26:3    31:2
discovered [1]        7:7
discovery [11]        4:8
4:16    4:19    22:9
22:12   24:14   27:7
30:18   30:19   31:9
31:15
discussed [1]        14:5
discussing [1]        8:7
discussion [4]        5:19
7:10    8:3     14:3
discussions [1] 5:9
dispute [1]        21:12
disputes [2]        9:5
30:20
dissatisfied [1] 8:6
DISTRICT [1]        1:2
Doctor [1]        24:24
24:24
document [7]        9:2
9:15    17:16   17:17
17:19   18:13   33:5
documentation [1]
25:18
documents [30] 4:20
9:3     9:8     9:11
10:4    17:24   18:3
20:6    20:11   23:11
23:12   23:13   23:14
24:21   25:11   26:13
27:4    28:8    28:9
28:12   28:14   28:20
28:23   28:24   30:11
30:14   31:8    31:11
32:21   33:20
done [2]        7:22    17:14
down [3]        15:14
15:15   30:20
Dr [42]        4:20    4:24
5:4     5:6     5:9
5:20    5:22    6:7
6:10    6:22    6:25
7:8     7:11    7:15
7:16    8:11    12:15
13:9    13:17   13:18
14:11   14:25   15:5
24:6    24:21   24:22
25:10   25:20   26:6

26:8    26:8    26:16
26:22   26:25   27:5
27:5    27:25   28:8
28:11   28:12   33:23
34:13
due [1]        26:19
during [3]        5:23
14:15   27:9
E [2]        3:2     3:2
e-mail [3]        11:23
17:25   18:21
e-mails [1]        34:6
earliest [1]        22:16
Ed [1]        3:18
EDWARD [1]        2:7
effort [1]        9:22
eighties [1]        25:14
either [6]        8:25
9:20    14:8    20:25
31:7    31:25
elderly [2]        11:9
32:2
electronic [1]        4:3
elsewhere [1]        24:25
employee [1]        4:24
employees [1]        19:23
end [4]        9:20    28:13
30:17   31:15
ended [2]        26:18
27:13
English [3]        7:17
16:19   16:21
ESQ [6]        1:17    1:17
1:21    2:3     2:3
2:7
essence [1]        11:5
essentially [3]        18:15
20:25   21:8
Europe [1]        24:25
everyone's [1]        17:3
evidence [4]        30:21
31:14   32:22   32:23
exact [1]        5:3
example [8]        9:14
9:19    17:25   20:7
21:17   22:7    28:25
33:22
except [1]        19:20
exclusive [1]        26:9
existed [1]        25:23
expect [2]        21:16
23:6
explanation [1] 16:20
16:25
explore [1]        5:9
explored [1]        28:2
extent [8]        12:3
13:23   17:24   19:5
19:9    21:19   21:23
32:19
extra [1] 11:20
Eyes [5] 9:12    9:15
9:18    9:18    17:22
face [1]  28:3

facet [1] 24:3
fact [9]        14:10   14:11
14:19   17:8    21:12
27:18   28:12   31:6
31:14
fair [3]  8:5     10:4
33:18
fairly [1]        9:6
9:8     12:25   15:15
far [3]  12:24   23:25
25:21
few [1]        17:4
fifties [1]        25:13
file [2]        27:17   27:18
27:18
files [3] 25:25   27:14
27:18
filing [4]        3:24
4:3     4:18    21:18
finally [2]        19:19
30:3
fine [1]        6:12
firm [1]        3:24
first [11] 6:2     10:18
11:17   12:18   13:15
13:24   18:22   22:19
26:9    28:20   29:11
five [1]        18:14
focus [1]        19:2
focused [1]        9:25
13:16
forget [1]        33:17
form [1]        16:14
formal [1]        28:7
formality [1]        30:22
formalize [1]        16:24
formally [1]        16:13
28:9
former [1]        10:20
forward [1]        11:2
found [2]        24:14
33:23
four [3]        10:11   25:21
26:16
fourth [1]        28:10
frail [2]        6:11    12:25
frame [2]        11:15
16:3
Friday [5]        7:20
10:19   10:22   22:17
23:6
fruitful [1]        34:10
full [1]        5:21
G [1]        3:2
Gee [1]        20:8
general [8]        8:18
10:20   15:12   18:13
20:13   24:18   31:7
31:16
generalized [1] 18:15
generally [2]        3:12
32:12
German [2]        7:17
23:16
germane [1]        13:5

14:6
Germany [3]        11:4
24:23   24:24
given [6]        14:10
14:11   17:8    31:14
goes [4]        6:5     12:24
24:3    25:18
good [11]        3:7
3:8     3:14    3:17
4:12    4:13    7:18
10:13   10:14   14:14
34:20
good-faith [1]        9:22
Government's [1]
17:21
Graham [13]        1:17
3:7     3:11    3:21
3:22    4:4     4:7
18:5    18:8    28:18
29:9    29:11   34:18
granted [1]        26:9
grasp [1]        31:13
guess [3]        5:14
7:19    14:20
Gunning [1]        1:24
hac [1]  3:25
Hague [4]        7:13
7:22    7:24    15:11
half [2]        11:8    12:17
half-a-day [1]        11:4
handful [1]        26:21
handle [1]        32:24
happy [8]        8:12
18:5    18:23   23:22
24:12   24:19   32:7
34:8
hard [1] 8:22
health [2]        12:24
12:25
hear [1]        18:20
heard [4]        18:23
20:16   25:22   32:2
hearing [1]        9:17
heart [1] 6:5
helpful [4]        16:23
17:7    24:15   34:15
hidden [4]        20:19
20:20   24:15   24:20
highly [1]        11:7
himself [1]        28:12
hinted [1]        21:14
history [2]        25:19
25:22
home [2]        6:14
27:25
Honor [35]        3:14
3:24    4:12    4:14
4:22    5:8     6:19
8:3     8:14    9:5
9:14    10:6    10:13
12:18   14:2    15:7
15:9    15:21   16:10
16:16   18:5    23:18
23:24   24:22   27:23
28:2    28:18   30:16
31:19   32:6    33:3

33:14   33:16   34:18
34:21
**Honor's** [1]   21:20
**HONORABLE** [1]
  1:13
**hope** [4]   3:11   7:3
  8:21   34:8
**hopefully** [2]   7:4
  33:12
**hoping** [1]   31:23
**hours** [6]   12:14
  12:16   12:25   13:4
  14:13   33:12
**identifications** [1]
  31:17
**identified** [2]   30:10
  30:12
**identify** [8]   19:25
  20:6   20:10   24:13
  30:4   30:5   30:6
  31:10
**identifying** [1]   32:20
**image** [1]   34:2
**immediately** [1]
  31:4
**important** [2]   21:15
  32:24
**importantly** [1] 20:19
**improper** [2]   19:24
  22:7
**in-house** [7]   5:16
  9:6   9:16   9:25
  10:3   10:4   24:2
**inadvertently** [2]
  27:24   34:4
**INC** [1]   1:7
**include** [4]   13:19
  14:11   14:12   15:5
**inconsistent** [1]
  15:19
**independent** [1]
  32:11
**indicate** [1]   15:17
**indicated** [2]   12:5
  30:3
**indicates** [1]   19:22
**indication** [1]   27:3
**inequitable** [1] 21:25
**influence** [2]   19:24
  22:8
**information** [3] 17:8
  17:23   30:23
**informed** [1]   12:12
**initial** [3]   8:4
  8:6   12:4
**inquire** [1]   11:17
  28:5
**inquired** [1]   33:5
**inquiry** [1]   28:7
**instructed** [1]   5:4
**insufficient** [1] 19:21
**intellectual** [2] 19:25
  21:2
**intention** [1]   27:9

**intentions** [1]   5:10
**interest** [1]   6:15
**interrogated** [1] 6:2
**interrogation** [1]
  6:20
**interrogatories** [21]
  8:2   8:5   8:10
  16:13   16:25   17:15
  18:6   18:10   18:14
  18:22   19:3   19:13
  22:15   22:20   23:2
  23:3   23:4   23:24
  29:13   32:4   32:19
**interrogatory** [7]
  8:20   16:14   20:23
  20:24   22:22   23:22
  29:18
**interrupting** [1] 29:4
**intervention** [3]
  7:4   8:23   9:21
**introducing** [1] 21:23
  22:10
**investigated** [1]
  13:10
**inviting** [1]   9:17
**involve** [1]   13:9
**involved** [1]   13:2
**issue** [7] 6:3   15:16
  15:23   21:14   22:19
  33:9   33:12
**issues** [22]   3:9
  4:8   4:16   6:5
  10:11   10:12   10:16
  11:16   13:8   16:7
  17:15   18:6   20:21
  21:23   23:18   23:22
  29:8   29:11   33:2
  33:6   34:14   34:14
**ITC** [10] 5:23   6:23
  7:23   9:17   11:11
  18:17   24:14   26:23
  27:10   28:22
**items** [2]   22:10
  24:20
**J** [2]   1:21   1:24
**James** [2]   1:17
  4:4
**John** [2] 2:3   3:16
**JR** [1]   1:17
**Judge** [1]   1:13
**July** [1] 18:10
**jurisdiction** [1] 11:12
**Justice** [1]   5:3
**Karen** [2]   2:3
  3:14
**keep** [2] 23:12   23:13
**keeping** [2]   9:25
  10:2
**kind** [4] 6:20   15:12
  31:17   32:21
**knowledge** [3]   7:15
  12:9   32:21
**L** [2]   1:13   2:3
**lab** [3]   25:18   25:21
  28:4
**lack** [1]   8:12

**laid** [1]   21:17
**language** [1]   7:17
**Lanham** [2]
  29:16
**last** [3]   11:15   11:23
  18:21
**late-breaking** [1]
  4:17
**latter** [1] 14:23
**law** [2]   19:16   25:8
**lead** [1]   18:6
**leads** [2] 19:12   34:5
**least** [4] 8:9   16:25
  17:2   30:22
**leave** [1] 34:2
**left** [1]   34:4
**legitimate** [1]   9:23
**less** [1]   22:12
**letter** [12]   16:19
  16:20   18:11   27:4
  27:8   27:9   27:11
  27:13   27:19   33:22
  33:23   34:2
**letters** [3]   26:21
  26:22   27:6
**license** [2]   26:9
  26:10
**life** [1]   7:19
**light** [1]   7:19
**likely** [1]   21:18
**limitations** [1]   6:20
**limited** [4]   13:17
  16:2   16:3   33:11
**limiting** [1]   14:3
**litigated** [1]   21:9
**litigation** [4]   11:11
  11:14   26:23   28:19
**LLP** [3]   1:20   2:2
  2:6
**local** [1] 33:17
**longer** [1]   11:10
**look** [2] 18:2   23:15
**looking** [1]   31:22
  34:7
**love** [2] 22:17   33:20
**Maaas** [1]   27:20
**Maas** [12]   4:21
  4:24   5:4   5:6
  13:9   13:18   20:9
  24:6   24:10   25:20
  27:5   33:23
**Maas'** [1]   5:9
**Macavoy** [1]   10:20
**makes** [1]   4:9
**manner** [1]   13:25
**marked** [3]   9:11
  9:15   9:18
**Mary** [2]   1:17
  3:22
**Maryland** [2]   4:19
  4:20
**materials** [1]   34:7
**matter** [2]   5:7
  32:9

**matters** [1]   13:5
**may** [15] 9:2   9:5
  9:20   12:19   13:6
  20:23   20:24   21:5
  22:18   26:14   27:2
  29:10   30:13   32:22
  34:9
**Mayr** [37]
  5:11   5:22   6:7
  6:10   6:22   6:25
  7:16   11:3   11:9
  11:19   12:13   13:5
  12:22   13:17   14:11
  14:25   15:5   15:11
  22:21   23:10   26:6
  24:24   25:10   26:6
  26:8   26:9   26:16
  26:22   26:25   27:5
  27:20   28:8   28:12
  29:12   33:4   33:23
**Mayr's** [9]   5:20
  7:8   7:11   7:15
  8:11   24:21   27:25
  28:11   34:13
**McCutchen** [2]   2:6
  3:19
**mean** [3] 12:25   15:22
  22:16
**meaningful** [1] 31:9
**means** [1]   14:21
**measure** [1]   30:25
**meeting** [1]   25:10
**mention** [1]   18:24
  18:25
**merely** [1]   12:6
**met** [3]   13:7   24:22
  32:14
**MEYR** [1]   1:4
**might** [14]   3:21
  8:19   14:15   16:5
  23:25   25:2   25:15
  26:20   27:3   27:4
  29:4   31:12   32:25
  34:9
**mirror** [1]   34:2
**miscaptioned** [1]
  18:3
**misrepresentation** [3]
  20:16   21:5   21:11
**misrepresentations** [5]
  19:23   20:2   20:4
  20:12   31:7
**misrepresented** [1]
  19:24
**miss** [1] 10:16
**missing** [1]   23:25
**Monday** [3]   23:7
  32:17   34:9
**morning** [10]   3:7
  3:8   3:14   3:17
  3:25   4:12   4:13
  8:8   10:13   10:14
**MORRIS** [1]   1:16
**most** [2]   4:22   22:22
**mostly** [1]   17:20
**motion** [3]   3:24
  4:18   21:19

**Mrs** [1]   15:11
**Ms** [23]   3:7   3:11
  3:14   3:18   3:21
  4:4   4:7   4:7
  10:13   10:15   10:24
  12:20   13:19   15:7
  17:10   17:17   18:5
  18:8   26:6   28:18
  29:9   29:11   34:18
**Munich** [9]   5:23
  6:14   6:17   11:11
  11:18   11:21   11:22
  12:13   17:3
**Myr's** [4]   12:3
  13:20   13:21   17:13
**Mysinger** [1]   12:20
**mystery** [1]   24:8
**N** [1]   3:2
**necessary** [1]   31:9
**need** [20]   11:17
  14:6   14:25   18:19
  19:7   19:18   20:10
  20:11   20:15   20:21
  22:3   22:5   22:8
  22:9   23:4   23:5
  23:13   23:14   23:16
  32:18
**needed** [2]   9:7
  20:17
**needs** [3]   12:17
  14:18   19:2
**negotiated** [1]   9:23
**negotiations** [3]
  9:24   12:5   15:3
**never** [2]   25:6
  27:8   33:24
**new** [4]   14:13   20:8
  22:10   34:14
**next** [2] 12:7   34:13
**NICHOLS** [1]   1:16
**night** [1] 11:23   18:21
**NIH** [13] 4:19   4:25
  6:3   9:17   19:23
  24:3   24:5   24:6
  27:7   33:20   33:24
  34:6   34:11
**nonparties** [1]   7:13
**Nordic** [19]   1:4
  3:15   4:24   8:12
  9:9   12:6   12:9
  13:20   17:11   18:17
  21:7   26:8   26:10
  26:12   26:18   26:22
  29:14   30:19   31:3
**Nordic's** [1]   19:13
  27:6
**Nos** [1]   8:14
**noted** [1]   4:2
**notes** [1] 15:14
**nothing** [3]   20:24
  24:20   28:17
**notice** [2]   7:9
  7:25
**noticed** [2]   7:24
  20:17
**notification** [1] 17:12
**notified** [1]   10:19

notify [1]                     18:2
now [11] 6:11                  7:25
  11:13   11:17               19:3
  19:4    21:7                22:8
  28:8    29:25               34:6
number [5]                    6:24
  6:25    9:2                 28:7
  30:12
numbers [3]                   18:3
  25:16   25:17
NVA [3] 25:12                 25:15
  25:23
O [1]        3:2
o'clock [1]                   1:11
objected [1]                  8:13
objecting [1]                 8:19
objection [1]                 8:17
objections [1]                8:18
obtained [1]                  20:8
obviously [3]                 7:17
  19:2    22:11
off [1]   4:15                13:4
office [3]                    25:4
  25:7    34:16
Official [1]                  1:24
old [3]   6:11                24:23
  25:20
one [26]  6:21                6:24
  9:10    9:14                9:14
  10:16   12:16               14:7
  16:3    19:14               19:16
  19:16   20:14               22:23
  24:3    26:5                27:5
  27:14   27:18               28:7
  31:10   33:3                33:17
  33:22   34:2                34:20
ones [5]  8:8                 18:24
  18:25   19:5                29:14
opposed [1]                   31:16
oral [1]  30:13
orally [1]                    31:8
order [9] 9:6                 9:24
  15:24   15:25               16:6
  21:10   21:20               30:18
  30:25
ordered [1]                   4:3
ordering [1]                  30:23
orders [1]                    15:22
ourselves [1]                 11:25
outside [6]                   5:12
  9:11    9:15                9:18
  11:11   17:22
outstanding [1] 32:19
overview [2]                  4:15
  10:6    10:8
owning [1]                    26:18
P [1]       3:2
pages [2]                     9:3
  9:10
paid [2]  24:7                26:12
parameters [1]  5:21
Parrett [2]                   1:17
  4:4
part [3]  8:23                29:24
  31:24

participate [1]  9:8
participating [1]
  9:7
particular [6]               18:18
  18:24   18:25               19:5
  30:9    30:11
particularly [1] 28:21
parties [1]                   32:18
partner [1]                   25:8
party [8] 7:12               11:10
  11:14   14:11               15:9
  28:22   32:4                33:20
Pascale [4]                   2:3
  3:14    3:15                3:18
past [3]  7:16                15:11
  30:19
patent [2]                    21:10
  21:13
patents [2]                   21:22
  30:8
pay [2]   11:20               11:24
payments [1]                  8:11
pending [1]                   7:23
  7:23
Pennington [26] 2:7
  3:18    3:22                4:12
  4:14    10:21               10:23
  10:25   12:18               12:22
  14:2    15:8                15:21
  16:10   17:25               23:20
  23:21   29:25               31:6
  31:19   32:6                32:11
  32:14   33:3                33:14
  33:16
Pennington's [2]
  10:16   22:18
people [7]                   15:15
  24:4    26:20               30:9
  31:10   32:20               34:6
percent [1]                   9:12
perfectly [2]                 6:24
  27:25
perhaps [1]                   7:18
  25:13
period [1]                    30:20
personnel [2]                 9:17
  24:2
perspective [1] 33:19
place [3] 4:23                5:24
  13:12
plaintiff [2]                15:16
  31:7
plaintiffs [5]               1:5
  1:22    3:15                11:20
  12:2
plaintiffs' [1]              3:13
plan [1]  16:8
PLC [1]   1:7
point [6] 14:24              17:9
  21:24   22:10               24:19
  26:5
poorly [1]                    16:6
posed [1]                     22:23
possible [1]                  22:8
possibly [1]                  34:5

Poston [2]                    27:2
  27:17
power [1]                     15:18
practices [3]                 19:15
  20:20   29:15
precluded [1]                 32:22
preferably [1]                30:12
prepare [1]                   20:14
preserved [1]                 6:7
Presumably [1] 21:5
pretty [5]                    10:6
  10:8    12:19               33:5
  33:9
primarily [1]                 7:17
primary [1]                   24:5
pro [1]   3:25
problem [7]                   10:2
  14:3    14:7                14:8
  31:19   31:24               33:7
procedure [1]                 15:12
Proceedings [1] 3:4
process [2]                   24:16
  31:9
produce [2]                   26:14
  28:23
produced [14]                 9:11
  9:13    23:11               26:7
  26:23   27:2                27:8
  27:19   27:22               27:23
  27:24   28:13               33:23
  33:24
producing [1]                 27:9
production [6]                9:2
  17:16   17:18               17:19
  33:6    34:10
Professor [11]               4:23
  5:11    11:3                11:9
  11:19   12:3                13:20
  13:21   17:13               22:21
  24:24
professorship [1]
  25:2
prohibit [1]                  13:11
proof [1]                     32:25
property [2]                  19:25
  21:3
proposal [1]                  17:20
propose [1]                   16:13
propounded [1] 32:4
protective [2]                9:6
  9:24
provide [8]                   7:11
  8:22    15:16               15:18
  23:22   30:23               30:25
  31:3
providing [2]                 16:19
  31:20
punched [1]                   27:16
  27:16
purposes [1]                  6:4
pursue [1]                    29:3
put [5]   6:19                7:5
  9:24    29:12               30:21
putting [1]                   27:12
quarter [1]                   11:5

questioning [1] 26:3
questions [9]                 10:7
  15:2    15:5                16:3
  16:11   17:4                17:5
  17:12   33:2
quite [3] 6:11                10:3
  19:20
R [1]        3:2
Reading [1]                   20:23
really [7]                    11:5
  12:16   15:25               19:18
  20:4    20:21               23:13
reason [1]                    23:11
  26:13   31:15
reasonable [5]                14:13
  22:16   22:18               23:7
  23:7
reasons [1]                   6:21
receipt [1]                   5:10
received [4]                  7:9
  9:2    16:20                31:10
receiving [1]                 16:19
recent [1]                    25:10
recently [4]                  7:7
  27:19   27:23               33:22
recessed [1]                  34:22
recognize [1]                 14:5
recollection [1] 16:17
record [5]                    8:10
  11:4    28:10               29:12
  30:23
recordkeeping [1]
  33:5
records [1]                   28:4
redirected [1]                6:9
reference [1]                 20:7
referred [1]                  26:7
  27:11
referring [1]                 24:9
  27:13
reflect [1]                   16:6
reintroduce [1]  3:21
relate [4]                    3:10
  14:8    19:6                25:12
related [6]                   5:6
  18:8    19:4                22:21
  23:3    23:10
relates [1]                   29:18
relating [1]                  22:23
  22:24
relevant [4]                  15:6
  15:6    28:8                32:21
relied [3]                    14:20
  14:21   14:22
rely [3]  12:4                12:7
  33:20
relying [3]                   18:17
  31:7    31:11
remain [1]                    8:24
  19:6
remaining [1]                 19:15
reminds [1]                   33:17
repeat [1]                    18:16
Reporter [1]                  1:24

represent [5]                 15:10
  27:3    28:3                32:8
  32:15
representation [1]
  28:9
represented [2] 8:13
  32:3
represents [1]                32:12
reproduced [1]                25:16
request [3]                   12:13
  29:2    29:24
requesting [2]                11:13
  12:2
requests [2]                  18:13
  18:16
research [1]                  6:4
resolve [1]                   3:10
resolved [1]                  16:7
respect [13]                  5:10
  14:19   15:19               16:18
  18:9    18:9                19:14
  19:18   22:19               26:17
  26:25   29:15               30:15
respective [1]                32:25
respond [4]                   12:10
  22:14   29:7                34:21
responding [1]                24:9
response [4]                  17:20
  20:24   24:12               26:4
responses [13]                8:4
  8:6    8:14                 8:20
  18:10   18:12               18:12
  18:18   19:13               22:17
  23:2    23:23               24:19
responsible [1] 32:5
restricted [1]                11:14
restriction [1]               7:5
restrictions [1]              13:13
result [1]                    26:2
retired [1]                   25:8
revised [1]                   17:20
RFP3 [1]                      17:21
right [20]                    3:12
  3:20    4:2                 4:11
  13:14   14:10               17:14
  18:4    18:7                21:2
  23:19   28:6                29:6
  30:21   31:5                32:10
  32:13   32:16               33:11
  34:12
rights [7]                    21:3
  21:10   21:13               26:11
  23:3    23:3                26:11
road [1]  30:20
ROBINSON [1]
  1:13
Roger [1]                     10:19
role [2]  7:15                7:19
Ron [1]   27:15
S [1]        1:8
sake [1]  33:8
says [5]  14:20               16:3
  21:19   21:20               28:14
scheduled [3]                 5:15
  10:18   23:8

scientists [1]    24:6
scope [4]    6:20
    13:16    15:2    15:4
search [1]    27:25
    28:2
second [2]    18:2
    30:9
secondly [1]    20:19
secrets [6]    19:4
    21:7    21:8    21:19
    21:21    30:8
see [5]    10:5    14:25
    17:3    25:6    33:7
seek [1]    29:20
sense [1]    4:9
sensitive [2]    9:25
    17:23
September [1]    1:11
served [1]    4:19
set [2]    15:2    15:4
seven [5]    12:13
    12:16    13:4    14:13
    33:12
seventies [1]    25:14
Shaw [3]    2:3
    3:16    3:17
show [1] 23:23
side [5]    6:16    8:25
    9:22    13:3    23:23
sides [5] 8:4    8:5
    8:19    8:21    31:22
significantly [1]
    20:3
skip [1]    17:17
SLR [1]    1:8
smoother [1]    5:14
someone [1]    28:14
somewhat [3]    4:17
    6:12    16:18
sorry [1] 26:3
sort [2]    16:19    30:22
sorts [1] 19:14
specific [8]    16:24
    17:5    20:6    20:10
    20:11    30:7    31:17
    33:20
specifically [4] 5:6
    22:15    31:3    32:12
specifics [1]    19:25
spoken [1]    25:6
spread [1]    14:15
stand [3]    8:16
    10:25    16:15
standpoint [1]    22:17
STARGATT [1]
    2:2
start [2] 3:12    4:14
started [1]    25:13
starts [1]    3:22
State [1] 19:16
statements [4]    30:5
    30:6    30:13    31:11
States [1]    6:15

States' [1]    11:12
status [2]    8:4
    9:23
still [3]    8:19    31:16
    34:14
stonewalling [1]
    33:19
strain [7]    5:10
    6:3    13:2    13:17
    13:21    21:2    26:18
strains [6]    21:10
    25:12    25:15    26:10
    26:19    26:25
straying [1]    13:4
subject [4]    15:23
    17:5    28:11    28:16
subjects [1]    7:6
subpoenas [1]    4:19
suddenly [1]    22:10
SUE [1] 1:13
sufficient [1]    30:4
suggesting [1]    16:12
superficial [1]    13:25
supplement [11]
    8:10    8:16    18:23
    19:9    23:23    24:12
    24:19    30:16    32:18
    32:20    34:9
supplemental [1]
    23:22
supplementals [1]
    34:10
supplementation [8]
    19:10    19:17    19:19
    19:20    30:2    31:3
    31:23    34:13
supplementations [1]
    8:22
supposed [2]    21:21
    22:12
supposedly [2]    20:16
    21:4
surely [1]    21:15
table [2] 20:22    21:17
taking [4]    5:19
    7:13    13:12    28:3
talks [1] 25:8
Tamany [2]    1:21
    3:23
TAYLOR [1]    2:2
technology [1]    24:7
telling [1]    15:19
ten [1]    25:20
terms [1]    32:22
test [2]    30:7    30:24
testify [1]    15:10
testimony [6]    4:20
    6:7    6:23    11:6
    15:6    15:13
Thank [7]    4:6
    4:11    18:4    23:19
    31:5    34:18    34:21
thereof [1]    8:12
they've [3]
    25:16    33:9

third [1] 30:11
Thirdly [1]    23:10
thoroughly [1]    6:2
thought [5]    4:14
    12:22    27:2    32:2
    33:3
thoughts [1]    29:7
thousands [1]    9:3
three [2] 25:21    26:16
three-hole [1]    27:16
through [1]    7:21
    7:24    12:6    24:14
    25:14    31:8    34:6
times [3]    14:15
    25:16    28:19
today [6]    3:23
    4:18    9:13    12:10
    16:15    34:19
together [1]    27:13
too [1]    23:24
took [3] 4:23    5:24
    11:15
topic [1] 5:5
topics [1]    17:12
totality [1]    8:17
touch [1]    10:15
towards [1]    17:11
trade [10]    19:4
    19:15    20:20    20:25
    21:6    21:8    21:19
    21:20    29:15    30:8
trail [1] 34:5
transaction [1]    4:23
transcribed [1]  6:8
transfer [9]    6:2
    6:4    13:2    13:9
    13:17    13:24    14:4
    26:17    26:25
transferred [2]    26:20
    26:22
translate [1]    23:17
translated [1]    11:5
translation [3]    14:12
    14:21    16:20
translator [1]    7:16
travel [1]    6:15
    11:18    11:19
traveling [2]    6:13
    11:21
trial [6]    6:8    7:2
    20:14    21:16    30:21
    32:23
trouble [1]    6:13
truth [1] 16:22
try [2]    7:4    10:15
trying [2]    4:15
    5:8
TUNNELL [1] 1:16
two [15]    5:2    5:22
    6:21    6:25    8:9
    12:17    12:19    12:21
    12:22    14:15    19:14
    19:15    22:12    22:24
    29:7

two-hole [1]    27:16
type [1] 17:12
types [1]    29:20
unable [1]    11:9
understand [12] 9:10
    11:19    24:22    26:21
    26:24    27:7    27:12
    27:15    27:20    29:25
    32:2    32:25
unfair [7]    19:15
    20:20    24:3    24:4
    24:16    24:18    29:15
unhappy [1]    8:9
United [1]    8:8
    11:12
University [7]    25:4
    25:7    25:21    25:24
    25:24    28:2    28:3
unlevel [1]    6:12
unsatisfied [1]  8:8
up [13]    4:9    9:20
    17:25    18:21    20:21
    20:21    21:17    22:11
    26:18    27:13    28:13
    28:17    33:13
upsetting [1]    13:6
usable [1]    6:24
used [2] 7:13    15:11
using [1]    24:5
Valerie [1]    1:24
value [1]    28:4
vein [1] 22:21
Venable [2]    1:20
    3:23
vice [1] 3:25
videotape [1]    6:10
videotaped [1]  6:8
view [1] 10:2    22:18
VINSON [1]    1:21
viral [6] 5:10    6:2
    13:2    13:17    13:21
    14:3
virtue [1]    21:20
virus [1] 13:24
voluntarily [4]    7:12
    12:10    15:17    15:18
vs [1]    1:6
W [2]    1:7    2:3
Waddups [1]    5:17
wall [1] 8:25
Washington [2] 1:21
    5:17
Wednesday [1]    1:11
week [2] 5:2    34:13
week's [1]    34:13
weekend [1]    32:17
weeks [3]    5:2
    7:25    22:12
whole [1]    28:15
wholesale [1]    21:23
wife [9]    7:8    7:11
    7:15    12:3    12:6
    12:7    14:19    15:5
    17:13

wife's [1]    7:18
willing [5]    7:11
    8:10    8:15    15:16
    27:25
Wilmington [1] 1:10
wish [1]    27:23
within [1]    15:2
Without [1]    16:11
writing [2]    15:15
    17:5
written [2]    16:25
    17:12
wrote [2]    15:14
    18:14
years [6] 6:11    24:23
    25:20    25:22    26:16
    26:19
yesterday [3]    17:20
    19:20    30:3
yet [1]    10:9
young [3]    2:2
    3:16    25:8

# EXHIBITS 20-21

## REDACTED IN THEIR ENTIRETY

# EXHIBIT 22

ACTIVE/72043580.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BAVARIAN NORDIC A/S,<br><br>                    Plaintiff,<br><br>v.<br><br>ACAMBIS INC. and<br>ACAMBIS PLC,<br><br>                    Defendants. | Civil Action No. 05-614 (SLR) |

## SUPPLEMENTAL EXPERT REPORT AND/OR LEGAL OPINION OF

## PROF. DR. DRES. H.C. JOSEPH STRAUS

### I.    INTRODUCTION

1.    My name is Joseph Straus and I have been retained as a legal expert on German Law by Bavarian Nordic A/S ("BN") in connection with the above-referenced case in the United States District Court for the District of Delaware to study and provide opinion on certain issues relating to ownership to and/or intellectual property rights in certain Modified Vaccinia Virus Ankara ("MVA") strains and vaccines. On October 2, 2006 I submitted my Expert Report and/or Legal Opinion.

2.    After having read the Expert Report and/or Legal Opinion of Prof. Dr. Winfried Tilmann of November 10, 2006, I wish to submit the following supplementary statement.

## II.    EXPERT REPORT AND/OR LEGAL OPINION OF PROF. DR. WINFRIED TILMANN

3.    Professor Tilmann correctly stated that for an ownership transfer, according to § 929 BGB (Bürgerliches Gesetzbuch – Civil Code), there need only be two elements: (1) change of possession and (2) agreement as to the transfer of ownership of the specific personal property transferred (No. 17).

4.    Whereas no dispute exists as to the fact that in the specific samples of MVA-572 sent from Professor Mayr to Dr. Moss of the National Institutes of Health (NIH) a change in possession took place, Professor Tilmann advocates also the view that the facts of the case at issue speak for themselves that Prof. Mayr and Dr. Moss also agreed as to the transfer of ownership of the specific personal property in the respective samples. According to Professor Tilmann:

> "Prof. Mayr sent the MVA-strains to Dr. Moss/NIH at the end of August 2001 without any commentary, especially not suggesting that Dr. Moss should return them or otherwise refrain from exercising ownership over the strains. He clearly did not want these MVA-strains returned, because they were to be used by the recipient. Nor did Prof. Mayr in his letter of September 12, 2001 sent to Dr. Moss after having sent the material to him, request any return of the changed or unchanged material. He had sent these MVA-strains once and for all." (No.19).

Prof. Tilmann goes on by stating:

> "This and the acceptance of the material and the letter of September 12, 2001 by Prof. Mayr can only be understood and interpreted as establishing an agreement regarding transfer of ownership. It was neither a lease (where there is no change in ownership

because there is a duty to hand back the material), nor a service contract (no change in ownership, duty to hand back the material). Prof. Mayr gave the material and did not expect to see his "property" preserved, which would include a right on his side to call the material back. That Prof. Mayr gave up possession is given. Prof. Mayr also clearly wanted Dr. Moss/NIH to 'have and to use' the MVA-572-strains. This fulfills the necessary elements for transfer of ownership (the latter being defined in § 903 BGB as being able to do with the object what you want and to exclude others from any intrusion)." (No. 20)

5.      Prof. Tilmann then interprets my Expert Report in a way as if my arguments against transfer of ownership would relate to what he calls "any underlying causal purpose-agreement." (No. 23)

6.      In order to avoid any misunderstanding, I, as not disputed by Prof. Tilmann, stated that according to the so-called *Abstraktionsprinzip* both transactions (i.e. sales contract and transfer of ownership) are legally independent transactions. Moreover, I emphasized that "a provision of an MVA-572-strain for research purposes certainly does not automatically qualify as a transfer of rights for commercial purposes unless there is a specific agreement between the parties to that effect, either explicitly or based on research or industry practice." (No. 32)

7.      Finally, I stated that Prof. Mayr has *neither explicitly nor implicitly agreed to transfer ownership or any commercial rights*, to Dr. Moss and/or NIH (No. 36). Thus, in my statement the transfer of ownership in MVA-572-strain has by no means been made dependent on an explicit agreement between Prof. Mayr on the one hand and Dr. Moss or NIH on the other, be it as regards the transfer of ownership, be it as regards any other "underlying agreement".

### III.    TRANSFER OF OWNERSHIP IN MOVABLES UNDER § 929 BGB

8.    According to the case law of the German Federal Supreme Court (BGH) for the *transfer of ownership* in movables it is required that

> "the owner of the thing deliver it to the acquirer and that both agree that the ownership is transferred: It suffices, when the will for the transfer of ownership is revealed from the circumstances. Whether the will to agree exists, is to be judged according to the general principles applicable to the interpretation of legal transactions [references omitted]."[1]

9.    In other words, the question, whether an agreement between the parties concerned as to the transfer of ownership is to be confirmed, depends on the circumstances of the case at issue. This, it has to be emphasized, does not relate to the underlying "causal purpose-agreement" or "any underlying obligatory purpose-agreement," in Prof. Tilmann's words, but exclusively to the *separately* and *independently* required agreement as to *the transfer of ownership*. It is also understood that the movable thing in which the ownership is to be transferred has to be specifically individualized since only in such objects a possession is possible. Therefore, ownership transfer in a quota of a larger quantity is not possible. § 929 BGB requires a separation of the specific objects.[2]

---

[1] 1990 NJW 1913, left column. In the original German: "… Zur Übertragung des Eigentums an einer beweglichen Sache [ist] erforderlich, dass der Eigentümer die Sache dem Erwerber übergibt und beide darüber einig sind, dass das Eigentum übergehen soll. Es reicht aus, wenn der Wille zur Eigentumsübertragung sich aus den Umständen ergibt. Ob dieser Einigungswille vorhanden ist, beurteilt sich nach den allgemeinen Grundsätzen der Auslegung von Rechtsgeschäften" [references omitted]. Cf. also Staudinger/Wiegand, 2004, § 929 No. 9 a), with further references.

[2] Erman/Michalski, § 929 BGB No. 2, with further references to the case law of the former Reichsgericht and the BGH.

4

10.    In the case at hand the circumstances decisive for whether an agreement *as to the transfer of ownership in MVA-572* existed in the sense of § 929 BGB cannot be reduced to the circumstances taken into account by Prof. Tilmann, i.e. to the letter of Prof. Mayr to Dr. Moss dated September 12, 2001. Rather the following circumstances count:

(i)    Prof. Mayr deposited the MVA-572-strain with the European Collection of Cell Cultures (ECACC) on *January 27, 1994*, accession number 94012707. Under the rules of ECACC, the deposited strains can be accessed and released without the depositor's consent, but only for use for research purposes.

(ii)    Prof. Mayr on *May 28, 1996* signed an Agreement with Bavarian Nordic, in which under No. 1.3 he offered Bavarian Nordic the *exclusive* and *sole access to MVA Vaccine Stock* and MVA Viral Stock in his possession. However, under the very same provision of that agreement it is stated:

"Bavarian Nordic recognizes that, in the scientific community, there is a growing interest in performing basic non-commercial research including the MVA-vector. Bavarian Nordic agrees not to unreasonably use its exclusivity to the MVA-system to hinder basic research by third party non-commercial academia including the MVA-system by rejecting access to the MVA-system."

This provision is found literally in all agreements which Prof. Mayr subsequently concluded with Bavarian Nordic in June 1996, June 1999, June 2001 as well as June 2003.

(iii)    With a letter dated *September 18, 1995*, Therion Biologics requested Prof. Mayr his MVA-strain of Vaccinia Virus. In the request they emphasized that "we will use this material 'for research purposes only.'" With the accompanying letter of September 26, 1995 Prof. Mayr sent to Mrs. Linda Gritz of Therion Biologics Corporation the requested material, without any further explanation.

5

(iv)    With a letter dated *September 14, 1995*, i.e. after the MVA-572 had been deposited with ECACC, Dr. Moss, Chief of the Laboratory of Viral Diseases of NIH, wrote to Prof. Mayr:

> "As you know, my laboratory has been using the MVA-strain of Vaccinia Virus *to make recombinant expression vectors*. Until now, we have been using the virus that was brought here by Gerd Sutter. However, it would be useful to have either an official vial of seed virus used for human vaccine production or a vial of vaccine. If you could supply me with such virus including lot number and date of preparation, it would be greatly appreciated. For your convenience, you could use my Federal Express Numbers to send the material. …
>
> Thank you for considering this request."[3]

(v)    With the accompanying letter of *September 19, 1995*, Prof. Mayr sent Dr. Moss the required material, without any comments.

(vi)    With a letter dated *August 3, 2001* Dr. Moss again wrote to Prof. Mayr:

> "Gerd Sutter told me the good news that you have been able to locate an early sample of MVA in your freezer and have agreed to send it to me. I wish to thank you for your generosity in this regard. As you are aware, MVA has taken on a new life as the premier vaccinia virus vector. I have enclosed a reprint of a recent paper that clearly illustrates the great potential value of MVA. …
>
> Again, I thank you for your kindness in this matter."

(vii)    Prof. Mayr with accompanying letter of *September 12, 2001*, without specific comments sent the requested material to Dr. Moss.

(viii)    National Institutes of Health (NIH) is the largest research institution in life sciences not only in the US, but worldwide. It is a non-for profit institution.

Because of its first-class cutting edge research, Prof. Mayr sent, supported by a grant which he received from the German Public Funding Authorities, his collaborator Gerd Sutter, to NIH, primarily with the task to sequence their MVA-strain of Vaccinia Virus.

(ix)    NIH has an Office of Technology Development at the National Institute of Allergy and Infectious Diseases (NIAID). According to its homepage[4]

> "The NIAID Office of Technology Development (OTD) accomplishes technology transfer by facilitating the transfer of significant research advances and resources to the broader scientific community and the development of collaborative relationships between NIAID scientists, industry, and academia. NIAID uses various mechanisms to accomplish these ends, including Material Transfer Agreements (MTAs), Co-Operative Research and Development Agreements (CRADAS), Materials-CRADAS (M-CRADas), Confidential Disclosure Agreements (CDAs), Clinical Trial Agreements (CTAs), Drug Screening Agreements (DSAs), Research Collaboration Agreements (RCAs), and, through the NIH Office of Technology Transfer (OTT), the patenting of inventions and the negotiation of various license agreements."

(x)    NIAID's OTD, as the commercial exploitation arm of NIH's NIAID never on its own initiative approached Prof. Mayr, nor was it, at least not visibly, involved in any communication between Dr. Moss and Prof. Mayr.

(xi)    On *January 10, 2002* Dr. Linda Gritz, Principle Scientist of Therion Biologics wrote to Prof. Mayr, *inter alia*:

> "As per our telephone conversation, I am writing to request several vials of your MVA-strain of Vaccinia Virus that were made before 1980. We

---

[3] Emphasis added.
[4] http://www.3.niaid.nih.gov/about/organization/odoffices/omo/otd/about/detel/default... (last visited November 28, 2006).

are interested in testing recombinant MVA for research in human clinical trials and I am very grateful for the 1983 stocks of MVA that you sent us several years ago. However, the United States Food and Drug Administration is concerned about the possible presence of prions in cell culture material derived in Europe after 1980. Therefore we are requesting earlier (1973 or 1974 or earlier?) stocks of your MVA. We will use this material for research purposes only."

(xii)    In a letter dated February 26, 2002, the same Dr. Gritz of Therion wrote to Prof. Mayr:

"As per our telephone conversation, I am writing about the MVA virus, MVA-572. CEF v. 22.2.74, that you sent to Dr. Bernard Moss. Dr. Moss is willing to send us the virus but would like *written permission from you before he sends us the virus*.

Therefore I would greatly appreciate it if you would send such a letter, giving Dr. Moss permission to provide MVA-572.CEF v. 22.2.74 (and derivatives) to Therion, at your earliest convenience: [here follow the mailing address of Dr. Moss and Dr. Gritz]."[5]

(xiii)    Professor Mayr neither required nor received any compensation for the transfer of possession in MVA-572 to Dr. Moss/NIH.

11.    The circumstances of the case at hand, to my understanding, do not allow any other conclusion as that there *was neither an explicit nor an implicit agreement between Prof. Mayr and Dr. Moss/NIH that the ownership in the sample of MVA-572*, i.e. the complete control to dispose of it at will, *in particular to commercially exploit*, e.g. *license or sell the progeny* of the MVA-572 strain, the *possession* of which Dr. Moss has acquired in 2001, were to

---

[5] Emphasis added.

be transferred to Dr. Moss and/or NIH.

12.     Not only had Prof. Mayr already in 1994, i.e. before sending any MVA strains to NIH's Dr. Moss, deposited the MVA-572 virus strain with the ECACC, thus made it available for research purposes to the academic community, he also entered the contractual obligation to allow access for commercial purposes to that material to Bavarian Nordic on *an exclusive basis* in the above mentioned agreement of June 1996. Thus, assuming that Prof. Mayr agreed upon transfer of ownership in the sample sent to NIH in 2001 is clearly in contradiction with all the circumstances of the case at hand. It implies the assumption that Prof. Mayr would have on purpose treated Dr. Moss and/or NIH in a privileged way as compared to other academic researchers seeking access to MVA-572, and also that Prof. Mayr *knowingly* violated his contractual obligations with Bavarian Nordic. Moreover, such an assumption is also *clearly inconsistent with the denial of Dr. Moss* to send samples of MVA-572 virus to Therion Biologics without *written permission* of Prof. Mayr.

13.     The *ex post* attempts of NIAID and its OTD, which first requested Dr. Moss not to reply to complaints raised by Prof. Mayr (see letter of Dr. Moss of April 23, 2003), to claim that NIH acquired, *free of any charge and any payment of any consideration and without any MTA* all rights with respect to the material, progeny and derivatives of the MVA-572.FHE-22.02.1974 that Prof. Mayr supplied to Dr. Bernard Moss in late summer 2001 (letter of Dr. John R. La Montagne of December 10, 2002), *find no support in the circumstances of the case*. Prof. Mayr had no reason to treat Dr. Moss and/or NIH as a non-for profit research institution any differently than any other colleague, who approached him with a request to access his MVA viral strains. There should be no doubt, especially in view of the circumstances described, that Prof. Mayr for sure would have acted differently if NIAID's OTD would have been involved in

the transfer of the respective strains on the side of Dr. Moss and NIH.

14.     Without going into details, it should be added that the assessment of the alleged ownership in MVA-572.FHE-22.02.1974, by NIH's NIAID itself seems to be reflected in the MTA signed between NIAID and Acambis, Inc., in 2002, where as regards that material, No. 10 reads as follows:

> "NO WARRANTIES, EXPRESSED OR IMPLIED, ARE OFFERED AS TO THE MERCHANTABILITY OR FITNESS FOR ANY PURPOSE OF THE MATERIALS PROVIDED TO RECIPIENT UNDER THIS AGREEMENT, OR THAT THE MATERIALS OR COMMERCIAL PRODUCTS MAY BE EXPLOITED WITHOUT INFRINGING THE PATENT RIGHTS OF ANY PARTIES. Recipient accepts transfer of the material "as is", and NIAID does not offer any guarantee of any kind."[6]

15.     For the sake of completeness only, it should finally be observed that in view of the specific properties of the material at hand, namely *its ability to be reproduced in a biological system*, thus, its use, even for research purposes only, being dependent on continuous reproduction of the strain, all comparisons of any acts typical of ownership in movables, *which are not biological material*, are vastly misplaced and, as a rule, not suitable to contribute to an adequate understanding of the issues at hand. This relates in particular to acts such as destruction, return of the material, etc. Not surprisingly, many distributors of biological materials, who for instance use the so-called lease-license model, do not even require or expect the return of the physical materials. The recipient may destroy the materials or retain them

---

[6] Emphasis in the original.

indefinitely. But restrictions apply to further transfers by the recipient.[7] Thus, the fact alone that a recipient of biological material may destroy it or retain it indefinitely, does not bear any significance as to the ownership in such material.


### IV. CONCLUSION

16.     Under the case law of the German Federal Supreme Court (BGH) in the case at hand, as a consequence of the *clear lack of a respective agreement*, no transfer of ownership from Prof. Mayr to NIH/Dr. Moss in MVA-572 has taken place under § 929 BGB. This lack of agreement as to the transfer of ownership ("Einigungswille") relates exclusively and specifically to the so-called "Verfügungsgeschäft", i.e. the transfer of ownership *in abstracto*.

Munich, November 29, 2006                    Prof. Dr. Dres. h.c. Joseph Straus

---

[7] O'Connor, The Use of MTAs to Control Commercialization of Stem Cell Diagnostics and Therapeutics, Berkeley Technology Law Journal Vol. 21:3, 1017 ss., at 1019, 1020 [2006].

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of November 2006, copies of BAVARIAN

NORDIC'S SUPPLEMENTAL EXPERT REPORT AND/OR LEGAL OPINION OF PROF.

DR. DRES. H.C. STRAUS  were served as follows:


**VIA ELECTRONIC MAIL AND U.S. MAIL :**
Mary B. Graham, Esq.
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

William D. Coston, Esq.
VENABLE  LLP
575 7th Street, N.W.
Washington, D.C. 20004

John W. Shaw, Esq.
Karen L. Pascale, Esq.
YOUNG CONAWAY STARGATT & TAYLOR
1000 West Street, 17th Floor
Wilmington, DE 19801


Krista L. Lynch
BINGHAM McCUTCHEN LLP
3000 K Street,  N.W.
The Washington Harbour
Washington, D.C.  20007
(202) 424-7500

# EXHIBITS 23-25

## REDACTED IN THEIR ENTIRETY

# EXHIBIT 26

# Handelsbanken Capital Markets
**Equity Research** | Local insight into hundreds of Nordic companies

Company Update ■ 12 June 2007



**BUY**
Reiterated

Price: DKK 589

# Bavarian Nordic, Biotechnology, DENMARK

## Fewer triggers but lower risk and upside intact

**Trading data**

| | |
|---|---|
| Mkt cap (EURm): | 605 |
| Mkt cap (DKKm): | 4,506 |
| No of shares (m): | 7.7 |
| Expected buybacks next 12m (% of MC): | 0 |
| Free float: | 78 % |
| Avg daily volume (000): | 51 |
| Avg daily value (EURm): | 4 |
| Bloomberg: | BAVA DC |
| Reuters: | BAVA.CO |
| Web address: | bavarian-nordic.com |
| Next event: | |

**12m target return**

| | |
|---|---|
| Target price (DKK): | 720 |
| of which dividend: | 0 |
| Expected total return (%): | 22.6 |

**Total return**

| % | -1m | -3m | -12m |
|---|---|---|---|
| Absolute: | 9.7 | 13.7 | 34.2 |
| Absolute EUR: | 9.8 | 13.8 | 34.4 |
| Relative DJ STOXX: | 11.0 | 8.9 | 10.6 |
| 52 week (H/L): | | | 610/335 |

**Balance sheet 2006**

| | |
|---|---|
| Net debt (DKKm): | -92.5 |
| Net debt/equity(%): | -13.4 |
| ROE (%): | -21.7 |
| ROIC (%): | n.m |

- Lower risk after award of larger than expected RFP3 contract
- Upside intact, now 23% after market setback
- Few short-term triggers but strategy update should be positive

**DKK 8.8bn contract hugely important – risk weighting lowered**

We were pleasantly surprised by the value, size of upfront payments and profitability of the RFP3 contract for Bavarian Nordic (BN), which is of huge importance to the company. We fully factor in the base contract and see an 85% chance that the optional part will be exercised. The contract also lowers the overall risk profile of BN – we cut our WACC to 11% (12.5%).

**New strategy plan and M&A speculation could support BN**

Our positive view was confirmed by a meeting with management on June 8. While future triggers will not be of the same magnitude as the US contract, we believe that the coming strategy plan from the new CEO should be a positive trigger and improve transparency on the future of BN. This plan could come as early as September 2007 and no later than year end. We also see a chance that M&A speculation could drive the share price higher.

**Weaker trigger picture, but strong upside remains**

After an initial share price increase of 16%, BN is now only ~7% above its level before the contract award. We find that highly unjustified given the surprising size of the RFP3 and the favourable contract terms. We still see strong upside of 23% and maintain our BUY rating despite the lack of short-term triggers. Our new target price is DKK 720 (645) per share.

Michael Novod, +45 33 41 8618, mino03@handelsbanken.se
Astrid Samuelsson, +46 8 701 3866, assa02@handelsbanken.se

**Share price – 12m**



Source: Reuters

**Key figures**

| DKKm | 2005 | 2006 | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|
| Sales | 248 | 176 | 385 | 728 | 1,526 |
| EBIT adj | -120 | -210 | -72 | 33 | 499 |
| *margin (%)* | *-48.4* | *-119* | *-18.8* | *4.5* | *32.7* |
| EBT | -116 | -199 | -51 | 48 | 507 |
| EPS reported | -16.2 | -22.5 | -4.76 | 6.2 | 66.2 |
| EPS adj (DKK) | -16.2 | -22.5 | -4.76 | 6.2 | 66.2 |
| *Y-o-y growth (%)* | *n.m* | *n.m* | *n.m* | *n.m* | *n.m* |
| *EPS adj revisions (%)* | *-* | *-* | *n.m* | *-69.6* | *-32.1* |
| P/E adj (x) | n.m | n.m | n.m | 94.5 | 8.9 |
| EV/EBIT (x) | n.m | n.m | n.m | >99 | 7.2 |
| EV/sales (x) | 11.0 | 17.8 | 10.5 | 5.5 | 2.4 |
| P/BV (x) | 4.56 | 4.67 | 4.10 | 3.93 | 2.73 |
| FCFE adj yield (%) | -10.3 | -4.2 | -1.2 | 0.32 | 9.2 |
| ROE adj (%) | -19.9 | -21.7 | -4.1 | 4.3 | 36.2 |

Source: Handelsbanken Capital Markets

## What has changed

| DKKm | SHB Q2 07e | chg (%) | SHB 2007e | chg (%) | SHB 2008e | chg (%) |
|---|---|---|---|---|---|---|
| Sales | 96.1 | n.m | 384.5 | 206 | 728.0 | -31 |
| EBIT adj | -18.1 | n.m | -72.3 | -80 | 32.8 | -81 |
| *margin* | *-18.8* | *n.m* | *-18.8* | *-93* | *4.5* | *-73* |
| EBT | -12.6 | n.m | -50.6 | -85 | 47.7 | -74 |
| Net income | -9.1 | n.m | -36.4 | -85 | 47.7 | -63 |
| EPS | -1.19 | n.m | -4.76 | -88 | 6.2 | -70 |
| EPS adj | -1.19 | n.m | -4.76 | -88 | 6.2 | -70 |

Source: Handelsbanken Capital Markets

## SHB vs. consensus

No consensus available.

## Cash flow trend



Source: Handelsbanken Capital Markets

## Revenue and profitability trend



Source: Handelsbanken Capital Markets

## MVA pipeline

| Product | Indication | Status | Next milestone |
|---|---|---|---|
| IMVAMUNE (market) (P) | Smallpox vaccine | Dialogue with US authorities | Expected award of RFP3 order |
| IMVAMUNE (development) (P) | Smallpox vaccine | Thre phase II trials ongoing, FDA fast track | Initiation of phase III early 2008 |
| MVA nef (T) | HIV | Phase II ongoing | Initiation of phase III in 2008 |
| MVA-BN polytope (T/P) | HIV | Two phase I ongoing, two phase II planned | Phase I results in H2 2007 and phase II started |
| MVA-BN multiantigen (T) | HIV | Pre-clinical studies ongoing | Awaiting phase I prophylactic studies |
| MVA-BN HER2 | Breast cancer | IND approved | Initiation of phase I/II in H1 2007 |
| MVA-BN PSA/PAP | Prostate cancer | Pre-clinical studies ongoing | Initiation of phase I in H2 2007 |

+5 pre-preclinical projects within HIV, measles, RSV, dengue fever and JEV

Source: Handelsbanken Capital Markets

## Balance sheet health trend



Source: Handelsbanken Capital Markets

## Ownership structure

| | Votes (%) | Capital (%) |
|---|---|---|
| A.J. Aamund | 17.4 | 17.4 |
| PKA | 5.1 | 5.1 |
| Number of A-shares | | 0 |
| Number of B-shares | | 7,651,416 |
| Total | | 7,651,416 |
| Free float | | 100% |

Source: Handelsbanken Capital Markets

# Investment case

*After several years of waiting, the highly anticipated RFP3 contract for the supply of a safe smallpox vaccine to the US strategic national stockpile has been awarded to Bavarian Nordic (BN). The size of the contract and its favourable terms warrant a lower risk profile for BN, therefore we cut our WACC to 11% (12.5%), bringing BN into line with the more advanced biotech/biopharmaceutical companies in our universe. We also reduce our loss before tax estimate by almost DKK 300m to DKK -51m for 2007e and estimate that Bavarian Nordic will have a cash position by Q3 2007e of more than DKK 900m, becoming profitable already in 2008e. Our new target price is DKK 720 per share (645) and our BUY rating is maintained.*

## DKK 8.8bn contract reduces risk and provides increased flexibility

*Delivery of first 20 million doses when EUA approved*

We believe that Bavarian Nordic has finally hit the jackpot by being awarded the highly anticipated RFP3 order from the US government for delivery of up to 80 million doses of safe third-generation IMVAMUNE smallpox vaccine. The initial order is for 20 million doses of vaccine, and deliveries will start as soon as Bavarian Nordic has obtained an emergency use authorisation (EUA) of IMVAMUNE – we expect this to happen during H2 2008 based on discussions with the company. We believe that Bavarian Nordic has already generated the majority of the data required by the CDC/FDA to obtain an emergency use authorisation, while additional phase III studies in immunecompromised individuals will be initiated during 2008 to obtain a BLA (biologic license application) on IMVAMUNE by 2010/11.

*Size of contract larger than expected*

We were surprised by the value, size of upfront payments and profitability of the RFP3 contract for BN, which is of huge importance to the company. We fully factor in the base contract to our forecasts and see an 85% chance that the optional part will be exercised. The contract also lowers the overall risk profile of BN and we cut our WACC to 11% (12.5%). The US order should make BN profitable already by 2008.

*BN profitable by 2008e – WACC lowered*

| Table 1. HCM universe WACCs | |
|---|---|
| Company | WACC |
| Active Biotech | 13.0% |
| Alk-Abello | 9.5% |
| AstraZeneca | 9.0% |
| Bavarian Nordic | 10.5% |
| Biotage | 8.9% |
| Coloplast | 7.1% |
| Elekta | 7.9% |
| Genmab | 11.0% |
| Getinge | 6.9% |
| Karo Bio | 14.0% |
| Lundbeck | 9.0% |
| Meda | 7.7% |
| Medivir | 14.0% |
| NeuroSearch | 15.0% |
| Novo Nordisk | 8.5% |
| Novozymes | 8.0% |
| Orexo | 12.3% |
| Orion | 7.9% |
| Q-Med | 8.2% |
| Raysearch | 9.3% |
| Sectra | 8.1% |
| William Demant Holding | 6.7% |
| Vitrolife | 10.3% |
| Simple average | 9.7% |

Source: Handelsbanken Capital Markets

We have had extensive contact with the company and on June 8 hosted a management presentation at Handelsbanken's premises regarding the RFP3 award. Bavarian Nordic is naturally pleased with the size and terms of the US government contract – the order was larger than what we and the company expected – but management also acknowledges that the near-term newsflow is likely to be less positive than in the past.

## Facts and details of RFP3

*Guidance raised by DKK 300m*

The initial order of 20 million doses of IMVAMUNE by the US government triggers a payment of DKK 2.8bn (USD 500m), which includes a large upfront and milestones of DKK 690m (USD 125m) to be paid during 2007-2008e. This year an estimated RPF 275m (USD 50m) will be received, which has made BN raise its revenue guidance by DKK 250m and PTP guidance by DKK 300m to a loss of DKK 51m in 2007e.

The contribution margin from the base contract is approximately DKK 1.5bn from a revenue base of DKK 2.8bn (54%) over five years. The US contract is the largest ever of its kind and, thanks to the US BARDA Act[†], it is also the first time a company has received any advance payments as part of a contract under the BioShield programme. This ensures a positive cash flow from the contract throughout the entire execution period. The largest proportion of vaccine deliveries will begin on the expected grant of a EUA, i.e. from mid-2008 onwards.

*Base contract of 20m doses, option for an additional 60m doses*

Contract includes options for up to an additional DKK 6bn (USD 1.1bn) for a further 60 million doses of IMVAMUNE. We have talked extensively to the company, which believes the likelihood for the US government exercising this option is very high. We concur with this, given that the US government has financed the entire development of the vaccine and since BN has issued a price guarantee for the remaining doses. The exercise of the optional element of the contract is also contingent on a BLA for IMVAMUNE by end-2010 and an approval for high-risk groups, such as HIV patients and other groups with immune system deficiencies. The company has informed us that these trials have already begun (in HIV patients).



**Figure 1. RFP3 status, clinical trials etc.**

Source: Bavarian Nordic and Handelsbanken Capital Markets

[†] Biomedical Advanced Research and Development Authority Act, December 2006

**Handelsbanken** Capital Markets

*Major stockpiles of old vaccines – potentially need to be replaced*

### Other potential smallpox contracts, but uncertain who, when and how much

Currently the US government has an existing stockpile of smallpox vaccines of about 300 million doses. This is the largest stockpile in the world (see Table 2). The US today has 41% of the global smallpox vaccine stockpile, while Germany, the UK, France and the Netherlands rank 2, 3, 4 and 5 respectively. We believe that Bavarian Nordic is already in talks with some of these countries to supply a third generation vaccine, but also that potential contracts in Europe and RoW are highly contingent on Bavarian Nordic obtaining an emergency use authorisation and potentially a BLA for IMVAMUNE.

We have contacted some of the relevant governments, through defence or health ministries, who confirm that potential tender processes or actual awards are contingent on good published data on IMVAMUNE. While we do not rule out tenders from defence ministries for vaccines for first responders, such as the recent Canadian tender, we emphasise the large uncertainty surrounding exactly which countries might make such tenders, when tenders might be announced and how large they might be. We believe that Bavarian Nordic is currently in discussions with three to five countries and that there are advanced talks with one country besides Canada.

**Table 2. Existing smallpox vaccine stockpiles**

| Country | Million doses | Country | Million doses |
|---|---|---|---|
| US | 300 | Singapore | 4 |
| Germany | 100 | Austria | 3 |
| UK | 80 | Switzerland | 3 |
| France | 60 | WHO | 2.5 |
| Japan | 31 | Greece | 2 |
| South Africa | 30 | Iran | 2 |
| Netherlands | 20 | Belgium | 1 |
| Malaysia | 15 | Hungary | 1 |
| Czech Republic | 10 | Sweden | 1 |
| South Korea | 10 | Ireland | 0.5 |
| Israel | 7 | Norway | 0.5 |
| Denmark | 6 | Australia | 0.5 |
| Canada | 6 | Poland | 0.5 |
| Spain | 6 | Croatia | 0.5 |
| India | 6 | Slovakia | 0.5 |
| Italy | 5 | Turkey | 0.5 |
| **Total** | **715** | | |

Source: Biosecurity and Bioterroism: Biodefence Strategy, Practice and Science, vol 3, no 3, 2005

### Estimate changes after RFP3 award

*Estimates raised by DKK 300m in 2007e, BN profitable in 2008e*

Our estimate changes may seem dramatic, but mainly reflect expected revenues shifting from one year to the next, while factoring in a larger share of the expected US cash flows, which triggers the increase to our target price. The size of the optional element of the contract was also almost double what we had expected. Moreover, our estimate changes now reflect new financial guidance for 2007e from Bavarian Nordic of a loss before tax of DKK 51m, generated on a guided revenue base of DKK 380m.

**Table 3. Estimate changes (DKK m)**

| | 2007e | 2008e | 2009e | 2007e | 2008e | 2009e | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|---|---|---|---|
| Sales | 126 | 1,048 | 2,259 | 385 | 728 | 1,526 | 206% | -31% | -32% |
| EBIT | -357 | 267 | 1,047 | -72 | 33 | 499 | n.m. | -88% | -52% |
| PBT | -341 | 278 | 1053 | -51 | 48 | 507 | n.m. | -83% | -52% |

Source: Handelsbanken Capital Markets

**Handelsbanken** Capital Markets

We still expect Bavarian Nordic to turn profitable from 2008e with revenues of DKK 728, EBIT of DKK33m and a profit before tax of DKK 48m.

Based on the new contract details and our meeting last week with management, we make the following new assumptions in our valuation model for Bavarian Nordic:

### RFP3

- USD 500m (DKK2.8bn) included with a 100% risk-adjustment during 2007-2011e, including upfront and milestone payments of USD 50m in 2007e, USD 75m in 2008e and USD 25m in 2009e. First deliveries to the US government expect during H2 2008 of 2-3m doses.

- Contractual options for RFP3 worth USD 1.1bn are included with 85% risk-adjustment during 2009-2014e, of which USD 300m is included from 2009-2011e as part of an R&D payment from the US government. The remaining USD 800m is included from 2012-2014e.

- We assume in our model a maintenance level of 80m doses to the US in the period 2015-2025e.

- The US IMVAMUNE franchise makes up about 40% of our DCF value, with 14% from the RFP3 base contract and 26% from the optional part of the contract.

### RoW smallpox vaccines

- No orders to be booked until 2009. Tenders may be announced prior to that, which is a realistic scenario, however we do not believe that any orders will be delivered or booked until an EUA and, potentially, a BLA have been obtained in the US.

- In RoW, we factor in 85m doses from 2009-2025e, which is risk-adjusted by 50%, i.e. the underlying sales forecast is at 170m doses, meaning that that RoW IMVAMUNE franchise makes up 28% of our DCF value.

### HIV revenues and rest of pipeline

*US franchise totals 40% of DCF value*

- We have become more cautious on the HIV Nef vaccine from Bavarian Nordic and believe it could take a considerable amount of time to get the product registered. We also believe that it will require a partner. We now factor in a potential launch in 2011 and risk-adjust all cash flow from this project by 15%. Peak revenues to Bavarian Nordic for the HIV Nef vaccine are estimated at DKK 500-600m between 2018e and 2025e, meaning that the HIV franchise makes up approx. 17% of our DCF value.

**Figure 2. DCF value split**



Source: Handelsbanken Capital Markets

**Handelsbanken** Capital Markets

### Weaker trigger outlook, but strong upside intact

*Fewer triggers going forward*

After an initial share price increase of about 16%, Bavarian Nordic is now only ~7% above the level before the contract award. We find this unjustified given the surprising size of the RFP and the favourable contract terms, despite the slightly weaker trigger picture over the next 3-4 months. We still see strong upside of 23% and maintain a BUY recommendation. Our new target price is DKK 720 per share.

**Figure 3. Share price performance, -2m**

*Upside intact after market setback*



Source: Datastream and Handelsbanken Capital Markets

### New strategy plan and M&A speculation

While any future triggers will not be of the same magnitude as the US contract, we still believe that the strategy plan from the new CEO should be a positive trigger and create more transparency about the future of BN. This plan could come as early as September 2007, at the latest by November/December. We also we see some possibility that M&A speculation could drive the share price higher.

*New strategy plan should be positive*

We fully acknowledge the hard and impressive work of the current CEO of Bavarian Nordic, however the company is now likely to enter a completely new phase, placing new and varied demands on the CEO. While we believe that Anders Hedegaard will be able to fulfil the expectations of the market by delivering a sound strategy plan for Bavarian Nordic as a biopharmaceutical company, we also believe that the strategy plan is a challenge as Bavarian Nordic needs a more focused approach in future.

Regarding M&A possibilities, we do not rule out that the company could be the target of speculation or an actual bid. We believe that the company has previously been approached by big pharma, as have many other biotech companies, but the uncertainty about the US contract and legal confrontations with Acambis have complicated the case. The US order, and Acambis' announcement that it will no longer be present in the field of MVA, makes this situation much more transparent. We have also had indications that companies such as Sanofi-Pasteur and Novartis are interested in entering the MVA field and using this vaccine technology, which could either mean greater competition or higher chance of M&A with Bavarian Nordic as a potential target. With regard to competition in this area, we believe that Bavarian Nordic will continue to fight for its IPR to the MVA technology.

### Legal disputes hopefully coming to an end

*Acambis litigation should be settled as soon as possible*

Bavarian Nordic is still engaged in legal disputes with Acambis, although their relevance has been reduced to some extent by the recent RFP3 progress. Acambis has ceased all activities within MVA and hence we hope that Bavarian Nordic and Acambis can settle the cases. We have discussed the matter with both Bavarian Nordic and Acambis; the latter has told us that Acambis continues to attempt to find a way to settle the dispute, given that MVA is no longer part of their strategy. However, Acambis also states that the outstanding issue is a realistic price for a settlement. We have asked Acambis what they believe is a realistic price, which they did not provide. However Acambis states that they have ongoing costs of about GBP 0.5m for the Delaware case, which they believe is the only relevant parameter at this point.

Of course, we believe that Bavarian Nordic should fight vigorously for its intellectual property rights, but we also believe that cases such as the Delaware suit, which deals with misuse of trade secrets, should be settled or terminated as a soon as possible as they have no value to the company after winning the RFP3 award. Such cases are costly and consume valuable time for senior employees, so the company needs to carefully assess the costs and benefits of the outstanding cases.

**Handelsbanken** Capital Markets

# Detailed estimates and valuation data

## P&L accounts – annual data

| 31/12 DKKm | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|---|---|---|
| Sales | 121 | 505 | 165 | 248 | 176 | 385 | 728 | 1,526 |
| Total op expenses | -138 | -269 | -235 | -362 | -366 | -437 | -676 | -1,009 |
| EBITDA | -17 | 236 | -70 | -114 | -190 | -53 | 52 | 517 |
| Depreciation & impairment | -5 | -9 | -18 | -7 | -20 | -20 | -19 | -18 |
| EBIT | -22 | 227 | -88 | -120 | -210 | -72 | 33 | 499 |
| Net financials | 1 | 3 | 5 | 4 | 11 | 22 | 15 | 8 |
| EBT | -21 | 230 | -77 | -116 | -199 | -51 | 48 | 507 |
| Paid tax | 0 | -67 | 24 | 22 | 56 | 14 | 0 | 0 |
| Deferred tax | 98 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Reported tax | 96 | -67 | 24 | 22 | 56 | 14 | 0 | 0 |
| *tax rate (%)* | *457* | *29.1* | *31.2* | *19.0* | *28.0* | *28.0* | *0.0* | *0.0* |
| Minorities | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| Net income | 75 | 163 | -53 | -94 | -143 | -36 | 48 | 507 |

| Growth % | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|---|---|---|
| Revenue | n.m | 317 | -67.3 | 50.3 | -29.0 | 118 | 89.3 | 110 |
| Total expenses | n.m | 94.9 | -12.8 | 54.0 | 1.1 | 19.6 | 54.7 | 49.1 |
| EBITDA | n.m | n.m | n.m | n.m | n.m | n.m | n.m | >900 |
| EBIT | n.m | n.m | n.m | n.m | n.m | n.m | n.m | >900 |
| EBT | n.m | n.m | n.m | n.m | n.m | n.m | n.m | >900 |
| Net income | n.m | 117 | n.m | n.m | n.m | n.m | n.m | >900 |

| Margins % | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|---|---|---|
| EBITDA | -14.1 | 46.7 | -42.3 | -45.8 | -108 | -13.7 | 7.1 | 33.9 |
| EBIT | -18.2 | 45.0 | -53.3 | -48.4 | -119 | -18.8 | 4.5 | 32.7 |
| EBT | -17.4 | 45.5 | -46.7 | -46.8 | -113 | -13.2 | 6.6 | 33.2 |
| Net income | 62.0 | 32.3 | -32.1 | -37.9 | -81.4 | -9.5 | 6.6 | 33.2 |

| Profitability % | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|---|---|---|
| ROE reported | 62.3 | 60.0 | -16.0 | -19.9 | -21.7 | -4.1 | 4.3 | 36.2 |
| ROE adj | 62.3 | 60.7 | -16.0 | -19.9 | -21.7 | -4.1 | 4.3 | 36.2 |
| Pre-tax ROIC | n.m | >200 | n.m | n.m | n.m | n.m | 6.8 | 91.4 |
| Revenue/capital invested | n.m | >500 | 71.8 | 64.3 | 38.9 | 82.2 | 145 | 258 |
| Revenue/total assets | 38.1 | 118 | 28.2 | 26.7 | 18.4 | 27.7 | 49.2 | 73.1 |
| Revenue/employee (000) | 1,952 | 5,805 | 1,138 | 1,710 | 1,214 | 2,652 | 5,021 | 10,524 |

| Adjusted values DKKm | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|---|---|---|
| Total adjustments to net inc | 0 | -2 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA | -17 | 238 | -70 | -114 | -190 | -53 | 52 | 517 |
| *margin (%)* | *-14.1* | *47.1* | *-42.3* | *-45.8* | *-108* | *-13.7* | *7.1* | *33.9* |
| EBITA | -22 | 229 | -88 | -120 | -210 | -72 | 33 | 499 |
| *margin (%)* | *-18.2* | *45.4* | *-53.3* | *-48.4* | *-119* | *-18.8* | *4.5* | *32.7* |
| EBIT | -22 | 229 | -88 | -120 | -210 | -72 | 33 | 499 |
| *margin (%)* | *-18.2* | *45.4* | *-53.3* | *-48.4* | *-119* | *-18.8* | *4.5* | *32.7* |
| EBT | -21 | 232 | -77 | -116 | -199 | -51 | 48 | 507 |
| Net income | 75 | 165 | -53 | -94 | -143 | -36 | 48 | 507 |

Source: Handelsbanken Capital Markets

**Handelsbanken** Capital Markets

## P&L accounts – quarterly data

| 31/12  DKKm | Q1 06 | Q2 06 | Q3 06 | Q4 06 | Q1 07 | Q2 07e | Q3 07e | Q4 07e |
|---|---|---|---|---|---|---|---|---|
| Sales | 35.3 | 75.7 | 32.5 | 32.5 | 28.8 | 96.1 | 96.1 | 163.5 |
| Total op expenses | -82.6 | -118.5 | -71.9 | -92.6 | -28.8 | -96.1 | -96.1 | -163.5 |
| EBITDA | -47.3 | -42.7 | -39.4 | -60.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| EBIT | -56.6 | -52.9 | -50.3 | -50.3 | -51.1 | -18.1 | -18.1 | 14.9 |
| Net financials | -4.3 | 2.2 | 6.6 | 6.6 | 0.0 | 0.0 | 0.0 | 0.0 |
| EBT | -60.9 | -50.7 | -43.7 | -43.7 | -51.7 | -12.6 | -12.6 | 26.4 |
| Reported tax | 14.8 | 15.7 | 12.6 | 12.6 | 0.0 | 0.0 | 0.0 | 0.0 |
| *tax rate (%)* | *24.3* | *31.0* | *28.9* | *28.9* | *0.0* | *0.0* | *0.0* | *0.0* |
| Net income | -46.1 | -35.0 | -31.1 | -31.1 | -40.6 | -9.1 | -9.1 | 22.4 |

| Growth % | Q1 06 | Q2 06 | Q3 06 | Q4 06 | Q1 07 | Q2 07e | Q3 07e | Q4 07e |
|---|---|---|---|---|---|---|---|---|
| Revenue | -50.1 | 5.7 | -48.7 | -23.3 | -18.4 | 27.0 | 196 | 403 |
| Total expenses | -2.8 | 61.1 | 3.5 | -30.6 | -65.1 | -18.8 | 33.7 | 76.4 |

| Margins % | Q1 06 | Q2 06 | Q3 06 | Q4 06 | Q1 07 | Q2 07e | Q3 07e | Q4 07e |
|---|---|---|---|---|---|---|---|---|
| EBITDA | -134 | -56.5 | -121 | -185 | n.m | n.m | n.m | n.m |
| EBIT | -160 | -69.9 | -155 | -155 | -177 | -18.8 | -18.8 | 9.1 |
| EBT | -173 | -67.0 | -134 | -134 | -180 | -13.2 | -13.2 | 16.2 |
| Net income | -131 | -46.2 | -95.6 | -95.6 | -141 | -9.5 | -9.5 | 13.7 |

| Adjusted values DKKm | Q1 06 | Q2 06 | Q3 06 | Q4 06 | Q1 07 | Q2 07e | Q3 07e | Q4 07e |
|---|---|---|---|---|---|---|---|---|
| EBITDA | -47.3 | -42.7 | -39.4 | -60.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| *margin (%)* | *-134* | *-56.5* | *-121* | *-185* | *n.m* | *n.m* | *n.m* | *n.m* |
| EBITA | -56.6 | -52.9 | -50.3 | -50.3 | -51.1 | -18.1 | -18.1 | 14.9 |
| *margin (%)* | *-160* | *-69.9* | *-155* | *-155* | *-177* | *-18.8* | *-18.8* | *9.1* |
| EBIT | -56.6 | -52.9 | -50.3 | -50.3 | -51.1 | -18.1 | -18.1 | 14.9 |
| *margin (%)* | *-160* | *-69.9* | *-155* | *-155* | *-177* | *-18.8* | *-18.8* | *9.1* |
| EBT | -60.9 | -50.7 | -43.7 | -43.7 | -51.7 | -12.6 | -12.6 | 26.4 |
| Net income | -46.1 | -35.0 | -31.1 | -31.1 | -40.6 | -9.1 | -9.1 | 22.4 |

Source: Handelsbanken Capital Markets

### Revenue, 12-month rolling



Source: Handelsbanken Capital Markets, Reuters

### EBIT, 12 month rolling



Source: Handelsbanken Capital Markets

**Handelsbanken** Capital Markets

## Forecast balance sheet

| 31/12  DKKm | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|---|---|---|
| Accounts receivable | 66 | 50 | 48 | 28 | 24 | 48 | 81 | 153 |
| Inventory | 31 | 0 | 39 | 10 | 13 | 28 | 53 | 112 |
| Other current assets | 0 | 18 | 25 | 15 | 16 | 36 | 68 | 142 |
| Cash other interest-bearing | 109 | 283 | 186 | 404 | 333 | 723 | 738 | 1,154 |
| Current Assets | 206 | 358 | 310 | 310 | 386 | 835 | 940 | 1,561 |
| Other intangible | 1 | 5 | 10 | 19 | 13 | 13 | 13 | 13 |
| Tangible assets | 10 | 17 | 207 | 346 | 408 | 392 | 378 | 365 |
| Shares associates | 0 | 18 | 23 | 0 | 0 | 0 | 0 | 0 |
| Oth non-IB fixed assets | 98 | 36 | 71 | 108 | 147 | 147 | 147 | 147 |
| Other financial assets | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Total assets | 318 | 428 | 585 | 929 | 954 | 1,387 | 1,479 | 2,087 |
| Equity | 196 | 347 | 315 | 630 | 691 | 1,098 | 1,146 | 1,652 |
| Interest-bearing debt | 6 | 4 | 170 | 261 | 240 | 240 | 240 | 240 |
| Provisions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Current liabilities | 115 | 77 | 99 | 80 | 112 | 139 | 182 | 284 |
| Total equity & liabilities | 318 | 428 | 585 | 928 | 954 | 1,387 | 1,479 | 2,087 |
| Net interest bearing debt | -106 | -280 | -16 | -143 | -93 | -483 | -498 | -914 |

Source: Handelsbanken Capital Markets

## Forecast cash flow

| DKKm | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|---|---|---|
| EBITA | -22 | 227 | -88 | -120 | -210 | -72 | 33 | 499 |
| - taxes on EBITA | 101 | -66 | 27 | 23 | 59 | 20 | 0 | 0 |
| - growth in NWC | 9 | -8 | -23 | -8 | -10 | -32 | -47 | -103 |
| - capex | -9 | -29 | -191 | -200 | -2 | -4 | -5 | -5 |
| + depreciation/impairment | 5 | 9 | 18 | 7 | 20 | 20 | 19 | 18 |
| + growth in provision | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| FCF to firm | 85 | 130 | -255 | -299 | -142 | -68 | 0 | 409 |
| + net financials | 1 | 3 | 5 | 4 | 11 | 22 | 15 | 8 |
| - paid tax on financials | -101 | -1 | -3 | -1 | -3 | -6 | 0 | 0 |
| FCF to equity | -16 | 134 | -254 | -296 | -135 | -52 | 15 | 416 |
| - acquisitions | 0 | -2 | 0 | 0 | 0 | 0 | 0 | 0 |
| + divestments | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| + equity issues / buy-backs | -80 | 0 | -11 | 0 | 0 | 443 | 0 | 0 |
| + other adjustments | 156 | 42 | 1 | 1 | 0 | 0 | 0 | 0 |
| Total Cash flow | 61 | 174 | -264 | -295 | -135 | 391 | 15 | 416 |
| Cap.ex to sales (%) | 7.3 | 5.7 | 115 | 80.7 | 1.0 | 1.0 | 0.69 | 0.35 |
| Cap.ex to depr (x) | 1.8 | 3.3 | 10.4 | 30.8 | 0.09 | 0.20 | 0.26 | 0.29 |

Source: Handelsbanken Capital Markets

**Handelsbanken** Capital Markets

## Financial ratios

|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e | 2009e |
|---|---|---|---|---|---|---|---|---|
| Equity/total assets | 61.8 | 81.0 | 54.0 | 67.9 | 72.4 | 79.1 | 77.5 | 79.2 |
| Net debt/equity | -53.8 | -80.7 | -5.0 | -22.7 | -13.4 | -44.0 | -43.5 | -55.3 |
| Net cash flow/Capex | <-200 | <-200 | 139 | 148 | >500 | <-200 | <-200 | <-200 |
| EBITDA net interest cover (x) | n.m | -78.6 | n.m | n.m | n.m | n.m | -3.5 | -68.5 |
| EBIT net interest cover (x) | n.m | -75.7 | n.m | n.m | n.m | n.m | -2.2 | -66.1 |
| FFO net interest cover (x) | -85.6 | -55.7 | n.m | n.m | n.m | n.m | -3.5 | -68.5 |
| FFO/Total debt | >500 | >500 | -24.8 | -34.9 | -54.2 | -13.5 | 21.5 | 215 |
| FFO/Net debt | -81.1 | -59.7 | 267 | 63.6 | 141 | 6.7 | -10.4 | -56.6 |
| FCFF/Total debt | >500 | >500 | -150 | -115 | -59.3 | -28.2 | -0.13 | 170 |
| Total debt/Capital | 3.0 | 1.1 | 35.1 | 29.3 | 25.8 | 18.0 | 17.3 | 12.7 |
| Short-term debt/Capital | 0.0 | 0.0 | 0.00 | 5.5 | 9.6 | 6.7 | 6.5 | 4.7 |
| Long-term debt/Capital | 3.0 | 1.1 | 35.1 | 23.8 | 16.2 | 11.3 | 10.9 | 8.0 |
| Funds from operations, DKKm | 86 | 167 | -42 | -91 | -130 | -32 | 52 | 517 |
| Inventory/sales | 25.6 | 0.06 | 23.7 | 3.9 | 7.3 | 7.3 | 7.3 | 7.3 |
| Receivable/sales | 54.6 | 13.3 | 44.1 | 17.1 | 23.1 | 21.7 | 20.5 | 19.3 |
| Acc.payable/sales | 95.2 | 15.3 | 59.9 | 12.5 | 12.7 | 12.7 | 12.7 | 12.7 |
| Working capital/sales | -14.9 | -1.9 | 7.9 | 8.4 | 17.7 | 16.3 | 15.1 | 14.0 |

| Credit ratings | Long-term | Outlook | Short-term |
|---|---|---|---|
| S&P | n.r. | -- | -- |
| Moody's | n.r. | -- | -- |
| Fitch | n.r. | -- | -- |

Source: Handelsbanken Capital Markets

**Handelsbanken** Capital Markets

| Per share data | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **DKK** | **2002** | **2003** | **2004** | **2005** | **2006** | **2007e** | **2008e** | **2009e** |
| No of shares, year-end (m) | 4.9 | 4.9 | 5.0 | 5.8 | 6.4 | 7.7 | 7.7 | 7.7 |
| No of shares, average (m) | 4.3 | 4.9 | 5.0 | 5.8 | 6.4 | 7.7 | 7.7 | 7.7 |
| EPS reported | 17.3 | 33.2 | -10.6 | -16.2 | -22.5 | -4.76 | 6.2 | 66.2 |
| *Y-o-y growth (%)* | *n.m* | *92.3* | *n.m* | *n.m* | *n.m* | *n.m* | *n.m* | *>900* |
| EPS adj | 17.3 | 33.6 | -10.6 | -16.2 | -22.5 | -4.76 | 6.2 | 66.2 |
| *Y-o-y growth (%)* | *n.m* | *94.7* | *n.m* | *n.m* | *n.m* | *n.m* | *n.m* | *>900* |
| Cash earnings | 18.4 | 35.0 | -7.0 | -15.1 | -19.3 | -2.20 | 8.7 | 68.6 |
| Book value | 40.0 | 70.7 | 62.6 | 109 | 108 | 144 | 150 | 216 |
| *Y-o-y growth (%)* | *245* | *76.6* | *-11.6* | *73.7* | *-0.24* | *32.4* | *4.3* | *44.2* |
| Net debt | -21.5 | -57.1 | -3.14 | -24.7 | -14.5 | -63.2 | -65.1 | -119 |
| NAV | 40.0 | 70.7 | 62.6 | 109 | 108 | 144 | 150 | 216 |

Source: Handelsbanken Capital Markets

| Valuation data | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **DKK** | **2002** | **2003** | **2004** | **2005** | **2006** | **2007e** | **2008e** | **2009e** |
| Share price year-end | 98.5 | 231 | 496 | 496 | 506 | 589 | 589 | 589 |
| Share price high | 100 | 235 | 588 | - | - | - | - | - |
| Share price low | 32.2 | 88.4 | 221 | - | - | - | - | - |
| Market cap (DKKm) | 483 | 1,131 | 2,501 | 2,876 | 3,227 | 4,506 | 4,506 | 4,506 |
| Net debt (DKKm) | -106 | -280 | -16 | -143 | -93 | -483 | -498 | -914 |
| MV associates (DKKm) | 0 | 18 | 23 | 0 | 0 | 0 | 0 | 0 |
| EV (DKKm) | 377 | 833 | 2,462 | 2,733 | 3,134 | 4,023 | 4,009 | 3,592 |
| P/E reported (x) | 5.7 | 6.9 | n.m | n.m | n.m | n.m | 94.5 | 8.9 |
| P/E adj (x) | 5.7 | 6.9 | n.m | n.m | n.m | n.m | 94.5 | 8.9 |
| EV/sales (x) | 3.1 | 1.6 | 14.9 | 11.0 | 17.8 | 10.5 | 5.5 | 2.4 |
| EBIT adj margin (%) | -18.2 | 45.4 | -53.3 | -48.4 | -119 | -18.8 | 4.5 | 32.7 |
| EBITDA adj margin (%) | -14.1 | 47.1 | -42.3 | -45.8 | -108 | -13.7 | 7.1 | 33.9 |
| EV/EBITDA (x) | n.m | 3.5 | n.m | n.m | n.m | n.m | 77.6 | 6.9 |
| EV/EBIT (x) | n.m | 3.6 | n.m | n.m | n.m | n.m | >99 | 7.2 |
| FCFE adj yield (%) | -3.3 | 11.9 | -10.2 | -10.3 | -4.2 | -1.2 | 0.32 | 9.2 |
| P/CEPS (x) | 5.3 | 6.6 | n.m | n.m | n.m | n.m | 67.7 | 8.6 |
| P/BV (x) | 2.46 | 3.26 | 7.9 | 4.56 | 4.67 | 4.10 | 3.93 | 2.73 |
| ROE adj (%) | 62.3 | 60.7 | -16.0 | -19.9 | -21.7 | -4.1 | 4.3 | 36.2 |
| Pre-tax ROIC (%) | n.m | >200 | n.m | n.m | n.m | n.m | 6.8 | 91.4 |

Source: Handelsbanken Capital Markets

**Peer group valuation**

TO BE ADDED

Source: Handelsbanken Capital Markets

**Handelsbanken** Capital Markets

# Disclosures

**Recommendation Structure, Definitions and Allocations**

Handelsbanken Capital Markets Equity Research (HCM) employs a four graded recommendation scale. The recommendations reflect the analyst's assessment of how much the share price may appreciate or depreciate in absolute terms in a 12-month time horizon and takes into account risks related to both fundamental expectations and share performance. **Investment ratings are determined by the ranges described in the table below.** The recommendations do not represent the analyst's or the bank's assessment of the company's fundamental value or quality. All investments involve risks and investors are encouraged to make their own decision as to the appropriateness of an investment in any securities referred to in this report, based on their specific investment objectives, financial status and risk tolerance. The recommendations and absolute performance intervals, together with the allocation of the rating categories amongst companies under coverage and amongst companies under coverage for which Handelsbanken has provided investment banking services in the past 12 months are listed below:

**Ratings: definitions and allocations**

| HCM rating | R$_{TP}$ is expected to be[1] | HCM Universe[2] | IB services[3] |
|---|---|---|---|
| **Buy** | >+20% | 29% | 27% |
| **Accumulate** | +5% - +20% | 41% | 49% |
| **Reduce** | -15% - +5 % | 29% | 24% |
| **Sell** | < -15 % | 1% | 0% |

**1** R$_{TP}$ is defined as the expected share price appreciation (depreciation) including dividends over the next 12 months

**2** Percentage of companies under coverage within each rating category

**3** Percentage of companies within each rating category for which investment banking services have been provided in the past 12 months

Source: Handelsbanken Capital Markets, as per 12/6 2007

At times, the expected total returns may fall outside of the above stated ranges because of price movement and/or volatility. Such interim deviations from specified ranges will be permitted but will become subject to review by Research Management. Recommendations are continuously reviewed by the analyst and monitored by the Research Management and will be updated and/or refreshed regularly. The rationale behind a change in recommendation will be explained in such a refresher/update.

For the recommendation history of **Bavarian Nordic**, please consult our web site www.handelsbanken.com/capitalmarkets, or contact Robert Gärtner +45 33 41 8613.

The Target price (TP) is the analyst's assessment of the level at which the share should be traded in a 12-month period. The TP is used as a basis for the recommendation (see explanation above) and takes into account timing-related issues and triggers, such as relative valuation and newsflow. The TP does not represent the analyst's or the bank's assessment of the company's fundamental value or quality.

**Research Disclaimers**

Handelsbanken Capital Markets, a division of Svenska Handelsbanken AB (publ) (collectively referred to herein as 'SHB') is responsible for the preparation of research reports.

All research reports are prepared from trade and statistical services and other information which SHB considers to be reliable.

SHB does not represent that such information is true, accurate or complete and it should not be relied upon as such.

In no event will SHB or any of its affiliates, their officers, directors or employees be liable to any person for any direct, indirect, special or consequential damages arising out of any use of the information contained in the research reports, including without limitation any lost profits even if SHB is expressly advised of the possibility or likelihood of such damages.

No independent verification exercise has been undertaken in respect of this information.

Any opinions expressed are the opinions of employees of SHB and its affiliates and reflect their judgment at this date and are subject to change.

The information in the research reports does not constitute a personal recommendation or investment advice.

Reliance should not be placed on reviews or opinions expressed when taking investment or strategic decisions.

SHB, its affiliates, their clients, officers, directors or employees own or have positions in securities mentioned in research reports.

SHB and/or its affiliates provide investment banking and non-investment banking financial services, including corporate banking services; and, securities advice to issuers of securities mentioned in research reports.

This document does not constitute or form part of any offer for sale or subscription of or solicitation of any offer to buy or subscribe for any securities nor shall it or any part of it form the basis of or be relied on in connection with any contract or commitment whatsoever.

Past performance may not be repeated and should not be seen as an indication of future performance.

The value of investments and the income from them may go down as well as up and investors may forfeit all principal originally invested. Investors are not guaranteed to make profits on investments and may lose money. Exchange rates may cause the value of overseas investments and the income arising from them to rise or fall.

This research product will be updated on a regular basis.

The distribution of this document in certain jurisdictions may be restricted by law and persons into whose possession this document comes should inform themselves about, and observe, any such restrictions.

No part of SHB research reports may be reproduced or distributed to any other person without the prior written consent of SHB. Research reports are distributed in the UK by SHB.

SHB is authorised by the Swedish Financial Supervisory Authority (Finansinspektionen), and regulated by the Financial Services Authority for the conduct of UK business. In the United Kingdom, the research reports are directed only at intermediate customers and market counterparties (as defined in the rules of the FSA) and the investments or services to which they relate are available only to such persons. The research reports must not be relied upon or acted on by private customers.

UK customers should note that SHB does not participate in the UK Financial Services Compensation Scheme and UK customers will not be protected by that scheme. This does not exclude or restrict any duty or liability that SHB has to its customers under the regulatory system in the United Kingdom.

SHB employees, including analysts, receive compensation that is generated by overall firm profitability.

The views contained in SHB research reports accurately reflect the personal views of the respective analysts, and no part of analysts' compensation is directly or indirectly related to specific recommendations or views expressed within research reports.

For specific analyst certification, please contact Robert Gärtner +45 33418613.

In the United Kingdom SHB is regulated by the FSA but recipients should note that neither the UK Financial Services Compensation Scheme not the rules of the FSA made under the UK Financial Services and Markets Act 2000 for the protection of private customers apply to this research report.

**When Distributed in the United States**

**Important Third-Party Research Disclosures:**

Research reports are prepared by SHB for information purposes only. SHB and its employees are not subject to the NASD's research analyst conflict rules. SHB research reports are intended for distribution in the United States solely to "major U.S. institutional investors," as defined in Rule 15a-6 under the Securities Exchange Act of 1934. Each major U.S. institutional investor that receives a copy of research report by its acceptance hereof represents and agrees that it shall not distribute or provide research reports to any other person. Reports regarding fixed-income products are prepared by SHB and distributed by SHB to major U.S. institutional investors under Rule 15a-6(a)(2). Any U.S. person receiving these research reports that desires to effect transactions in any fixed-income product discussed within the research reports should call or write SHB. Reports regarding equity products are prepared by SHB and distributed in the United States by Handelsbanken Markets Securities Inc. ("HMSI") under Rule 15a-6(a)(2). Any U.S. person receiving these research reports that desires to effect transactions in any equity product discussed within the research reports should call or write HMSI.

HMSI is a NASD Member, telephone number (+212-326-5153).

For company-specific disclosure texts, please consult the Handelsbanken Capital Markets website: www.handelsbanken.com/research.

Those wishing to see the disclosure text who do not have the access to the website, please contact Robert Gärtner on tel +45 33418613.

**Please be advised of the following important research disclosure statements:**

SHB is regulated in Sweden by the Swedish Financial Supervisory Authority, in Norway by the Financial Supervisory Authority of Norway, In Finland by the Financial Supervision of Finland and in Denmark by the Danish Financial Supervisory Authority.

SHB has recently had, currently has, or will be seeking corporate finance assignments with the subject company.

According to the Bank's Ethical Guidelines for the Handelsbanken Group, the board and all employees of the Bank must observe high standards of ethics in carrying out their responsibilities at the Bank, as well as other assignments. The Bank has also adopted guidelines to ensure the integrity and independence of research analysts and the research department, as well as to identify, eliminate, avoid, deal with, or make public actual or potential conflicts of interests relating to analysts or the Bank. As part of its control of conflicts of interests, the Bank has introduced restrictions ("Chinese walls") in communication between the Research department and other departments of the Bank. In addition, in the Bank's organisational structure, the Research department is kept separate from the Corporate Finance department and other departments with similar remits. The guidelines also include regulations for how payments, bonuses and salaries may be paid out to analysts, what marketing activities an analyst may participate in, how analysts are to handle their own securities transactions and those of closely related persons, etc. In addition, there are restrictions in communications between analysts and the subject company. For full information on the Bank's ethical guidelines and guidelines on conflicts of interests relating to analysts, please see the Bank's website www.handelsbanken.com/About the bank/IR/Corporate social responsibility/Ethical guidelines or Guidelines for research.

**Bavarian Nordic**

As of Jun 12, 2007

- Handelsbanken's analysts Michael Novod and Astrid Samuelsson have no positions in Bavarian Nordic or a related instrument.

## 12m share price vs. recommendation and target



Source: Handelsbanken Capital Markets

## DCF model

### Assumptions

| | | | |
|---|---|---|---|
| Risk free rate | 4.4% | Sustainable growth | 3.0% |
| Equity beta | 1.10 | | |
| Risk premium | 4.0% | DCF value | 685 |
| WACC | 11.0% | *Disc/prem to share* | 16% |

| Averages (%) | 01-04 | 04-06 | 06-11 | 11-16 | 16-26 | 26+ |
|---|---|---|---|---|---|---|
| Revenue CAGR | n.m | 3.3 | 63.4 | 0.2 | -1.8 | 3.0 |
| EBITDA CAGR | n.m | n.m | n.m | 1.6 | -3.5 | |
| EPS Adj CAGR | n.m | n.m | n.m | 3.3 | -1.4 | |
| EBITDA marg | -3.1 | -65.3 | -0.8 | 41.9 | 42.3 | |
| EBIT marg | -8.7 | -73.7 | -4.5 | 41.2 | 41.6 | |
| Net inc marg | 20.8 | -50.5 | 0.6 | 31.6 | 36.6 | |

Source: Handelsbanken Capital Markets

## EPS estimates revisions – 2007



Source: Handelsbanken Capital Markets

## EPS estimates revisions – 2008



Source: Handelsbanken Capital Markets

## Historical P/E valuation 3Y



Source: Handelsbanken Capital Markets & Company fundamentals

## Historical P/E valuation 10Y



Source: Handelsbanken Capital Markets & Company fundamentals

## Opportunities

- Complete replacement of US smallpox vaccine stockpile
- Smallpox vaccine orders materialising outside the US
- Strong phase II data on HIV Nef vaccine
- Partner deal on HIV vaccines or MVA technology
- Product inlicensing or M&A

Source: Handelsbanken Capital Markets

## Risks

- Political risks jeopardising smallpox vaccine orders
- Delays in government contracts
- Defeats in law suits against Acambis
- Pipeline failures
- No demand for additional smallpox vaccines outside the US

Source: Handelsbanken Capital Markets

## Company overview

| P&L | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | - | - | - | - | - | - | - | - | - | - | - | - | 121 | 505 | 165 | 248 | 176 | 385 | 728 |
| growth (%) | - | - | - | - | - | - | - | - | - | - | - | - | n.m | 317 | -67.3 | 50.3 | -29.0 | 118 | 89.3 |
| EBITDA | - | - | - | - | - | - | - | - | - | - | - | - | -17 | 236 | -70 | -114 | -190 | -53 | 52 |
| margin % | - | - | - | - | - | - | - | - | - | - | - | - | -14.1 | 46.7 | -42.3 | -45.8 | -108 | -13.7 | 7.1 |
| EBIT | - | - | - | - | - | - | - | - | - | - | - | - | -22 | 227 | -88 | -120 | -210 | -72 | 33 |
| margin % | - | - | - | - | - | - | - | - | - | - | - | - | -18.2 | 45.0 | -53.3 | -48.4 | -119 | -18.8 | 4.5 |
| Net income | - | - | - | - | - | - | - | - | - | - | - | - | 75 | 163 | -53 | -94 | -143 | -36 | 48 |
| growth % | - | - | - | - | - | - | - | - | - | - | - | - | n.m | 117 | n.m | n.m | n.m | n.m | n.m |
| Adjusted Net income | - | - | - | - | - | - | - | - | - | - | - | - | 75 | 165 | -53 | -94 | -143 | -36 | 48 |
| growth % | - | - | - | - | - | - | - | - | - | - | - | - | n.m | 120 | n.m | n.m | n.m | n.m | n.m |

| Cash flow | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capex | - | - | - | - | - | - | - | - | - | - | - | - | -9 | -29 | -191 | -200 | -2 | -4 | -5 |
| FCF to firm | - | - | - | - | - | - | - | - | - | - | - | - | 85 | 130 | -255 | -299 | -142 | -68 | 0 |
| FCF to equity | - | - | - | - | - | - | - | - | - | - | - | - | -16 | 134 | -254 | -296 | -135 | -52 | 15 |

| Ratios (%) | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-tax ROIC | - | - | - | - | - | - | - | - | - | - | - | - | n.m | >200 | n.m | n.m | n.m | n.m | 6.8 |
| ROE reported | - | - | - | - | - | - | - | - | - | - | - | - | 62.3 | 60.0 | -16.0 | -19.9 | -21.7 | -4.1 | 4.3 |
| Capex to Revenue | - | - | - | - | - | - | - | - | - | - | - | - | 7.3 | 5.7 | 115 | 80.7 | 1.0 | 1.0 | 0.8 |
| NWC to Revenue | - | - | - | - | - | - | - | - | - | - | - | - | -14.9 | -1.9 | 7.9 | 8.4 | 17.7 | 16.3 | 15.1 |
| Revenue/assets (x) | - | - | - | - | - | - | - | - | - | - | - | - | 0.64 | 1.4 | 0.33 | 0.33 | 0.19 | 0.33 | 0.51 |
| Revenue/IC (x) | - | - | - | - | - | - | - | - | - | - | - | - | n.m | >500 | 0.72 | 0.64 | 0.39 | 0.82 | 1.5 |
| Net debt/Equity | - | - | - | - | - | - | - | - | - | - | - | - | -53.8 | -80.7 | -5.0 | -22.7 | -13.4 | -44.0 | -43.5 |
| Equity/Total assets | - | - | - | - | - | - | - | - | - | - | - | - | 61.8 | 81.0 | 54.0 | 67.9 | 72.4 | 79.1 | 77.5 |

| Share data | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg no shares (m) | - | - | - | - | - | - | - | - | - | - | - | - | 4.3 | 4.9 | 5.0 | 5.8 | 6.4 | 7.7 | 7.7 |
| change (%) | - | - | - | - | - | - | - | - | - | - | - | - | n.m | 13.0 | 1.8 | 16.1 | 10.0 | 20.0 | 0 |
| Share price YE (DKK) | - | - | - | - | - | - | - | - | - | - | - | - | 98.5 | 230.6 | 496.1 | 496.1 | 506.0 | 589.0 | 589.0 |
| Market cap (DKK) | - | - | - | - | - | - | - | - | - | - | - | - | 483 | 1,131 | 2,501 | 2,876 | 3,227 | 4,506 | 4,506 |
| EV (DKK) | - | - | - | - | - | - | - | - | - | - | - | - | 377 | 833 | 2,462 | 2,733 | 3,134 | 4,023 | 4,009 |
| Net debt/share | - | - | - | - | - | - | - | - | - | - | - | - | -21.5 | -57.1 | -3.1 | -24.7 | -14.5 | -63.2 | -65.1 |
| EPS reported | - | - | - | - | - | - | - | - | - | - | - | - | 17.3 | 33.2 | -10.6 | -16.2 | -22.5 | -5.0 | 0.51 |
| growth (%) | - | - | - | - | - | - | - | - | - | - | - | - | n.m | 92.3 | n.m | n.m | n.m | n.m | n.m |
| EPS adj | - | - | - | - | - | - | - | - | - | - | - | - | 17.3 | 33.6 | -10.6 | -16.2 | -22.5 | -4.76 | 6.2 |
| growth (%) | - | - | - | - | - | - | - | - | - | - | - | - | n.m | 94.7 | n.m | n.m | n.m | n.m | n.m |
| BVPS | - | - | - | - | - | - | - | - | - | - | - | - | 40.0 | 70.7 | 62.6 | 109 | 108 | 144 | 150 |

| Valuation (x) | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007e | 2008e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P/E reported | - | - | - | - | - | - | - | - | - | - | - | - | 5.7 | 6.9 | n.m | n.m | n.m | n.m | 94.5 |
| P/E adjusted | - | - | - | - | - | - | - | - | - | - | - | - | 5.7 | 6.9 | n.m | n.m | n.m | n.m | 94.5 |
| P/CEPS | - | - | - | - | - | - | - | - | - | - | - | - | 5.3 | 6.6 | n.m | n.m | n.m | n.m | 67.7 |
| EV/EBITA | - | - | - | - | - | - | - | - | - | - | - | - | n.m | 3.6 | n.m | n.m | n.m | n.m | >99 |
| EV/Sales | - | - | - | - | - | - | - | - | - | - | - | - | 3.1 | 1.6 | 14.9 | 11.0 | 17.8 | 10.5 | 5.5 |
| P/Sales | - | - | - | - | - | - | - | - | - | - | - | - | 3.5 | 2.2 | 15.0 | 11.6 | 18.3 | 11.7 | 6.2 |
| P/BV | - | - | - | - | - | - | - | - | - | - | - | - | 2.5 | 3.3 | 7.9 | 4.6 | 4.7 | 4.1 | 3.9 |
| FCFE Yield (%) | - | - | - | - | - | - | - | - | - | - | - | - | -3.3 | 11.9 | -10.2 | -10.3 | -4.2 | -1.2 | 0.32 |

### Quarterly

| | Q1 06 | Q2 06 | Q3 06 | Q4 06 | Q1 07 | Q2 07e | Q3 07e | Q4 07e |
|---|---|---|---|---|---|---|---|---|
| Revenues | 35 | 76 | 33 | 33 | 29 | 96 | 96 | 163 |
| YoY change (%) | -50.1 | 5.7 | -48.7 | -23.3 | -18.4 | 27.0 | 196 | 403 |
| EBIT adj | -57 | -53 | -50 | -50 | -51 | -18 | -18 | 15 |
| YoY change (%) | 229 | 767 | 361 | -41.4 | -9.7 | -65.8 | -64.0 | -130 |
| Gross margin (%) | 24.1 | 19.4 | 10.5 | 10.5 | 37.5 | 88.3 | 88.3 | 45.3 |
| EBIT margin (%) | -160 | -69.9 | -155 | -155 | -177 | -18.8 | -18.8 | 9.1 |
| EPS reported | -8.0 | -6.0 | -5.4 | -5.1 | -5.3 | -1.19 | -1.19 | 2.93 |

### Consensus estimates

| | Revenue | | | EPS reported | | |
|---|---|---|---|---|---|---|
| | SHB | Cons | % diff | SHB | Cons | % diff |
| 2007 | 385 | 1,487 | -74.1 | -4.76 | 48.9 | -110 |
| 2008 | 728 | 1,867 | -61.0 | 6.2 | 113 | -94.5 |

| Share structure | No |
|---|---|
| A-shares | 0 |
| B-shares | 7,651,416 |

**Calendar**

| Shareholder | % vote | % cap |
|---|---|---|
| A.J. Aamund | 17.4 | 17.4 |
| PKA | 5.1 | 5.1 |
| Free float | 100 | |

**Management**
CEO: Peter S. Wulff
CFO: Hans Christian Teisen
IR: Rolf Sass Sørensen
Phone number: +45 3326 8383

**Geographical split - DKK**     Revenue 2006     %

**Divisional split - DKK**     Revenue 2006     % 1 - Profit 2006     %

### Company profile

Founded in 1994, Bavarian Nordic A/S is a leading international biopharmaceutical company developing, producing and marketing inno-vative vaccines to prevent and treat infectious diseases. With operations in Denmark and Germany, Bavarian Nordic employs over 125 people and is listed on the Copenhagen Stock Exchange under the trading symbol BAVA. Bavarian Nordic's patented core technology, MVA-BN®, is one of the world's safest, multivalent vaccine vectors and is ideally suited for use against various infectious diseases such as smallpox and HIV.

**Svenska Handelsbanken AB (publ)**

**Stockholm**
Blasieholmstorg 11
SE-106 70 Stockholm
Tel. +46 8 701 10 00
Fax. +46 8 611 11 80

**Copenhagen**
Amaliegade 3,
Box 1032
DK-1007 København K
Tel. +45 33 41 8200
Fax. +45 33 14 1734

**Helsinki**
Aleksanterinkatu 11
FI-00100 Helsinki
Tel. +358 10 444 11
Fax. +358 10 444 2578

**Oslo**
Rådhusgaten 27,
Postboks 332 Sentrum
NO-0101 Oslo
Tel. +47 22 94 0700
Fax. +47 2233 6915

**London**
Trinity Tower,
9 Thomas More Street
London GB-E1W 1GE
Tel. +44 207 578 8668
Fax. +44 207 578 8090

**New York**
**Handelsbanken Markets Securities Inc.**
875 Third Avenue, 4 th floor
New York, NY 10022-7218
Tel. +1 212 446 4700
Fax. +1 212 326 2730
NASD, SIPC